The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEBORAH FRAME-WILSON, CHRISTIAN SABOL, SAMANTHIA RUSSELL, ARTHUR SCHAREIN, LIONEL KEROS, NATHAN CHANEY, CHRIS GULLEY, SHERYL TAYLOR-HOLLY, ANTHONY COURTNEY, DAVE WESTROPE, STACY DUTILL, SARAH ARRINGTON, MARY ELLIOT, HEATHER GEESEY, STEVE MORTILLARO, CHAUNDA LEWIS, ADRIAN HENNEN, GLENDA R. HILL, GAIL MURPHY, PHYLLIS HUSTER, and GERRY KOCHENDORFER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMAZON.COM, INC., a Delaware corporation,

Defendant.

No. 20-cv-00424-RAJ

FIRST AMENDED CLASS ACTION COMPLAINT

**DEMAND FOR JURY TRIAL**



**TABLE CONTENTS**

<u>Page</u>

I. INTRODUCTION ....................................................................................................1

 A. Summary of Allegations ..............................................................................1

 B. Identity of Class Products .........................................................................16

 C. The Economic Impact of Amazon's Anticompetitive Conduct.................17

II. JURISDICTION .....................................................................................................19

III. VENUE ....................................................................................................................20

IV. PARTIES .................................................................................................................20

 A. Plaintiffs .....................................................................................................20

  1. Virginia .........................................................................................20

  2. California .......................................................................................21

  3. Alabama ........................................................................................22

  4. Arizona ..........................................................................................23

  5. Arkansas ........................................................................................24

  6. Florida ...........................................................................................25

  7. Illinois ...........................................................................................25

  8. Iowa...............................................................................................26

  9. Maine .............................................................................................26

  10. Nevada ...........................................................................................27

  11. New Hampshire .............................................................................27

  12. Pennsylvania .................................................................................28

  13. Tennessee ......................................................................................29

  14. Texas .............................................................................................29

  15. Utah...............................................................................................31

  16. Vermont.........................................................................................31

  17. Washington ....................................................................................32

  18. Wisconsin......................................................................................33

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

B.      Defendant .................................................................................33

V.      STATEMENT OF FACT ......................................................................34

        A.      Background ...............................................................................34

                1.      Amazon charges high fees that third-party sellers pass on to
                        their customers both on and off the Amazon.com platform. .........35

                2.      Amazon's pricing policies stifle ecommerce price
                        competition. ...................................................................41

                3.      Amazon's price restraint is just one example by which it
                        exploits its market power to deny third-party sellers a fair
                        opportunity to compete. ....................................................45

                4.      Amazon's agreement with its third-party sellers causes
                        higher prices on its outside competitors' sites. ..........................48

        B.      Amazon's two million third-party sellers agreed under Amazon's
                former PMFN not to offer their products to U.S. customers at a
                lower price through any competing retail ecommerce channels..........................51

        C.      Amazon's two million third-party sellers agree under Amazon's
                current "fair pricing" provision that selling at a lower price through
                competing retail ecommerce channels will subject them to costly
                penalties. .................................................................................51

        D.      Amazon's former PMFN and current "fair pricing" provision
                reduce price competition and cause consumers to pay more.................................52

        E.      Amazon has a monopoly in the retail ecommerce market or
                minimally in several categories of goods...............................................56

        F.      Alternatively, Amazon has attempted to monopolize the general
                retail ecommerce market.................................................................60

        G.      Amazon is the subject of a government investigation for possible
                antitrust violations, including whether it uses its relationship with
                its third-party sellers to harm competition. ...........................................61

VI.     INTERSTATE TRADE AND COMMERCE ...................................................63

VII.    RELEVANT MARKET..........................................................................63

VIII.   CLASS ACTION ALLEGATIONS ...........................................................73

IX.     ANTITRUST INJURY .........................................................................77

X.      CAUSES OF ACTION ........................................................................78

FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT
        (15 U.S.C. § 1) *PER SE* ...................................................................78



SECOND CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 1 (ALTERNATIVE TO *PER SE*) ..........................................................80

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION (15 U.S.C. § 2) ..............................................82

FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) ......................84

FIFTH CAUSE OF ACTION VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS AND CONSUMER PROTECTION STATUTES..........................................................................................85

SIXTH CAUSE OF ACTION UNJUST ENRICHMENT (Applies To All States Except Alaska, Delaware, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, New York, And Ohio)..................................87

JURY TRIAL DEMANDED ..........................................................................87

PRAYER FOR RELIEF ................................................................................88



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys and experts in the field of antitrust economics.

## I.      INTRODUCTION

### A.      Summary of Allegations

1.      Amazon.com, Inc. ("Amazon") has many competitive advantages over the third-party sellers, with whom it competes in the sale of goods on the Amazon.com platform. One critical advantage is the absence of seller and advertising fees that it charges them to compete on its platform. These fees add significantly to third-party sellers' cost of doing business on Amazon's platform and substantially reduce the price competition Amazon faces from them on its own platform. As if that were not enough, Amazon abuses the power of its marketplace platform by restraining its third-party sellers from competing on *any other* website or competing ecommerce channel at a lower price—even when they incur no seller fees and could profitably sell their goods at significantly lower prices. This illegal restraint on competition is precisely what the antitrust laws are intended to combat.

2.      Amazon is "the world's largest online retailer."[1] Its market valuation recently rose to $1.5 trillion, "more than that of Walmart, Target, SalesForce, IBM, eBay, and Etsy combined."[2] Sales on Amazon's website, through its app or voice control devices (collectively referred to as the "Amazon.com platform") account for almost half of all retail ecommerce in the United States.[3] Amazon's nine closest competitors have a distant 1.1%-6.6% share of the retail ecommerce market.[4] Amazon operates as retailer, selling directly to its customers. It also

---

[1] Declaration of Ella Irwin, Director of Marketplace Abuse at Amazon (Jul. 13, 2018), *Kangaroo Mfg., Inc. v. Amazon.com*, Case No. 17-cv-1806SPL (D. Ariz.), Dkt. No. 75 ("Irwin Decl."), ¶ 2.

[2] Press Release (Jul. 29, 2020) https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=3199.

[3] *Amazon Now Has Nearly 50% of US Ecommerce Market*, Emarketer (Jul. 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.

[4] *Id.*

HB   HAGENS BERMAN

operates what some economists call a "two-sided platform," meaning that it provides services to two different groups (here third-party sellers and their customers) who both depend on the Amazon platform to intermediate between them.[5] As a retail seller, Amazon sells approximately 12 million products on the Amazon.com platform, covering a wide range of consumer goods.[6] Amazon's products and customers overlap with those of its third-party sellers, whom it permits for a fee to register with Amazon Marketplace to sell their products on the Amazon.com platform within the same categories of consumer goods that Amazon itself offers for sale.[7] As an example, Amazon sells Apple watches on the Amazon.com platform, while at the same time an Amazon third party seller, like Adorama, may also sell the same product on the Amazon.com platform. Nicholas Denissen, Amazon's Vice President of Marketplace Business, describes the Amazon.com platform as "an online marketplace where millions of third-party sellers" sell their goods.[8] This arrangement gives sellers access to millions of buyers and buyers access to millions of sellers.[9] He likens it to "an online mall where independent merchants display their products to people perusing the website."[10]

3.    Amazon drives consumers to its platform with the lure of low prices, but in fact, it suppresses competition from its third-party sellers on external platforms, where they would otherwise competitively price their goods at a lower price.[11]

---

[5] *See Ohio v. American Express Co.*, ___U.S.___ , 138 S. Ct. 2274, 2276-77 (2018).

[6] *How many products does Amazon carry?* 360pi (May 2016), https://0ca36445185fb449d582-f6ffa6baf5dd4144ff990b4132ba0c4d.ssl.cf1.rackcdn.com/IG_360piAmazon_9.13.16.pdf.; Amazon store directory, https://www.amazon.com/gp/site-directory?ref_=nav_em_T1_0_2_2_36__fullstore.

[7] Irwin Decl., ¶ 5.

[8] Declaration of Nicholas Denissen, Amazon's Vice President of Marketplace Business (Jun. 30, 2017), *Oberdorf v. Amazon.com*, Case No. 16-cv-1127MWB (M.D. Pa.), Dkt. No. 31 ("Denissen Decl."), ¶ 5.

[9] *Id.*

[10] *Id.*

[11] *See infra* Sec. I(C).



4.      Amazon enforces its price restraint by contract. When a seller registers with Amazon Marketplace, "it agrees to the terms of the Amazon Services Business Solutions Agreement (BSA) and the policies incorporated in that agreement.[12] The BSA establishes rules for selling on the Amazon.com platform, and any seller holding an Amazon Seller Account must adhere to them.[13] It costs less to sell on the sellers' own websites and other third-party marketplaces, and in a competitive market third-party sellers would sell their products at lower prices on other platforms because their cost structure allows them to do so. But the BSA prevents them from offering a competitive price on external platforms.

5.      Amazon continues to enforce its anticompetitive restraint of third-party sellers to this day, although it now relies on a different contractual provision than it did before March 2019. Until then, the BSA included an express "price parity" (*i.e.*, platform most favored nation or "PMFN") provision, governing the price of products the seller offered for sale through its or any of its affiliates' other retail channels other than physical stores.[14] The PMFN required that sellers:

> maintain parity between the products you offer through Your Sales Channels and the products you list on any Amazon Site by ensuring that … the purchase price and every other term of sale … is at least as favorable to Amazon Site users as the most favorable terms via Your Sales Channels (excluding consideration of Excluded Offers).[15]

6.      Amazon's PMFN clause restrains competition by forcing its third-party sellers to sell their products on external platforms at uncompetitive prices equal to or higher than the seller's listing on the Amazon.com platform. Last March, under threat of a Federal Trade Commission (FTC) investigation, Amazon officially withdrew its PMFN provision.[16] But

---

[12] Irwin Decl., ¶ 4.

[13] *Amazon Pricing Policy*, Feedadvisor, https://feedvisor.com/university/amazon-pricing-policy/.

[14] Irwin Decl., Ex. A at 14 (definition) and 18 (section S-4 Parity with Your Sales Channel).

[15] *Id.*, Ex. A at 18.

[16] *See, e.g.*, Greg Magana, *Amazon is ending its restrictive pricing practice*, Business Insider (Mar. 13, 2019), https://www.businessinsider.com/amazon-ends-restrictive-pricing-parity-2019-3.

Amazon continues to enforce this very price fixing agreement under its "fair pricing" provision.[17] Amazon's "fair pricing" policy states that "Amazon regularly monitors the prices of items on our marketplaces," and that if it sees "pricing practices" on the Amazon.com platform "that harm[] customer trust, Amazon can remove the Buy Box [*i.e.*, the coveted one-click-to-buy button[18]], remove the offer, suspend the ship option, or, in serious or repeated cases, suspend[] or terminat[e] selling privileges."[19] One of the pricing practices Amazon identifies as "harmful" to customer trust is "[s]etting a price on a product or service that is significantly higher than recent prices offered *on or off* Amazon."[20]

7.      Amazon's "fair pricing" provision merely reiterates the requirement of its former PMFN. Both require Amazon third-party sellers to maintain equal or higher prices on other platforms or lose privileges on the Amazon.com platform. Under the "fair pricing" provision, "[a]ny single product or multiple products packages must have a price that is equal to or lower than the price of the same item being sold by the seller on other sites or virtual marketplaces."[21] The "fair pricing" provision "applies to both the individual product price as well as the collective price that the item or items are being sold for."[22] Third-party sellers receive "price alerts" with a warning from Amazon that show the product, the price on Amazon and the price found elsewhere on the web without identifying the competing website.[23] The outcome is the same both

---

[17] *See, e.g.*, Guadalupe Gonzalez, *You're No Longer Required to Sell Products for Less on Amazon. The Problem? If You Don't, You've Got Another Penalty Coming*, https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html.

[18] *Infra* ¶¶ 86-87.

[19] *Amazon Marketplace Fair Pricing Policy*, Amazon Seller Central, https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&ref=efph_G5TUVJKZHUVMN77V_cont_521.

[20] *Id*. (emphasis added).

[21] *Amazon Pricing Policy*, Feedadvisor, https://feedvisor.com/university/amazon-pricing-policy/.

[22] *Id.*

[23] Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, Bloomberg (Aug. 5, 2019) https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-sellers-that-offer-better-prices-on-walmart.

under the PMFN clause and under the "fair pricing" provision: both have "the effect of getting sellers to raise prices elsewhere, rather than risk lower revenue from Amazon."[24]

8.    Amazon's agreement with its third-party sellers is an impermissible restraint on price between market participants who perform the same marketplace function. Amazon, the "Everything Store," is a current or potential competitor with all of its third-party sellers. It designed its platform so that many "sellers, in addition to Amazon, may list the same product for sale from a single product page on" the Amazon.com platform.[25] All sellers may "compete for the Buy Box, which is awarded to the best performing seller. Amazon may win the Buy Box like any other seller."[26] In his April 11, 2019 letter to investors, Amazon CEO, Jeff Bezos, emphasized Amazon's competitive relationship with its "independent sellers," who "compete against our first-party [retail] business."[27] He compared the extraordinary growth of Amazon's "first-party business," from "$1.6 billion in 1999 to $117 billion" in 2018, with the even more remarkable growth of "third-party sales," which grew "from $0.1 billion to $160 billion" in 2018.[28] He bluntly concluded: "Third-party sellers are kicking our first party butt. Badly."[29]

9.    On and off the Amazon.com platform, Amazon competes with its third-party sellers as ecommerce retailers in the sale of the same or competing goods. For example, Amazon competes with Amazon third-party seller Adorama, not only when it sells on the Amazon.com platform, but also when Adorama sells on its own website and through Walmart.com, eBay, and Newegg. In keeping with the previous example, when Adorama prices an Apple watch for sale on the Amazon.com platform, it must take into account the seller fees associated with Amazon's

---

[24] Nick Statt, *Amazon price alerts are leading sellers to raise prices on Walmart or risk losing perks*, The Verge,(Aug. 5, 2019), https://www.theverge.com/2019/8/5/20755342/amazon-marketplace-antitrust-sellers-raise-prices-walmart-competition-ftc.

[25] Irvin Decl., ¶ 3.

[26] Irvin Decl., ¶ 13.

[27] https://www.sec.gov/Archives/edgar/data/1018724/000119312519103013/d727605dex991.htm.

[28] *Id.*

[29] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

platform. Even though it can sell the same watches profitably at a lower price on other platforms, Adorama must raise the price of these watches on Walmart.com, eBay, Newegg and its own website to comply with Amazon's price restraint. If it prices the watch lower on any of these other platforms, it loses selling privileges with Amazon.

10.     Adorama is not unique. Eighty percent of Amazon's third-party sellers also sell their products on other online retail websites that compete with the Amazon.com platform, most commonly on eBay, their own websites, or Walmart.[30]



11.     Each of these sellers must price their products on other websites based on the high cost of selling on the Amazon.com platform, rather than setting competitive prices commensurate with lower-cost platforms.

12.     Amazon injures consumers by driving up the price of consumer goods. This is most evident in the case of goods sold on the third-party sellers' own websites, where they incur no sellers' fees. For example, Amazon third-party seller Molson Hart reports that a $150 item

---

[30] Rani Molla & Jason Del Rey, *A fifth of professional Amazon merchants sell more than $1 million a year — double the share from last year*, Vox (May 23, 2018), https://www.vox.com/2018/5/23/17380088/amazon-sellers-survey-third-party-marketplace-walmart-ebay; Catie Grasso, *The State of the Amazon Marketplace 2019*, Feedadvisor, (May 15, 2019), https://feedvisor.com/resources/amazon-trends/the-state-of-the-amazon-marketplace-2019/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292  206.623.0594 FAX

sold on Amazon would make his company the same profit as an item sold for $37 less on his company website:

> We designed, manufactured, imported, stored, shipped the item, and then we did customer service. Amazon hosted some images, swiped a credit card, and got $40 [for a $150 toy].
>
> This is the core problem. Were it not for Amazon, this item would be $40 cheaper. And this is how Amazon's dominance of the industry hurts consumers.[31]

13.   Amazon's restraint also prevents its third-party sellers from dropping prices on other third-party platforms with lower fees. For example, Amazon's third-party sellers incur considerably lower fees when selling on Amazon's nearest competitor, eBay. As the following examples illustrate, all in Amazon charges its third-party seller about 23% to sell a $30 book, while eBay charges 16%, and it charges its third-party seller 31% to sell a $15 DVD, while eBay charges 21% to sell on its platform:[32]

---

[31] Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, Medium, https://medium.com/swlh/amazon-needs-a-competitor-and-walmart-aint-it-5997977b77b2.

[32] Max Godin, *Selling on Amazon vs eBay – Discover Which is Better and Why*, Crazylister (May 15, 2018), https://crazylister.com/blog/selling-on-amazon-vs-ebay/.

FIRST AMENDED CLASS ACTION COMPLAINT - 7
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

| Example 1: Books | | |
|---|---|---|
| Sale Price | $30.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $3.40 | $4.50 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $1.17 | $0.00 |
| Total Fees | $4.87 | $6.84 |
| Total Profit | $25.13 | $23.16 |
| Profit Margin | 83.77% | 77.20% |

| Example 2: DVDs | | |
|---|---|---|
| Sale Price | $15.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $2.12 | $2.25 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $0.75 | $0.00 |
| Total Fees | $3.16 | $4.59 |
| Total Profit | $11.85 | $10.41 |
| Profit Margin | 78.97% | 69.40% |

14.     Walmart operates its own competing online marketplace platform. Many of Amazon's third-party sellers also sell there and incur fewer fees. For example, an account manager—a free service on Walmart—costs $1600 per month + 0.3% of total sales on Amazon,

FIRST AMENDED CLASS ACTION COMPLAINT - 8
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

capped at $5,000 per month.[33] Amazon added this service (and the additional fee) to address the often-cited complaint from its third-party sellers that Amazon's largely faceless organization makes it impossible for them to navigate glitches and changing rules.[34] About 94% of third-party sellers rely on storage, packaging and delivery by Amazon (Fulfillment by Amazon or FBA), and until this year, Walmart had no equivalent of this service.[35] One non-service-related cost to FBA sellers is a $0.20 per unit charged to provide individual sku stickers—otherwise Amazon will store a seller's products with other sellers' inventory, and "if other sellers have sent in a counterfeit product or used-condition product that they are trying to pawn off as a new-condition product, now the new seller may get itself into trouble with Amazon for selling a problematic product to a customer even if it was technically not their product."[36] Walmart has no equivalent fee.

15.     Since 2014, Amazon began charging its third-party sellers optional advertising fees to ensure that their products show up when customers search for their products on the Amazon.com platform. For consumers, that means that advertising influences search results more than relevance; for third-party sellers, it means higher selling costs. For example, Amazon charged its third-party seller, Molson Hart, $763,000 for advertising and commissions in 2018:

> In exchange for this $763,000, they operate an online catalog and
> deliver search results. We sell about 200 products on Amazon.

---

[33] Strategic Account Services-Core, Amazon, https://sell.amazon.com/programs/paid-services.html?ref_=asus_soa_rd&.

[34] Hillary Milnes, *Amazon is chasing growth and shifting resources to third-party sellers*, Digiday (Jan. 31, 2019), https://digiday.com/marketing/amazon-chasing-growth-shifting-resources-third-party-sellers/.

[35] David Hamrick, *Amazon FBA vs FBM Comparison Guide*, Jungle Scout (Mar. 4, 2020), https://www.junglescout.com/blog/amazon-fba-vs-fbm/ ; Melissa Repko, Walmart steps up competition with Amazon by fulfilling orders for third-party vendors, CNBC (Feb. 25, 2020), https://www.cnbc.com/2020/02/25/walmart-wants-to-make-it-easier-for-third-party-vendors.html.

[36] James Thompson, *Amazon Selling Pitfalls Even the Savviest Sellers Forget* , Big Commerce, https://www.bigcommerce.com/blog/amazon-selling-pitfalls-problems/#fulfillment-by-amazon.



Does it cost anywhere near $763,000 to display our products there? Definitely not.[37]

16.     Walmart's on-platform advertising service, which just began this year, is neither as extensive as Amazon's nor, because of the relatively small number of sellers and products, as necessary to make sellers' products visible.[38] Amazon's third-party sellers could therefore profitably lower their prices on Walmart's platform if not restrained by Amazon. In fact, Walmart routinely does field requests from third-party sellers to raise prices on its marketplace because they worry that a lower price on the Walmart platform will jeopardize their sales on the Amazon.com platform.[39]

17.     Many of the two million retailers who sell on the Amazon.com platform do so reluctantly. "Virtually every manufacturer and retailer of consumer goods in America faces [the] same predicament," explains Stacy Mitchell, co-director of Institute for Local Self-Reliance said in recent testimony to the House of Representatives' Judiciary Committee.[40] "In order to reach more than half of the online market, they have to sell through a platform operated by one of their most aggressive and formidable competitors," which she describes as "a bitter pill."[41] Amazon's ownership of the largest retail marketplace platform gives it the necessary leverage to restrain its third-party sellers from competing anywhere else on price. Almost half of Amazon's third-party sellers generate 81% to 100% of their revenues from sales on the Amazon.com platform.[42] As its

---

[37] *Supra* Hart.

[38] Greg Swan, *The Ultimate Walmart Marketplace Guide (Pros, Cons, Secrets and More)* (Jan 9, 2020), https://tinuiti.com/blog/walmart/why-walmart-is-the-next-blue-ocean-opportunity-for-ecommerce-marketers/.

[39] *Supra Amazon Squeezes Sellers That Offer Better Prices on Walmart*.

[40] Testimony of Stacy F. Mitchell, Co-Director Institute for Local Self-Reliance, (Jul. 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-MitchellS-20190716.pdf.

[41] *Id.*

[42] J. Clement, *Percentage of e-commerce revenue from Amazon sales according to Amazon marketplace sellers in 2018*, Statista (May 4, 2019), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.



1   third-party seller, Molson Hart, succinctly puts it: "[W]e have nowhere else to go and Amazon

2   knows it."[43]

3       18.    Amazon has engaged and continues to engage in anticompetitive conduct on a

4   massive scale. Collectively, sales on the Amazon.com platform accounted for 49.1% of the total

5   U.S. retail ecommerce market in 2018.[44] Third-party sellers accounted for 68% of the sales

6   revenue on the Amazon.com platform, or one third of the revenue generated by the entire U.S.

7   retail ecommerce market.[45] By contractually enforcing a price policy that requires all its third-

8   party sellers to raise prices outside the Amazon.com platform to supracompetitive prices,

9   Amazon engages in a price-fixing scheme that broadly and anticompetitively impacts virtually

10   all products offered for sale in the U.S. retail ecommerce market.

11       19.    This horizontal agreement between competing retailers to restrain price

12   competition is a *per se* violation of federal antitrust law. Alternatively, even if the agreement

13   could be construed as a vertical price restraint, it is a *per se* violation under California and

14   Maryland's antitrust laws. Nor can Amazon justify a vertical price restraint under federal

15   antitrust law or state laws that would apply the rule of reason to vertical restraints because

16   Amazon has no pro-competitive justification for raising prices on retail platforms that compete

17   with Amazon or its marketplace platform.

18       20.    Amazon cannot justify its price restraint as a permissible restraint on intrabrand

19   competition. Amazon's price restraint applies to all goods its third-party sellers sell, not just

20   specific brands. Nor is its restraint the functional equivalent of a minimum resale agreement

21   between a manufacturer and its distributors. Contractually, Amazon disclaims "any partnership,

22   joint venture, agency, franchise, sales representative, or employment relationship between" it and

23   its third-party sellers.[46] Amazon does not supply any products to its third-party sellers for resale,

24

25   _____

26       [43] *Supra* Hart.

    [44] *Supra Amazon Now Has Nearly 50% of US Ecommerce Market*.

27       [45] *Id.*

28       [46] Irvin Decl., Ex. A at 6 ¶ 13.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1  nor does Amazon enforce this restraint at the behest of brand manufacturers in furtherance of

2  intrabrand competition.

3       21.    Amazon's conduct also demonstrates an abuse or attempted abuse of monopoly

4  power in violation of Section 2 of the Sherman Act. Amazon's dominance of the industry hurts

5  consumers. Were it not for Amazon, the ecommerce market price for products sold by its third-

6  party sellers would be substantially cheaper.

7       22.    Amazon's dominance in consumer product search also permits it to exercise a

8  significant level of control over the flow of available information to consumers on the internet.[47]

9  Lina Khan, a fellow on the Open Markets team at New America, a center-left think tank,

10  explains that this "affords Amazon a lot of power and control."[48]  In a written statement, David

11  Cicilline, Chair of the House Judiciary Antitrust, Commercial and Administrative Law

12  Subcommittee, likewise recently concluded that Amazon's platform "is a bottleneck for a key

13  channel of distribution," evidently referring to "online marketplace sales."[49]

14       23.    The figures below show Amazon's dominant position in the online retail market

15  and how its conduct can affect the whole ecommerce sector.

16       24.    After an extensive, year-long investigation, the Chair of the House Judiciary

17  Antitrust, Commercial and Administrative Law Subcommittee has concluded that Amazon

18  captures "70% of all online marketplace sales."[50] Previously, in 2018, Amazon represented 50%

19  of all online retail revenue.[51]

---

[47] *See infra* Sec. V(E).

[48] Robinson Meyer, *When Does Amazon Become a Monopoly?*, ATLANTIC MONTHLY (Jun. 16, 2017), https://www.theatlantic.com/technology/archive/2017/06/when-exactly-does-amazon-become-a-monopoly/530616/.

[49] *Supra* Press Release (Jul. 29, 2020).

[50] *Id.*

[51] J. Clement, *Leading U.S. online marketplaces 2018, by GMV*, Statista (Mar. 1, 12, 2019), https://www.statista.com/statistics/977262/top-us-online-marketplaces-by-gmv/.

FIRST AMENDED CLASS ACTION COMPLAINT - 12
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12



13    25.    Amazon's market share has been increasing over the past five years, as shown by

14  the growth of its sales.[52]

15
16
17
18
19
20
21
22
23
24
25
26
27    [52] J. Clement, *U.S. Amazon marketplace sales 2016-2019*, Statista, Jun 12, 2019,
https://www.statista.com/statistics/882919/amazon-marketplace-sales-usa/.
28

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX



26.     Third-party sellers account for the majority of sales on the Amazon.com platform.[53]



---

[53] Laureen Thomas & Courtney Reagan, *Watch out, retailers. This is just how big Amazon is becoming*, CNBC, www.cnbc.com/2018/07/12/amazon-to-take-almost-50-percent-of-us-e-commerce-market-by-years-end.html.



27.     Amazon has obtained monopoly power in the U.S. retail ecommerce market, as demonstrated by its power to set the prevailing prices of the vast majority of consumer goods offered for sale on the internet and that it exercises extraordinary control over millions of its online retail competitors.

28.     In the alternative, Amazon has obtained monopoly power in the U.S. online retail sub-markets for home improvement tools, men's athletic shoes, skin care, batteries, golf, cleaning supplies, and kitchen and dining products, where it has the overwhelming majority share in each of these markets. Amazon has willfully acquired its monopoly power in the U.S. retail ecommerce market and/or these identified U.S. online retail sub-markets through anticompetitive conduct, including enforcement of its former PMFN and its current "fair pricing" provision, thereby causing supracompetitive prices for Class Products in the U.S. retail ecommerce market. Such conduct is an abuse or attempted abuse of monopoly power in violation of Section 2 of the Sherman Act.

29.     In the event that Amazon does not already have a monopoly in the U.S. retail ecommerce market, it has attempted to monopolize this market. Amazon exercises broad control over the online prices of virtually every consumer good by controlling the prices that its two million third-party sellers may offer through competing retail ecommerce channels. Amazon's contractual pricing provisions further this goal and cause supracompetitive prices. If Amazon does not already have monopoly power in the ecommerce market, there is a dangerous probability that it will achieve one because sales on the Amazon.com platform account for nearly half of all revenue from retail ecommerce sales in the United States. Alex Sheppard at the New Republic explained a few years ago: "If Amazon now controls the pricing in the book industry, just imagine what it can do in the broader world of retail."[54]

---

[54] Alex Sheppard, *How Amazon Is Changing the Whole Concept of Monopoly*, New Republic (Jun. 19, 2017), https://newrepublic.com/article/143376/amazon-changing-whole-concept-monopoly.



30.     Amazon's anticompetitive conduct also violates multiple state antitrust, consumer protection, and unjust enrichment laws by causing consumers to overpay for consumer goods purchased online.

31.     Plaintiffs on their own behalf and that of similarly situated consumers, seek monetary recovery and injunctive relief for harm caused by Amazon's violations of federal antitrust law and state laws—harm that persists and will not abate unless Amazon is stopped.

**B.     Identity of Class Products**

32.     Amazon injured Plaintiffs and Class[55] members, when they overpaid for products at prices inflated by Amazon's anticompetitive conduct.

33.     Without discovery, the exact number or a complete list of all products affected by Amazon's former PMFN and current "fair pricing" policy is unknown at this time. Based on publicly available information, Plaintiffs estimate that Class Products consist of approximately 600 million consumer products offered by Amazon's third-party sellers.[56]

34.     Class Products encompass all products subject to Amazon's anti-competitive pricing policies. To qualify as a Class Product, the product must be sold through a retail ecommerce channel other than the Amazon.com platform, and the product must be concurrently offered by Amazon's third-party sellers on the Amazon.com platform. For example, CaddiesShack is a third-party seller on Amazon, who sold Bridgestone Tour B330-S Golf Balls (12-pack) in March of this year on its own website, the Amazon.com platform, eBay, and Walmart.com.[57] Other sellers, who offered the same product on eBay, Walmart.com or any other ecommerce platform, were spared the price competition that CaddiesShack and other Amazon sellers otherwise would have provided. Therefore, to qualify as a Class Product, it is not

---

[55] *Infra* ¶ 157.

[56] *How Many Products Does Amazon Sell? – January 2018*, ScrapeHero, https://www.scrapehero.com/many-products-amazon-sell-january-2018/.

[57] *Infra* ¶ 112.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1    necessary that the product sold through a competing retail ecommerce channel be sold by an

2    Amazon third-party seller.

3           35.    "Amazon regularly monitors the prices of items" its third-party sellers offer on the

4    Amazon.com platform, "including shipping costs, and compares them with other prices available

5    to our customers . . . on or off Amazon" and penalizes violations.[58] As a result of its price

6    monitoring and enforcement of its pricing policies, Amazon is expected to maintain pricing data

7    not only for products offered for sale on the Amazon.com platform, but also Class Products, *i.e.*

8    the same products sold through competing retail ecommerce channels.

9    **C.    The Economic Impact of Amazon's Anticompetitive Conduct**

10           36.    Through its price-fixing agreement with its third-party sellers and its abuse of its

11    monopoly power, Amazon has suppressed competition and caused supracompetitive prices in the

12    ecommerce retail market. As an example, considering an average industry markup of 38.9% on

13    books, music and video, if it costs the seller $1 to buy a CD from a distributor, it would charge

14    $1.39 on its own website. If the retailer also sells through Amazon and eBay, they would also

15    incur a minimum fee of 15% from Amazon and 12% from eBay.[59]  To maintain the same

16    markup, the retailer would list the product on Amazon at $1.63 and $1.58 on eBay. Because

17    Amazon requires its third-party seller to set its lowest price on the Amazon.com platform, it

18    would sell its CD on all platforms for $1.63. Customers who could buy at a cheaper price outside

19    of the Amazon.com platform overpay by 3.5% on eBay and 17.6% on the seller's own website.[60]

20           37.    The same analysis of the impact of Amazon's price restraint can be applied to

21    each of the principal categories of goods sold on the Amazon.com platform with varying input

22    from Amazon's and eBay's fees and the industry average markup.

23

24

25           [58] *Supra* Amazon Marketplace Fair Pricing Policy.

26           [59] eBay, https://www.ebay.com/help/selling/fees-credits-invoices/fees-business-
      sellers?id=4122.

27           [60] For ease of reference, Plaintiffs have rounded the prices to the nearest cent and the
      percentages to the nearest tenth of a percentage. They base their calculations, however, on
28    numbers that are more exact.

FIRST AMENDED CLASS ACTION COMPLAINT - 17
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

| | Fees | | | | | |
|---|---|---|---|---|---|---|
| Category | Amazon Fees | eBay Fees | Markup | Own site $1 cost | Amazon $1 cost | eBay $1 cost |
| Books/Music/Video | 15% | 12.0% | 38.9% | $1.39 | $1.63 | $1.58 |
| Toys & Hobby | 15% | 9.15% | 78.6% | $1.79 | $2.10 | $1.97 |
| Computer/Consumer Electronics | 8% | 7.65% | 33.3% | $1.33 | $1.45 | $1.44 |
| Office equipment | 12% | 4.00% | 40.8% | $1.41 | $1.60 | $1.47 |
| Furniture & Home Furnishings | 12% | 9.15% | 40.8% | $1.41 | $1.60 | $1.55 |
| Health & Beauty | 12% | 9.2% | 400.0% | $5.00 | $5.65 | $5.50 |
| Food & Beverage | 12% | 9.15% | 29.9% | $1.30 | $1.47 | $1.43 |
| Auto & Parts | 12% | 8.15% | 18.7% | $1.19 | $1.35 | $1.29 |
| Kitchen & Dining | 15% | 9.15% | 80.0% | $1.80 | $2.12 | $1.98 |
| Home Improvement Tools | 15% | 9.15% | 49.3% | $1.49 | $1.76 | $1.64 |
| Men's Athletic Shoes | 17% | 9.2% | 150.0% | $2.50 | $2.99 | $2.75 |
| Skin Care | 15% | 9.15% | 400.0% | $5.00 | $5.88 | $5.50 |
| Batteries | 15% | 9.15% | 33.3% | $1.33 | $1.57 | $1.47 |
| Golf | 15% | 9.15% | 62.6% | $1.63 | $1.91 | $1.79 |
| Cleaning Supplies | 15% | 9.15% | 29.9% | $1.30 | $1.53 | $1.43 |
| Other | 15% | 9.2% | 80.0% | $1.80 | $2.12 | $1.98 |

38.     On average, across all categories, Amazon's restraint has resulted in an overcharge of 15.9% if sold on the third-party sellers' own websites and 5.6% if sold on another online marketplace platform:

| Category | Amazon v Other Two-Sided Platforms | Amazon v Retailers' Own Websites |
|---|---|---|
| Books / Music / Video | 3.5% | 17.6% |
| Computer / Electronics | 6.9% | 17.6% |
| Health and Beauty | 0.4% | 8.7% |
| Home and Kitchen | 9.1% | 13.6% |
| Clothing and Accessories | 3.2% | 13.6% |
| Home Improvement Tools | 2.7% | 13.0% |
| Sports and Outdoors | 2.7% | 13.0% |
| Toys and Games | 4.4% | 13.6% |
| Food and Beverages | 6.9% | 17.6% |
| Office Products | 6.9% | 17.6% |
| Other | 8.8% | 19.8% |
| Average | 5.6% | 15.9% |

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1    This conservative estimate of overcharge does not take into consideration additional unique fees

2    or costs that third-party sellers typically incur when selling on the Amazon.com platform.[61]

3         39.    The impact of Amazon's restraint on its third-party sellers is not limited to the

4    third-party sellers' sales. Item-by-item price competition has controlled the U.S. retail

5    ecommerce market in recent years across multiple platforms.[62] In a competitive market, other

6    ecommerce sellers would be expected to lower their prices in response to price challenges. For

7    example, Home Depot will match the "price on an identical, in-stock item from any other

8    retailer."[63] Dell, Sam's Club, Joann Fabrics (Joann.com), Hayneedle and YLiving also match

9    prices of online competitors, regardless of size.[64] And as a practical matter, because so many

10   consumers use Google or Amazon to compare prices, most major online retailers are likely to

11   match the lowest online prices, regardless of the seller.

12        40.    Amazon's restraint on competition artificially inflated the market price for Class

13   Products in the U.S. ecommerce market and directly injured Plaintiffs and Class members, who

14   overpaid for Class Products.

15                          **II.    JURISDICTION**

16        41.    This Court has federal question jurisdiction pursuant to the federal antitrust laws

17   invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28

18   U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

19        42.    This Court also has subject matter jurisdiction pursuant to the Class Action

20   Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse

21

22       [61] *See supra* Sec. I(A).

23       [62] Kim Souza, TB&P, *The Supply Side: Amazon remains low-price leader online against competitors*, (Dec. 8, 2019) https://talkbusiness.net/2019/12/the-supply-side-amazon-remains-low-price-leader-online-against-competitors/; *see also infra* Sec. V(A)(4).

24       [63] Home Depot, Low Price Guarantee, https://www.homedepot.com/c/PM_New_Lower_Price.

25

26       [64] Dell, Get the best deal with Price Match and Price Guarantee, https://www.dell.com/en-us/shop/price-match-guarantee/cp/price-match-guarantee; Sam's Club Price Match Policy, https://www.samsclubcontacts.com/price-match-policy; Joan.com, Frequently Asked Questions, https://www.joann.com/faqs.html#ProductInfo; Hayneedle Best Price Guarantee, https://www.hayneedle.com/help-center/best-price-guarantee/; YLiving Pricing & Low-Price Guarantee, https://www.yliving.com/customer-service/pricing.html.

27

28

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

43.     Plaintiffs are residents of Alabama, Arkansas, Arizona, California, Florida, Georgia, Illinois, Iowa, Maine, Nevada, New Hampshire, Pennsylvania, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and Wisconsin, who purchased consumer goods online. Plaintiffs were harmed and injured financially because of Defendant's conduct, as described further herein.

44.     This Court has personal jurisdiction over Amazon because Amazon has its principal headquarters in Washington, does business in Washington, directly or through agents, and has registered with the Washington Secretary of State such that it has sufficient minimum contacts with Washington.

## III.     VENUE

45.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal place of business is in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## IV.     PARTIES

### A.     Plaintiffs

#### 1.     Virginia

46.     Deborah Frame-Wilson is a resident of Winchester, Virginia. She regularly shops from multiple online retailers, including Fanatics.com, Walmart.com, and QVC. Ms. Frame-Wilson also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Ms. Frame-Wilson made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on September 1, 2019, she purchased from Fanatics.com a Nebraska Cornhuskers Shield Money Clip & Wallet - Black for $26.73 (inclusive of customer discount and shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

offered free shipping. And on February 18, 2020, she purchased a DVD, Auntie Mame, online from Walmart for in-store pick-up for $9.99, a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform even when shipping is included. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Ms. Frame-Wilson has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 2.  California

47.     Christian Sabol is a resident of Redondo Beach, California. He regularly shops online, particularly for ski gear, on websites like Walmart, The House Outdoor Gear, Snow Inn, and Next Adventure. Mr. Sabol also shops on the Amazon.com platform, but he is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Mr. Sabol made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products, including at least one product he purchased from one of Amazon's third-party sellers on another platform. For example, on July 15, 2019, he purchased a set of BIC Classic Pocket Lighters, assorted colors, 5 ct. from The Official BIC Store on Walmart.com, for $6.49 with no added shipping charge, a price equal to the price Amazon third-party seller The Official BIC Store concurrently offered that product on the Amazon.com platform, while also providing free shipping. On May 31, 2020, he purchased online from PureFormulas, Inc. (also an Amazon.com third-party seller), on Walmart.com, Nutrition Now PB8 Probiotic 120 Capsules for $15.84 with no added shipping costs, a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who offered free shipping. And on July 30, 2020, he purchased Nutrition Now PB8 Acidophilus for Life Probiotic 120 Capsule from a seller on Walmart.com for $14.99 with no added shipping costs, a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

have resulted in a lower market price for this product. Mr. Sabol has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 3.    Alabama

48.    Samanthia Russell is a resident of Tuscaloosa, Alabama and recently lived in Georgia. She regularly shops online on websites like Best Buy and Walmart.com. Ms. Russell also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Ms. Russell made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on March 13, 2020, she purchased online from Best Buy for in-store pickup a ROKU Premiere 4k Streaming Media Player Black for $29.99, a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who provided free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Ms. Russell has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

49.    Arthur Scharein is a resident of Decatur, Alabama. He regularly shops online on websites like Sur La Table, Beach Olive Oil, Ancient Olive, Costco, WMF silverware, Pfaltzgraff, and Fabulous Fur. Mr. Scharein also shops on the Amazon.com platform, but he is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Mr. Scharein made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on April 1, 2020, he purchased online 40 Nespresso Capsules OriginalLine, Fortissio Lungo Dark Roast Coffee from Nespresso at $0.70 per capsule with free shipping, a price equal to the lowest per unit price concurrently offered by an Amazon third-party seller on the

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

Amazon.com platform, who also offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Mr. Scharein has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

       **4.**     **Arizona**

       50.     Lionel Keros is a resident of Queen Creek, Arizona. He regularly shops online on websites like HOCAFF, Le Panier Francais, Adorama, Newegg, Ebay, Home Depot, and Walmart.com. Mr. Keros also shops on the Amazon.com platform, but he is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Mr. Keros made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. These purchases include products he purchased from Amazon's third-party sellers on other platforms. For example, on November 18, 2019, he bought Bemka Salmon Roe, 2oz from HOCAFF on its own website for $11.00, a price higher and having a higher shipping fee than the price Amazon third-party seller HOCAFF concurrently offered that product on the Amazon.com platform. On March 20, 2020, he bought an LG 32GK650G-B 32'' monitor from Adorama on the NewEgg website for $499.32 (inclusive of tax and shipping), a price equal to the price Amazon third-party seller Adorama concurrently offered that product on the Amazon.com platform (inclusive of tax and shipping). On March 31, 2020, he purchased Box Car Willie Tomato Seeds from genesisseed on eBay for $3.99 with free shipping, a price higher than the price Amazon third-party seller genesisseed concurrently offered that product on the Amazon.com platform, who also provided free shipping. And on March 21, 2020, he purchased an Essence Premium Quality 5-Stage Under-Sink Reverse Osmosis Drinking Water Filter System online from HomeDepot for $199.95 with free shipping, a price equal to the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who also provided free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a

lower market price for these products. Mr. Keros has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**5.      Arkansas**

51.      Nathan Chaney is a resident of Little Rock, Arkansas. He regularly shops online on websites like legoshop.com, Pro Bass Shops, and Zappos.com. Mr. Chaney also shops on the Amazon.com platform, but he is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Mr. Chaney made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on May 21, 2019, he purchased online from REI Thule WingBar Evo Load Bars – Pair for $175.89 (with no shipping fee) and Thule Rapid Traverse Foot Pack – Set of 4 for $175.89 (with no shipping fee), prices higher than the lowest prices concurrently offered by Amazon third-party sellers on the Amazon.com platform, who also provided free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Mr. Chaney has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

52.      Chris Gulley is a resident of Prescott, Arkansas. He regularly shops online on websites like eBay, QVC, and Walmart.com. Mr. Gulley also shops on the Amazon.com platform, but he is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Mr. Gulley made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on January 1, 2019, he purchased a 32-Inch Alpha Series 720p LED HDTV from QVC for $161.12 (inclusive of tax and shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1   (inclusive of tax and shipping). Amazon's anticompetitive price policies prevented the price

2   competition that would have resulted in a lower market price for this product. Mr. Gulley has

3   been injured and will continue to be injured by paying more for Class Products than he would

4   have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth

5   herein.

6       **6.      Florida**

7       53.     Sheryl Taylor-Holly is a resident of Ocklawaha, Florida. She regularly shops

8   online on websites like eBay and Walmart.com. Ms. Taylor-Holly also shops on the

9   Amazon.com platform, but she is not making any claims relating in any way to any products or

10  services sold or distributed by Defendant or through the Amazon.com platform. Many of the

11  purchases Ms. Taylor-Holly made on websites other than the Amazon.com platform are products

12  that were also concurrently available for sale by an Amazon third-party seller on the

13  Amazon.com platform, *i.e.*, Class Products. For example, on October 4, 2018, she purchased a

14  Swingline Electric Stapler, Optima Grip, 20 Sheet Capacity online from Walmart.com for $28.11

15  with free shipping, a price higher than the lowest price concurrently offered by an Amazon third-

16  party seller on the Amazon.com platform, who also provided free shipping. Amazon's

17  anticompetitive price policies prevented the price competition that would have resulted in a

18  lower market price for these products. Ms. Taylor-Holly has been injured and will continue to be

19  injured by paying more for Class Products than she would have paid or would pay in the future

20  in the absence of Defendant's unlawful acts, as set forth herein.

21      **7.      Illinois**

22      54.     Anthony Courtney is a resident of Chicago, Illinois. He regularly shops online on

23  websites like Chewy.com, Walmart.com, Target.com, Fingerhut.com, and Groupon. Mr.

24  Courtney also shops on the Amazon.com platform, but he is not making any claims relating in

25  any way to any products or services sold or distributed by Defendant or through the

26  Amazon.com platform. Many of the purchases Mr. Courtney made on websites other than the

27  Amazon.com platform are products that were also concurrently available for sale by an Amazon

28  third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on May 17,

HAGENS BERMAN

2018, he purchased a Targus Legend IQ Backpack for 16'' Laptop for $59.99 with free shipping, a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who also offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Mr. Courtney has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**8. Iowa**

55. Dave Westrope is a resident of Ankeny, Iowa. He regularly shops online on websites like eBay. Mr. Westrope also shops on the Amazon.com platform, but he is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Mr. Westrope made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on November 25, 2018, he purchased Motorcraft SP-493 spark plugs (set of 6) on eBay for $25.50, a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform even with shipping included. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Mr. Westrope has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**9. Maine**

56. Stacy Dutill is a resident of Waterville, Maine. She regularly shops online on websites like eBay and Walmart.com. Ms. Dutill also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Ms. Dutill made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

example, on April 6, 2019, she purchased Manna Pro 5 lb. Sho-Glo Supplement for Horses from Hayneedle on the Walmart website for $24.26 with free shipping, a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, which also offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Ms. Dutill has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**10.   Nevada**

57.   Sarah Arrington is a resident of Las Vegas, Nevada. She regularly shops online on websites like Walmart, Vitacost, Chewy, Right Stuff, Holabird Sports, Ulla Popken, Pokemon Center, and Lane Bryant. Ms. Arrington also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Ms. Arrington made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on August 6, 2019, she purchased Trinity Seven Manga Volume 15.5 for $9.74 plus shipping from RightStuffAnime, a price equal to the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform inclusive of shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Ms. Arrington has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**11.   New Hampshire**

58.   Mary Elliot is a resident of Fremont, New Hampshire. She regularly shops online on websites like Chewy, CVS, JC Penney, Kohl's, Macy's, Old Navy, Puritan's Pride, Walgreen's and Woot. Ms. Elliot also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed by Defendant or

through the Amazon.com platform. Many of the purchases Ms. Elliot made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on December 11, 2019, she purchased CeraVe Daily Moisturizing Lotion for normal to dry skin 12 ounce online from CVS for $13.35 (with no added shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who offered free shipping. And on April 8, 2020, she bought online from Kohl's Burt's Bees Rosemary & Lemon Hand Cream 1 ounce for $5.39 (with no added shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who offered free shipping. Both Amazon sellers offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Ms. Elliot has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 12.   Pennsylvania

59.     Heather Geesey is a resident of Dover, Pennsylvania. She regularly shops online on websites like Home Depot, Allivet, Squid Socks, DHC, and Petflow. Ms. Geesey also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Ms. Geesey made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. These purchases include products she purchased from Amazon's third-party sellers on other platforms. For example, on March 27, 2019, she purchased from Wow Apple Cider Vinegar Shampoo + One Wow Hair Conditioner from BuyWow on its own website for $ 29.95 (with no added shipping), a price slightly higher than the price Amazon third-party seller BuyWow concurrently offered that product on the Amazon.com platform, where it also offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

product. Ms. Geesey has been injured and will continue to be injured by paying more for Class

Products than she would have paid or would pay in the future in the absence of Defendant's

unlawful acts, as set forth herein.

**13.    Tennessee**

60.    Steve Mortillaro is a resident of Nashville, Tennessee. He regularly shops online

on websites like Best Buy, Target, and Walmart. Mr. Mortillaro also shops on the Amazon.com

platform, but he is not making any claims relating in any way to any products or services sold or

distributed by Defendant or through the Amazon.com platform. Many of the purchases Mr.

Mortillaro made on websites other than the Amazon.com platform are products that were also

concurrently available for sale by an Amazon third-party seller on the Amazon.com platform,

*i.e.*, Class Products, including at least one product he purchased from an Amazon third-party

seller on another platform. For example, on June 5, 2019, Mr. Mortillaro purchased Bariatric

Choice once daily bariatric multivitamin, 45 mg of iron from Bariatric Choice on its own website

for $29.95 with free shipping, a price equal to the price Amazon third-party seller Bariatric

Choice concurrently offered that product on the Amazon.com platform, who also offered free

shipping. On June 22, 2017, he purchased an iRobot Roomba 690 Wi-Fi Connected Vacuuming

Robot from Bed Bath & Beyond for $374.99, a price higher than the lowest price concurrently

offered by an Amazon third-party seller on the Amazon.com platform, who offered free

shipping. Amazon's anticompetitive price policies prevented the price competition that would

have resulted in a lower market price for this product. Mr. Mortillaro has been injured and will

continue to be injured by paying more for Class Products than he would have paid or would pay

in the future in the absence of Defendant's unlawful acts, as set forth herein.

**14.    Texas**

61.    Chaunda Lewis is a resident of Savannah, Texas. She regularly shops online on

websites like Walmart, Sam's Club, Bath Body Works, and Kroger. Ms. Lewis also shops on the

Amazon.com platform, but she is not making any claims relating in any way to any products or

services sold or distributed by Defendant or through the Amazon.com platform. Many of the

purchases Ms. Lewis made on websites other than the Amazon.com platform are products that

were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on November 9, 2018, she purchased from Bath Body Works: Room Perfume Spray Japanese Cherry Blossom for $6.00 ($10.94 inclusive of shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform inclusive of shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Ms. Lewis has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

62.     Adrian Hennen is a resident of Carrollton, Texas. He regularly shops online on websites like Target and Best Buy. Mr. Hennen also shops on the Amazon.com platform, but he is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Mr. Hennen made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on March 21, 2020, he purchased a PNY CS900 240GB 2.5" SATA III Internal Solid State Drive online from Best Buy for in-store pick-up for $29.99, a price equal to the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who offered free shipping. The same day, he also purchased online from Best Buy for in-store pick-up an AMD Ryzen 5 3600 Six-Core 3.6 GHz Socket AM4 for $199.99, a price higher than the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Mr. Hennen has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

FIRST AMENDED CLASS ACTION COMPLAINT - 30
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1

### 15.    Utah

2       63.    Glenda R. Hill is a resident of Ivins, Utah. She regularly shops online on websites

3 like ShoeDazzle, 4USports, Fabric.com, and ZipperStop. Ms. Hill also shops on the

4 Amazon.com platform, but she is not making any claims relating in any way to any products or

5 services sold or distributed by Defendant or through the Amazon.com platform. Many of the

6 purchases Ms. Hill made on websites other than the Amazon.com platform are products that

7 were also concurrently available for sale by an Amazon third-party seller on the Amazon.com

8 platform, *i.e.*, Class Products. For example, On January 22, 2020, she purchased from

9 Fabric.com Dritz Home 44403 Cover Buttons for $6.06 (with no added shipping cost), a price

10 higher than the lowest price concurrently offered by an Amazon third-party seller on the

11 Amazon.com platform, who also offered free shipping. Amazon's anticompetitive price policies

12 prevented the price competition that would have resulted in a lower market price for these

13 products. Ms. Hill has been injured and will continue to be injured by paying more for Class

14 Products than she would have paid or would pay in the future in the absence of Defendant's

15 unlawful acts, as set forth herein.

16      ### 16.    Vermont

17      64.    Gail Murphy is a resident of Shelburne, Vermont. She regularly shops online on

18 websites like Sam's Club and OWC. Ms. Murphy also shops on the Amazon.com platform, but

19 she is not making any claims relating in any way to any products or services sold or distributed

20 by Defendant or through the Amazon.com platform. Many of the purchases Ms. Murphy made

21 on websites other than the Amazon.com platform are products that were also concurrently

22 available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class

23 Products. These purchases include products she purchased from an Amazon's third-party seller

24 on another platform. For example, on April 21, 2018, she bought an OWC 2 x 8.0GB 1333MHz

25 DDR3 SO-DIMM PC10600 Memory Upgrade Pin from OWC on its own website for $154.99, a

26 price equal to the price Amazon third-party seller OWC concurrently offered that product on the

27 Amazon.com platform. It offered free shipping on both sites. On April 27, 2018, she purchased

28 an OWC 2 x 8.0GB 1333MHz DDR3 SO-DIMM PC10600 204 Pin from OWC on its own

website for $154.99, a price equal to the price Amazon third-party seller OWC concurrently offered that product on the Amazon.com platform, however while it offered free shipping on Amazon, it charged Ms. Murphy $168.65 inclusive of shipping. On June 23, 2018, she purchased an OWC 4 x 4.0GB 1333MHz DDR3 SO-DIMM PC10600 204 Pin from OWC on its own website for $139.97, a price equal to the price Amazon third-party seller OWC concurrently offered that product on the Amazon.com platform. It offered free shipping on both sites. On April 20, 2019,  she purchased an OWC 1.0TB Mercury Electra 6G SSD 2.5" Serial-ATA 7mm Solid State Drive from OWC on its own website for $139.99 , a price slightly higher than the price Amazon third-party seller OWC concurrently offered that product on the Amazon.com platform. It offered free shipping on both sites. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Ms. Murphy has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**17.  Washington**

65.     Phyllis Huster is a resident of Bellevue, Washington. She regularly shops online on websites like Underarmor, Lowes, Home Depot, Instacart, NRS, Fred Meyer's, NHLshop, Fanatics, Eddie Bauer, Lane Bryant, Ace Hardware, and REI. Ms. Huster also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform. Many of the purchases Ms. Huster made on websites other than the Amazon.com platform are products that were also concurrently available for sale by an Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products. For example, on June 18, 2020, she purchased an NRS Men's H2Core Silkweight Hoodie from NRS.com for $59.95 (with no added shipping cost), a price equal to the lowest price concurrently offered by an Amazon third-party seller on the Amazon.com platform, who also provided free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Ms. Huster has been injured and will continue to be injured by paying more for

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1  Class Products than she would have paid or would pay in the future in the absence of

2  Defendant's unlawful acts, as set forth herein.

3        **18.   Wisconsin**

4        66.     Gerry (Chip) Kochendorfer is a resident of Menomonie, Wisconsin. He regularly

5  shops online on websites like Revzilla, Best Buy, Chewy, American Musical Supply, and Rite

6  Aid. Mr. Kochendorfer also shops on the Amazon.com platform, but he is not making any claims

7  relating in any way to any products or services sold or distributed by Defendant or through the

8  Amazon.com platform. Many of the purchases Mr. Kochendorfer made on websites other than

9  the Amazon.com platform are products that were also concurrently available for sale by an

10  Amazon third-party seller on the Amazon.com platform, *i.e.*, Class Products, including at least

11  one product he purchased from an Amazon third-party seller on another platform. For example,

12  on June 19, 2019, he purchased a Casio CTK2550 61 Key Portable Keyboard Premium Package

13  from American Musical Supply on its own website for $129.95, a price equal to the price

14  Amazon third-party seller American Musical Supply concurrently offered that product on the

15  Amazon.com platform. It offered free shipping on both sites. Amazon's anticompetitive price

16  policies prevented the price competition that would have resulted in a lower market price for

17  these products. Mr. Kochendorfer has been injured and will continue to be injured by paying

18  more for Class Products than he would have paid or would pay in the future in the absence of

19  Defendant's unlawful acts, as set forth herein.

20        67.     Online retail should be the most competitive industry in the world, but Amazon's

21  anticompetitive pricing policy severely restrains price competition by imposing a price floor for

22  products sold through retail ecommerce channels other than the Amazon.com platform. This

23  effect on competitors' prices is illustrated in the previous examples, where the price for each

24  Class Product purchased on a competing platform is equal to or greater than the best price

25  offered by Amazon's third-party sellers on the Amazon.com platform.

26  **B.   Defendant**

27        68.     Amazon is an online retailer giant with its principal headquarters in Seattle,

28  Washington. Amazon sells directly to its retail customers on the Amazon.com platform. Amazon

also maintains Amazon Marketplace, a platform for its two million third-party sellers, whom it also permits to sell on the Amazon.com platform. Amazon contractually obligates its third-party sellers to adhere to the pricing policies challenged in this lawsuit.

69.     Amazon's third-party sellers' registration is handled on the Amazon.com platform, where Amazon also has maintained the agreements with its third-party sellers relevant to this lawsuit. It is believed, and therefore alleged, that substantially all of the misconduct alleged in this complaint occurred in or emanated from Amazon's headquarters and principal place of business in Seattle, Washington.

## V.     STATEMENT OF FACT

### A.     Background

70.     The world's largest retailer is also the world's largest platform for third-party retailers, with whom Amazon competes in the sale of consumer retail goods.

71.     From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business, but check out from Amazon Marketplace and you can quickly find your business in bankruptcy. For example, Molson Hart, who sells toys on Amazon reports: "Were we to be suspended from selling on Amazon.com, it would probably take 3–6 months before we'd be bankrupt. We are not alone. This is typical for small to medium sized businesses which sell online today. In fact, most companies like our own, would probably go bust even faster."[65]

72.     In addition to the website traffic the Amazon.com platform generates, Amazon's third-party sellers also benefit from Amazon's 105 million Prime members in the United States.[66] To put that into perspective, more American households have Amazon Prime accounts than attend church regularly or have a landline phone.[67] Prime membership is a paid subscription

---

[65] *Supra* Hart.

[66] *Number of Amazon Prime members in the United States as of June 2019*, Statista, https://www.statista.com/statistics/546894/number-of-amazon-prime-paying-members/.

[67] Margot Whitney, Complete Beginner's Guide to Advertising on Amazon, Wordstream (Aug. 27, 2019), https://www.wordstream.com/blog/ws/2017/09/11/amazon-advertising

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

service with Amazon's retail customers, which entitles them to benefits, including free two-day shipping on Prime products.[68] According to a survey, an estimated 20% of Amazon Prime members shopped on Amazon a few times per week, and 7% did so almost daily.[69] U.S. Prime members spend an average of $1,400 per year on the Amazon.com platform.[70] Another survey found that an astonishing *96%* of all Prime members are more likely to buy products from the Amazon.com platform than any other ecommerce site.[71]

        **1.**      **Amazon charges high fees that third-party sellers pass on to their customers both on and off the Amazon.com platform.**

       73.     Because of the fees it charges its third-party sellers, the Amazon Marketplace is hugely profitable for Amazon. Amazon's profit margin on its seller service fees is significantly higher than the margin on its own retail sales on the Amazon.com platform.[72] Whereas Amazon operates its own retail operations with razor-thin margins, it takes a significant percentage of each sale by its third-party sellers plus additional charges to store and ship the inventory of the merchants that use the Fulfilled by Amazon service.[73] Because of this, financial analysts at Evercore ISI recently valued Amazon's third-party services at more than $250 billion, while giving its in-house retail operations a value of just $120 billion [74]

---

[68] *Number of Amazon Prime members in the United States as of June 2019*

[69] *Id.*

[70] Average annual amount spent on Amazon according to U.S. Amazon Prime and non-Prime members as of March 2019, Statista, https://www.statista.com/statistics/304938/amazon-prime-and-non-prime-members-average-sales-spend/.

[71] Kiri Masters, *89% Of Consumers Are More Likely To Buy Products From Amazon Than Other E-Commerce Sites: Study*, Forbes (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/#452623b04af1.

[72] Adam Levy, *Amazon's Third-Party Marketplace Is Worth Twice as Much as Its Own Retail Operations*, Motley Fool (Apr. 11, 2019), https://www.fool.com/investing/2019/03/07/amazons-third-party-marketplace-is-worth-twice-as.aspx.

[73] *Id.*

[74] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

74.     The retailer's relationship with Amazon begins with a modest $40 registration fee that lets it reach 95 million unique visitors per month in the United States.[75] But sellers "have to play by Amazon's rules, and Amazon.com isn't just a marketplace, it's also a seller."[76] Amazon charges a commission ("referral fees") for each item sold on their platform, typically around 15%.[77] Amazon also charges a per-item fee or a monthly subscription and it charges the seller the lesser of $5 or 20% of the price as a fee for any refunds when a shopper returns the product.[78] Optionally, and for an additional fee, Fulfillment by Amazon (FBA) will store, pick, pack, ship orders, and manage customer service and returns. Sellers who enroll in FBA qualify for Amazon Prime and free shipping eligible orders, otherwise most sellers must join a waitlist to join Seller Fulfilled Prime, which commits sellers to fulfill orders with two-day delivery at no additional charge for Prime customers.[79] Accepting FBA services also greatly increases the likelihood that Amazon's algorithm will select the seller's product for the coveted Amazon Buy Box.[80] Meanwhile, sellers' enrollment in FBA is a win for Amazon, who never takes title to the third-party seller's inventory,[81] yet enjoys a steady revenue from its sellers, who do all the merchandising and take on the inventory risk.[82]

---

[75] Amazon Services Registration Page, https://services.amazon.com/sem-landing.html?ref=pd_sl_2thvswwc79_b&hvdev=c&ld=SEUSSOABING-B20000SC-D&hvadid=78615157546872&hvqmt=p&tag=mh0b-20&hvbmt=bb.

[76] Leanna Zeibak, *7 Steps to Winning the Amazon Buy Box in 2019*, Tinuitu (Aug. 14, 2018), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

[77] David Hamrick, *Amazon FBA Fees, How They Work, and How to Profit as a Seller*, Jungle Scout (Feb. 7, 2020), https://www.junglescout.com/blog/amazon-fba-fees/.

[78] *Id.*

[79] *Reach hundreds of millions of Amazon customers worldwide-fast*, Amazon Seller Central, https://sellercentral.amazon.com/; *Sell products with the Prime badge directly from your warehouse*, Amazon Seller Central, https://services.amazon.com/services/seller-fulfilled-prime.html.

[80] *Supra* Zeibak.

[81] Irwin Decl., ¶ 5.

[82] Daphne Howland, *Amazon Caves on Seller Pricing*, Retail Dive (Mar. 13, 2019), https://www.retaildive.com/news/amazon-caves-on-seller-pricing/550388/.

FIRST AMENDED CLASS ACTION COMPLAINT - 36
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

75.     Unlike subscription fees to access the platform, sellers do not pay referral fees up-front, but instead Amazon takes them out of the sellers' Amazon account after they make the sale. Amazon charges higher referral fees for those item categories where it has a significant dominance in the ecommerce market, *i.e.*, kitchen and dining products, home improvement tools, batteries, golf, skin care, cleaning supplies, books, music, videos, and men's athletic shoes.[83]




Amazon Sales as % of US E-Commerce Retail Market v. Referral Fees (2018)

Higher fees make it more difficult and costly for third-party sellers to compete with Amazon in these categories of goods. This gives Amazon an immense competitive advantage over its third-party sellers on and off the Amazon.com platform in areas where it already dominates, and it magnifies Amazon's already formidable power to control market prices, especially in the categories of goods where it has the most market share.

---

[83] *Amazon FBA Fees, How They Work, and How to Profit as a Seller*; Corey McNair, *Top 10 US Ecommerce Companies in 2018*, eMarketer (Sep. 17, 2018), https://www.junglescout.com/blog/amazon-fba-fees/#all-fees, https://www.emarketer.com/content/top-10-us-ecommerce-companies-in-2018.

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

76.     The fees Amazon charges make it difficult to compete on the Amazon.com

platform in any category. "Every year it's been a ratchet tighter," said Bernie Thompson, a top

seller of computer accessories whom Amazon has highlighted in its marketing to other

merchants. "Now you are one event away from not functioning."[84] Between 2015 and 2018,

Amazon's revenue from third-party seller fees grew from $16 billion to $43 billion, outpacing

both the overall growth of Amazon's retail sales, and the growth of sales made by third-party

sellers on the Amazon.com platform.[85]

77.     "Amazon collects 27 cents of each dollar customers spend buying things its

merchants sell, a 42 percent jump from five years ago, according to Instinet, a financial research

firm. That does not include what companies pay to place ads on Amazon, a business that Wall

Street considers as valuable as Nike." [86]

78.     On-platform advertising is another cost that sets Amazon apart from other

platforms. Amazon is the third largest provider of digital advertising, behind only Google and

Facebook.[87] Investors expect its $10 billion advertising sales[88] to jump $28.4 billion over the

next five years.[89] (By comparison, Walmart's ad offerings to its third-party sellers are at the

nascent stage.[90]) According to John Denny, who ran ecommerce for the drink company Bai,

---

[84] Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, NYT (Dec. 19, 2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html.

[85] *Supra* Mitchell.

[86] *Supra* Weise.

[87] Eugene Kim, *Amazon quietly removes promotions of its own products as calls for tech regulation escalate*, NBC (Apr. 3, 2019), https://www.nbcnews.com/tech/tech-news/amazon-quietly-removes-promotions-its-own-products-calls-tech-regulation-n990666?cid=public-rss_20190410.

[88] Nicole Perrin, *Amazon Advertising 2019. Growth and Performance Are Strong at the No. 3 US Digital Ad Seller*, Emarketer (Nov. 7, 2019), https://www.emarketer.com/content/amazon-advertising-2019.

[89] Lara O'Reilly and Laura Stevens, *Amazon com: Emerges as Advertising Giant*, Market Screener, (Nov. 27, 2018), https://www.marketscreener.com/AMAZON-COM-12864605/news/Amazon-com-Emerges-as-Advertising-Giant-27665223/.

[90] Tara Johnson, Selling on Walmart: Vendor vs. Third Party vs. Hybrid, Tinuiti (JUN 26, 2020), https://tinuiti.com/blog/walmart/selling-on-walmart-vendor-vs-third-party-vs-hybrid/.

FIRST AMENDED CLASS ACTION COMPLAINT - 38
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

companies used to believe that if they had a great product, it would show up in Amazon's search results, and sales would follow. "Those days are over," Mr. Denny said. "There are no lightning strikes on Amazon anymore."[91] Paid advertising works much like Google search ads.[92] When customers conduct a search on Amazon.com, they receive a combination of organic results (based on relevance) and sponsored listings (results given to consumers because the brand or seller paid for a specific search term).[93] In other words, Amazon rewards its advertisers by dedicating more search space to sponsored advertising instead of organic search results, meaning that advertised products have priority over results based on customer satisfaction.[94] For many Amazon sellers, placing advertisements on the Amazon.com platform is necessary to getting or maintaining a high ranking on the platform. That means that Amazon's third-party sellers must pay more money to sell the same products. For example, on a $150 product, Amazon charges Molson Hart's company a $17.58 advertising fee to appear in Amazon's search results.[95]

79.     "It's increasingly pay-to-play," said Melissa Burdick, a 10-year Amazon veteran who now advises major consumer brands.[96] Quartile tested the importance of on-platform ads in 2018 when it stopped running ads on Amazon for 750 popular products and found that sales shrank by 24%.[97] The effect only increased over time. After 10 weeks, sales of the products without ads had tumbled 55%.[98]

---

[91] *Supra* Weise.

[92] *Supra* Whitney.

[93] The Badger, *Organic vs Paid Search on Amazon [Infographic]*. Adbadger (Mar. 19, 2019),https://www.adbadger.com/blog/organic-vs-paid-search-amazon/.

[94] *Supra* Hart.

[95] *Id*.

[96] *Supra* Weise.

[97] *Id*.

[98] *Id*.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

80.     Amazon also charges sellers fees for some types of customer reviews.[99] All of these added fees mean that sellers' prices go up on the Amazon.com platform, and by virtue of Amazon's pricing policies, other platform as well. Some third-party sellers report giving Amazon 40% or more for each transaction, an increase from 20% just a few years ago.[100]

81.     Market analyst Simeon Siegel notes that "although every unit sold through 3P . . . comes at lower reported revenue[,] . . . the collected fees flow through at much higher margin rates," meaning that Amazon's gross margin continues to grow even when selling fewer of its own goods.[101] For example, Amazon generated $43 billion in third-party seller service revenues in 2018, which accounted for the second-largest revenue segment of the online retail platform, after Amazon's own retail product sales.[102]

82.     Collectively, the seller fees Amazon charges are substantial and built into the prices its sellers charge their customers for products purchased on the Amazon.com platform. Because Amazon's pricing policies do not permit its sellers to sell at lower prices on other platforms, these fees are also embedded into the prices they offer on other platforms due to Amazon's aggressive enforcement of its price restraint. To ensure compliance, Amazon's "automated system continually checks and informs the seller within 15 minutes if a violation has occurred."[103] If Amazon finds that a seller violated this restraint, it issues a policy warning in the seller's central account.[104] Violations could result in removal of the seller's product listing or suspension of the seller's account.[105] It was reported that "Amazon even checks [the seller's]

---

[99] *Id.*; *What is the Early Reviewer Program?* Amazon, https://www.amazon.com/gp/help/customer/display.html?nodeId=202094910.

[100] *Supra Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

[101] *Supra Howland.*

[102] J. Clement, *Percentage of paid units sold by third-party sellers on Amazon platform as of 4th quarter 2019*, Statista (Jan. 31, 2020), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

[103] Rupert Heather, *The Little-Known Amazon Pricing Rule that Would Burn Your Business*, Xsellco, https://www.xsellco.com/resources/amazon-pricing-rule-burn-business/.

[104] *Id.*

[105] Sarah Sayed, *5 Pricing Do's and Don'ts on Amazon and Walmart Marketplace*, Worldfirst Blog (Apr. 11, 2018), https://www.worldfirst.com/us/blog/selling-online/5-pricing-

---

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

listings for similar products that are differently described, by color or size, for example. In other words, there's no hiding place."[106] As one advisor phrased it, "[I]f you get caught, Amazon won't hold back from enforcing penalties or suspensions."[107] Jarvin Karnani, who has been selling on Amazon Marketplace for two years, told the FTC, "[I]f Amazon suspends you, it's like a death knell . . . [W]hen Amazon shuts you off, they sit on your money for 90 days and there's nothing you can do."[108] To ensure compliance with Amazon's price policies, some sellers have come to rely on an external service to replicate their prices across multiple marketplaces.[109]

**2.      Amazon's pricing policies stifle ecommerce price competition.**

83.      "A staggering number (82%) of consumers cited price as a very important factor when buying a product on Amazon."[110] But Amazon's PMFN had the effect of *reducing* price competition. Third-party sellers, who would have sold their products for less, for example, on their own websites (*e.g.*, by avoiding Amazon's estimated 15% fee),[111] were prevented from selling at lower prices.[112]

---

dos-donts-amazon-walmart-marketplace/. Amazon's contracts with its third-party sellers are confidential. Plaintiffs therefore rely on publicly available third-party sources for their content.

[106] *Supra* Heather.

[107] *Supra* Sayed.

[108] Spencer Soper & Ben Brody. *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

[109] *Supra* Heather.

[110] Catie Grasso, *Amazon Pricing Strategy: How Much Should You Sell a Product For?*, Feedadvisor (Jan. 31, 2020), https://feedvisor.com/resources/marketplace-fees-policies/amazon-pricing-strategy/.

[111] *What it costs to sell on Amazon in 2018*, Xsellco, https://www.xsellco.com/resources/amazon-seller-fees-2018/; *supra* Hart ("Amazon takes a 15% commission on every product we sell on their website. We don't have this fee when we sell toys on our own website, so we could sell our products for 15% less and make roughly the same amount of money as we do on Amazon.").

[112] Letter from Senator Richard Blumenthal to Josephs Simons, Federal Trade Commission Chair (Dec. 19, 2018), https://www.blumenthal.senate.gov/imo/media/doc/12.19.18%20-%20DOJ%20-%20Price%20Parity.pdf.



84. Amazon came under fire for its PMFN in December 2018, when Senator Blumenthal called for an FTC investigation of the practice.[113] Years earlier, Amazon withdrew this very practice in Europe under pressure from British and German regulators.[114] In response to the Blumenthal letter, Amazon also quietly withdrew its PMFN in the U.S. in March of last year.[115] At the time, Dani Nadel, president of Feedvisor, a company that advises Amazon sellers, expected it to be a watershed moment that would lead "the greater e-commerce landscape" to be "much more dynamic."[116] Likewise, David Simnick, co-founder and CEO of Soapbox, a Washington, D.C.-based soap and shampoo maker that sells on Amazon, reported that when he learned that Amazon was revoking its PMFN, "I almost did a back flip in the hotel gym."[117]

85. But the watershed moment never came. Amazon continues to punish retailers, who price lower on other sites.[118] Despite Amazon's official withdrawal of the price parity provision last year, the Feedadviser website reported this year that "many sellers are still operating by the price parity rule *in fear that their account will be impacted as a result*."[119]

86. In fact, while Amazon withdrew its PMFN, it continues to enforce a "fair pricing" provision, which has the same effect as its former PMFN.[120] Whereas the PMFN prohibited sellers from offering cheaper deals through competing retail ecommerce channels, the "fair pricing" rule likewise penalizes merchants who sell their products at a higher price on the Amazon.com platform by removing the product from the Buy Box, suspending shipping options,

---

[113] *Id.*

[114] *Id.*

[115] Catherine Shu, *Amazon Reportedly Nixes Its Price Parity Requirement for Third-Party Sellers in the U.S.*, Tech Crunch (Mar. 11, 2019), https://techcrunch.com/2019/03/11/amazon-reportedly-nixes-its-price-parity-requirement-for-third-party-sellers-in-the-u-s/.

[116] *Supra* Howland.

[117] *Supra* Gonzalez.

[118] *Supra* Hart; Gonzalez.

[119] *Supra Amazon Pricing Strategy: How Much Should You Sell a Product For*? (emphasis added).

[120] *Supra* Gonzalez.


1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1  and terminating selling privileges.[121] Products outside the Buy Box are overlooked by the

2  algorithms Amazon uses to determine which products shoppers see on the platform.[122]

3      87.    The "Buy Box" is the white box on the right side of the product details page

4  where shoppers can click "Add to Cart" or "Buy Now." It is a critical listing for third-party

5  sellers. Over 80% of Amazon purchases made on desktops are done via the Buy Box, and due to

6  the smaller screen size, an even higher percentage of mobile Amazon purchases are made

7  through the Buy Box option.[123/124]



8

9

10

11

12

13

14

15

16

17

18

19

20      88.    When users click the "Add to Cart" button on the Amazon.com platform, they are

21  buying from one merchant and one merchant only—the Buy Box winner.[125] Similarly, when a

22

23  _____

24  [121] *Id.*

25  [122] *Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

26  [123] Conor Bond, *Why You Need the Amazon Buy Box and How to Get It,* Ecommerce
    Strategy, https://www.wordstream.com/blog/ws/2018/10/03/amazon-buy-box.

27  [124] Meyers Soap entry on Amazon, www.amazon.com/Mrs-Meyers-Clean-Day-Lavender/
    dp/B01N1N6FMZ (retrieved March 9, 2020).

28  [125] *Supra* Zeibak.

user opts for the "Buy Now" button that, too, will lead to the Buy Box owner.[126] Over 90% of sales occur using the Buy Box.[127] Eligibility depends on a number of factors, including the seller's reputation, price, efficiency, and whether the seller is selling its product for a lower price through competing retail ecommerce channels.[128]

89.     When Amazon discovers that a third-party seller offers the same product on another site at a lower price, it sends a pricing alert that warns the seller that its product is no longer eligible for the Buy Box. The effect is chilling for most third-party sellers, who cannot afford to jeopardize their sales on Amazon by offering better deals on other sites.[129] Jason Boyce, a former Amazon third-party seller, who now runs a consulting firm, Avenue 7 Media, instructs clients to offer the same prices on all sites to avoid losing prominence on Amazon even if they can afford to sell for less on other sites. He explains: "Amazon is in control of the price, not the merchant."[130]

90.     For example, retailer David Simnick reports that his sales plunge as much as 40 or 50 percent a day when his listings lose the Buy Box, and that he can reclaim the Buy Box only if he tweaks its pricing either at the Amazon.com platform or at the cheaper retailer, so that both offerings are priced equally.[131] He said that despite the withdrawal of Amazon's PMFN, his company had about six different products removed from the Buy Box option when it sold some of the same products at Target for $1 less.[132]

91.     Molson Hart, whose company, Viahart, sells toys online, says that 98% of its sales come from the Amazon.com platform and that other platforms like eBay and Walmart

---

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

[130] *Id.*

[131] *Supra* Gonzalez.

[132] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

account for less than 2% of his company's revenue.[133] He confirmed that even after Amazon officially ended its PMFN, it continued to punish sellers who list prices on other websites for less than the price on Amazon: "If we sell our products for less on channels outside Amazon and Amazon detects this, our products will not appear as prominently in search and, if you do find them, they will lose their prime check mark and with that, their sales."[134]

### 3.   Amazon's price restraint is just one example by which it exploits its market power to deny third-party sellers a fair opportunity to compete.

92.   As a matter of economics, third-party sellers have little choice but to accept Amazon's control over pricing. Amazon's platform "serves as [a] critical arter[y] of commerce."[135] "They control everything," explained a baby products retailer that formerly sold on the Amazon.com platform.[136] "If they don't want an item on there, they can decide that. If they only want one seller to sell something, they can set that rule."[137] Amazon's control over other retailers' access to the platform give it immense power over other ecommerce retailers and "the incentive and ability to exploit this power," by charging "exorbitant fees, impos[ing] oppressive contracts, and extract[ing] valuable data from the people and businesses that rely on" Amazon.[138] Its "business practices and decisions have an outsized effect on our economy."[139] Its misuse of its market power creates "a bottleneck" for online retail sales.[140]

93.   Amazon's price restraint is just one of several examples, by which Amazon adopts and enforces rules on its platform that unfairly benefit itself and jeopardize its third-party sellers' businesses. For example, in 2019, Amazon abruptly and radically altered the terms by which businesses could access its platform, by forcing some vendors to become third-party

---

[133] *Supra* Soper & Brody.

[134] *Supra* Hart.

[135] *Supra* Press Release (Jul. 29, 2020).

[136] *Supra* Mitchell.

[137] *Id.*

[138] *Supra* Press Release (Jul. 29, 2020).

[139] *Id.*

[140] *Id.*

sellers[141] Pushing vendors onto the marketplace allowed Amazon to offload the risk and costs of buying, storing and shipping the merchandise, and permits Amazon to charge them for these services and take a commission on each transaction.[142] Rina Yashayeva, former business development manager at Amazon and current Vice President of Marketplaces at Stella Rising, explains: "Amazon used to focus on wholesale so they could control more of how brands appear on the site, but what they're realizing is there's more than one way to do things. And seller-side is pay-to-play. They can essentially make more money while doing less work."[143] Will Land, CEO of Marketplace Valet, an ecommerce logistics provider and consulting firm in Riverside adds: "Now more Amazon vendors will have to sell on the marketplace or risk getting stuck with unsold inventory. When you get used to those big checks, it's hard to pull away."[144]

94.     The deal Amazon reached with Apple to restrict sales of Apple products likewise abruptly upended hundreds of third-party sellers who formerly offered those products for sale on the Amazon.com platform.[145] By cutting a deal to limit sales on the Amazon.com platform to Amazon and a limited number of Apple-authorized sellers, Amazon gained a rare insight into how Apple's business works online, as explained by Sucharita Kodali, a Forrester analyst specializing in ecommerce and consumer trends.[146] By selling directly on Amazon, Apple and other brands are "exposing proprietary business confidential information, like sales data, margin data, units sold, [and] reasons for returns . . . ."[147]

---

[141] *Supra* Mitchell.

[142] Spencer Soper, *Amazon stops ordering from many suppliers, pushing them to bear the risks instead*, LA Times (Mar. 17, 2019), https://www.latimes.com/business/la-fi-amazon-marketplace-20190307-story.html#:~:text=Based%20on%20the%20target%20valuation,even%20the%20biggest%20of%20stores.

[143] *Supra* Milnes.

[144] *Amazon stops ordering from many suppliers, pushing them to bear the risks instead.*

[145] *Supra* Mitchell.

[146] Nick Statt, *Apple And Amazon Cut A Deal That Upended The Mac Resale Market*, Verge (May 21, 2019), https://www.theverge.com/2019/5/21/18624846/amazon-marketplace-apple-deal-iphones-mac-third-party-sellers-john-bumstead.

[147] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

95.     Separately, in 2018, Amazon put a great deal of financial strain on many third-party payers, accustomed to more immediate payment from consumers, when it rolled out a "pay by Invoice" policy that permitted business customers 30 days to pay for products purchased on the Amazon.com platform.[148] One third-party seller complained that Amazon's policy uses the third-party sellers "to finance the growth" of its own business customers.[149] Jerry Kavesh, the CEO of 3P Marketplace Solutions, a consulting firm for the Amazon marketplace, explained why this placed an unfair burden on third-party sellers: "This new policy at least doubles the cash a small seller needs to have on hand in order to operate, which many small firms simply do not have and do not have the ability to access.[150] He predicted that it "could put sellers in a cash bind, where they may not be able to pay suppliers and employees, which is problematic at best, and worst could put them out of business."[151]

96.     Amazon's access to consumer and seller data also gives it unfair advantages over its third-party sellers. Amazon is like "a shopping mall" that not only tracks "all the foot traffic into a store, but also which items caught a customer's glance, which products made it into the shopping cart but were never purchased, as well as complete transaction and revenue data and all customer reviews." [152] It compiles a massive set of consumer data, based on its retail customers' shopping information, including minutiae, like how long a consumer considers a product.[153] Former Amazon employees reportedly told Yahoo Finance that the internal data Amazon compiles is much more sophisticated than the information available in the public domain, or any

---

[148] Eugene Kim, *Some Amazon sellers are outraged over a new payment policy designed to attract more corporate buyers*," CNBC (Aug. 21, 2018). https://www.cnbc.com/2018/08/21/amazon-corporate-buyers-longer-terms-some-sellers-upset.html.

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973, 993 (May 19, 2019).

[153] Amazon Privacy Notice, https://www.amazon.com/gp/help/customer/display.html?nodeId=201909010#GUID-1B2BDAD4-7ACF-4D7A-8608-CBA6EA897FD3__SECTION_87C837F9CCD84769B4AE2BEB14AF4F01.

third-party tools built for sellers.[154] This data collection has helped Amazon evolve into a giant among online retail stores by collecting, storing, processing, and analyzing personal information from its retail customers to determine how they are spending their money.[155]

97.     It gives "Amazon an unprecedented vantage point over 50% of ecommerce in the United States."[156] This raises a red flag for Andrea Leigh, formerly of Amazon and currently the vice president of Ideoclick, an agency that helps sellers and brands sell on Amazon. "When [the sellers' data is] leveraged to promote [Amazon's] private label products, I can see how it would be perceived as unfair and even maybe predatory."[157]

### 4.     Amazon's agreement with its third-party sellers causes higher prices on its outside competitors' sites.

98.     Revenue from Amazon's third-party sellers on the Amazon.com platform alone represents about a third of all U.S. ecommerce retail revenue. Its anticompetitive agreement with its sellers reduces the collective market share these sellers would otherwise acquire outside of the Amazon.com platform. It also shields both Amazon and its outside competitors in the ecommerce market, *e.g.*, Walmart.com, from the more vigorous price competition that would otherwise have occurred. By driving Class Products to supracompetitive prices, Amazon has directly injured and continues to injury Plaintiffs and Class members on whichever platforms they shop for Class Products.[158]

---

[154] Krystal Hu, *Revealed: How Amazon uses third-party seller data to build a private label juggernaut*, Yahoo Finance (Sept. 27, 2019).

[155] Jennifer Wills, *7 Ways Amazon Uses Big Data to Stalk You (AMZN)*, Investopedia (Oct. 20, 2018), https://www.amazon.com/gp/help/customer/display.html?nodeId= 201909010#GUID-1B2BDAD4-7ACF-4D7A-8608-CBA6EA897FD3__SECTION_ 87C837F9CCD84769B4AE2BEB14AF4F01.

[156] Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973, 993 (May 19, 2019).

[157] Eugene Kim, *Amazon quietly removes promotions of its own products as calls for tech regulation escalate*, CNBC (Apr. 3, 2019), https://www.nbcnews.com/tech/tech-news/amazon-quietly-removes-promotions-its-own-products-calls-tech-regulation-n990666?cid=public-rss_20190410.

[158] Plaintiffs and Class members do not raise any claims relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform.

FIRST AMENDED CLASS ACTION COMPLAINT - 48
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

99.     Online retailers primarily compete for market share by offering consumers the lowest price in the market.[159] Across multiple platforms, U.S. ecommerce retailers have engaged in intense item-by-item and per unit price competition in recent years.[160] Numerous studies throughout the Class Period confirm the tendency of competing online retailers to follow the price leader (usually Amazon). For example, the Boston-based ecommerce analytics firm, Profitero, found that Walmart's online pricing averaged just 2.9% higher than Amazon, based on a review of prices between June and August 2017 of more than 52,000 exactly matched, in-stock products across 13 categories, including beauty, toys & games, electronics and pet supplies.[161] Profitero subsequently analyzed daily prices of 21,939 beauty, grocery and household supplies products collected from September 1, 2017, to November 30, 2017 and found on average only a 1.8% difference between Walmart's and Amazon's prices for grocery, and in the beauty category prices on Jet.com were within 1.4% of Amazon prices.[162] A study in late 2018 of 100,000 products found that Walmart's online prices average just 2.3% higher than Amazon's and that it edged out Amazon in home storage and baby categories with prices averaging 0.7% and 0.3% less than Amazon.[163] A 12-week study in 2019 found that Kroger's online prices averaged only 1.6% higher than Amazon.[164] In the pet category, Chewy averaged just 0.4% more expensive

---

[159] Mike Black, *How Online Price Wars Are Threatening Brands*, Profitero (Apr. 26, 2018), https://www.profitero.com/2018/04/how-online-price-wars-are-threatening-brands/.

[160] *Supra* Souza; Jason Del Rey, *Amazon and Walmart are in an all-out price war that is terrifying America's biggest brands*, Vox (Mar. 30, 2017); *see also* https://www.vox.com/2017/3/30/14831602/amazon-walmart-cpg-grocery-price-war.

[161] Jannie Cahill, *New Profitero Study Reveals Amazon is Winning the Online Price War – But Walmart is on the Offensive*, Profitero (Oct. 30, 2017), https://www.profitero.com/2017/10/new-profitero-study-reveals-amazon-is-winning-the-online-price-war-but-walmart-is-on-the-offensive/.

[162] Jannie Cahill, *Walmart Online Grocery Prices Edge Closer to Amazon, Intensifying the Grocery Wars*, Profitero (Feb. 27, 2018), https://www.profitero.com/2018/02/walmart-online-grocery-prices-edge-closer-to-amazon-intensifying-the-grocery-wars/.

[163] Andria Cheng, *Walmart May Be Catching Up To Amazon On Prices But Still Has A Ways To Go, Study Shows*, Forbes (Nov. 9, 2018), https://www.forbes.com/sites/andriacheng/2018/11/09/amazon-holiday-ecommerce-walmart-target-kroger-grocery-home-depot/#121f7ade2521.

[164] *Supra* Souza.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

than Amazon, Walmart priced its music CDs online on average just 0.5% over Amazon's, and Target priced its beauty products on average just 2.2% more than Amazon.[165]

100.   Amazon's external competitors also follow price changes by Amazon's third-party sellers. In one example, reported by Profitero, a third-party seller on the Amazon.com platform triggered an online price war that resulted in a dog-food brand losing 33% of its price value in just six days.[166]



101.   Amazon's outside competitors compete on price largely by matching or coming close to the lowest ecommerce market prices. By stifling competition from its third-party sellers, whose sales represent about a third of all ecommerce revenue generated in the United States, Amazon significantly reduced the competitive pressure on itself and its outside rivals, resulting in supracompetitive ecommerce market prices for Class Goods and injuring Plaintiffs and Class members, who purchase Class Goods.

---

[165] *Id.*

[166] *Supra* Black.

1

**B.     Amazon's two million third-party sellers agreed under Amazon's former PMFN not
to offer their products to U.S. customers at a lower price through any competing
retail ecommerce channels.**

2

3      102.     Amazon is a retailer that competes with its two million third-party sellers in the

4   online sale of consumer goods. These third-party sellers also sell on other websites, like eBay,

5   Walmart.com, or the seller's own website, like Molson Hart's company, Viahart.

6      103.     The problem with PMFNs is that they penalize discounts, which can "soften price

7   competition[] and lead to higher prices."[167] All third-party sellers on the Amazon.com platform

8   agreed to Amazon's former PMFN and its current "fair pricing" provision as a condition of the

9   right to sell their goods at the Amazon.com platform. Under the PMFN, sellers agreed not to

10  lower the price of their goods on competing retail ecommerce channels even if it costs them less

11  to sell the products there and they would gain more market share by passing their savings onto

12  their customers.

13     104.     Amazon regularly monitors retail ecommerce prices offered to U.S. customers

14  both by its external competitors and its third-party sellers.[168] Amazon regularly enforces its price

15  restraint, often within 15 minutes of discovering a price differential, and the enforcement and

16  threat of enforcement has regularly prevented its sellers from offering lower prices through

17  competing retail ecommerce channels.[169]

18

**C.     Amazon's two million third-party sellers agree under Amazon's current "fair
pricing" provision that selling at a lower price through competing retail ecommerce
channels will subject them to costly penalties.**

19

20     105.     Like the PMFN, the current "fair pricing" provision creates significant financial

21  disincentives to any sellers who dare to offer lower prices outside the Amazon.com platform. For

22  example, suspension or termination could bankrupt a seller, and ineligibility for the Buy Box

23

24

25

[167] Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*
127 YALE L.J. 2176, 2179 (2018).

26

[168] *Supra* Sayed; *Amazon Pricing Strategy: How Much Should You Sell a Product For?*

27  [169] *Supra* Heather.

28

may reduce a seller's revenue from the product by as much as 40%.[170] The only way sellers can regain eligibility for Buy Box or otherwise void the penalty is by bringing their products' prices on the competing retail ecommerce channels into price parity with their listings on the Amazon.com platform, just as Amazon's former PMFN required.[171]

106.    Amazon regularly enforces its "fair pricing" policy, which has the same impact as its former PMFN, in that Amazon significantly penalizes its sellers, who offer lower prices through competing retail ecommerce channels. In recognition of this, third-party sellers continue to maintain price parity across their online platforms.[172]

107.    As a seller, Amazon also benefits from its anticompetitive price policies. By prohibiting or penalizing its third-party sellers' price competition outside of the Amzon.com platform, Amazon avoids a head-to-head competition with its third-party sellers on an even playing field, where the seller is not paying fees to Amazon.

**D.    Amazon's former PMFN and current "fair pricing" provision reduce price competition and cause consumers to pay more.**

108.    Amazon's price policies have an anticompetitive effect because they eliminate external price competition from its third-party sellers in the U.S. retail ecommerce market. Selling on Amazon Marketplace is not cheap.[173] Sellers would benefit more by competing directly with Amazon on price in competing retail ecommerce channels. Amazon's price policies have prevented or penalized sellers from doing this, which has resulted in reduced price competition and higher online prices for consumers.

109.    Absent Amazon's anticompetitive price policies, third-party sellers would have set a lower price on a platform with lower fees than Amazon or an even lower price on the seller's own website. Amazon injured consumers, who purchased the same products offered by

---

[170] *Supra Amazon Pricing Strategy: How Much Should You Sell a Product For?*; Gonzalez; Hart.

[171] *Supra* Gonzalez.

[172] *Supra Amazon Pricing Strategy: How Much Should You Sell a Product For?*

[173] *See, e.g., supra* Hart.

Amazon's third-party sellers, because they purchased at prices artificially inflated by Amazon's anticompetitive price policies. For example, a customer, who purchased a $150 toy on Viahart (the same price concurrently offered at Amazon) paid $37 more for the toy than if the seller was able to sell the product for $37 less on its own website, while making the same profit.[174] Amazon's "fair pricing" policy has a broad reach, encompassing virtually all consumer products. Consumers who make purchases from competing retail ecommerce channels of any of the hundreds of millions of Class Products concurrently offered at the Amazon.com platform are reasonably likely to be injured in the future by Amazon's current "fair pricing" policy.

110.    The following six charts illustrate the effect of Amazon's price restraint on products its third-party sellers sell across multiple platforms[175]:

111.    The average price of men's athletic shoes in the last decade has ranged between $40 and $50.[176] Recent prices of Amazon third-party sellers on the Amazon.com platform and other platforms for several products were within this range and the sellers did not vary them across multiple platforms, demonstrating the effectiveness of Amazon's price restraint and its negative impact on price competition from other platforms:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|----------|---------|--------|---------|------|-------------|
| Orva Stores | Skechers Men's Equalizer Pesistent Slip-On, Charcoal/Black | $49.95 | $49.95 | N/A | N/A |
| Shoebacca | Diadora Mens Titan Premium Running Sneakers, Blue/Pink | $39.95 | $39.95 | $39.95 | $39.95 |
| | Diadora Mens Kick Casual Sneakers, White, Grey or Black | $39.95 | $39.95 | $39.95 | $39.95 |
| | Diadora Mens N.92 Casual Sneakers, Grey | $39.95 | $39.95 | $39.95 | N/A |
| | Diadora Mens N-6100-4 Running Shoes, Blue | $39.95 | $39.95 | $39.95 | N/A |

112.    Recent prices of Amazon third-party sellers on the Amazon.com platform and other platforms had virtually identical prices for several golf ball products across multiple platforms, again demonstrating the effectiveness of Amazon's price restraint and its negative impact on price competition from other platforms:

---

[174] *Id.*

[175] The sources of each of the charts are Amazon.com, eBay, Walmart, and other retailer website identified in the charts (retrieved March 5, through March 18, 2020). Note: N/A means that the product is not sold in that marketplace. Shipping is free for all the instances considered.

[176] Athletic Footwear - United States. Retrieved March 11, 2020, from https://www.statista.com/outlook/11020000/109/athletic-footwear/united-states.

FIRST AMENDED CLASS ACTION COMPLAINT - 53
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|----------|---------|--------|---------|------|-------------|
| Greater Golf Express | Volvik 2020 Magma Golf Balls, 12-Pack | $39.99 | $39.99 | $39.99 | $39.99 |
| CaddiesShack | Bridgestone Tour B330-S Golf Balls, 12-Pack | $34.99 | $34.99 | $34.99 | $34.99 |
| | Volvik S4 White Color Golf Balls, 12-Pack | $44.38 | $44.95 | $44.99 | N/A |
| Golf Ball Divers | Titleist Pro V1 AAA Golf Balls, Used, 36-Pack | $39.99 | $39.99 | N/A | N/A |
| | Bridgestone Golf Precept Laddie Extreme Golf Balls, Used, 36 Pack | $29.99 | $29.99 | N/A | N/A |

113.    In 2018, Amazonbasics, Amazon's private label, was the leading online brand for disposable batteries, accounting for 26% of the ecommerce market.[177] Recent prices of third-party sellers of several battery products on the Amazon.com platform and other platforms were virtually identical to the prices on the Amazon.com platform or higher on external platforms, again demonstrating the effectiveness of Amazon's price restraint and its negative impact on price competition from other platforms:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|----------|---------|--------|---------|------|-------------|
| Pharmapacks | Eveready Super Heavy Duty Batteries, AAA, 4 Each | $3.36 | $3.36 | $5.04 | N/A |
| Chrome Batteries | 12V 7AH Sealed Lead Acid (SLA) Battery | $21.80 | $21.80 | $29.90 | $21.90 |
| East Coast Photo | Synergy Digital AA NiMH 2800mAh Rechargeable Batteries, Pack of 4 | $12.55 | $12.55 | N/A | $12.55 |
| | DogWatch DG-8000 Large Gray Dog Collar Battery | $8.95 | $8.95 | N/A | $8.95 |
| | Dantona ULA100AAB Alkaline, AA, Pack of 100 | $33.95 | $33.95 | N/A | $33.95 |

114.    Amazon sells over 1.1 million home improvement products per year, with a revenue of $6.1 billion in 2017.[178] Recent prices of Amazon third-party sellers on the Amazon.com platform and other platforms were unvaried for several home improvement products across multiple platforms, again demonstrating the effectiveness of Amazon's price restraint and its negative impact on price competition from other platforms:

---

[177] Jan Conway, *Market share for largest household battery manufacturers sold online in 2018*, Statista, https://www.statista.com/statistics/718199/online-market-share-household-batteries.

[178] J Clement, *US Amazon sales in selected retail product sectors 2017*, Statista, https://www.statista.com/statistics/709493/us-amazon-sales-selected-retail-sectors/.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Mix Wholesale | Cauldham 5 Pack Solid Kitchen Cabinet Arch Pulls Handles (3-3/4" Hole Centers) - Curved Drawer/Door Hardware - Style T750 - Matte Black | $13.99 | $13.99 | N/A | $13.99 |
| | Cauldham Heavy-Weight Bin Cup Drawer Pulls (3" Hole Centers) - Classic Kitchen Cabinet Door Handle Hardware - Style B350 - Oil Rubbed Bronze | $14.99 | $14.99 | N/A | $14.99 |
| | Cauldham 5 Pack Solid Kitchen Cabinet Knobs Pulls (1" Square) - Transitional Dresser Drawer/Door Hardware - Style S685 - Satin Nickel | $14.99 | $14.99 | N/A | $14.99 |
| Ron's Home and Hardware | WV15TV 1.5 In. Chip Brush, Pack of 36 | $21.37 | $21.37 | N/A | N/A |
| Southfork Homecenter | ProSource Single And Utility Unitrack Shelf Bracket, 8 In L X 2-1/2 In W 1.8 Mm Thick, Steel, White | $9.38 | $9.38 | N/A | N/A |

115.    Kitchen and dining is another leading product category, accounting for 39% of all Amazon sales in the United States as of January 2019.[179] Recent prices of Amazon third-party sellers on the Amazon.com platform and other platforms for several kitchen and dining products were virtually indistinguishable, again demonstrating the effectiveness of Amazon's price restraint and its negative impact on price competition from other platforms:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| eKitchenWorld | Lodge 5 Inch Square Cast Iron Skillet | $15.40 | $15.40 | $15.40 | $15.40 |
| | Ginsu Essential Dishwasher Safe 6 Piece Steak Knife Set | $19.94 | $19.94 | $19.94 | $19.94 |
| BigKitchen | GreenPan Paris 3 Quart Non-Stick Dishwasher Safe Ceramic Covered Sauce Pan | $52.41 | $52.41 | N/A | N/A |
| Zwilling J.A. Henckels | Demeyere Industry 5-Ply 8-inch Stainless Steel Traditional Nonstick Fry Pan | $79.95 | $79.95 | $79.95 | $79.99 |
| Gourmet Forte | Kai Pure Komachi 2 3pc Prep Knife Set | $22.95 | $22.95 | N/A | N/A |

116.    Cleaning supplies is another top selling product category on the Amazon.com platform. Recent prices of Amazon third-party sellers on the Amazon.com platform and other platforms for several cleaning products were virtually indistinguishable, again demonstrating the effectiveness of Amazon's price restraint and its negative impact on price competition from other platforms:

---

[179] Jay Clement, *Leading product categories purchased by Amazon shoppers in the United States as of February 2019* (Aug. 9, 2019), Statista, https://www.statista.com/statistics/1086637/amazoncom-3p-seller-metrics-usa/.



| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Microfiber Products | Microfiber Mop Kit for All Floor Types 100% Green Clean | $28.95 | $28.95 | N/A | N/A |
| | 18" Aluminum Commercial Mop Hardware | $29.95 | $29.95 | N/A | N/A |
| Ron's Home and Hardware | Armaly Brands 00009 Proplus Heavy-Duty Utility Sponge, 12-Pack | $30.37 | $38.95* | N/A | N/A |
| Southfork Homecenter | Continental Commercial Swivel Snap C702048 Dust Mop Frame 48 in | $13.97 | $13.97 | $13.97 | N/A |

**E.    Amazon has a monopoly in the retail ecommerce market or minimally in several categories of goods.**

117.    Amazon has a monopoly in the U.S. retail ecommerce market, as demonstrated by its power to control prices of a vast number of goods offered for sale in the U.S. retail ecommerce market. Its pricing policies support monopoly power "because people who prefer to shop on Walmart [or other sites] end up having to pay a higher price."[180] Many third-party sellers have forgone selling on other platforms just to avoid conflicts under Amazon's pricing policy. For example, Jason Boyce, who advises online sellers, said of a health care supply company he advises: "My client cut off Walmart — Walmart! — because it was hurting their Amazon business," Mr. Boyce said. "If that's not monopoly power, I don't know what is."[181] Sally Hubbard, a former assistant attorney general of New York and current director of enforcement strategy with Open Markets Institute, a think tank that advocates for more aggressive policing of competition laws, agrees: "You ask anybody who knows anything about Amazon, and they will say yes, Amazon has the ability to control prices in some respects. And it certainly has the ability to exclude competition."[182] Similarly, Lina Khan whom the House of Representative's antitrust subcommittee hired as its counsel, opines that it is important to distinguish between Amazon's innovations and its abuse of market power: "We as a society can live in a world of internet commerce without resigning ourselves to all that commerce being mediated by Amazon."[183]

---

[180] *Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

[181] *Supra* Weise.

[182] Ben Unglesbee, *Is Amazon on a collision course with the government?*, RetailDive (Sept. 30, 2019), https://www.retaildive.com/news/is-amazon-on-a-collision-course-with-the-government/563622/.

[183] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT - 56
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1



118.     Amazon achieved market dominance at least in part through the contractual controls it exercises over the prices its third-party sellers can offer products through competing retail ecommerce channels.

119.     Amazon's price policies are injurious to market competition. Consumers pay inflated prices for products that are protected from competitive pricing by Amazon's anticompetitive pricing policies. None of the other competing retailers have comparable infrastructure, inventory, customer base, search or data advantages to challenge Amazon in the ecommerce market.

120.     "[C]ompanies that once drew sufficient consumer traffic from search engines to their own sites are now compelled to become vendors or sellers on Amazon's platform — or forego access to a majority of online shopping traffic."[184] This "gives it an unprecedented degree of structural power in the economy."[185] As early as 2016, the internet-marketing firm BloomReach Inc. found that 55% of those surveyed first start with Amazon when searching for products.[186] Consumer preference for the Amazon.com platform as a starting point has only increased with time. A survey conducted by Feedadviser in 2019 found that 66% of consumers start their search for new products on the Amazon.com platform and 74% start there when they are ready to buy a specific product.[187]

---

[184] *Supra* Mitchell.

[185] *Id.*

[186] Spencer Soper, *More than 50% of Shoppers Turn First to Amazon in Product Search*, BLOOMBERG, Sept. 26, 2016, https://www.bloomberg.com/news/articles/2016-09-27/more-than-50-of-shoppers-turn-first-to-amazon-in-product-search.

[187] Feedadvisor, *The 2019 Amazon Consumer Behavior Report*, https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf.



121.    With 600 million products and two million sellers on the Amazon.com platform Amazon has unparalleled inventory, mostly housed in a sprawling network of roughly 100 warehouses scattered across the United States.[188] Amazon has now surpassed DHL to become the world's largest provider of shipping and fulfillment services, giving it a vast edge over its competitors in the distribution of products.[189] It currently delivers a little less than half of all

---

[188] Nate Rattner and Annie Palmer, *This map shows how Amazon's warehouses are rapidly expanding across the country*, CNBC (Jan. 19, 2020), https://www.cnbc.com/2020/01/19/map-of-amazon-warehouses.html.

[189] *Supra* Weise.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1    items ordered on the Amazon.com platform and by 2022, it is expected to deliver 65% of

2    them.[190]

3          122.    This also allows Amazon to wield a lot of power over its third-party sellers.

4    Approximately 94% of them rely on Amazon to store and fulfill their orders; about 64% rely on

5    Amazon exclusively for these services, and 37% rely on Amazon as the sole source of their

6    income.[191] When Amazon made the decision to prioritize household essentials during the corona

7    pandemic, it left these sellers in a huge bind because they could not sell the products stored in

8    Amazon's warehouses. Sellers, who borrowed from Amazon, were even worse off. For example,

9    Miles Szczurek, head of operations at the 3D-printing tool manufacturer AMX3d, said his

10   company took out a small business loan with Amazon, and when it could not stock products in

11   Amazon's warehouses, he feared it would be impossible to pay back: "When Amazon put this

12   restriction in place, they made no adjustments to the terms of the loans."[192] He expressed

13   concerns about the time it will likely take for Amazon to resume full service, adding: "I think

14   this points to a significant weakness with a single venue having this much market share."[193]

15         123.    The sheer size of Amazon's first-party retail operations allows it to offer the full

16   suite of entire digital sales infrastructure to third-party sellers, such as inventory management,

17   fulfillment, return processing, and advertising.[194] Lacking that scale, Amazon's rivals like

18   Walmart and Target, who also offer third-party marketplaces, cannot truly compete.[195] And by

19

20

21

22         [190] Emma Cosgove, *Amazon Logistics parcel volume will surpass UPS and FedEx by 2022*,
23   Retail Dive, (Dec. 16, 2019), https://www.retaildive.com/news/amazon-logistics-volume-
     surpass-ups-fedex-2022-morgan-stanley/569140/.

24         [191] *Amazon's New 'Essential Items' Policy Is Devastating Sellers*, Wired (Mar. 24, 2020),
     https://www.wired.com/story/amazon-essential-items-policy-devastating-sellers/.

25         [192] *Id.*

26         [193] *Id.*

27         [194] *Supra* Adam Levy.

     [195] *Id.*

28

FIRST AMENDED CLASS ACTION COMPLAINT - 59
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

1    selling more services, Amazon generates greater profits from the sales of third-party sellers than

2    its competitors can on their online marketplaces.[196]

3         124.    The Amazon.com platform accounts for 70% of all online marketplace sales.[197]

4    In 2018, it generated almost half of the revenue of all retail ecommerce in the United States,

5    while its nine closest competitors had a distant 1.1%-6.6% share in revenue of the retail

6    ecommerce market.[198] This, along with direct evidence of Amazon's power to raise prices and

7    exclude competition, supports monopoly power.

8         125.    Alternatively, at a minimum, Amazon has a monopoly in the ecommerce

9    submarkets where it has the lion's share of those markets. For example, inclusive of its third-

10   party sellers, Amazon currently enjoys an overwhelming share of the retail ecommerce market in

11   the following categories of goods: home improvement tools (93%); men's athletic shoes (74%),

12   skin care (91%), batteries (97%), golf (92%), cleaning supplies (88%), and kitchen and dining

13   (94%).[199]

14   **F.    Alternatively, Amazon has attempted to monopolize the general retail ecommerce
     market.**

15

16        126.    Amazon, inclusive of its third-party sellers, controls 70% of all online

17   marketplace sales.[200] Previous estimates in 2018 found that it generated nearly 50% of the

18   revenue from all online sales of consumer goods; compared to a meager 21% *combined* revenue

19   share of the next nine biggest online retailers.[201] Amazon has the power to control retail

20

21   _____

     [196] *Id.*

22   [197] *Supra* Press Release (Jul. 29, 2020).

23   [198] The percentage shares in 2019 were approximately the same in 2019. Marianne Wilson,
     *eMarketer: Amazon to capture 47% of all U.S. online sales in 2019* (Feb. 15, 2019),

24   https://chainstoreage.com/technology/emarketer-amazon-to-capture-47-of-all-u-s-online-sales-
     in-2019 (Amazon had 47% and the next nine competitors collectively had 22.4% of the retail

25   ecommerce market.).

26   [199] Amy Gresenhues, *Amazon Owns More Than 90% Market Share Across 5 Different
     Product Categories [Report]*, Marketing Land (May 31, 2018), https://marketingland.com/
     amazon-owns-more-than-90-market-share-across-5-different-product-categories-report-241135.

27   [200] *Supra* Press Release (Jul. 29, 2020).

28   [201] *Supra Amazon Now Has Nearly 50% of US Ecommerce Market.*

FIRST AMENDED CLASS ACTION COMPLAINT - 60
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

ecommerce prices generally in the United States and demonstrates this power by setting a floor price, for products sold anywhere online by its two million third-party sellers.

127.    Amazon has achieved this market power at least in part by enforcing its former PMFN and its current "fair pricing" policy.

128.    Setting a floor price for products sold through competing retail ecommerce channels is anticompetitive and causes consumers to overpay in their online purchases.

129.    Alternatively, if Amazon does not already exercise monopoly power in the U.S. retail ecommerce market, it has a dangerous probability of achieving a monopoly in this market through its internet dominance and its injurious price policies.

**G.    Amazon is the subject of a government investigation for possible antitrust violations, including whether it uses its relationship with its third-party sellers to harm competition.**

130.    Last summer, the Washington Post reported that the FTC planned to investigate Amazon as part of a broad investigation into the large technology companies.[202] This follows an earlier announcement that the FTC had established a special task force to monitor the big tech companies and to investigate "any potential anticompetitive conduct in those markets, and tak[e] enforcement actions when warranted."[203] According to Gene Kimmelman, the president of Public Knowledge, a Washington-based consumer advocacy group: "This should be a wake-up call to both Google and Amazon to behave themselves because it at least shows that the Justice Department and FTC are thinking about them."[204]

131.    Vox reported that the FTC started questioning some of Amazon's competitors last summer about its business practices, according to someone briefed on the discussions.[205]

---

[202] Tony Romm, *Amazon could face heightened antitrust scrutiny under a new agreement between U.S. regulators*, Wash. Post (Jun. 1, 2019) https://www.washingtonpost.com/technology/2019/06/02/amazon-could-face-heightened-antitrust-scrutiny-under-new-agreement-between-us-regulators/.

[203] *Id.*

[204] *Id.*

[205] Jason Del Rey, *Amazon may soon face an antitrust probe. Here are 3 questions the FTC is asking about it.*, Vox (Jun. 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/amazon-ftc-antitrust-investigation-prime.

FIRST AMENDED CLASS ACTION COMPLAINT - 61
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

132.    Bloomberg reported that FTC investigators began interviewing Amazon's third-party sellers last fall as part of a sweeping probe to determine whether Amazon is using its market power to hurt competition.[206] Reportedly, several attorneys and an economist have been conducting interviews that typically last about 90 minutes.[207] According to Michael Kades, who spent 20 years at the FTC, the length of the interviews and the manpower devoted to examining Amazon point to a serious inquiry rather than investigators merely responding to complaints and going through the motions: "Early in an investigation, that's a sign of staff doing a serious job," Kades said. "They're spending lots of time with witnesses and trying to really understand what they're saying."[208] Reportedly, regulators are skeptical that shoppers and suppliers have real alternatives to Amazon.[209]

133.    Jennifer Rie, an analyst at Bloomberg Intelligence who specializes in antitrust litigation, offered the opinion that FTC investigators are "in a background phase," when they are "trying to learn as much as they can about the industry from people who aren't the target of their investigation."[210]

134.    Diana Moss, president of the American Antitrust Institute, a nonprofit that advocates for aggressive antitrust enforcement says that "the central question in an inquiry like this" is whether "merchants are so reliant on Amazon for sales that they are unwilling to offer better prices on other platforms like Walmart and EBay" and whether that can hurt competition.[211]

135.    The Free & Fair Markets Initiative, likewise applauded the FTC's efforts: "It is welcome news to see that regulators are finally getting serious about taking on the unfair

---

[206] *Supra* Soper & Brody.

[207] *Id.*

[208] *Id.*

[209] *Id.*

[210] *Id.*

[211] *Id.*

1  advantage Amazon has staked out on its platform," said Robert B. Engel, a spokesperson for the

2  group, in a statement.[212]

3      136.    To date, the House Judiciary Committee has held six hearings as part of a year-

4  long antitrust investigation into digital markets, touching on issues like data privacy, innovation,

5  the free press and competition. As part of that investigation, the Committee requested documents

6  and information on Amazon's market share and closest competitors in numerous submarkets of

7  the U.S. retail and ecommerce retail markets.[213] Most recently, in late July 2020, Amazon CEO

8  Jeff Bezos testified in person at a hearing entitled "Online Platforms and Market Power, Part 6:

9  Examining the Dominance of Amazon, Apple, Facebook, and Google," where the Committee

10  raised concerns about Amazon's market power and whether it gives an unfair advantage over

11  third-party merchants when it competes with them to sell similar products on its own platform.

12  In a written statement, the presiding Chair expressed concerns that Amazon's dominance in

13  "online marketplace sales" presents a risk that a single action by that company could "affect

14  hundreds of millions of us in profound and lasting ways."[214]

## VI.    INTERSTATE TRADE AND COMMERCE

16      137.    Amazon's activities as alleged in this complaint were within the flow of, and

17  substantially affected, interstate commerce. Amazon sells goods on its own behalf and as a

18  platform for its third-party sellers across, and without regard to, state lines.

## VII.    RELEVANT MARKET

20      138.    Plaintiffs' horizontal price-fixing claim is a *per se* violation and does not require

21  them to prove the relevant market. To the extent the Rule of Reason needs to be applied to these

22  facts, no elaborate industry analysis is necessary. Amazon and its competitors in the U.S.

23  ecommerce retail market have agreed to raise the ecommerce price of retail goods. This price-

25      [212] Ben Fox Rubin, *FTC investigation into Amazon reportedly gearing up*, C/net (Sept. 11, 2019), https://www.cnet.com/news/ftc-investigation-into-amazon-reportedly-gearing-up/.

26      [213] Letter from U.S. House of Representatives Committee on the Judiciary to Jeff Bezos, Amazon CEO (Sept. 13, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/amazon%20rfi%20-%20signed.pdf.

28      [214] *Supra* Press Release (Jul. 29, 2020).



fixing agreement causes direct harm to consumers. There is no countervailing pro-competitive justification. Even without proof of market power, there is no justification for such a naked restraint of trade by agreement among competitors.

139.    In the alternative and for purposes of Plaintiffs' monopoly claims, the antitrust injuries alleged herein, including harm to consumers, who purchase products online that are concurrently offered on the Amazon.com platforms, have occurred in the U.S. retail ecommerce market. Amazon monopolizes or attempts to monopolize this market.

140.    Government agencies, economists, customers and retailers alike recognize the retail ecommerce market as a distinct market within the U.S. retail market. Industry recognition of a distinct ecommerce retail market is relevant because economic actors usually have accurate perceptions of economic realities and the parties active in the market understand its function and demarcation.

141.    For example, the U.S. Census Bureau defines ecommerce as "[t]he sale of goods and services where the buyer places an order, or the price and terms of the sale are negotiated over an Electronic Data Interchange, the Internet, or any other online system (extranet, e-mail, instant messaging)." The market also includes mobile shopping.[215] It has collected data on ecommerce sales since 1998.[216] In 2002, it began compiling E-STATS, statistics "devoted exclusively to 'Measuring the Electronic Economy,'"[217] and it publishes quarterly ecommerce reports.[218] More recently, the Census Bureau released a supplemental data table on retail ecommerce by type of retailer to enhance "understanding of where consumers are shopping online" and "provide an overview of trends in retail and e-commerce sales."[219] Census data are

---

[215] J. Clement, Statista, *E-commerce in the United States - Statistics & Facts*, Mar, 12, 2019, https://www.statista.com/topics/2443/us-ecommerce/.

[216] https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[217] https://www.census.gov/programs-surveys/e-stats.html.

[218] https://www.census.gov/retail/ecommerce/historic_releases.html.

[219] https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

also available for ecommerce sales by type of product.[220] Similarly, the Bureau of Labor Statistics Producer Price Index (PPI) program separately tracks the ecommerce industry group, which includes both electronic shopping and auctions.[221] According to a publication by the U.S. Bureau of Labor Statistics, ecommerce retailers typically maintain lower margins than brick-and-mortar stores because of lower overhead costs associated with preserving store appearance, *e.g.*, décor and store maintenance.[222] Because they do not have the same overhead, the publication finds that online retailers can provide more competitive prices, whereas brick-and-mortar stores, on the other hand, offer consumers immediate gratification and personalized service.[223] On the other hand, data from the U.S. Census Bureau indicated that brick and mortar stores require less advertising and that on average, ecommerce and mail-order retailers spent three times as much as store retailers on advertising and promotions per dollar of sales.[224]

142.     Ecommerce has unique characteristics, including the marketing and distribution of products. Economists recognize that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[225] An online channel has distinct characteristics from a physical channel.[226] Ecommerce has a superior method of transmitting information, effective asynchronous communication, greater flexibility in dealing with information, with far greater interactivity and search capability.[227] "Despite the relative

---

[220] *Id.*

[221] Lana Borgie, *Trends in producer prices between e-commerce and brick-and-mortar retail trade establishments*, Prices & Spending Vol. 3, No. 18, Aug. 2014, https://www.bls.gov/opub/btn/volume-3/pdf/trends-in-producer-prices-between-e-commerce-and-brick-and-mortar-retail-trade-establishments.pdf.

[222] *Id.* at 3.

[223] *Id.* at 2-3.

[224] *Id.* at 3-4 and n.8.

[225] Forsythe, S.M., & Shi, B. (2003). *Consumer patronage and risk perceptions in Internet shopping*. Journal of Business Research 56, 867–875 at 874.

[226] Katawetawaraks, C., & Wang, C. H. (2011). *Online Shopper Behavior: Influences of Online Shopping Decision*. Asian Journal of Business Research, 1(2), 66-74.

[227] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce*, JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 15, No.1 (Winter 2001) at 5, https://www.gsb.stanford.edu/sites/gsb/files/publication-

FIRST AMENDED CLASS ACTION COMPLAINT - 65
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

inefficiency of delivering goods directly to the home," ecommerce leads to unique cost savings because "supplying direct to the consumer is less expensive than doing so through a store."[228] Ecommerce retail businesses avoid the costs "of handling within the store (unpacking, stocking and maintaining shelves, and such), theft (which can easily account for 3 percent of the sales of a retailer), rent (low-cost distribution centers replace expensive urban or suburban real estate), and selling costs (automated and tele-sales replace relatively expensive in-store salespeople)."[229] Consumers similarly benefit from greater "information about available goods and services, and services; an improvement in access to these goods; and the ability to customize goods to fit the tastes of buyers."[230] Economists also recognize that the physical location of the business operating within ecommerce becomes less relevant because the ecommerce market "facilitates production and distribution across borders ... and can assist in opening markets that were previously closed."[231] The lower transaction costs and production costs also facilitate easier entry into the market and increase competition.[232] Demand side preferences also make online retailing unique in terms of certain factors such as convenience and price.[233] Because competing offers are "just a few clicks away on the Internet, online consumers can more easily compare different

---

pdf/Economics%20and%20Electronic%20Commerce.pdf; *see also* David VanHoose, ECOMMERCE ECONOMICS (Routledge 2nd Ed. 2011); http://cw.routledge.com/textbooks/vanhoose/.

[228] *Id.*

[229] *Id.* at 5-6.

[230] *Id.* at 6-7.

[231] Andrew D. Mitchel, *Towards Compatibility: The Future of Electronic Commerce within the Global Trading System*, J Int Economic Law (2001) 4 (4): 683.

[232] *Id.*

[233] Tracey Wallace, The 2018 Omni-Channel Retail Report: Generational Consumer Shopping Behavior Comes Into Focus, https://www.bigcommerce.co.uk/blog/omni-channel-retail/#developing-your-omni-channel-strategy; *see also* Isabel P. Enrique and Sergio Romàn, *The Influence of Consumers' Cognitive and Psychographic Traits on Perceived Deception: A Comparison Between Online and Offline Retailing Contexts*, J Bus Ethics (2014) 119:405–422 (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived deception associated with online vis- à-vis in-store shopping, indicating that they need to be considered as distinct experiences for the customer).



alternatives before buying with lower search cost than offline consumers."[234] Online shoppers can also more easily put off purchases decisions until they are ready to buy because they have not invested in travel time and do not face the pressure from the salespeople that shoppers in brick and mortar stores experience.[235]

143.    Yale economist Fiona Morton notes that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[236] The combination of these attributes "tend to generate concentrated markets, or market structures containing few firms," and, "the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[237]

144.    The Stigler Committee on Digital Platforms, on which Ms. Morton also serves as the chair of the Subcommittee on Market Structure and Antitrust, reports: "Traditional brick-and-mortar stores and online platforms differ greatly in their advertising and personalization capabilities."[238] Online retailers "almost always require account creation for purchasing, verify this information for each transaction, and have direct or easy access to detailed non-shopping information about their customers."[239] This account creates a digital identity, which incorporates select data on age, sex, address, email address, preferences, and, potentially more information.[240] By comparison, physical shops tend not to force shoppers to identify themselves—and indeed consumers who use cash, credit cards with chips or phone payment apps do not identify

---

[234] *Supra* Isabel P. Enrique and Sergio Romàn at 408.

[235] *Id.*

[236] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf.

[237] *Id.*

[238] Stigler Committee on Digital Platforms (Sep. 16, 2019), https://research.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf, at 45.

[239] Stigler Committee on Digital Platforms at 45.

[240] *Id.* at 54.

FIRST AMENDED CLASS ACTION COMPLAINT - 67
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

themselves to the store.[241] In addition to the data the online retailers collect, data intermediaries also collect consumers' information that they then sell. Consumers on the internet leave numerous traces of their activities across a broad range of applications, and the emergence of the Internet of Things means that platforms have access to yet more data generated by home appliances, cars, and other devices, *e.g.*, tracking eye movement, mouse movement, body movement, and body position.[242] Advances in data mining and artificial intelligence enable firms to learn more from data than was conceivable a few decades ago.[243] The digital identities online retailers create help them identify and tag users to the data they generate, permitting the collection and analysis of vast amounts of data on individual behavior. This ability to merge a consumer's purchase history with other detailed information about their customers' lives from other consumer data sources gives online platforms a distinct advantage over in-store retailers to design targeted advertising for particular consumers, based on many aspects of their lives beyond their historical shopping habits.[244] Lina M. Khan adds: "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store – precisely because the type of behavior that online firms can track is far more detailed and nuanced."[245]

145.    Large platform operators like Amazon operate other services (for example, Prime video, Goodreads, Kindle books), that allow them to collect different dimensions of data on a consumer (for example, identity, location, and purchase intent) which give faster intelligence on competitive threats and superior insights into what firms they should block, which they should

---

[241] *Id.* at 45; *How Does the Chip in My Credit Card Work?* Ascent (Nov 20, 2018), https://www.fool.com/the-ascent/credit-cards/articles/how-does-the-chip-in-my-credit-card-work/.

[242] Stigler Committee on Digital Platforms at 48.

[243] *Id.*

[244] *Id.* at 45. *See also id.* at 232 ("It is not evident from Amazon's privacy policies that there are limits on the company's ability to purchase data from a third party like Fitbit, to aggregate that database with Amazon's own data, and then to identify particular kinds of consumers (e.g., long-distance runners) on that basis.").

[245] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 764 (2017).



buy, and how they should grow strategically.[246] The Stigler Committee on Digital Platforms reports: "This gives the platform an advantage over a rival entrant considering the same set of opportunities, and increases their abilities to exclude such rivals."[247]

146.    U.S. retailers recognize the online market as a separate economic entity. Only 28% of small businesses sell online.[248] Established large retailers, *e.g.*, Walmart, Target, and Costco, have an online presence, but focus their efforts overwhelmingly on their physical stores. For example, in 2017, ecommerce accounted for only 5.5% of revenue for Target,[249] 4% for Costco,[250] and 3% for Walmart.[251] Online retailers commonly advertise only online, whereas store retailers advertise both on and offline.[252] Unlike brick and mortar stores, ecommerce retailers do not have a way to take payment by cash or checks.[253] Brick and mortar stores typically provide customer service in-store to respond to questions about product offerings, whereas customer service for ecommerce retail is typically less comprehensive or effective.[254]

147.    U.S. consumers distinguish between ecommerce and brick-and-mortar shopping markets. As a practical matter, the ecommerce market requires access, usually through a personal

---

[246] Stigler Committee on Digital Platforms at 75.

[247] *Id.*

[248] Jia Wertz, *How Brick-And-Mortar Stores Can Compete With E-Commerce Giants*, Forbes, May 17, 2018, https://www.forbes.com/sites/jiawertz/2018/05/17/how-brick-and-mortar-stores-can-compete-with-e-commerce-giants/#4be14a943cc0.

[249] Nat Levy, *Target's digital sales grew 10X faster than in-store sales in 2018, as retailer adjusts to battle Amazon*, Geekwire, Mar. 5, 2019, https://www.geekwire.com/2019/targets-digital-sales-grew-10x-faster-store-sales-2018-retailer-adjusts-battle-amazon/.

[250] *Trefis Team, How Much Of Wal-Mart's Revenue Will Come From E-Commerce In 2020?*, Forbes, Nov. 27, 2017, https://www.forbes.com/sites/greatspeculations/2017/11/27/how-much-of-wal-marts-revenue-will-come-from-e-commerce-in-2020/#454ed14359f2.

[251] Ecommerce accounts for 4% of Costco's sales and is growing 12%, https://www.digitalcommerce360.com/2017/03/06/e-commerce-accounts-4-costcos-sales-growing-12/.

[252] Anna Johansson, *6 Fundamental Differences Between E-Commerce & Brick-and-Mortar Stores*, RetailNext, https://retailnext.net/en/blog/6-fundamental-differences-between-e-commerce-brick-and-mortar-stores/.

[253] *Id.*

[254] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT - 69
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

computer, smart phone or tablet, and most, but not all U.S. consumers have access to this market.[255] According to a Pew Research Center study in 2016, 64% of U.S. consumers prefer shopping in physical stores, and when purchasing something for the first time, 84% of U.S. consumers found it important to be able to ask questions about what they are buying or to buy from sellers they are familiar with, and 78% think it is important to be able to try the product out in person, where physical stores have an advantage over ecommerce.[256]

148.     Ecommerce attracts a younger demographic. A 2017 survey by Statista found that 67% of Millennial shoppers preferred to search and purchase on ecommerce sites rather than in store, while only 28% of seniors do.[257] Online retailers offer a broader selection and a larger inventory than offline retailers do. Consumers can shop online 24/7 and locate hard-to-find items more easily than they could by searching physical stores.[258] Online retail provides greater convenience to consumers who can order products from any location without having to find a brick-and-mortar store selling the specific product with the specific desired attributes and the desired quantity.[259] Shopping in physical stores offers more social interaction and socializing with other shoppers and it is faster and easier to return a defective or unwanted product in-store rather than shipping back to an online retailer.[260] The following graphic summarizes the key differences between markets from the consumers' perspective:[261]

---

[255] Aaron Smith and Monica Anderson, *Online Shopping and E-Commerce, Pew Research Center*, Dec. 19, 2016, https://www.pewresearch.org/internet/2016/12/19/online-shopping-and-e-commerce/.

[256] *Id.*

[257] Clement, J. U.S. online shopping preference 2017, by age group, Aug. 12, 2019, https://www.statista.com/statistics/242512/online-retail-visitors-in-the-us-by-age-group/.

[258] Susan Ward, *Brick and Mortar Stores vs Online Retail Sites*, Jun. 25, 2019, https://www.thebalancesmb.com/compare-brick-and-mortar-stores-vs-online-retail-sites-4571050; https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[259] *Id.*

[260] Ward.

[261] Rose Leadem, *67 Fascinating Facts About Ecommerce vs. Brick and Mortar (Infographic)*, Dec. 30, 2017, https://www.entrepreneur.com/article/306678.

FIRST AMENDED CLASS ACTION COMPLAINT - 70
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

149. Ecommerce stores have a distinctly different look and feel to customers than markets that rely on a different chain of distribution, *e.g.*, in-store purchases, mail-order or purchases made from traveling sales staff. Typically, with a few clicks or a simple voice command, an ecommerce retailer will send the product directly to the consumers without any interaction with sales staff.

FIRST AMENDED CLASS ACTION COMPLAINT - 71
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

150.    For purposes of antitrust injuries alleged herein for which proof of the relevant market is required, Plaintiffs allege that Amazon monopolizes the U.S. retail ecommerce market as a whole. In the alternative, the relevant markets are the U.S. ecommerce retail market for the sales of

(a) home improvement tools,

(b) men's athletic shoes,

(c) skin care,

(d) batteries,

(e) golf,

(f) cleaning supplies, and

(g) kitchen and dining products (collectively the "Identified Sub-markets").

151.    Amazon's restraints on competition directly impact the U.S. retail ecommerce market and each of the Identified Sub-markets as alleged herein.

152.    Plaintiffs seek relief on behalf of themselves and other purchasers of products that are concurrently offered on the Amazon.com platform but were purchased through other retail ecommerce channels. The Amazon.com platform is a two-sided market but not a *two-sided transaction market* for purposes of the claims set forth herein because Defendant can and does charge its third-party sellers fees, *e.g.*, registration, storage, and refund fees, without simultaneously providing a transaction for its retail customers.[262] And Defendant can and does charge its retail customers without simultaneously providing a transaction for its third-party sellers, *e.g.*, Prime membership fees and purchases, when Amazon itself is the seller.[263] Moreover, any justification for retaining retail customers on the Amazon.com platform cannot justify price fixing on competing retail ecommerce channels.

153.    In the alternative, if the Amazon.com platform is considered a two-sided transaction market, eliminating Amazon's anticompetitive pricing policies would not lead to any

---

[262] *Supra* Secs. I(A) and V(A)(1).

[263] *Supra* ¶ 74.



discernible negative indirect network effects under the circumstances described herein. For example, unlike credit-card transaction platforms, allowing third-party sellers to compete on price through competing retail ecommerce channels would not reduce the money available to pay rebates or rewards to consumers because Amazon does not pay rebates or rewards to its retail customers.

154.    Amazon harms consumers by imposing a price floor condition on its two million third-party sellers that results in supracompetitive prices for goods sold on the U.S. retail ecommerce market. Amazon harms competition by significantly restraining the price that its two million retail sellers can offer their products through competing retail ecommerce channels. While harming consumers and competition, Amazon itself benefits from its pricing policies. First, it attracts more customers to the Amazon.com platform. That offers more sales opportunities and more opportunities to acquire more shopping and sales data that it can incorporate into its data-driven business models and reinforce its competitive edge over its rivals. And second, it avoids head-to-head competition with its third-party sellers outside the Amazon.com platform, where they would offer better price competition.

155.    Amazon also does not need the contested price policies to prevent free riding from third-party sellers, from whom Amazon already collects substantial fees. Amazon already severely limits their communications with platform customers and suspends their account if they divert customers away from the Amazon.com platform.[264] Nor are they needed to combat free riding from consumers. Many regular Amazon customers already pay substantial fees for their Prime membership, and Amazon controls 70% of all online marketplace sales.

156.    In fact, Amazon can point to no legitimate considerations that countervail the propriety of the monetary and injunctive relief that Plaintiffs seek.

### VIII.   CLASS ACTION ALLEGATIONS

157.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive

---

[264] *Supra* Hart; Irvin Decl., Ex. A at 6 (¶ 14).

relief pursuant to federal law and pursuant to various state antitrust, unfair competition, unjust

enrichment, and consumer protection laws of the states listed below on behalf of the members of

the following Classes:

> **National Class:** All persons who, on or after March 19, 2016,
> purchased through any other retail ecommerce channel in the
> United States other than the Amazon.com platform one or more
> products concurrently offered for sale by Amazon's third-party
> sellers on the Amazon.com platform.

> **State Classes**: All persons who, on or after March 19, 2016,
> purchased in [state] through any other retail ecommerce channel in
> the United States other than the Amazon.com platform one or more
> products concurrently offered for sale by Amazon's third-party
> sellers on the Amazon.com platform.

158. Excluded from the Classes are the Defendant and its officers, directors,

management, employees, subsidiaries, or affiliates. Also excluded are the district judge or

magistrate judge to whom this case is assigned, as well as those judges' immediate family

members, judicial officers and their personnel, and all governmental entities.

159. The identity of all products encompassed within the National and State Classes'

definition, *i.e.*, Class Products, are readily identifiable from information and records maintained

by Defendant.[265] The identity of the members of the Classes and their records of Class Product

purchases, is readily available through multiple sources that record online purchases, including

Class members' own records of online transactions and payment, the records of the online

retailers, from whom the Class Products were purchased, and Class members' and online

retailers' records of payment through PayPal, credit cards and other financial institutions.

160. **Numerousity:** Members of the Classes are so numerous that joinder is

impracticable. Plaintiffs believe that there are tens of millions of members of the National Class

(if not more), geographically dispersed throughout the United States, such that joinder of all

Class members is impracticable. Plaintiffs believe that there are tens of thousands of members of

each of the State Classes (if not more), such that joinder of all State Class members is likewise

impracticable.

---

[265] *Supra* Sec. I(B).

FIRST AMENDED CLASS ACTION COMPLAINT - 74
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

161.    **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Classes.

162.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Classes both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Classes, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

163.    **Commonality:** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Classes and because Class members share a common injury. Thus, determining damages with respect to the Classes as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Classes are inherent in Defendant's wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed Classes arose from the same anticompetitive conduct alleged herein.

164.    There are common questions of law and fact specific to the Classes that predominate over any questions affecting individual members, including:

(a)    Whether Defendant and its third-party sellers unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing under Amazon's former PMFN that third-party sellers would not sell their products to buyers through competing retail ecommerce channels at a price lower than what they offered at the Amazon.com platform;

(b)    Whether Defendant and its third-party sellers unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing that third-party sellers would be penalized under Amazon's current "fair pricing" policy if they offered their products to buyers through competing retail ecommerce channels at a lower price than what they offered at the Amazon.com platform;

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1   (c)   Whether Defendant has unlawfully monopolized, or attempted to

2   monopolize, the U.S. retail ecommerce market, including by way of the contractual terms,

3   policies, practices, mandates, and restraints described herein;

4   (d)   Alternatively, whether Defendant has unlawfully monopolized the

5   Identified Submarkets within the U.S. retail ecommerce market, *i.e.*, U.S. ecommerce retail sales

6   of home improvement tools, men's athletic shoes, skin care, batteries, golf, cleaning supplies,

7   and kitchen and dining products;

8   (e)   Whether competition in the U.S. retail ecommerce market or any of the

9   Identified Submarkets has been restrained and harmed by Amazon's monopolization, or

10   attempted monopolization, of these markets;

11   (f)   Whether consumers and Class members have been damaged by

12   Defendant's conduct;

13   (g)   The amount of any damages; and

14   (h)   The nature and scope of injunctive relief necessary to restore a

15   competitive market.

16   165.   **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad

17   of individual actions for the conduct complained of were undertaken, there likely would be

18   inconsistent or varying results. This would have the effect of establishing incompatible standards

19   of conduct for the Defendant. Certification of Plaintiffs' proposed Classes would prevent these

20   undesirable outcomes.

21   166.   **Injunctive relief:** By way of its conduct described in this complaint, Defendant

22   has acted on grounds that apply generally to the proposed Classes. Accordingly, final injunctive

23   relief is appropriate respecting the Classes as a whole.

24   167.   **Predominance and superiority:** This proposed class action is appropriate for

25   certification. Class proceedings on these facts and this law are superior to all other available

26   methods for the fair and efficient adjudication of this controversy, given that joinder of all

27   members is impracticable. Even if members of the proposed Classes could sustain individual

28   litigation, that course would not be preferable to a class action because individual litigation

FIRST AMENDED CLASS ACTION COMPLAINT - 76
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IX.   ANTITRUST INJURY

168.   During the Class Period, Plaintiffs and Class members directly purchased Class Products, *i.e.*, they directly purchased—through a retail ecommerce channel other than the Amazon.com platform—products Amazon's third-party sellers concurrently offered for sale on the Amazon.com platform. Because of Defendant's anticompetitive conduct, Plaintiffs and Class members were forced to pay more for Class Products than they would have if Amazon had permitted its third-party sellers to engage in price competition outside the Amazon.com platform. Defendant therefore has caused Plaintiffs and Class members to suffer overcharge damages. Because Defendant continues to enforce its anticompetitive "fair pricing" policy, Plaintiffs and Class members are reasonably likely to incur future overcharges for Class Products. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of federal antitrust laws, including its anticompetitive agreement with its third-party sellers, its monopolization, or its attempted monopolization of the relevant markets, as alleged herein.

169.   Defendant, through its unlawful conduct alleged herein, increased prices offered through competing retail ecommerce channels, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges. Plaintiffs and Class members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices caused by Defendant's anticompetitive activity. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Amazon's anticompetitive



conduct is stopped, Plaintiffs and the Class will incur future overcharges in their direct purchases of Class Products.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1) *PER SE*

170.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

171.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

172.    Plaintiffs and members of the Class are not making any claims against Defendant relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform.

173.    Defendant's third-party sellers are its U.S. ecommerce retail competitors. Amazon is also a manufacturer and sells its own brands of goods that compete with goods its third-party sellers offer, but the agreements at issue in this lawsuit are not intrabrand agreements. Amazon does not supply goods to any of its sellers that they then sell at retail.

174.    Amazon's PMFN clause and fair pricing policy are not to be confused with a vertical restraint between a manufacturer and its distributor to set minimum resale prices. That Defendant and its third-party sellers both sell on the Amazon.com Platform does not alter the fact that both Defendant and its third-party sellers perform similar functions in the sale of comparable goods. Amazon's third-party sellers do not act as distributors or retailers of goods produced by Amazon. Amazon provides a common market platform that facilitates sales, but it does not stand on a different level from its third-party sellers in the distribution of their goods. By conditioning third-party sellers' access to customers on the Amazon.com platform on an agreement not to compete on price outside of the platform, Amazon engages in a purely horizontal restraint on trade with its competitors at the same level of distribution in the market. Stated otherwise, Amazon relies on its platform agreement as the means of entering into a horizontal price-fixing agreement with its third-party sellers. A *per se* analysis applies to restraints of this nature.



175.    As a retail ecommerce seller, Defendant directly offers for sale a broad range of goods on the Amazon.com platform. On information and belief, all products offered by third-party sellers on the Amazon.com platform are reasonably interchangeable with one or more products that Defendant directly sells on the Amazon.com platform, such that there is cross-elasticity of demand between Defendant's products and the products that its third-party sellers offer on the Amazon.com platform. Stated otherwise, all of the products sold by third-party sellers on the Amazon.com platform compete with one or more of Defendant's own products that it also sells on the Amazon.com platform, or, alternatively, as the "Everything Store," Amazon is a current or potential competitor with all of its third-party sellers in the ecommerce retail market.

176.    Class Products (*i.e.*, the same products offered by Defendant's third-party sellers on the Amazon.com platform but purchased through competing retail ecommerce channels) are therefore reasonably interchangeable with products sold directly by Defendant on the Amazon.com platform, such that there is cross-elasticity of demand between Defendant's products and Class Products.

177.    Plaintiffs do not believe it is necessary to prove a relevant market for purposes of their horizontal price-fixing claim. To the extent one is required, the relevant market is the retail ecommerce market.

178.    To the extent required, the relevant geographic market is the entire United States.

179.    In violation of Section 1 of the Sherman Antitrust Act, Defendant entered into a horizontal agreement with its two million third-party sellers on Amazon Marketplace concerning the price they were allowed to sell their products in the United States. Specifically, Defendant and its contractual partners unlawfully agreed under Amazon's former PMFN that third-party sellers will not offer their products to their customers in the U.S. ecommerce market at a price lower than the price they offer them on the Amazon.com platform. Under Amazon's current "fair pricing" provision, Defendant and its contractual partners likewise unlawfully agree that any third-party seller, who offers its products to its customers at a price lower than the price it offers them on Amazon.com platform, will be subject to severe penalties, including rendering the seller's products ineligible for Amazon's Buy Box or suspending or terminating the seller's

FIRST AMENDED CLASS ACTION COMPLAINT - 79
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1   account with Amazon. These unlawful agreements have unreasonably restrained price

2   competition among retailers for online sales of consumer goods and had the effect of establishing

3   a floor price for Class Products. This combination is *per se* unlawful price-fixing.

4        180.    Plaintiffs and the Class members have been injured and will continue to be

5   injured in their businesses and property by paying more for Class Products than they would have

6   paid or would pay in the future in the absence of Defendant's unlawful acts.

7        181.    Plaintiffs and Class members are direct purchasers because they directly purchase

8   Class Products, whose retail price is inflated as a direct result of Amazon's anticompetitive

9   agreements with its two million third-party sellers.

10        182.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing

11   violations alleged in this Complaint.

12   <strong>SECOND CAUSE OF ACTION<br>VIOLATION OF 15 U.S.C. § 1<br>(ALTERNATIVE TO <em>PER SE</em>)</strong>

13

14        183.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though

15   fully set forth herein. This Count is brought in the alternative if the agreement between Amazon

16   and its third-party sellers is determined to be a vertical price restraint and the conduct at issue is

17   not a *per se* violation.

18        184.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each

19   member of the proposed nationwide Class described above.

20        185.    Plaintiffs and members of the Class are not making any claims against Defendant

21   relating in any way to any products or services sold or distributed by Defendant or through the

22   Amazon.com platform.

23        186.    The agreements to fix the price of products sold outside of the Amazon.com

24   Platform have harmed competition in the relevant market and caused prices to be higher in the

25   relevant market than the prices would have been without the agreement between Defendant and

26   its third-party sellers.

27

28



187.    The agreements have an open and obvious adverse effect on competition. By forcing its third-party sellers to raise prices on other platforms, Amazon limits the number of meaningful choices consumers have in the sale of Class Products.

188.    Amazon's PMFN and "fair pricing" have actual detrimental effects, *i.e.*, less competitive pricing and greater price conformity.

189.    An observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

190.    Defendant and its third-party sellers did not act unilaterally or independently, or in their own economic interests, when entering into the agreements. The agreements, and their enforcement substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiffs and the Class thereby.

191.    Defendant is liable for the creation, maintenance, and enforcement of the agreements under a "quick look" or rule of reason standard.

192.    Defendant possesses market power. In 2018, for example, retail sales on the Amazon.com platform represented 49% of all sales in the U.S. retail ecommerce market. Ebay, the next largest competitor, had less than 7%. That Amazon has market power is also evident from the power it has to raise prices above those that would be charged in a competitive market.

193.    Amazon also has unique advantages that allow it to exercise market power. It controls 66% of all online product searches for first time purchases and 74% for goods previously purchased. It has a much larger inventory than any of its competitors. It has a vast digital advantage over its competitors, having amassed detailed consumer preferences and behavior over decades from its 200 million unique monthly customers. And it has a superior infrastructure that provides fast shipping at lower cost.

194.    Amazon's relationship with its third-party sellers is further evidence of its market power. It has the power to dictate and arbitrarily change the rules by which its third-party sellers have access to the Amazon.com platform, *e.g.*, extending the amount of time that business buyers have to pay third-party sellers, deciding what products they can sell and whether they can

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

participate as vendors or third-party sellers, and bends the rules to give itself the advantage in the buybox and in the sponsored advertising. Amazon charges them exorbitant fees that give Amazon a competitive advantage over its third-party sellers and uses their supplier information to contract directly with the supplier and their customer information to decide what areas to focus its retail or product developments.

195.   There is no legitimate, pro-competitive business justification for Amazon's PMFN and fair pricing agreements or any justification that outweighs their harmful effect. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

196.   Plaintiffs and members of the Class were injured in their business or property by paying higher prices for Class Products than they would have paid in the absence of Defendant's unlawful conduct.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION**
**(15 U.S.C. § 2)**

197.   Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

198.   Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

199.   Plaintiffs and members of the Class are not making any claims against Defendant relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform.

200.   The relevant market is the U.S. retail ecommerce market, *i.e.*, the online market for the sale of consumer goods in the United States.

201.   Defendant possesses market power. It currently controls 70% of all online marketplace sales.[266] In 2018, for example, retail sales on the Amazon.com platform represented 49% of all sales revenue in the U.S. retail ecommerce market. That Amazon has market power is also evident from the power it has to raise prices above those that would be charged in a

---

[266] *Supra* Press Release (Jul. 29, 2020).



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

competitive market. Amazon also has unique advantages that allow it to exercise and maintain market power, *e.g*., search, inventory, data, and infrastructure dominance. Amazon's market power is also demonstrated by the exorbitant fees it charges its third-party sellers and the power to adopt and enforce rules on the platform that benefit itself and jeopardize its third-party sellers' businesses.

202.    Alternatively, the relevant markets are the Identified Sub-markets for U.S. retail ecommerce, where Defendant, inclusive of its third-party sellers, holds the lion's share of the market for each of the Identified Sub-markets: home improvement tools (93%), men's athletic shoes (74%), skin care (91%), batteries (97%), golf (92%), cleaning supplies (88%), and kitchen and dining (94%).[267]

203.    Defendant has willfully acquired its monopoly power in the applicable markets by unlawful and improper means, including through its enforcement of its former PMFN and its current "fair pricing" provision. These provisions establish a price floor based on the seller's price listing on the Amazon.com platform. By requiring its two million third-party sellers to apply a price floor on all other retail ecommerce channels, Defendant largely immunizes Class Products from competitive pricing in the relevant market and causes Class Products to be sold at supracompetitive prices.

204.    Plaintiffs and Class members are direct purchasers because they directly purchase Class Products through a U.S. ecommerce retail channel that competes with the Amazon.com platform.

205.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Class Products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

206.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

---

[267] Amy Gresenhues, *Amazon Owns More Than 90% Market Share Across 5 Different Product Categories [Report]*, Marketing Land (May 31, 2018), https://marketingland.com/amazon-owns-more-than-90-market-share-across-5-different-product-categories-report-241135.

HB   HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292  206.623.0594 FAX

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT –**
**ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2)**

207.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

208.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

209.    Plaintiffs and members of the Class are not making any claims against Defendant relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform.

210.    If Defendant does not already have a monopoly in the U.S. retail ecommerce market and/or in the Identified Sub-markets, it has attempted to monopolize these markets.

211.    Through enactment of the pricing policies challenged herein—Amazon's former PMFN and its current "fair pricing" policy—Defendant has demonstrated its intent to control online prices of virtually every consumer good offered in the U.S. retail ecommerce market.

212.    Through its enforcement of its former PMFN and current "fair pricing" policy, Defendant has furthered its goal of controlling prices of virtually every consumer good offered in the applicable markets.

213.    There is a dangerous probability that Defendant will succeed in monopolizing the applicable markets. Defendant, inclusive of its third-party sellers, already accounts for almost 50% of the U.S. retail ecommerce market.

214.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Class Products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

215.    Plaintiffs and Class members are direct purchasers because they directly purchase Class Products that are inflated as a direct result of Amazon's anticompetitive conduct.

216.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

FIRST AMENDED CLASS ACTION COMPLAINT - 84
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS AND**
**CONSUMER PROTECTION STATUTES**

217.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

218.    Defendant engaged in unfair methods of competition, and unfair or unconscionable, acts or practices to restrain trade, monopolize or attempt to monopolize the relevant market.

219.    For each of the states set forth below, a significant volume of intrastate commerce was impacted by Defendant's illegal conduct as alleged above. That is, online purchases of Class Products occurred in each of the states at supracompetitive prices due to Defendant's illegal conduct.

220.    Plaintiffs and members of the State Classes are not making any claims against Defendant relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform.

221.    As a direct and proximate result of Defendant's unfair or unconscionable conduct, Plaintiffs and Class members paid higher prices for Class Products than they would have paid but for Defendant's unlawful conduct.

222.    The gravity of harm from Defendant's wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and Class members could not reasonably have avoided injury from Defendant's wrongful conduct.

223.    There was and is a gross disparity between the price that Plaintiffs and the Class members paid for Class Products and the value they received.

224.    By engaging in such conduct, Defendant violated the following statutes:

     a.    Ala. Code §§ 8-19-1, *et seq.*

     b.    Alaska Stat. §§ 45.50.471, *et seq.*

     c.    Ariz. Code §§ 44-1401, *et seq.*

     d.    Cal. Bus. & Prof Code §§ 16720, *et seq.*

     e.    Conn. Code §§ 42-110a, *et seq.*

     f.    D.C. Code §§ 28-3901, *et seq.*



g.    Fla. Stat. §§ 501.201, *et seq.*

h.    Ga. Code §§ 10-1-370, *et seq.*

i.    Haw. Rev. Stat. §§ 481-1, *et seq.*

j.    Idaho Code §§ 48-601, *et seq.*

k.    815 ILCS §§ 505/1, *et seq.*

l.    Ind. Code §§ 24-5-0.5-1, *et seq.*

m.    Kan. Stat. Ann. §§ 50-101

n.    Ky. Rev. Stat. § 367.120, *et seq.*

o.    La. Rev. Stat. §§ 51:1401, *et seq.*

p.    Me. Rev. Stat. §§ 207, *et seq.;* Me. Rev. Stat. tit. 10, § 1101, *et seq.*

q.    Md. Code Ann., Com. Law § 11-201, *et seq.*,

r.    Mass. Ann. Laws, Ch. 93A, *et seq.*

s.    Minn. Stat. § 325D.49, *et seq.*

t.    Miss. Code §§ 75-24-1, *et seq.*

u.    Mo. Rev. Stat. §§ 407.010, *et seq.*

v.    Mont. Code §§ 30-14-101, *et seq.*

w.    Neb. Rev. Stat. §§ 59-1601, *et seq.*

x.    Nev. Rev. Stat. §§ 598.0903, *et seq.*

y.    N.H. Rev. Stat. Ch. 358-A

z.    N.M. Stat. §§ 57-12-1, *et seq.*

aa.    N.C. Gen. Stat. §§ 75-1, *et seq.*

bb.    15 OK Stat §§ 15-751.1, *et seq.*

cc.    Or. Rev. Stat. Ann§ 646.705, *et seq.*

dd.    R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

ee.    S.C. Code Ann. §§ 39-5-10, *et seq.*

ff.    S.D. Codified Laws § 37-1-1, *et seq.*

gg.    Tenn. Code Ann. §§ 47-25-101, *et seq.*

hh.    Utah Code Ann. §§ 76-10-3101, *et seq.*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

ii. Vt. Tit. 9, §§ 2451, *et seq.*

jj. Rev. Code Wash. §§ 19.86.010, *et seq.*

kk. W. Va. Code §§ 46A-6-101, *et seq.*

ll. Wis. Stat. §§ 133.01, *et seq.*

225. As a direct and proximate result of Defendant's unlawful conduct, Class members in each of these states have been injured in their businesses and property in that they paid more for online purchases of Class Products than they would have paid absent the Defendant's unlawful conduct.

**SIXTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Applies To All States Except Alaska, Delaware, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, New York, And Ohio)**

226. Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

227. Plaintiffs and members of the Class are not making any claims against Defendant relating in any way to any products or services sold or distributed by Defendant or through the Amazon.com platform.

228. To the detriment of Plaintiffs and members of each of the State Classes, Defendant has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct. Defendant has unjustly benefited by reducing price competition and causing consumers to pay higher online prices for Class Products than they would in the absence of Defendant' anticompetitive conduct.

229. Between the parties, it would be unjust for Defendant to retain the benefits attained by its actions. Accordingly, Plaintiffs and members of the Class seek full restitution of Defendant's enrichment, benefits and ill-gotten gains acquired as a result of the wrongful or unlawful conduct alleged herein.

**JURY TRIAL DEMANDED**

230. Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

FIRST AMENDED CLASS ACTION COMPLAINT - 87
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A.      The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      Adjudication that the acts alleged herein constitute monopolization or attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.      Adjudication that the acts alleged herein violate the state laws alleged herein;

E.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

F.      Pre-judgment and post-judgment interest on such monetary relief;

G.      Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendant as a result of the anticompetitive conduct alleged herein;

H.      Equitable relief requiring that Amazon cease the abusive, unlawful, and anti-competitive practices described herein (including pursuant to federal antitrust law: *see, e.g.*, 15 U.S.C. § 26), as requested he therein;

I.      The costs of bringing this suit, including reasonable attorneys' fees; and

J.      All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

FIRST AMENDED CLASS ACTION COMPLAINT - 88
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

DATED this 3rd day of August, 2020        Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By ___*/s/Steve W. Berman*___
      Steve W. Berman (WSBA No. 12536)

 _/s/ Barbara A. Mahoney_
  Barbara A. Mahoney (WSBA No. 31845)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

KELLER ROHRBACK L.L.P.

By___*/s/ Derek W. Loeser*___
      Derek W. Loeser (WSBA No. 24274)

1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Dloeser@kellerrohrback.com

*Attorneys for Plaintiffs and the Proposed Class*



1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on August 3, 2020, a true and correct copy of the foregoing was

3

filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

4

/s/ Steve W. Berman

5

Steve W. Berman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT - 90
Case No. 20-cv-00424-RAJ
010888-11/1331636 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX