# Exhibit A

Filed
D.C. Superior Court
06/01/2021 14:12PM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **DISTRICT OF COLUMBIA**, a municipal corporation, 400 6th Street N.W., 10th Floor Washington, D.C. 20001,<br><br>    Plaintiff,<br><br>  **v.**<br><br>**AMAZON.COM, INC.**, 410 Terry Ave. North, Seattle, WA, 98109,<br><br>    Defendant. | Civil Action No.:<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff District of Columbia (the "District"), by and through the Office of the Attorney General, brings this action against Defendant Amazon.com, Inc. ("Amazon") for violations of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.* In support of its claims, the District states as follows:

## INTRODUCTION

1. Amazon is the world's largest online retailer, with a market share that far surpasses its nearest competitors. Through its Amazon.com platform, Amazon dominates the online retail sales market, controlling between 50-70% of all online retail sales in the U.S., and Amazon holds an even larger market share of multi-seller online retail platforms, such as Walmart.com and eBay.  For most Americans, Amazon is overwhelmingly the first place they turn to buy something online. Given Amazon's dominant market share and massive customer base, over two million independent, third-party sellers (TPSs) rely on Amazon's online retail

1

platform to sell their own products.

2.      Amazon's online retail sales platform benefits from, and is protected by, Amazon's anticompetitive business practices. Far from enabling consumers to obtain the best products at the lowest prices, Amazon instead causes prices across the entire online retail sales market to be artificially inflated, both for products sold on Amazon's online retail sales platform and on its competitors' online retail sales platforms.

3.      For years, Amazon has required that TPSs who want to sell their products on Amazon's online retail sales platform execute its Business Solutions Agreement (BSA). Until at least 2019 in the United States, the BSA included a clause that explicitly prohibited TPSs from offering their products on a competing online retail sales platform, including the TPS's own website, at a lower price or on better terms than the TPS offered the products on Amazon. This prohibition was called the "price parity provision" ("PPP") and is considered a platform most favored nation agreement ("PMFN").

4.      Through this anticompetitive restraint, Amazon suppressed competition from other online retail sales platforms, such as eBay, Walmart, and even the TPSs' *own* websites. This restraint also artificially raised the price of goods to consumers across the online retail sales market, because TPSs were forced to incorporate Amazon's high fees and costs into their product prices not only when selling on Amazon, but also when selling across the entire online retail sales market by virtue of the PPP. Competition and consumers were directly harmed by virtue of higher prices, as well as through the loss of choice, innovation, and competition among online retail sales platforms, as other online retail sales platforms were not able to use lower product prices to lure buyers and sellers to their competing online retail sales platform and capture some of Amazon's dominant market share.

5.      Prior to 2013, Amazon imposed this same PPP on sellers utilizing Amazon's European online retail sales platform(s). In 2013, competition authorities in the United Kingdom and Germany initiated investigations to determine whether Amazon's PPP was anticompetitive and increased consumers' prices online. During these investigations, Amazon withdrew the PPP in Europe, but maintained the PPP in the United States and elsewhere.

6.      In 2019, under intense scrutiny from Congress and U.S. government regulatory officials, Amazon removed the PPP from its BSA in the United States. However, Amazon quickly replaced the PPP with an effectively-identical substitute, its Fair Pricing Policy ("FPP"). TPSs are required in the modified BSA to agree to all Amazon policies, including the FPP, which permits Amazon to impose sanctions on a TPS that offers a product for a lower price or on better terms on a competing online retail sales platform. This includes banishing the TPS from the Amazon platform which, given Amazon's dominance in the online retail sales market, can result in devastating economic consequences. Thus, the effect of both the PPP and the FPP (referred to collectively hereafter at times as the "platform most-favored nation policies" or "PMFNs") is the same: Amazon restrains TPSs from selling their products on any other online retail sales platform—including TPSs' *own* platforms—at prices lower, or on better terms, than they offer their products on Amazon's online retail sales platform. This causes prices to consumers across the online retail sales market to be higher than they would be otherwise.

7.      The anticompetitive impact of Amazon's conduct is compounded by a complex scheme of fees and extra charges—sometimes equaling up to 40% of the total product price— that Amazon imposes on TPSs to sell their products on Amazon's platform. These

unreasonably-high charges—which Amazon can charge TPSs because of its market power—are then passed on to customers not only on Amazon's platform, but also on all other online retail platforms by virtue of Amazon's PMFNs.

8.      Amazon horizontally competes with other online retail sales platforms, like Walmart and eBay, in the online retail marketplace. Amazon also horizontally competes with many of its TPSs because: (1) Amazon and many of its TPSs compete against each other through their respective online retail sales platforms; and (2) Amazon sells its own products in direct competition with many TPSs' products in the online retail sales market. By restraining TPSs' ability to offer lower prices and better terms on their own or other online retail sales platforms—and thereby restraining other online retail sales platforms' ability to compete for those sales by offering TPSs lower fees or better terms on which to offer their products— Amazon has engaged in horizontal agreements in restraint of trade, in violation of D.C. Code § 28-4502, resulting in supra-competitive prices in the online retail sales market.

9.      Amazon also has a vertical relationship with TPSs to the extent that Amazon provides its platform for a fee to TPSs as a vehicle through which to sell their products online. Amazon's PMFNs constitute unreasonable vertical agreements in restraint of trade, in violation of D.C. Code § 28-4502, in that they reduce and eliminate price competition among online retail sales platforms and create an artificially high price floor for products sold on those platforms.

10.     Amazon's PMFNs also allowed it to acquire, and now illegally maintain, monopoly power in the online retail sales market in violation of D.C. Code § 28-4503. Similarly, Amazon's conduct and market share demonstrate an intent to monopolize, and a dangerous probability that Amazon will succeed in monopolizing, the online retail sales market,

an attempt to monopolize in violation of D.C. Code § 28-4503, resulting in supra-competitive prices in the online retail sales market.

11.     The anticompetitive effects of Amazon's conduct go beyond higher prices to consumers. In addition to causing prices in the online retail sales market to be artificially inflated, Amazon's actions have resulted in less choice for consumers and TPSs in the online retail sales market, suppressed innovation, and reduced investment in potentially-competing online retail sales platforms.

12.     The District brings this case seeking to have this Court: enjoin Amazon from engaging in these and similar anticompetitive practices in violation of D.C. Code §§ 28-4502 and 28-4503; provide other appropriate injunctive relief; order restitution and damages for harmed consumers; impose civil penalties to deter future misconduct by Amazon and others; and award attorneys' fees and costs.

## JURISDICTION

13.     This Court has subject matter jurisdiction over this case pursuant to D.C. Code §§ 1-301.81, 11-921, 28-4507, and 29-214.20(a). This Court has personal jurisdiction over Amazon pursuant to D.C. Code §§ 13-422 and 13-423(a).

## THE PARTIES

14.     Plaintiff District of Columbia, a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1). The

Attorney General is specifically authorized to enforce the District's antitrust laws, including D.C. Code §§ 28-4502 and 28-4503.

15.     Defendant Amazon is an online retail sales giant with its principal headquarters in Seattle, Washington. Amazon sells its own products on its online retail sales platform, Amazon.com. It also allows TPSs to sell their products on its online platform through what it calls "Amazon Marketplace." Over two million TPSs in the U.S. alone sell their products on Amazon.com through Amazon Marketplace. Amazon's agreement with TPSs requires them to agree to the pricing policies challenged in this lawsuit. At all times material to this Complaint, Amazon advertised, marketed, promoted, offered for sale, and sold goods in the District.

## RELEVANT FACTS

### A.  AMAZON IS THE DOMINANT PLAYER IN THE U.S. ONLINE RETAIL SALES MARKET.

16.     Amazon is the world's largest online retail platform. Since its early days, founder Jeff Bezos made clear that Amazon intended to ignore short-term profitability and instead grow market share in, and dominate, the markets in which the company operated. Amazon is estimated to have between 50-70% of the market share of the online retail sales market. By contrast, the next two largest retail platforms—Walmart.com and eBay—have only around 5% of the market each. Amazon controls an even larger market share of multi-seller online retail platforms, like Walmart.com and eBay. Amazon is, by far, the most-visited website for online retail shopping, with 2.6 billion visits in a single month. Sixty-six percent of consumers start their search for new products on Amazon, and a staggering 74% go directly to Amazon when they are ready to buy a specific product. Given its ubiquitous presence in the online retail sales market, Amazon's business practices and decisions have an outsized effect on the U.S. economy.

## B. AMAZON DISADVANTAGES TPSs AND CONSUMERS ON ITS ONLINE RETAIL PLATFORM.

17.    Products sold on Amazon's online retail sales platform fall into two categories. First, Amazon operates as an online retail seller of its own private-label products or products sourced wholesale from other vendors or manufacturers. Second, Amazon provides access to its online retail sales platform for a fee to TPSs to sell their own products to consumers. There are over two million sellers in the U.S. who use Amazon's online platform to sell their products. TPSs account for approximately 60% of the value of products sold on Amazon's online retail sales platform. In other words, TPSs sell more on Amazon's platform than Amazon itself.

18.    When a TPS wants to sell its products on Amazon's online retail sales platform, it starts by opening a Seller Central account with Amazon. To do so, TPSs select from one of two selling plans—either a per-sale charge of $0.99 or a flat monthly fee of $39.99.

19.    TPSs can then create product listings or match existing product listings and begin selling their products. Once a sale is made, sellers can either fulfill their own orders or they can select "Fulfillment by Amazon" ("FBA"). When a TPS selects FBA, Amazon charges the TPS to handle inventory, ship the product to the consumer, collect payments, process returns, and credit the seller's account.

20.    When Amazon and multiple TPSs offer the same or similar products, Amazon combines all of the offers onto one product page, with one of the sellers' products being awarded the "Featured Offer" or "Buy Box." This product becomes the offer most visible to the consumer on the product detail page and the product easiest for the consumer to purchase on Amazon's platform. Those sellers not winning the Buy Box are relegated to a less prominent location on the listing page.

21.     Being awarded Amazon's Buy Box is critical for TPSs: 82% of all TPSs' sales on Amazon's platform occur through the Buy Box, and the percentage is even higher for mobile purchases. Most people searching for a product on Amazon's platform will not even see a TPS's product unless it appears in the Buy Box, putting those non-Buy-Box TPSs at a significant competitive disadvantage.

22.     Amazon's selection of a product for the Buy Box occurs through operation of a complex algorithm that considers a variety of factors. Notably, the Buy Box is *not* reserved for the best-priced product. Instead, Amazon's selection methods for the Buy Box winner consider factors that further reinforce Amazon's online retail sales market dominance. For example, the Buy Box selection algorithm favors those sellers who pay Amazon for FBA over those who do not. This is true even though a seller who is not using FBA has the lower price. The Buy Box algorithm also considers whether a seller is "Prime eligible," meaning eligible for free 2-day delivery under the "Amazon Prime" program.

23.     Purchasing Amazon's FBA service is the easiest way to become Prime eligible, which is critical for a TPS to have access to Amazon's huge community of Amazon Prime repeat buyers. Thus, many of the important factors in determining Buy Box eligibility involve elements that benefit *Amazon* rather than ensuring fulsome competition on the merits for the sale of the best product for the best price to the consumer.

24.     A ProPublica investigation into Amazon's Buy Box practices confirms that Amazon cares more about enriching itself than offering its customers competitive prices. The investigation looked at 250 frequently purchased products over several weeks to see which ones were selected for the Buy Box. About three-quarters of the time, Amazon awarded the Buy Box

to its *own* products and those of companies that *pay for its related platform services* even when there were substantially less expensive offers available from others.

25.      Amazon's online retail platform competes with other online retail platforms, including those of Amazon TPSs who sell their products through their own online retail platforms. Similarly, in a recent survey of TPSs, 53% of respondents indicated that Amazon sells its own products in direct competition with those sellers. Thus, not only is Amazon the gatekeeper to its online retail sales platform which has a dominant market share, it is also the most significant horizontal competitor to many of the TPSs who chose to utilize Amazon's platform.

### C.  AMAZON'S BUSINESS SERVICES AGREEMENT SUPPRESSES PRICE COMPETITION.

26.      All TPSs are required to execute Amazon's Business Solutions Agreement ("BSA") in order to offer their products on Amazon. Prior to 2019, the BSA included an express "price parity provision" ("PPP") that required a TPS's "purchase price and every other term of sale be at least as favorable to Amazon Site users as the most favorable terms via Your Sales Channels . . . ." "Your Sales Channels" included the TPS's own website, as well as other non-Amazon online retail sales platforms.

27.      Prior to 2013, Amazon imposed the same or similar PPP on TPSs throughout Europe. In 2013, antitrust officials from the United Kingdom's Office of Fair Trading and Germany's Federal Cartel Office launched investigations into Amazon's PPP. German authorities were especially concerned that the price parity clauses were a horizontal price-fixing agreement between competitors. In August 2013, Amazon informed the European regulators that it would abandon the PPP across the EU. However, the PPP remained in place for years longer in the United States and elsewhere.

28.     In December 2018, U.S. Senator Richard Blumenthal (D-CT) wrote to the U.S. Department of Justice and the Federal Trade Commission expressing concern over the continued application of Amazon's PPP in the U.S.:

> Amazon's price parity provisions may raise prices for consumers both in the short term and in the long run. In the short term, these clauses prohibit third-party merchants who sell on online marketplaces from passing on any savings to consumers. For example, if a competitor to Amazon charges lower commission fees to third-party merchants operating on its site, Amazon's price parity provision will prohibit sellers from reducing their prices to reflect the lower cost of selling through Amazon's competitor. In the long run, these provisions may permit Amazon to steadily raise the transaction fees it charges third-party merchants, secure in the knowledge that sellers will either have to accept the higher fees or charge all its online customers higher prices across all sales channels.

Senator Blumenthal concluded that U.S. regulators could "easily establish that Amazon has the high market share typically necessary to bring successful litigation under Section 2 [of the Sherman Act.]."

29.     Just a few months later, in March 2019, Amazon eliminated the PPP from its BSA in the United States. However, Amazon continued to enforce effectively the same restrictions through its new PMFN, the Fair Pricing Policy ("FPP").

30.     The BSA now requires sellers to agree to be bound to applicable Program Policies, including the FPP, which states, in part:

> Amazon regularly monitors the prices of items on our marketplaces, including shipping costs, and compares them with other prices available to our customers. If we see pricing practices on a marketplace offer that harms customer trust, Amazon can remove the Buy Box, remove the offer, suspend the ship option, or, in serious or repeated cases, suspending [sic] or terminating [sic] selling privileges.
>
> Pricing practices that harm customer trust include, but are not limited to: . . . setting a price on a product or service [on Amazon's platform] that is significantly higher than recent prices offered on or off Amazon.[1]

---

[1] Amazon Seller Central, *Amazon Marketplace Fair Pricing Policy*, https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V.

31.     The FPP mirrors the restraints of its predecessor PMFN. It allows Amazon to penalize a seller for selling products on non-Amazon online retail sales platforms for a better price or on better terms than they are sold on Amazon. Amazon's FPP, like the prior PMFN, diminishes competition among online retail sales platforms by restricting sellers' ability to offer their products on those platforms, including the sellers' own platforms, at lower prices.

32.     Amazon aggressively enforces its PMFNs. Amazon uses software and employees to monitor publicly available information about products offered by TPSs on other online retail platforms. When Amazon discovers that a TPS is offering the same product on another online retail sales platform at a lower price, it sends a pricing alert that warns the seller that its product is no longer eligible for the Buy Box. TPSs regularly report receiving these types of alerts. Given the importance of the Buy Box feature, this punishment can be devastating for TPSs. Amazon punishes TPSs not complying with its PMFNs in additional ways, including freezing TPSs' inventory, placing holds on TPSs' accounts and payments from Amazon sales, and suspending or revoking the TPSs' accounts entirely.

## D. AMAZON'S INFLATED SELLING FEES FURTHER RAISE PRICES FOR CONSUMERS ACROSS THE ONLINE RETAIL SALES MARKET.

33.     Amazon charges is TPSs high fees to sell their products on Amazon's online retail sales platform. Over the past five years, Amazon has added an extra 11% to its cut of TPS sales. It is estimated that, including FBA charges on top of all other fees, sellers on Amazon.com pay a 45% commission. TPSs have no choice but to select FBA and pay these high fees because it is the primary way for a TPS's products to become "Prime Eligible" and, in turn, become eligible for the Buy Box. In other words, participating in Amazon's FBA program—and paying Amazon up to a 45% commission—is necessary to meaningfully access customers on Amazon's platform.

34.     Amazon's basic fee, it's "referral fee," is 15% on most products, while its referral fee on some products, such as clothing, is higher. This referral fee has stayed at approximately the same level since Amazon launched its TPS platform in 2000. Given Amazon's massive growth, and its ability to spread fixed costs across far more transactions, Amazon's referral fees should have declined. They have not, demonstrating that there is no competitive pressure from other online retail sales platforms forcing Amazon to lower its fees.

35.     By contrast, Amazon's competitors in the online retail sales market charge much lower fees and costs for sellers to sell on their platforms. For example, Walmart charges no setup, subscription, or listing fees, only a referral fee on each sale. TPSs who choose to use Walmart's Fulfillment Services program are charged a fixed monthly storage and fulfillment/delivery fees that are significantly less than what Amazon charges. Walmart sellers are not forced into a $39.99 monthly subscription. Another competitor, eBay, generally offers at least 50 free product listings before charging its $0.35 product listing fees, and generally sets its commissions well below Amazon's. Additionally, many TPSs offer sales through their own online websites, incurring no fees at all. Thus, selling on Amazon is substantially more expensive than on its competitor online retail sales platforms, and those high fees are distributed throughout the online retail sales market by virtue of Amazon's PMFNs. Amazon's dominance in the online retail sales market is evident from the fact that it sees little seller attrition from fee increases.

36.     The high fees Amazon charges its TPSs are a substantial source of revenue for Amazon. Between 2014 and 2020, Amazon's revenue from TPS fees and charges grew from $11.75 billion to over $80 billion. Indeed, Amazon's third-party services were recently valued at more than $250 billion – Amazon's retail in-house operations were valued at just $120

billion. Seller fees now account for 21% of Amazon's total corporate revenue. Amazon's profit margins on seller fees are about 20%, four times higher than its margins on its own retail sales.

37.     Amazon's PMFNs force TPSs to incorporate Amazon's inflated fees into their prices on all online retail sales platforms market-wide, including the seller's own online retail sales platform. Absent this restraint, many TPSs would be able to sell their products on their own or other online retail sales platforms for less than they sell them on Amazon's platform, which would make the products available to consumers at lower prices and entice buyers and sellers to utilize competing platforms and incentivize new competing online retail sales platforms.

### E. AMAZON ABUSES ITS MARKET POWER IN THE U.S. ONLINE RETAIL SALES MARKET.

### 1. <u>Amazon's Platform Competes in the U.S. Online Retail Sales Market.</u>

38.     Amazon is the dominant player in the U.S. market for online retail sales. As such, Amazon's platform competes with other online retail platforms like eBay, Walmart.com, and individual TPS websites for revenues from online retail purchases. It is its dominance in the online retail sales market that Amazon seeks to protect through its anticompetitive conduct.

39.     The online retail sales market is separate and distinct from the brick-and-mortar retail sales market ("physical retail sales"). The FTC has recognized that a relevant market may be divided by channel of sale resulting in separate markets for brick-and-mortar sales and online sales. The U.S. House of Representatives' Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary ("House Antitrust Subcommittee") recently conducted an extensive investigation of anticompetitive practices in the tech industry—including Amazon—concluding that the online retail sales market was a distinct market. The U.S. Department of Commerce tracks online retail sales as a separate category,

acknowledging its distinction from physical retail sales.

40.     Consumers do not consider the online retail sales market and the physical retail sales market to be substitutes. Consumers online can shop for a virtually-unlimited range of products, without limitation to what products are available in their individual geographic market. Consumers can shop online with no limitation as to the time of day or day of the week. Online consumers can quickly identify competing offers and more easily compare different alternatives before buying with lower search costs than physical retail consumers. As a result of the enormous amount of data collected by online platforms about a consumer's buying habits, a consumer can receive product suggestions based on a comprehensive analysis of what the consumer is and is not likely to buy. The degree to which an online retailer can tailor and personalize an online shopping experience to a consumer is different in kind from the methods available to physical retailers, precisely because the type of behavioral data that online firms can track is far more detailed and nuanced.

41.     Economists and academics recognize consumers' distinction between online retail and physical retail sales channels and, therefore, the lack of substitutability between the two. For example, one study of consumer perceptions discovered that consumers expect lower pricing from online retail sales platforms, in consideration of the perceived difference in overhead costs between online and physical retailers. Another economic paper applied econometric analysis to sales data and found that consumers shopping online are generally more price sensitive than in the physical retail market. A third study noted that online systems of purchase have a major difference from the traditional way of shipping with respect to terms of distribution and logistics.

42.      Sellers similarly do not consider online retail and physical retail channels to be close substitutes. As do consumers, sellers recognize the superiority of online retail sales because of the unlimited geographic scope and hours of service. Economists recognize that the online retail sales market represents a fundamentally different environment for retailing from traditional retailing. This perception is confirmed by research showing that sellers' cost savings between online retail platforms and physical sales include the reduction of handling costs within a physical store (unpacking, stocking, and maintaining shelves), theft (which can easily account for 3% of the sale of a retailer), rent (low-cost distribution centers replace expensive urban or suburban real estate) and selling costs (automated and tele-sales replace relatively expensive in-store salespeople). The U.S. Bureau of Labor Statistics also notes that online retailers typically maintain lower margins than physical retailers due to lower overhead costs.

43.      Online retailers also differ from physical retailers in the extent to which they have access to vastly more and different information about their potential or existing customers than do physical retailers. For example, whereas physical retailers are generally only able to collect information on actual sales, online retailers track what shoppers are searching for but cannot find, which products they repeatedly return to, what they keep in their shopping cart, and what their mouse hovers over on the screen. Indeed, Amazon believed as far back as 1998 that personalization of the shopping experience would be one of the insurmountable advantages of e-commerce over its brick-and-mortar counterparts. Not only is vastly more information about individual customer sales habits available to an online retailer, but an online retailer is also able to better analyze overall demand for a product or products based on this data.

44.      Business and industry experts similarly recognize that the online retail market and the physical retail market are not close substitutes. Industry reports studying trends in

commerce regularly compare Amazon exclusively to other online retail competitors. A 2019 study of consumer behavior compared activity on Amazon only to that on other online retail sales platforms as competitors. A commonly-cited marketing research company, eMarketer, similarly determines Amazon market share based only on the shares of other online retailers.

45.     The U.S. Census Bureau also noted that physical retailers typically engage in less advertising than online retailers, with the latter spending nearly three times as much on advertising and promotions per dollar of sales. Online retail has additional unique characteristics, including in the marketing and distribution of products. Online retail allows for more efficient information dispersion, unique communication methods, increased flexibility in digesting consumer information, and enhanced consumer interactivity and search capability.

46.     Amazon acknowledges the distinction between online and physical retail sales. For example, when considering how Amazon's marketplace competes for TPSs, Amazon has identified eBay as Amazon's main competitor. Tellingly, Amazon's PMFNs only dictate what TPSs can do on other *online* retail sales platforms, but do not apply to physical retail sales. This is because Amazon's intent with these requirements is not to control all retail, but to protect its monopoly in the distinct market of online retail sales.

### 2. __Amazon's Market Power Is Demonstrated by Its Control Over Pricing.__

47.     Market power exists where a market participant has the power to control prices or exclude competition. Amazon's market power in the online retail sales market is demonstrated by its ability to impose its PMFNs on TPSs, which effectively dictate pricing throughout the market. These agreements create a price floor across all online retail sales platforms, resulting in the "Amazon price" spreading across the entire online retail sales market, despite TPSs' ability and desire to sell their products for less on other online retail sales platforms.

**3.** **Amazon's Market Power Is Demonstrated by Its Dominant and Durable Market Share.**

48.      Amazon has as much as 70% market share in the U.S. online retail sales market, and an even larger market share of multi-seller online retail platforms, like Walmart.com and eBay. Amazon's market share in the U.S. online retail sales market has grown substantially in recent years. In 2016, Amazon's market share in the online retail sales market was estimated to be 38.1%. More recent estimates place Amazon's market share at more than 50%. The House Antitrust Subcommittee estimated that Amazon controls 65% to 70% of all U.S. online retail sales. In contrast, Amazon's nine closest online retail sales platform competitors individually have a distant 1.1% to 6.6% share of the online retail sales market each. For example, Walmart, has just 5.3% market share; eBay has just 4.7%. Other online retail sales competitors of Amazon have referred to it as an 800-pound tech gorilla.

49.      Amazon's dominance in the online retail sales market is overwhelming. One industry group, the Institute for Local Self-Reliance, noted that companies that once drew sufficient consumer traffic from search engines to their own sites are now compelled to become sellers on Amazon's platform, or forego access to a majority of online shopping traffic.

**4.** **Amazon's Market Share Is Protected by Barriers to Entry.**

50.      Amazon's market share and dominance in the online retail sales market is not fleeting; instead, as the House Antitrust Subcommittee concluded, Amazon has significant and durable market power in the U.S. online retail sales market.

51.      Amazon's dominant market share is protected by significant barriers to entry, many of which Amazon itself created. For some of the barriers erected by Amazon, Amazon was willing to invest massive sums of money and incur years of staggering financial losses as a first and dominant mover in the online retail sales space. While it is relatively easy to begin

17

selling products online, meaningful entry into the online retail sales market with the scope and scale required to grow into a viable long-term online retail sales competitor to Amazon is very difficult given the barriers to entry that Amazon has created. Amazon acknowledges that entry by new participants into online commerce requires significant incremental investments in brand development, inventory, and marketing/customer acquisition. Commentators recognize that practical barriers to successful and sustained entry as an online retail sales platform are very high, given the huge first-mover advantages stemming from data collection and network effects that Amazon enjoys.

52.     The most significant barrier to entry into the online retail market is network effects. According to the House Antitrust Subcommittee, digital markets tend to be characterized by strong network effects, making them prone to concentration and monopolization. Because the value of an online retail sales platform to buyers and sellers increases as more of each of them utilize the platform, new entrants into the market find it extremely difficult to gain traction when going up against a large, well-established incumbent with hundreds of millions of buyers and sellers. Buyers are more likely to choose Amazon than a competitor because it has amassed millions of sellers from whose products a buyer can choose. Sellers are more likely to choose Amazon because of its hundreds of millions of customers to whom they can sell. Amazon's dominant market share and PMFNs remove any incentive or ability for a TPS to entice consumers to competing platforms by offering its products for less on those platforms, including their own websites. Thus, any online retail competitor looking to gain market share by competing on price (or terms) is constrained in that endeavor and is thus unable to gain enough of a user base—both buyers and sellers—to increase its platform's value.

53.     Amazon reinforces these network effects in a variety of ways. For example, Amazon's massive customer base is in part the result of its Amazon Prime program, on which Amazon historically has been willing to incur massive financial losses to create barriers against its competition. Amazon Prime is a paid annual membership service available to Amazon's retail customers, which entitles them to certain benefits, including free two-day shipping on Prime products. Prime was first offered in 2005, priced at $79/year. The explicit purpose of pricing Prime so low was to change people's mentality so they wouldn't shop anywhere else online. Over the years, Prime has expanded to include many other benefits, including an e-book lending library, Prime Video (with original programming and access to movies and tv shows), and Prime Music, all of which further bind customers to Amazon (referred to as "consumer viscosity"). Prime enabled Amazon to build a massive customer base, enhancing the network effects that favor Amazon's online retail sales platform. Amazon was willing to incur those substantial losses on Prime in exchange for acquiring substantial market power in the online retail sales market.

54.     It is estimated that there are 126 million Prime members in America – virtually one per each of the 128.5 million households in the U.S. A survey found that an astonishing 96% of all Prime members are more likely to buy products from Amazon's online retail sales platform than any other online retail platform. Amazon Prime creates "switching costs" that deter a buyer or a seller from leaving Amazon's online retail sales platform for a competitive alternative.

55.     Another barrier to entry is the massive quantity of data about its buyers and sellers that Amazon collects on its platform. Amazon collects detailed pricing and revenue data, along with customer reviews, information on what customers viewed but did not purchase, and

how long they viewed items. Amazon uses this data to target products for individual users, enticing customers to spend more on Amazon's platform. Faced with such an insurmountable barrier to entry, market entrants find it difficult to compete. Moreover, Amazon's significant market power in the market for cloud computing further entrenches Amazon's market dominance in the online retail sales market, which relies heavily on large data analysis capabilities.

56.     Another barrier to entry is Amazon's use of its delivery and logistics services to entrench its online retail sales market dominance. Sellers need access to the huge number of regular buyers who are members of Amazon Prime. Sellers generally cannot be successful without access to those buyers. The easiest way to become "Prime eligible" is for sellers to pay Amazon for its FBA logistics and delivery services. Eighty-five percent of the top 10,000 TPSs use FBA, up from 56% in the last four years. Amazon now delivers nearly two-thirds of the products purchased on its platform. It is the fourth-largest package delivery company in the United States. The market power it has in the delivery services market provides Amazon with another barrier against current or potential competitors. Jeff Bezos stated in 2015 that "FBA is so important because it is glue that inextricably links Marketplace and Prime. Thanks to FBA, Marketplace and Prime are no longer two things. Their economics . . . are now happily and deeply intertwined."

**5.  Amazon's Conduct and Policies Reinforce and Maintain Its Dominant Market Share.**

57.     Amazon's PMFNs entrench Amazon as the dominant player in the online retail sales market. While TPSs, absent Amazon's constraint, would be incentivized to avail themselves of alternative online retail sales platforms—like Walmart, eBay, and their own platforms, which have significantly lower or no fees, and in turn provide their products for

lower prices to consumers to increase sales, they are unable to provide this benefit to consumers because they cannot sell for less on those other platforms. For example, Walmart routinely fields requests from merchants to raise prices on Walmart's online retail sales platform because the merchants worry that a lower price on Walmart will jeopardize their status on Amazon. Fear of Amazon may even cause sellers to remove listings from other online market platforms entirely.

58.     Competing online retail sales platform owners have vocally condemned Amazon's anticompetitive practices. For example, one of Amazon's competitors told the House Antitrust Subcommittee that "as Amazon raises the costs to sellers, and requires that Amazon have the lowest prices available, for a seller to be able to make significant sales on [Amazon's] marketplace, these sellers will raise the price on competitor sites to match Amazon's price."[2] Given that online shoppers' most important criteria for purchasing is price, this severely handicaps the ability of any new online retail sales platform to gain market share.

59.     By ensuring that TPSs cannot offer lower prices on other online retail sales platforms, Amazon ensures that those competitors cannot effectively gain market share, which in turn reinforces Amazon's ability to dictate fees and pricing policy to TPSs. The House Antitrust Subcommittee's investigation confirms that Amazon's "history of using MFN clauses" ensures that none of its "TPSs can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[3] Similarly, European investigators noted that when sellers cannot offer lower prices to Amazon's online retail sales platform competitors, "it can be difficult for other internet marketplaces that

---

[2] House Antitrust Subcommittee, *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations,* 296 (Oct. 6, 2020),
https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf
[3] *Id.* at 295.

compete with Amazon, especially new platforms entering the market, to reach a large number

of customers."[4]

**F. AMAZON'S ANTICOMPETITIVE CONDUCT HARMS CONSUMERS, TPSs, AND COMPETITION THROUGH HIGHER PRICES AND LESS CHOICE.**

60.     Amazon's PMFNs cause customers to pay higher prices for a wide variety of

goods purchased online. TPSs operating on Amazon's Marketplace cannot offer lower prices

on competing platforms, even if they can profitably do so. And, in setting prices elsewhere

online, those sellers must incorporate the cost of Amazon's high fees into their sales prices. The

real-world impact of Amazon's PMFNs is higher prices for consumers across the online retail

market.

61.     Amazon's PMFNs work exactly as economists predicted. A recent economic

article by two highly respected economists states:

> The potential competitive dangers from platform MFNs call for antitrust scrutiny.
> . . . The setting we analyze has vendors selling goods or services through online
> platforms. The vendors set the sales price for their customers and pay the platform
> a transaction fee built into the price. The platform in turn requires vendors not to
> sell for less on other sites or platforms. This platform MFN prevents the vendor
> from allowing its product to be offered at a lower price on its own website (if any)
> or on a rival platform. As a result, entrants are excluded, allowing the platform . . .
> imposing the MFN to charge supra-competitive prices.[5]

62.     It is exactly this impact on pricing that caused the British and German regulators

to investigate Amazon for its PMFN in 2013. In their investigations, those European authorities

noted that Amazon's PMFN clause "soften[s] competition between Amazon and other internet

marketplace operators, leading to increased seller fees and generally higher retail prices with

---

[4] European Commission, *Germany and United Kingdom: Antitrust Cases against Amazon formally closed*, https://ec.europa.eu/competition/ecn/brief/05_2013/amaz_deuk.pdf.
[5] Jonathan Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 Yale L. J. 2176 (2018).

insufficient countervailing benefits, to the detriment of consumers."[6] The German Cartel Office went on to say that it found the PMFN to "constitute[] a horizontal trade cooperation between Amazon and third party sellers that has as its object and effect various restrictions of competition." Amazon's current PMFN has the same effect, allowing Amazon to maintain high TPS fees, increasing retail prices, reducing choice for consumers, and stifling innovation in the online retail sales market.

**COUNT I**

**HORIZONTAL AGREEMENT IN RESTRAINT OF TRADE
IN VIOLATION OF D.C. CODE § 28-4502**

63.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

64.     Amazon's online retail sales platform competes against the online retail sales platforms of TPSs who sell their products on both Amazon's online retail sales platform and their own online retail sales platforms. Amazon also manufactures and sells its own brands of goods, or goods that it has obtained from its vendors, that directly compete with goods that many of its TPSs offer on Amazon's online retail sales platform and on competing platforms.

65.     Through Amazon's PMFNs, Amazon and its TPSs unlawfully agreed that TPSs will not offer their products anywhere in the online retail sales market at a price lower than the price they offer them on Amazon's online retail sales platform, setting a price floor below which the product cannot be sold. This conduct causes prices to District residents to be higher than they otherwise would be, excludes the entry and growth of competitor platforms in the online retail market, and decreases innovation and consumer choice in the online retail sales market.

---

[6] European Commission, *Germany and United Kingdom: Antitrust Cases against Amazon formally closed*, https://ec.europa.eu/competition/ecn/brief/05_2013/amaz_deuk.pdf.

66.     As a direct and proximate cause of Amazon's exclusionary scheme, District residents have been injured because they have been denied a competitive marketplace for online retail sales and paid higher prices for products than they would have paid absent Amazon's anticompetitive acts. District consumers are deprived of choosing from a full, competitive range of online retailers who may have offered lower prices.

67.     Amazon's PMFNs are a *per se* violation of D.C. Code § 28-4502.

## COUNT II

### VERTICAL AGREEMENT IN RESTRAINT OF TRADE
### IN VIOLATION OF D.C. CODE § 28-4502

68.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

69.     Amazon sells access to its online retail sales platform and related services to TPSs to enable TPSs to sell their products. As part of this access, Amazon requires TPSs to agree not to sell their products on their own or other online retail sales platforms at prices below or on better terms than the TPSs offer the products on Amazon's online retail sales platform. The PMFNs create an artificially high price floor across the entire online retail sales marketplace that is facially anticompetitive.

70.     There is no procompetitive justification for Amazon's anticompetitive and exclusionary conduct. Even if there were a procompetitive justification, the agreements are broader than necessary to achieve such a purpose.

71.     The anticompetitive effects of Amazon's anticompetitive conduct outweigh pro-competitive effects, if any, that its conduct may have.

72.     As a direct and proximate cause of Amazon's exclusionary scheme, District residents have been injured because they have been denied a competitive marketplace for online

24

retail sales and paid higher prices for products than they would have paid absent Amazon's anticompetitive acts. District consumers are deprived of choosing from a full, competitive range of online retailers who may have offered lower prices.

73.     Amazon's conduct is an unreasonable restraint of trade in a violation of D.C. Code § 28-4502.

## COUNT III

### ILLEGAL MAINTENANCE OF MONOPOLY
### IN VIOLATION OF D.C. CODE § 28-4503

74.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

75.     At all relevant times, Amazon has possessed market power in the online retail sales market in the United States by virtue of its dominant market share. Amazon is estimated to control between 50-70% of the online retail sales market. Amazon controls an even larger market share of multi-seller online retail platforms. Amazon's market power is further demonstrated by its ability to set and control pricing across the entire online retail sales market, and its ability to charge its TPSs high fees for access to its platform and services.

76.     Amazon's market power is protected through barriers to entry, including the network effects created by its massive customer and seller users; its unparalleled collection of buyer and seller data; and its delivery and logistics capabilities.

77.     Amazon has willfully maintained and enhanced its market power through its anticompetitive and exclusionary conduct. Amazon has used its PMFNs to ensure that TPSs will not offer products for a lower price or on better terms on a competing online retail sales platform. Amazon thereby uses its PMFNs to reduce and foreclose competition from other online retail sales platforms.

78.     By forcing TPSs to price their products at artificially-high levels on other platforms, Amazon forecloses its platform competitors' (including TPSs' own sites) ability to compete on price and gain market share, enabling Amazon to maintain its dominance within the online retail sales market.

79.     Amazon's conduct has harmed and continues to harm competition and consumers in the District. As a direct and proximate cause of Amazon's exclusionary scheme, District residents have been injured because they have been denied a competitive marketplace for online retail sales and paid higher prices for products than they would have paid absent Amazon's anticompetitive acts. District consumers are deprived of choosing from a full, competitive range of online retailers who may have offered lower prices.

80.     Amazon's anticompetitive conduct constitutes unlawful monopoly maintenance in violation of D.C. Code § 28-4503

## COUNT IV

## ATTEMPTED MONOPOLIZATION
## IN VIOLATION OF D.C. CODE § 28-4503

81.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

82.     Amazon is estimated to control between 50-70% of the online retail sales market. Amazon controls an even larger market share of multi-seller online retail platforms. Amazon's market share far outpaces its online retail sales platform rivals.

83.     Amazon has engaged in anti-competitive conduct, including through its institution, implementation, and enforcement of its PMFNs. Through those restraints, Amazon has demonstrated its intent to control prices, exclude competitors, and suppress competition and innovation in the online retail sales market.

84.     There is a dangerous probability that Amazon will be successful in achieving its goal of obtaining monopoly power in the online retail sales market (if it has not already done so). In 2016, Amazon had a 38% market share of the online retail sales market. It now has over 50%, and possibly as high as 70%, market share, and an even higher market share of multi-seller online retail platforms.

85.     As a direct and proximate cause of Amazon's exclusionary scheme, District residents have been injured because they have been denied a competitive marketplace for online retail sales and paid higher prices for products than they would have paid absent Amazon's anticompetitive acts. District consumers are deprived of choosing from a full, competitive range of online retailers who may have offered lower prices.

86.     Amazon's anticompetitive conduct constitutes an attempt to achieve a monopoly in violation of D.C. Code § 28-4503.

## PRAYER FOR RELIEF

87.     The District of Columbia respectfully requests that this Court, as authorized by statute and its own equitable powers, enter final judgment against Amazon and:

a.      Adjudge and decree that Amazon's actions constitute unreasonable and unlawful restraints of trade in violation of the District of Columbia Antitrust Act, D.C. Code § 28-4502;

b.      Adjudge and decree that Amazon acted unlawfully to maintain or attempt to achieve a monopoly in the online retail sales market in the United States, in violation of the District of Columbia Antitrust Act, D.C. Code § 28-4503;

c. Enjoin and restrain Amazon, its affiliates, assignees, subsidiaries, successors, and transferees, and its officers, directors, partners, agents and employees, and all other persons acting or claiming to act on Amazon's behalf or in concert with it, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

d. As needed, enter such relief to remove any ability of Amazon to harm competition by disadvantaging any current, potential, or nascent threat to its market power, including but not limited to structural relief as well as effective, monitorable, and measurable conduct remedies that eliminate the ability of Amazon to continue to reap benefits from its pattern of competitive harm;

e. Appoint a corporate monitor to ensure implementation of all structural or practice remedies ordered by the Court, as well as to ensure that Amazon does not engage in further anticompetitive conduct, at Amazon's expense;

f. Award to Plaintiff any other equitable relief as the Court finds appropriate to redress Amazon's violations of the laws specified above and to restore competitive conditions in the markets affected by Amazon's unlawful conduct and deprive Amazon of any advantages from its unlawful acts;

g. Award to Plaintiff the maximum civil penalties as provided by the D.C. Antitrust Act;

h.   Award to Plaintiff actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the D.C. Antitrust Act;

i.   Award pre-judgment and post-judgment interest on such monetary relief;

j.   Award to Plaintiff statutory or equitable disgorgement, or any other equitable relief for the benefit of the District consumers as appropriate under the D.C. Antitrust Act;

k.   Award to the District of Columbia its costs, including reasonable attorneys' fees; and

l.   Order any additional relief that this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

DATED: May 25, 2021

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

  _/s/ Kathleen Konopka_____
Kathleen Konopka [D.C. Bar 495257]
kathleen.konopka@dc.gov
Catherine A. Jackson
catherine.jackson@dc.gov
Jennifer C. Jones
jen.jones@dc.gov
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
Tel: (202) 442-9853


  _/s/ Swathi Bojedla_____
Swathi Bojedla [D.C. Bar 1016411]
sbojedla@hausfeld.com
Paul T. Gallagher [D.C. Bar 439701]
pgallagher@hausfeld.com
Hilary K. Scherrer [D.C. Bar 481465]
hscherrer@hausfeld.com
Leland Shelton
lshelton@hausfeld.com
Theodore F. DiSalvo [D.C. Bar 1655516]
tdisalvo@hausfeld.com
Halli Spraggins [D.C. Bar 1671093]
hspraggins@hausfeld.com
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, D.C. 20006
Tel: (202) 540-7375


*Attorneys for Plaintiff District of Columbia*

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

District of Columbia
_____
Plaintiff

vs.

Case Number _____

Amazon.com, Inc.
_____
Defendant

**SUMMONS**

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Swathi Bojedla
_____
Name of Plaintiff's Attorney

888 16th Street N.W., Suite 300
_____
Address
Washington, DC 20006

(202) 540-7200
_____
Telephone

_Clerk of the Court_

By _____
                             Deputy Clerk

Date _____

如需翻译，请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828를 전화로 연락세요    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

     IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

     If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                              Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

District of Columbia
_____
                                              Demandante
              contra
                                                        Número de Caso: _____
Amazon.com, Inc.
_____
                                              Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Swathi Bojedla                                        *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

888 16th Street N.W., Suite 300                     Por: _____
Dirección                                                      Subsecretario
Washington, DC 20006

(202) 540-7200                                     Fecha _____
Teléfono

如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 통역을 원하시면 (202) 879-4828 로 연락하십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

District of Columbia

Case Number: _____

vs

Date: May 25, 2021

Amazon.com, Inc.

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Swathi Bojedla | Relationship to Lawsuit |
| Firm Name:<br>Hausfeld LLP | ☒ Attorney for Plaintiff |
| Telephone No.:         Six digit Unified Bar No.:<br>(202) 540-7200              1016411 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury        ☐ 6 Person Jury          ☒ 12 Person Jury

Demand: $ Restitution and Civil Penalties          Other: __Injunctive Relief__

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____ Judge: _____ Calendar #:_____

Case No.:_____ Judge: _____ Calendar#:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☐ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent   ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation            ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                   Over $25,000 Pltf. Grants Consent          Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation            ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees               Under $25,000 Pltf. Grants Consent          Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                         Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile                  ☐ 03 Destruction of Private Property   ☐ 05 Trespass
☐ 02 Conversion                  ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process            ☐ 10 Invasion of Privacy             ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 11 Libel and Slander                        Not Malpractice)
☐ 03 Assault and Battery         ☐ 12 Malicious Interference           ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution            ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)  ☐ 14 Malpractice Legal                ☐ 20 Friendly Suit
☐ 06 False Accusation            ☐ 15 Malpractice Medical (Including Wrongful Death)   ☐ 21 Asbestos
☐ 07 False Arrest                ☐ 16 Negligence- (Not Automobile,     ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                               Not Malpractice)              ☐ 23 Tobacco
                                                                       ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☒ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D.  REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

May 25, 2021
_____
Date