The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEBORAH FRAME-WILSON, CHRISTIAN
SABOL, SAMANTHIA RUSSELL, ARTHUR
SCHAREIN, LIONEL KEROS, NATHAN
CHANEY, CHRIS GULLEY, SHERYL
TAYLOR-HOLLY, ANTHONY COURTNEY,
DAVE WESTROPE, STACY DUTILL,
SARAH ARRINGTON, MARY ELLIOT,
HEATHER GEESEY, STEVE MORTILLARO,
CHAUNDA LEWIS, ADRIAN HENNEN,
GLENDA R. HILL, GAIL MURPHY,
PHYLLIS HUSTER, and GERRY
KOCHENDORFER, on behalf of themselves
and all others similarly situated,

Plaintiffs,

v.

AMAZON.COM, INC., a Delaware
corporation,

Defendant.

No. 20-cv-00424-RAJ

SECOND AMENDED CLASS ACTION
COMPLAINT

**DEMAND FOR JURY TRIAL**



**TABLE CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

      A.    Summary of Allegations ...........................................................................1

            1.    Amazon's MFN agreements improperly restrains
                  competition. ...................................................................................4

            2.    Through their MFN agreements, Amazon and its third-
                  party sellers combine to confer Amazon Marketplace's
                  monopoly power. ..........................................................................18

      B.    Identity of Class Products ......................................................................23

      C.    The Economic Impact of Amazon's Anticompetitive Conduct............24

II.   JURISDICTION ................................................................................................27

III.  VENUE ..............................................................................................................27

IV.   PARTIES ...........................................................................................................27

      A.    Plaintiffs .................................................................................................27

            1.    Virginia .........................................................................................27

            2.    California ......................................................................................28

            3.    Alabama ........................................................................................29

            4.    Arizona .........................................................................................30

            5.    Arkansas .......................................................................................31

            6.    Florida ..........................................................................................32

            7.    Illinois ..........................................................................................32

            8.    Iowa..............................................................................................33

            9.    Maine ............................................................................................33

            10.   Nevada ..........................................................................................34

            11.   New Hampshire ............................................................................35

            12.   Pennsylvania ................................................................................35

            13.   Tennessee .....................................................................................36

            14.   Texas ............................................................................................37

            15.   Utah...............................................................................................38

SECOND AMENDED CLASS ACTION COMPLAINT - i
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

16.     Vermont ................................................................38

17.     Washington ...........................................................39

18.     Wisconsin .............................................................40

B.     Defendant ..........................................................................41

V.     STATEMENT OF FACT ..................................................................41

A.     Background ........................................................................41

1.     Amazon competes with its third-party sellers in the sale of retail goods. ..................................................................42

2.     The MFN agreements are *per se* violations because they are agreements between horizontal competitors that restrain competition and raise prices in the online retail market in which Amazon and its third-party sellers compete. ...................46

3.     German competition authorities found that Amazon's Price Parity restricted competition both as a horizontal price fixing agreement with its third-party sellers and by erecting a barrier to competition with Amazon Marketplace from other online retail marketplaces. .....................................49

4.     Amazon charges high seller fees that raise online prices of consumer goods on and off Amazon Marketplace. ................51

5.     Amazon knowingly manipulates online prices through its MFN agreements despite warnings from antitrust regulators about their anticompetitive effect. ......................................57

6.     Amazon and its third-party sellers also directly cause consumers to overpay for goods purchased from non-conspirators at prices inflated by Amazon's MFN agreements. ............................................................59

B.     Amazon's two million third-party sellers agreed under Amazon's former Price Parity not to offer their products to U.S. customers at a lower price through any competing retail e-commerce channels......62

C.     Amazon's two million third-party sellers agree under Amazon's current Fair Pricing provision that selling at a lower price through competing retail e-commerce channels will subject them to costly penalties. ..............................................................................63

D.     Amazon's MFN agreements reduce price competition and cause consumers to pay more. ......................................................63

E.     Through combination or conspiracy with its third-party sellers, Amazon has a monopoly in the relevant markets. ..................67

F.     Alternatively, Amazon has attempted to monopolize the relevant markets through its MFN agreements with its third-party sellers.........................72



G.    Amazon is the subject of a government investigation for possible antitrust violations, including whether it uses its relationship with its third-party sellers to harm competition. .......................................... 73

VI.    INTERSTATE TRADE AND COMMERCE ..................................... 76

VII.    RELEVANT MARKETS ................................................................... 76

1.    U.S. retail ecommerce market and Identified Submarkets are relevant markets to assess Amazon's anticompetitive MFNs. ........................................................................................ 76

2.    The two-sided Online Retail Marketplace Market is another relevant market to assess whether Amazon's MFN agreements have had an anticompetitive impact. ........................ 84

VIII.    CLASS ACTION ALLEGATIONS ................................................... 90

IX.    ANTITRUST INJURY ...................................................................... 94

X.    CAUSES OF ACTION ..................................................................... 95

FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1) *PER SE* ............................................................................. 95

SECOND CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 1 (ALTERNATIVE TO *PER SE*) ........................................................................ 97

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION (15 U.S.C. § 2) ............................................................ 99

FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) .................................... 100

FIFTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2) .................................... 100

SIXTH CAUSE OF ACTION VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16700, ET SEQ. (*PER SE* VIOLATION ON BEHALF OF THE CALIFORNIA CLASS) ..................... 102

JURY TRIAL DEMANDED ............................................................................. 103

PRAYER FOR RELIEF .................................................................................... 103


1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys and experts in the field of antitrust economics.

## I.       INTRODUCTION

### A.      Summary of Allegations

1.      The Court denied Amazon.com, Inc.'s ("Amazon") motion to dismiss Plaintiffs' monopoly claims asserted under Section 2 of the Sherman Act and Plaintiffs' rule-of-reason-price-fixing claim under Section 1 of the Sherman Act. The Court dismissed all other claims with leave to amend. Plaintiffs' amendments made to address the Court's concerns consist of the following:

2.      *First*, Plaintiffs' Second Amended Complaint ("SAC") addresses the deficiencies the Court identified in Plaintiffs' horizontal price-fixing claim. Specifically, the SAC makes clear how Amazon's most favored nations agreements ("MFN agreements" or "MFNs") with its third-party sellers govern the way that Amazon and its third-party sellers "compete with one another in online sales" and how by challenging these agreements Plaintiffs are "challenging Amazon's conduct as a competitor to its third-party sellers." [1] The SAC demonstrates that the MFN agreements are agreements between competitors to increase their prices across online retail sales. As online retailers, Amazon and its third-party sellers compete not only against each other on Amazon's online retail platform, "Amazon Marketplace"—which includes sales made through Amazon's website, app, and voice-controlled devices—but also more broadly against other online offers available to Amazon customers through competing ecommerce channels. By agreeing that the third-party sellers will not undercut Amazon Marketplace prices when selling on other ecommerce channels, even though it would be profitable for third-party sellers to do so, these MFN agreements raise the prices of third-party seller goods *off* Amazon Marketplace and, as a result, also raise Amazon's own retail prices *on* Amazon Marketplace; Amazon, as a first-party seller is spared from having to compete with retail prices that—absent the MFN

---

[1] *Frame-Wilson v. Amazon.com, Inc.*, No. 2:20-cv-00424-RAJ, 2022 U.S. Dist. LEXIS 44109, at *18 (W.D. Wash. Mar. 11, 2022).

SECOND AMENDED CLASS ACTION COMPLAINT - 1
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

agreements—would be lower on other online retail channels. *See* Sec. I.A.1.a and Sec. V.A.1-3. The SAC also makes clear why Amazon's relationship with its third-party sellers is not analogous to hybrid dual-distribution models,[2] under which a manufacturer imposes a price restraint on its third-party distributors, with whom it also competes at the distribution level. Such *intra*brand price restraints can actually further competition by strengthening competition *between* brands. Here, by contrast, there are no manufacturer-condoned price restraints aimed at furthering competition between brands. The SAC alleges that Amazon's agreements fall under the *per se* rule because they hamper competition *between* brands[3] by indiscriminately setting floor prices across multiple brands for millions of products—including brand products that manufacturers have not authorized their distributors to sell on Amazon Marketplace (like Nike and Birkenstock). *See* Sec.V.A.2 and Sec. V.D. The SAC also addresses the Court's concern that the MFN agreements are simply "setting requirements as a condition for platform access" and that third-party sellers would not be allowed to compete against Amazon absent Amazon's approval.[4] The SAC allegations make clear that Amazon Marketplace is not the only online forum that permits third-party sellers to compete against Amazon, indeed 80% of them sell through other ecommerce channels, and further that the source of Plaintiffs' antitrust injury is not Amazon's regulation of third-party sellers' competition on Amazon Marketplace, but rather how the MFN agreements fix prices across the internet at artificially high levels that benefit Amazon in its retail capacity—*i.e.*, as a horizontal competitor.[5] *See* Sec.I.A.1 and Sec.V.A.2.

---

[2] *Id.* at *18.

[3] *Ohio v. American Express Co.*, ___ U.S. ___, ___, 138 S. Ct. 2274, 2290 (2018) (holding that the "promotion of interbrand competition" is "after all, . . . the primary purpose of the antitrust laws") (quotation omitted).

[4] *Frame-Wilson*, 2022 U.S. Dist. LEXIS 44109, at *19 (relying on *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1077 (S.D. Cal. 2012)).

[5] Compare *Sambreel*, 906 F. Supp. 2d at 1077 n.3 ("While this language is broadly written and may imply that Facebook may threaten to prohibit Advertising Partners from advertising on Facebook [if] they also advertise with Sambreel on its applications *outside* of Facebook.com, Sambreel does not allege sufficient facts to support a claim that Facebook actually took any steps to do so. The Court thus finds that to interpret the language of the agreement itself as having the *potential* to violate the antitrust laws, in the absence of allegations that such conduct actually occurred, would be purely advisory and the Court declines to do so here.") (emphasis in original).



3.      *Second*, the Court's order recognized that Plaintiffs who purchased directly from Amazon's alleged co-conspirator sellers had standing, while deferring its ruling on Plaintiffs' umbrella liability claims.[6] To underscore how Plaintiffs' monopoly allegations are tied to their standing as direct purchasers from Amazon's co-conspirators, the SAC adds a claim that Amazon and its third-party sellers combined or conspired through their MFN agreements to monopolize the relevant markets. *See* Sec. X. And to support all Plaintiffs' standing as direct purchasers from co-conspirators, Plaintiffs allege additional purchases and opportunities to purchase from third-party sellers. *See* Sec. IV.A.

4.      *Third*, the Court ruled that Plaintiffs alleged a plausible market based on their online product category submarkets, while deferring ruling on whether the U.S. retail ecommerce as a whole provides a plausible single market in which to evaluate the impact of Amazon's conduct on competition.[7] Consistent with the Court's order, the SAC expands Plaintiffs' market allegations by adding additional online product submarkets in which Amazon's market shares exceed 50%. *See* Sec. V.E and Sec. VII.A. And because the House Judiciary Committee and other antitrust regulators found that Amazon dominates the Online Retail Marketplace Market (defined below), the SAC asserts this as an alternative market. *See* Sec. VII.B.

5.      *Fourth*, the Court agreed with Plaintiffs that California antitrust law allows Plaintiffs to pursue price-fixing agreements, whether horizontal or vertical, as *per se* violations, but the Court dismissed this claim because Plaintiffs had not adequately plead it.[8] The SAC fully pleads this claim. *See* Sec. IV.A and Sec. X.

6.      *Fifth*, throughout the SAC, Plaintiffs streamline their allegations, simplify the nomenclature they used in prior versions of the complaint, address relevant developments, like findings by the House Judiciary Committee on Amazon's anticompetitive conduct that issued after Plaintiffs' last amendment, and more fully address relevant regulatory findings, like the German competition authority's determination that Amazon's Price Parity provision (defined

---

[6] *Frame-Wilson*, 2022 U.S. Dist. LEXIS 44109, at *13.

[7] *Id.* at *26.

[8] *Id.* at *36-38 and n.3.

below), one of the two MFN agreements that Plaintiffs challenge, is a horizontal price-fixing agreement.

**1.   Amazon's MFN agreements improperly restrains competition.**

7.     Under the MFN agreements with Amazon, Amazon's third-party sellers agree not to sell their goods through another online channel at a lower price, thereby ensuring that the price fixed by the MFN serves as the floor price for the third-party sellers' retail business. For example, if a third-party sells a shirt for $30 on Amazon Marketplace (where Amazon takes an average minimum commission of 15%), the seller, by agreement, does not sell the same shirt at a lower price on its own website (where it pays no commission) or eBay (where it pays a lower commission), and if the seller fails to comply with its agreement with Amazon, it risks suspension or termination of its account on Amazon Marketplace. By thus agreeing to manipulate online retail prices, Amazon and its online retail competitors violate Section 1 of the Sherman Act, whether under the *per se* analysis or the rule of reason.

> **a.   Amazon and its third-party sellers' agreements are *per se* violations of Section 1 because they governs the way that horizontal competitors compete in the sale of online goods and set online prices for competing goods.**

8.     Amazon and its third-party sellers are all online retailers and horizontal competitors in the online retail market. Amazon operates its own retail business, selling directly to its online customers on Amazon Marketplace. Amazon operates Amazon Marketplace both as a platform for its own retail sales business and as a "two-sided platform."[9] Amazon designed its platform so that many "sellers, in addition to Amazon, may list the same product for sale from a single product page on" Amazon Marketplace.[10] This arrangement gives sellers access to

---

[9] *See, e.g.,* Marc Rysman, "The Economics of Two-Sided Markets", *Journal of Economic Perspectives*, Vol. 23, No. 3 (Summer 2009), pp. 125-143, p. 125 ("Broadly speaking, a two-sided market is one in which 1) two sets of agents interact through an intermediary or platform, and 2) the decisions of each set of agents affects the outcomes of the other set of agents, typically through an externality… a successful payment card requires both consumer usage and merchant acceptance, where both consumers and merchants value each others' participation.").

[10] Declaration of Ella Irwin, Director of Marketplace Abuse at Amazon (Jul. 13, 2018), *Kangaroo Mfg., Inc. v. Amazon.com*, Case No. 17-cv-1806SPL (D. Ariz.), Dkt. No. 75 (Irwin Decl.), ¶ 3.

millions of buyers and buyers access to millions of sellers.[11] Amazon likens its marketplace to "an online mall where independent merchants display their products to people perusing the website."[12] Consumers may purchase from any seller on Amazon Marketplace, including Amazon, but they make payment directly to Amazon. Amazon takes a commission with each sale and sellers often pay additional fees for other services.

9.      As the largest retail seller on Amazon Marketplace, Amazon sells approximately 12 million unique products, covering a wide range of consumer goods.[13] Amazon's own retail customers overlap with those of its third-party sellers, and often Amazon and its third-party sellers offer the very same product.[14] As an example, Amazon sells Apple watches on Amazon Marketplace, while at the same time an Amazon third-party seller, like Adorama, may also sell the exact same models on Amazon Marketplace as Amazon itself. In other instances, Amazon and its third-party sellers offer similar products that likewise compete for consumers of the same product category.

10.      As a retailer, Amazon has many competitive advantages over the third-party sellers, with whom it competes in the sale of goods on and off Amazon Marketplace. One critical advantage is the absence of seller and advertising fees that it charges them to compete on its platform. These fees add significantly to third-party sellers' cost of doing business on Amazon's platform. Because its third-party sellers must factor in these fees when setting their prices on Amazon Marketplace, this substantially reduces the price competition Amazon's own retail business faces from competing sellers on Amazon Marketplace. So, in the previous example, Adorama can sell the same watch as Amazon for $300, but whereas that sales price nets Amazon

---

[11] Declaration of Nicholas Denissen, Amazon's Vice President of Marketplace Business (Jun. 30, 2017), *Oberdorf v. Amazon.com*, Case No. 16-cv-1127MWB (M.D. Pa.), Dkt. No. 31 (Denissen Decl.), ¶ 5.

[12] *Id.*

[13] *How many products does Amazon carry?* 360pi (May 2016), https://0ca36445185fb449d582-f6ffa6baf5dd4144ff990b4132ba0c4d.ssl.cf1.rackcdn.com/IG_360piAmazon_9.13.16.pdf.; Amazon store directory, https://www.amazon.com/gp/site-directory?ref_=nav_em_T1_0_2_2_36__fullstore.

[14] Irwin Decl., ¶ 5.

SECOND AMENDED CLASS ACTION COMPLAINT - 5
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1   the full $300, Adorama may only receive about $255 after Amazon takes its commission and

2   fees.

3       11.     If Adorama lowered the price of the same model Apple watch on its own website

4   to $255, a discount reflecting the amount of money that it saves by not paying Amazon's

5   commission and fees, it could make more sales at the same return as its sales on Amazon

6   Marketplace. Alternatively, if Adorama did not have its own website or wanted to reach a

7   different consumer group, it could sell its Apple watches on another online marketplace. For

8   example, eBay typically charges lower seller fees than Amazon. Adorama could potentially

9   charge $280 for the same watch it sells on Amazon Marketplace for $300 and still receive $255

10  for each sale after paying eBay's commission and fees.

11      12.     But Amazon and its third-party sellers contractually agree under their MFNs not

12  to engage in this competition. And by foregoing the substantial competition that would otherwise

13  occur when third-party sellers sell their goods through ecommerce channels that lower their cost

14  of doing business, Amazon and its third-party sellers manipulate online prices.

15      13.     The agreements between Amazon and its third-party sellers are formed when the

16  seller registers with Amazon Marketplace and "agrees to the terms of the Amazon Services

17  Business Solutions Agreement (BSA) and the policies incorporated in that agreement."[15] The

18  BSA establishes rules for selling on Amazon Marketplace, and any seller holding an Amazon

19  Seller Account must adhere to them.[16]

20      14.     Before March 2019, the MFN contained in the BSA was an express "Price Parity"

21  provision, governing the price of products the seller offered for sale through its or any of its

22  affiliates' other retail channels other than physical stores.[17] The Price Parity required that sellers:

23          maintain parity between the products you offer through Your Sales
            Channels and the products you list on any Amazon Site by
24          ensuring that … the purchase price and every other term of sale …
            is at least as favorable to Amazon Site users as the most favorable
25

26      [15] Irwin Decl., ¶ 4.

27      [16] *Amazon Pricing Policy*, Feedadvisor, https://feedvisor.com/university/amazon-pricing-policy/.

28      [17] Irwin Decl., Ex. A at 14 and 18 (section S-4 Parity with Your Sales Channel).

terms via Your Sales Channels (excluding consideration of Excluded Offers).[18]

15.     Despite the recognition by multiple regulators of the anticompetitive nature of Amazon's Price Parity, Amazon continued to enforce that clause in the United States for six more years, until March 2019. Then, under threat of an investigation by the Federal Trade Commission (FTC), Amazon finally withdrew its Price Parity in the United States.[19]

16.     But that withdrawal was merely nominal because the BSA continued the MFN agreement under a different provision. The BSA calls its current MFN agreement a "Fair Pricing" Policy. It states that "Amazon regularly monitors the prices of items on our marketplaces," and that if it sees "pricing practices" on Amazon Marketplace "that harm[] customer trust, Amazon can remove the Buy Box [*i.e.*, the coveted one-click-to-buy button], remove the offer, suspend the ship option, or, in serious or repeated cases, suspend[] or terminat[e] selling privileges."[20] One of the pricing practices Amazon identifies as "harmful" to customer trust is "[s]etting a price on a product or service that is significantly higher than recent prices offered *on or off* Amazon."[21] Amazon applies this provision to require that "[a]ny single product or multiple products packages must have a price that is equal to or lower than the price of the same item being sold by the seller on other sites or virtual marketplaces."[22]

17.     Amazon's Fair Pricing provision merely reiterates the requirement of its former Price Parity that Amazon third-party sellers must maintain equal or higher prices on other platforms or lose privileges on Amazon Marketplace. The U.S. House Subcommittee on antitrust confirmed that Amazon uses the Fair Pricing provision anticompetitively "to penalize sellers that

---

[18] *Id.*, Ex. A at 18.

[19] *See, e.g.*, Greg Magana, *Amazon is ending its restrictive pricing practice*, Business Insider (Mar. 13, 2019), https://www.businessinsider.com/amazon-ends-restrictive-pricing-parity-2019-3.

[20] *Amazon Marketplace Fair Pricing Policy*, Amazon Seller Central, https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&ref=efph_G5TUVJKZHUVMN77V_cont_521.

[21] *Id.* (emphasis added).

[22] *Supra Amazon Pricing Policy*, Feedadvisor, https://feedvisor.com/university/amazon-pricing-policy/.



offer products at a lower price on competing sites."[23] Third-party sellers receive "price alerts" with a warning from Amazon that show the product, the price on Amazon and the price found elsewhere on the web without identifying the competing website.[24] The outcome is the same both under the Price Parity and under the Fair Pricing provisions (collectively "MFN agreements"): sellers either raise their prices on other websites or lose selling privileges on Amazon Marketplace.

18.     Amazon's agreements with its third-party sellers are impermissible restraints on price between market participants who perform the same marketplace function. Amazon, the "Everything Store," is a current or potential competitor with all its third-party sellers. In his April 11, 2019 letter to investors, Amazon CEO, Jeff Bezos, emphasized Amazon's competitive relationship with its "independent sellers," who "compete against our first-party [retail] business."[25] He compared the extraordinary growth of Amazon's "first-party business," from "$1.6 billion in 1999 to $117 billion" in 2018, with the even more remarkable growth of "third-party sales," which grew "from $0.1 billion to $160 billion" in 2018.[26] He bluntly concluded: "Third-party sellers are kicking our first party butt. Badly."[27]

19.     By complying with the MFN agreements, third-party sellers are not simply consenting to existing rules on Amazon Marketplace as a condition of access. They are agreeing to the way that Amazon and its third-party sellers compete with each other in online retail sales and third-party sellers set their prices for goods that compete with Amazon in conformity with this agreement.

---

[23] SUBCOMMITTEE ON ANTITRUST, COMMERCIAL, AND ADMINISTRATIVE LAW OF THE COMMITTEE ON THE JUDICIARY, 116TH CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS, MAJORITY STAFF REPORT AND RECOMMENDATIONS (House Report) at 296 (2020), available at https://kl.link/3jGISfK.

[24] Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, Bloomberg (Aug.5, 2019) https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-sellers-that-offer-better-prices-on-walmart.

[25] https://www.sec.gov/Archives/edgar/data/1018724/000119312519103013/d727605dex991.htm.

[26] *Id.*

[27] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

20.     Critically, outside of Amazon Marketplace, most third-party sellers have a separate retail business. Eighty percent of Amazon's third-party sellers also sell their products on other online retail websites that compete with Amazon Marketplace, most commonly on eBay, their own websites, or Walmart.[28]



21.     Amazon's third-party sellers include household names with their own popular online retail stores, like Jockey, Eddie Bauer, Land's End, Hickory Farms, and Weathertech.[29] Yet as a condition for selling on Amazon Marketplace, each of these sellers must price their products on other websites based on the high cost of selling on Amazon Marketplace, rather than setting competitive prices commensurate with lower-cost platforms.

22.     The MFN agreements directly impact competition between Amazon and its third-party sellers, beginning with the "Buy Box," where most sales on Amazon Marketplace take

---

[28] Rani Molla & Jason Del Rey, *A fifth of professional Amazon merchants sell more than $1 million a year — double the share from last year*, Vox (May 23, 2018), https://www.vox.com/2018/5/23/17380088/amazon-sellers-survey-third-party-marketplace-walmart-ebay; Catie Grasso, *The State of the Amazon Marketplace 2019*, Feedadvisor, (May 15, 2019), https://feedvisor.com/resources/amazon-trends/the-state-of-the-amazon-marketplace-2019/.

[29] *Big National Brands As Amazon Sellers*, Lean Edge Marketing (February 10, 2020), https://www.leanedgemarketing.com/blog/big-brands-that-are-amazon-sellers.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

place. In Amazon's own words, all sellers may "compete for the Buy Box, which is awarded to the best performing seller. Amazon may win the Buy Box like any other seller."[30]

23.     When consumers log onto Amazon Marketplace, they conduct a search for a good or a specific product (like "Chapstick" or "lip balm"). Amazon Marketplace applies an algorithm that analyzes the hundreds of millions of product offerings on its site and returns ranked search results responsive to that search. The top ranking offer occupies the Buy Box and is prominently displayed in the search results on the right side of the product detail page. By clicking on the Buy Box (typically identified by the signal "buy now" or "add to cart") on this page, the customer purchases from the seller with the winning offer. To view all other offers, the customer usually must leave the product detail page and scroll through the offer listing pages, which typically provide offers from sellers with higher prices, slower delivery times, or lower approval ratings than the Buy Box winner, as the following images illustrate:[31]



[30] Irwin Decl., ¶ 13.

[31] Eyal Lanxner, *The Amazon Buy Box: How It Works for Sellers, and Why It's So Important*, https://www.bigcommerce.com/blog/win-amazon-buy-box/#what-is-the-amazon-buy-box.

SECOND AMENDED CLASS ACTION COMPLAINT - 10
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2



24.     On mobile devices, the Buy Box has even greater importance. It features the Buy Box directly under the product image without identifying any other sellers or showing app users the option of viewing the offer listing page, as the following image illustrates[32]:

---

[32] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT - 11
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX



25.     Consumers regularly rely on Amazon's selection of the Buy Box winner, where an estimated 90% of all sales occur.[33]

26.     By choosing a default option from among the competing sellers' offers and displaying it prominently, Amazon not only simplifies consumers' choices on Amazon Marketplace, it also makes the Buy-Box-winning offer the determinative price on Amazon Marketplace despite the presence of multiple other prices for the same products or goods. When

---

[33] Leanna Zeibak, *7 Steps to Winning the Amazon Buy Box in 2019*, Tinuitu (Aug. 14, 2018), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

outside retailers compete with Amazon, they therefore look to the Buy Box winner on Amazon Marketplace. Conversely, when competing for the Buy Box, sellers on Amazon Marketplace, including Amazon, compete against lower prices offered outside of Amazon Marketplace, *e.g.*, by applying a dynamic pricing algorithm to ensure that their offerings are competitively priced both against other sellers on Amazon Marketplace and against online competitors outside of Amazon Marketplace.

27. Lower prices on other retail sites or marketplaces puts pressure on Amazon Marketplace sellers, including Amazon itself, to lower their prices or lose sales to other online competitors. Amazon's MFNs alleviate that pressure by restraining its third-party sellers from competing on *any other* website or competing ecommerce channel at a lower price —even when they incur no seller fees and could profitably sell their goods at significantly lower prices. The MFN agreements therefore raise both the third-party sellers' and Amazon's prices.

28. Amazon cannot justify its price restraint as a potentially permissible restraint on intrabrand competition (like a minimum resale agreement between a manufacturer and its distributors). Contractually, Amazon disclaims "any partnership, joint venture, agency, franchise, sales representative, or employment relationship between" it and its third-party sellers.[34] Amazon also does not supply any products to its third-party sellers for resale, nor does Amazon enforce the MFNs at the request of brand manufacturers in furtherance of intrabrand competition. On the contrary, the MFN agreements apply to all goods third-party sellers sell, including brands that compete with each other. These agreements directly restrain online competition between Amazon, for example, in its sale of Hanes, Jockey, and AmazonBasic undershirts, and third-party sellers of Hanes or Jockey undershirts.

---

[34] Irwin Decl., Ex. A at 6 ¶ 13.

SECOND AMENDED CLASS ACTION COMPLAINT - 13
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

29.     These horizontal agreements between competing retailers to restrain online price competition are precisely what Section 1 of the Sherman Act prohibits and are therefore *per se* violations of federal antitrust law.[35]

### b.     Rule of reason

30.     Alternatively, even if the agreements could be construed as vertical price restraints, they are *per se* violations under California's antitrust law. Nor can Amazon justify its conduct under the rule of reason because it has no pro-competitive justification for raising prices on retail platforms that compete with Amazon or its platform.

31.     As noted, Amazon's MFNs injure consumers by driving up the price of consumer goods. This is most evident in the case of goods sold on the third-party sellers' own websites, where they incur no sellers' fees. For example, retailer Molson Hart reports that a $150 item sold on Amazon would make his company the same profit as an item sold for $37 less on his company website:

> We designed, manufactured, imported, stored, shipped the item, and then we did customer service. Amazon hosted some images, swiped a credit card, and got $40 [for a $150 toy].
>
> This is the core problem. Were it not for Amazon, this item would be $40 cheaper. And this is how Amazon's dominance of the industry hurts consumers.[36]

32.     Amazon's MFNs also restrain competition on other marketplace platforms with lower fees. For example, Amazon's third-party sellers incur considerably lower fees when selling on Amazon's nearest competitor, eBay. As the following examples illustrate, all in Amazon charges its third-party seller about 23% to sell a $30 book, while eBay charges 16%, and it

---

[35] *Leegin Creative Leather Products v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) (An agreement between "competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful.").

[36] Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, Medium, https://medium.com/swlh/amazon-needs-a-competitor-and-walmart-aint-it-5997977b77b2 (Hart).



charges its third-party seller 31% to sell a $15 DVD, while eBay charges 21% to sell on its platform:[37]

| Example 1: Books | | |
|---|---|---|
| Sale Price | $30.00 | |
| | 🛍 eBay | a  Amazon |
| Final Value Fee | $3.40 | $4.50 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $1.17 | $0.00 |
| Total Fees | $4.87 | $6.84 |
| Total Profit | $25.13 | $23.16 |
| Profit Margin | 83.77% | 77.20% |

| Example 2: DVDs | | |
|---|---|---|
| Sale Price | $15.00 | |
| | 🛍 eBay | a  Amazon |
| Final Value Fee | $2.12 | $2.25 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $0.75 | $0.00 |
| Total Fees | $3.16 | $4.59 |
| Total Profit | $11.85 | $10.41 |
| Profit Margin | 78.97% | 69.40% |

33.    Walmart operates its own competing online marketplace platform. Many of Amazon's third-party sellers also sell there and incur fewer fees. For example, an account

---

[37] Max Godin, *Selling on Amazon vs eBay – Discover Which is Better and Why*, Crazylister (May 15, 2018), https://crazylister.com/blog/selling-on-amazon-vs-ebay/.

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

manager—a free service on Walmart—costs $1600 per month + 0.3% of total sales on Amazon, capped at $5,000 per month.[38] Amazon added this service (and the additional fee) to address the often-cited complaint from its third-party sellers that Amazon's largely faceless organization makes it impossible for them to navigate glitches and changing rules.[39] About 94% of third-party sellers rely on storage, packaging and delivery by Amazon (Fulfillment by Amazon or FBA), and until 2020, Walmart had no equivalent of this service.[40] One non-service related cost to FBA sellers is a $0.20 per unit cost to provide individual sku stickers—otherwise Amazon will store a seller's products with other sellers' inventory, and "if other sellers have sent in a counterfeit product or used-condition product that they are trying to pawn off as a new-condition product, now the new seller may get itself into trouble with Amazon for selling a problematic product to a customer even if it was technically not their product."[41]   Walmart has no equivalent fee.

34.      Amazon also charges its third-party sellers optional advertising fees to ensure that their products show up when customers search for their products on Amazon Marketplace. "Those fees make it harder" for sellers to lower their "prices on Amazon; instead, sellers are likely to raise their prices elsewhere."[42] Walmart's on-platform advertising service, which just began in 2020, is neither as extensive as Amazon's nor, because of the relatively small number

---

[38] Strategic Account Services-Core, Amazon, https://sell.amazon.com/programs/paid-services.html?ref_=asus_soa_rd&.

[39] Hillary Milnes, *Amazon is chasing growth and shifting resources to third-party sellers*, Digiday (Jan. 31, 2019), https://digiday.com/marketing/amazon-chasing-growth-shifting-resources-third-party-sellers/.

[40] David Hamrick, *Amazon FBA vs FBM Comparison Guide*, Jungle Scout (Mar. 4, 2020), https://www.junglescout.com/blog/amazon-fba-vs-fbm/; Melissa Repko, Walmart steps up competition with Amazon by fulfilling orders for third-party vendors, CNBC (Feb. 25, 2020), https://www.cnbc.com/2020/02/25/walmart-wants-to-make-it-easier-for-third-party-vendors.html.

[41] James Thompson, *Amazon Selling Pitfalls Even the Savviest Sellers Forget* , Big Commerce, https://www.bigcommerce.com/blog/amazon-selling-pitfalls-problems/#fulfillment-by-amazon.

[42] Nick Statt, *Amazon price alerts are leading sellers to raise prices on Walmart or risk losing perks*, The Verge, (Aug. 5, 2019), https://www.theverge.com/2019/8/5/20755342/amazon-marketplace-antitrust-sellers-raise-prices-walmart-competition-ftc.

of sellers and products, as necessary to make sellers' products visible.[43] Amazon's third-party

sellers could therefore profitably lower their prices on Walmart's platform if not restrained by

Amazon. And in fact, Walmart routinely does field requests from third-party sellers to raise

prices on its marketplace because they worry that a lower price on the Walmart platform will

jeopardize their sales on Amazon Marketplace.[44]

35.     Many of the two million retailers, who sell on Amazon Marketplace, do so

reluctantly. "Virtually every manufacturer and retailer of consumer goods in America faces [the]

same predicament," explained Stacy Mitchell, co-director of Institute for Local Self-Reliance, in

recent testimony to the House of Representatives' Judiciary Committee.[45] "In order to reach

more than half of the online market, they have to sell through a platform operated by one of their

most aggressive and formidable competitors," which she describes as "a bitter pill."[46] Amazon's

ownership of the largest retail marketplace platform gives it the necessary leverage to restrain its

third-party sellers from competing anywhere else on price. Almost half of Amazon's third-party

sellers generate 81% to 100% of their revenues from sales on Amazon Marketplace.[47] As its

third-party seller, Molson Hart, succinctly puts it: "[W]e have nowhere else to go and Amazon

knows it."[48]

36.     By contractually enforcing a price policy that requires all its third-party sellers to

raise prices outside Amazon Marketplace to supracompetitive prices, Amazon engages in a

---

[43] Greg Swan, *The Ultimate Walmart Marketplace Guide (Pros, Cons, Secrets and More)* (Jan. 9, 2020), https://tinuiti.com/blog/walmart/why-walmart-is-the-next-blue-ocean-opportunity-for-ecommerce-marketers/.

[44] Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, Bloomberg (Aug. 5, 2019) https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-sellers-that-offer-better-prices-on-walmart.

[45] Testimony of Stacy F. Mitchell, Co-Director Institute for Local Self-Reliance, (Jul. 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-MitchellS-20190716.pdf.

[46] *Id.*

[47] J. Clement, *Percentage of e-commerce revenue from Amazon sales according to Amazon marketplace sellers in 2018*, Statista (May 4, 2019), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

[48] *Supra* Hart.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

price-fixing scheme that broadly and anticompetitively impacts virtually all products offered for sale in the U.S. retail e-commerce market. There has been no greater harm from a price fixing scheme in U.S. antitrust history.

> **2.      Through their MFN agreements, Amazon and its third-party sellers combine to confer Amazon Marketplace's monopoly power.**

37.      Section 2 of the Sherman Act prohibits combinations and conspiracies to monopolize. Through their MFN agreements, Amazon combines or conspires with its third-party sellers to create and maintain Amazon Marketplace's monopoly power. This exercise of monopoly power hurts consumers. Were it not for these anticompetitive MFNs, the e-commerce market price for products sold by Amazon's third-party sellers would be substantially cheaper and the market would provide more competition, consumer choice and innovation in online retail shopping.

38.      Amazon is "the world's largest online retailer."[49] Its market valuation recently rose to $1.5 trillion, "more than that of Walmart, Target, SalesForce, IBM, eBay, and Etsy combined."[50] Amazon Marketplace captures around 90% of all online marketplace sales.[51] By comparison, Amazon's two closest competitors in online marketplaces, Walmart and eBay, account for only 7.1% and 4.3%, respectively, of online retail sales revenue and are only peripheral players in the online retail marketplace market.[52]

39.      The figures below also show Amazon Marketplace's dominant position in the online retail market and how its conduct can affect the whole e-commerce sector.

40.      The U.S. e-commerce market is dominated by Amazon Marketplace, which accounts for over half of all online retail sales.[53]

---

[49] Irwin Decl., ¶ 2.

[50] Press Release (Jul.29, 2020) https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=3199.

[51] *Amazon Marketplace is 25% of US E-commerce*.

[52] Blake Droesch, *Amazon dominates US ecommerce, though its market share varies by category*, eMarketer (Apr. 27, 2021), https://www.emarketer.com/content/amazon-dominates-us-ecommerce-though-its-market-share-varies-by-category.

[53] House Report at 255.





41.      Amazon Marketplace's market share has been increasing, as shown by the growth of its sales.[54]



[54] J. Clement, *U.S. Amazon marketplace sales 2016-2019*, Statista, Jun 12, 2019, https://www.statista.com/statistics/882919/amazon-marketplace-sales-usa/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

42.     Third-party sellers account for the majority of sales on Amazon Marketplace[55]



43.     Amazon Marketplace has obtained monopoly power in the U.S. retail e-commerce market, as demonstrated by its power to set the prevailing prices of the vast majority of consumer goods offered for sale on the internet and that it exercises extraordinary control over millions of its online retail competitors.

44.     Amazon Marketplace dominates online retail sales in numerous product categories. For example, in 2018, tracking the number of online purchases across 100 million devices from 500 different e-commerce retailers and marketplaces, market analyst, Jumpshot, found that Amazon Marketplace had a 97% share of online battery purchases, 94% share of online kitchen and dining product purchases, a 93% share of online home improvement tool purchases, a 92% share of online golf-related product purchases and a 91% share of online skin care product purchases.[56]

[55] Laureen Thomas & Courtney Reagan, *Watch out, retailers. This is just how big Amazon is becoming*, CNBC, www.cnbc.com/2018/07/12/amazon-to-take-almost-50-percent-of-us-e-commerce-market-by-years-end.html.

[56] Amy Gresenhues, *Amazon Owns More Than 90% Market Share Across 5 Different Product Categories [Report]*, Marketing Land (May 31, 2018), https://martech.org/amazon-owns-more-than-90-market-share-across-5-different-product-categories-report/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

45.     In a 2019 report, Jumpshot found that Amazon Marketplace had over 50% market share—the presumptive threshold for monopolies—in 18 categories:[57]



46.     Because Amazon Marketplace accounts for over 50% of online sales in the U.S., it has monopoly power in that market. In the alternative, Amazon has minimally obtained monopoly power in the product category submarkets with U.S. online retail markets, where its market share exceeds 50%.

47.     Amazon, by conspiracy or combination with its third-party sellers, has willfully acquired its monopoly power in the U.S. retail e-commerce market or these identified U.S. online retail Submarkets through anticompetitive conduct, including enforcement of its MFN agreements, thereby causing supracompetitive prices for Class Products in the U.S. retail e-commerce market. Such conduct is an abuse or attempted abuse of monopoly power in violation of Section 2 of the Sherman Act.

---

[57] 2019 Jumpshot report, Losers Brands and Retailers Who Couldn't Make It Happen in 2018 at 21.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

48.     If Amazon does not already have a monopoly in the U.S. retail e-commerce market, there is a dangerous probability that it will achieve one because sales on Amazon Marketplace account for nearly half of all retail e-commerce sales in the United States. Alex Sheppard at the New Republic explained a few years ago: "If Amazon now controls the pricing in the book industry, just imagine what it can do in the broader world of retail."[58]

49.     Amazon's dominance not only increases online prices, it also reduces consumer choices and prevents more innovative online shopping marketplaces from competing in the United States. "The concept of shopping Amazon built - a search bar with infinite selection - doesn't have the excitement and inspiration of some of the more modern e-commerce models, especially those in China."[59] For instance, both Amazon and Alibaba use machine learning to recognize patterns in shopping behavior, but whereas Amazon generally limits its suggestions to items similar to the ones the customer previously bought or things that other customers, searching for the same item, also bought, Alibaba provides a much more extensive and innovative list of suggestions.[60]

50.     But Amazon Marketplace does not need to be innovative to attract customers. By manipulating online prices through their MFN agreements, Amazon and its third-party sellers create barriers to competition with other existing or potential online marketplace operators that cannot rely on price competition to gain a share of the online retail marketplace market.

51.     Plaintiffs on their own behalf and that of similarly situated consumers, seek monetary recovery and injunctive relief for harm caused by Amazon's violations of federal antitrust law and the antitrust law of California—harm that persists and will not abate unless Amazon is stopped. When Plaintiffs originally filed this lawsuit, Amazon's mandatory

---

[58] Alex Sheppard, *How Amazon Is Changing the Whole Concept of Monopoly*, New Republic (Jun. 19, 2017), https://newrepublic.com/article/143376/amazon-changing-whole-concept-monopoly.

[59] *Minimum Viable Amazon*, Marketplace Pulse (Jan. 21, 2021), https://www.marketplacepulse.com/articles/minimum-viable-amazon.

[60] Dashveenjit Kaur, Techwire Asia (Jan. 28, 2021), *China vs. US e-commerce – How they're very different*, https://techwireasia.com/2021/01/china-vs-us-e-commerce-how-theyre-very-different/.

arbitration clause prevented them from asserting injuries arising from their purchases on Amazon Marketplace. Now that Amazon has changed its policy, Plaintiffs are free to assert such claims, *e.g.*, through the class claims asserted in the related *De Coster* action, where a proposed class of consumers who purchase on Amazon Marketplace also assert Sherman Act claims against Amazon arising from its anticompetitive MFN agreements.[61] Claims asserted in the current action, however, solely address overcharge injuries that Amazon's MFN agreements have caused on online retail sites that compete with Amazon Marketplace.

**B.    Identity of Class Products**

52.    Amazon injured Plaintiffs and members of the Class (defined below), when they overpaid for products at prices inflated by Amazon's anticompetitive conduct.

53.    Without discovery, the exact number or a complete list of all products affected by Amazon's MFN agreements is unknown at this time. Based on publicly available information, Plaintiffs estimate that Class Products consist of approximately 340 million consumer products offered by Amazon's third-party sellers.[62]

54.    Class Products encompass all products subject to Amazon's anti-competitive pricing policies. To qualify as a Class Product, the product must be sold through a retail e-commerce channel other than Amazon Marketplace, and the product must be concurrently offered by Amazon's third-party sellers on Amazon Marketplace. For example, CaddiesShack is a third-party seller on Amazon, who sold Bridgestone Tour B330-S Golf Balls (12-pack) in March of 2020 on its own website, Amazon Marketplace, eBay, and Walmart's online marketplace.[63] Other sellers, who offered the same product on eBay, Walmart or any other e-commerce platform, were spared the price competition that CaddiesShack and other Amazon sellers otherwise would have provided. Therefore, to qualify as a Class Product, it is not

---

[61] *De Coster, et al. v. Amazon.com, Inc.*, 2:21-cv-00693-RSM (W.D. Wash.).

[62] 15 Amazon Statistics You Need to Know in 2022, repricerexpress.com, https://www.repricerexpress.com/amazon-statistics/ (last visited Mar. 3, 2022).

[63] *Infra* Section V.D.

SECOND AMENDED CLASS ACTION COMPLAINT - 23
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

necessary that the product sold through a competing retail e-commerce channel be sold by an Amazon third-party seller.

55.     "Amazon regularly monitors the prices of items" its third-party sellers offer on Amazon Marketplace, "including shipping costs, and compares them with other prices available to our customers . . . on or off Amazon" and penalizes violations.[64] As a result of its price monitoring and enforcement of its pricing policies, Amazon is expected to maintain pricing data not only for products offered for sale on Amazon Marketplace, but also Class Products, *i.e.*, the same products sold through competing retail e-commerce channels.

**C.     The Economic Impact of Amazon's Anticompetitive Conduct**

56.     Amazon's price-fixing agreements with its third-party sellers suppressed competition and caused supracompetitive prices. As an example, considering an average industry markup of 38.9% on books, music and video, if it costs the seller $1 to buy a CD from a distributor, it would charge $1.39 on its own website. If the retailer also sells through Amazon and eBay, they would also incur a minimum fee of 15% from Amazon and 12% from eBay.[65] To maintain the same markup, the retailer would list the product on Amazon at $1.63 and $1.58 on eBay. Because Amazon requires its third-party seller to set its lowest price on Amazon Marketplace, it would sell its CD on all platforms for $1.63. Customers who could buy at a cheaper price outside of Amazon Marketplace overpay by 3.5% on eBay and 17.6% on the seller's own website.[66]

57.     The same analysis of the impact of Amazon's price restraint can be applied to each of the principal categories of goods sold on Amazon Marketplace with varying input from Amazon's and eBay's fees and the industry average markup.

---

[64] *Supra* Amazon Marketplace Fair Pricing Policy.

[65] eBay, https://www.ebay.com/help/selling/fees-credits-invoices/fees-business-sellers?id=4122.

[66] For ease of reference, Plaintiffs have rounded the prices to the nearest cent and the percentages to the nearest tenth of a percentage. They base their calculations, however, on numbers that are more exact.

SECOND AMENDED CLASS ACTION COMPLAINT - 24
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292  206.623.0594 FAX

| Category | Fees | | | Own site $1 cost | Amazon $1 cost | eBay $1 cost |
|---|---|---|---|---|---|---|
| | Amazon Fees | eBay Fees | Markup | | | |
| Books/Music/Video | 15% | 12.0% | 38.9% | $1.39 | $1.63 | $1.58 |
| Toys & Hobby | 15% | 9.15% | 78.6% | $1.79 | $2.10 | $1.97 |
| Computer/Consumer Electronics | 8% | 7.65% | 33.3% | $1.33 | $1.45 | $1.44 |
| Office equipment | 12% | 4.00% | 40.8% | $1.41 | $1.60 | $1.47 |
| Furniture & Home Furnishings | 12% | 9.15% | 40.8% | $1.41 | $1.60 | $1.55 |
| Health & Beauty | 12% | 9.2% | 400.0% | $5.00 | $5.65 | $5.50 |
| Food & Beverage | 12% | 9.15% | 29.9% | $1.30 | $1.47 | $1.43 |
| Auto & Parts | 12% | 8.15% | 18.7% | $1.19 | $1.35 | $1.29 |
| Kitchen & Dining | 15% | 9.15% | 80.0% | $1.80 | $2.12 | $1.98 |
| Home Improvement Tools | 15% | 9.15% | 49.3% | $1.49 | $1.76 | $1.64 |
| Men's Athletic Shoes | 17% | 9.2% | 150.0% | $2.50 | $2.99 | $2.75 |
| Skin Care | 15% | 9.15% | 400.0% | $5.00 | $5.88 | $5.50 |
| Batteries | 15% | 9.15% | 33.3% | $1.33 | $1.57 | $1.47 |
| Golf | 15% | 9.15% | 62.6% | $1.63 | $1.91 | $1.79 |
| Cleaning Supplies | 15% | 9.15% | 29.9% | $1.30 | $1.53 | $1.43 |
| Other | 15% | 9.2% | 80.0% | $1.80 | $2.12 | $1.98 |

58.    On average, across all categories, Amazon's restraint has resulted in overcharge of 15.9%, if sold on the third-party sellers' own websites and 5.6%, if sold on another online marketplace platform:

| Category | Amazon v Other Two-Sided Platforms | Amazon v Retailers' Own Websites |
|---|---|---|
| Books / Music / Video | 3.5% | 17.6% |
| Computer / Electronics | 6.9% | 17.6% |
| Health and Beauty | 0.4% | 8.7% |
| Home and Kitchen | 9.1% | 13.6% |
| Clothing and Accessories | 3.2% | 13.6% |
| Home Improvement Tools | 2.7% | 13.0% |
| Sports and Outdoors | 2.7% | 13.0% |
| Toys and Games | 4.4% | 13.6% |
| Food and Beverages | 6.9% | 17.6% |
| Office Products | 6.9% | 17.6% |
| Other | 8.8% | 19.8% |
| Average | 5.6% | 15.9% |

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

This conservative estimate of overcharge does not take into consideration additional unique fees or costs, previously discussed, that third-party sellers typically incur when selling on Amazon Marketplace.

59.     The impact of Amazon's restraint on its third-party sellers and ultimately consumers is not limited to the third-party sellers' sales. Item-by-item price competition has controlled the U.S. retail ecommerce market in recent years across multiple platforms.[67] In a competitive market, other e-commerce sellers would be expected to lower their prices in response to price challenges. For example, Home Depot will match the "price on an identical, in-stock item from any other retailer."[68] Dell, Sam's Club, Joann Fabrics (Joann.com), Hayneedle and YLiving also match prices of online competitors, regardless of size.[69] And as a practical matter, because so many consumers use Google or Amazon to compare prices, most major online retailers are likely to match the lowest online prices, regardless of the seller.[70] The MFN agreements therefore cause consumer overcharges even when they purchase the products from non-conspiring retailers that sell the very same products that are the subject of Amazon and its co-conspiring third-party sellers' agreement.

60.     Amazon's restraint on competition artificially inflated the market price for Class Products in the U.S. ecommerce market and directly injured Plaintiffs and Class members, who overpaid for Class Products.

---

[67] Kim Souza, TB&P, *The Supply Side: Amazon remains low-price leader online against competitors*, (Dec. 8, 2019) https://talkbusiness.net/2019/12/the-supply-side-amazon-remains-low-price-leader-online-against-competitors/; *see also infra* Section V.A.6.

[68] Home Depot, Low Price Guarantee, https://www.homedepot.com/c/PM_New_Lower_Price.

[69] Dell, Get the best deal with Price Match and Price Guarantee, https://www.dell.com/en-us/shop/price-match-guarantee/cp/price-match-guarantee; Sam's Club Price Match Policy, https://www.samsclubcontacts.com/price-match-policy; Joan.com, Frequently Asked Questions, https://www.joann.com/faqs.html#ProductInfo; Hayneedle Best Price Guarantee, https://www.hayneedle.com/help-center/best-price-guarantee; YLiving Pricing & Low-Price Guarantee, https://www.yliving.com/customer-service/pricing.html.

[70] Retail Industry Leaders Association letter to the Federal Trade Commission re: Competition and Consumer Protection in the 21st Century Hearings (Project Number P181201) (Jun. 30, 2019) ("RILA letter") at 3.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

## II.   JURISDICTION

61.     This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

62.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

63.     Plaintiffs are residents of Alabama, Arkansas, Arizona, California, Florida, Georgia, Illinois, Iowa, Maine, Nevada, New Hampshire, North Carolina, Pennsylvania, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin, who purchased consumer goods online. Plaintiffs were harmed and injured financially because of Defendant's conduct, as described further herein.

64.     This Court has personal jurisdiction over Amazon because Amazon has its principal headquarters in Washington, does business in Washington, directly or through agents, and has registered with the Washington Secretary of State such that it has sufficient minimum contacts with Washington.

## III.   VENUE

65.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal place of business is in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## IV.   PARTIES

**A.    Plaintiffs**

**1.     Virginia**

66.     Deborah Frame-Wilson is a resident of Winchester, Virginia. She regularly shops from multiple online retailers, including Fanatics.com (a third-party seller on Amazon Marketplace), Walmart, and QVC. Many of the purchases Ms. Frame-Wilson made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an

Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on September 1, 2019, she purchased from Fanatics.com a Nebraska Cornhuskers Shield Money Clip & Wallet - Black for $26.73 (inclusive of customer discount and shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who offered free shipping. And on February 18, 2020, she purchased a DVD, Auntie Mame, online from Walmart for in-store pick-up for $9.99, a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace even when shipping is included. Additionally, because she regularly shops from an Amazon third-party seller on its own website and on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Frame-Wilson has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

## 2.      California

67.      Christian Sabol is a resident of Redondo Beach, California. He regularly shops online, particularly for ski gear, on websites like Walmart, The House Outdoor Gear, Snow Inn, and Next Adventure. Many of the purchases Mr. Sabol made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products, including at least one product he purchased from one of Amazon's third-party sellers on another platform. For example, on July 15, 2019, he purchased a set of BIC Classic Pocket Lighters, assorted colors, 5 ct. from The Official BIC Store on Walmart for $6.49 with no added shipping charge, a price equal to the price Amazon third-party seller The Official BIC Store concurrently offered that product on Amazon Marketplace, while also providing free shipping. On May 31, 2020, he purchased online from PureFormulas Inc. (also a third-party seller on Amazon Marketplace) on Walmart Nutrition Now PB8 Probiotic 120 Capsules for $15.84 with no added shipping costs, a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who offered free shipping. And on July 30, 2020, he purchased Nutrition Now PB8 Acidophilus for

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

Life Probiotic 120 Capsule from a seller on Walmart for $14.99 with no added shipping costs, a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because he regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Sabol has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 3.   Alabama

68.   Samanthia Russell is a resident of Tuscaloosa, Alabama and recently lived in Georgia. She regularly shops online on websites like Best Buy and Walmart. Many of the purchases Ms. Russell made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on March 13, 2020, she purchased online from Best Buy for in-store pickup a ROKU Premiere 4k Streaming Media Player Black for $29.99, a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who provided free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because she regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Russell has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

69.   Arthur Scharein is a former resident of Decatur, Alabama and current resident of Villages, Florida. He regularly shops online on websites like Fabulous Fur (a third-party seller on Amazon Marketplace), Nespresso, Sur La Table, WMF silverware, Beach Olive Oil, Ancient Olive, Costco, and Pfaltzgraff. Many of the purchases Mr. Scharein made on websites other than

Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on April 1, 2020, he purchased online 40 Nespresso Capsules OriginalLine, Fortissio Lungo Dark Roast Coffee from Nespresso, at $0.70 per capsule with free shipping, a price equal to the lowest per unit price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who also offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because he regularly shops from an Amazon third-party seller on its own website and Amazon sellers agree to MFNs, he is likely to be injured in the future. Mr. Scharein has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 4.    Arizona

70.    Lionel Keros is a resident of Queen Creek, Arizona. He regularly shops online on websites like HOCAFF, Le Panier Francais, and Adorama (all third-party sellers on Amazon Marketplace), as well as Newegg, Ebay, Home Depot, and Walmart. Many of the purchases Mr. Keros made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. These purchases include products he purchased from Amazon's third-party sellers on other platforms. For example, on November 18, 2019, he bought Bemka Salmon Roe, 2oz from HOCAFF on its own website for $11.00, a price higher and having a higher shipping fee than the price Amazon third-party seller HOCAFF concurrently offered that product on Amazon Marketplace. On March 20, 2020, he bought an LG 32GK650G-B 32'' monitor from Adorama on the NewEgg website for $499.32 (inclusive of tax and shipping), a price equal to the price Amazon third-party seller Adorama concurrently offered that product on Amazon Marketplace (inclusive of tax and shipping). On March 31, 2020, he purchased Box Car Willie Tomato Seeds from genesisseed on eBay for $3.99 with free shipping, a price higher than the price Amazon third-party seller genesisseed concurrently offered that product on Amazon Marketplace, who also provided free shipping. Amazon's anticompetitive price policies

prevented the price competition that would have resulted in a lower market price for these products. Additionally, because he regularly shops from Amazon third-party sellers on their own websites and on eBay, Newegg, and Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Keros has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 5. Arkansas

71.     Nathan Chaney is a resident of Little Rock, Arkansas. He regularly shops online on websites like Fanatics and Zappos (both third-party sellers on Amazon Marketplace), as well as legoshop.com and Bass Pro Shops. Many of the purchases Mr. Chaney made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on May 21, 2019, he purchased online from REI Thule WingBar Evo Load Bars – Pair for $175.89 (with no shipping fee) and Thule Rapid Traverse Foot Pack - Set of 4 for $175.89 (with no shipping fee), prices higher than the lowest prices concurrently offered by Amazon third-party sellers on Amazon Marketplace, who also provided free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because he regularly shops from Amazon third-party sellers on their own websites and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Chaney has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

72.     Chris Gulley is a resident of Prescott, Arkansas. He regularly shops online on websites like eBay, QVC, and Walmart. Many of the purchases Mr. Gulley made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on January 1, 2019, he purchased a 32-Inch Alpha Series 720p LED HDTV from QVC for $161.12

(inclusive of tax and shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace (inclusive of tax and shipping). Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because he regularly shops on eBay and Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Gulley has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 6.    Florida

73.    Sheryl Taylor-Holly is a resident of Ocklawaha, Florida. She regularly shops online on websites like eBay and Walmart. Many of the purchases Ms. Taylor-Holly made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on October 4, 2018, she purchased a Swingline Electric Stapler, Optima Grip, 20 Sheet Capacity online from Walmart for $28.11 with free shipping, a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who also provided free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Additionally, because she regularly shops on eBay and Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Taylor-Holly has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 7.    Illinois

74.    Anthony Courtney is a resident of Chicago, Illinois. He regularly shops online on websites like Chewy.com, Walmart, Target, Fingerhut, and Groupon. Many of the purchases Mr. Courtney made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*,

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1   Class Products. For example, on May 17, 2018, he purchased a Targus Legend IQ Backpack for

2   16'' Laptop for $59.99 with free shipping from Fingerhut, a price higher than the lowest price

3   concurrently offered by an Amazon third-party seller on Amazon Marketplace, who also offered

4   free shipping. Amazon's anticompetitive price policies prevented the price competition that

5   would have resulted in a lower market price for these products. Additionally, because he

6   regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because

7   these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Courtney has

8   been injured and will continue to be injured by paying more for Class Products than he would

9   have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth

10  herein.

11          **8.      Iowa**

12          75.     Dave Westrope is a resident of Ankeny, Iowa. He regularly shops online on

13  websites like eBay. Many of the purchases Mr. Westrope made on websites other than Amazon

14  Marketplace are products that were also concurrently available for sale by an Amazon third-party

15  seller on Amazon Marketplace, *i.e.*, Class Products. For example, on November 25, 2018, he

16  purchased Motorcraft SP-493 spark plugs (set of 6) on eBay for $25.50, a price higher than the

17  lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace even

18  with shipping included. Amazon's anticompetitive price policies prevented the price competition

19  that would have resulted in a lower market price for this product. Additionally, because he

20  regularly shops on eBay, where Amazon third-party sellers are also likely to sell, and because

21  these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Westrope has

22  been injured and will continue to be injured by paying more for Class Products than he would

23  have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth

24  herein.

25          **9.      Maine**

26          76.     Stacy Dutill is a resident of Waterville, Maine. She regularly shops online on

27  websites like eBay and Walmart. Many of the purchases Ms. Dutill made on websites other than

28  Amazon Marketplace are products that were also concurrently available for sale by an Amazon

third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on April 6, 2019, she purchased Manna Pro 5 lb. Sho-Glo Supplement for Horses from Hayneedle on the Walmart website for $24.26 with free shipping, a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, which also offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because she regularly shops on eBay and Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Dutill has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**10. Nevada**

77.     Sarah Arrington is a resident of Las Vegas, Nevada. She regularly shops online on websites like Ulla Popken (a third-party seller on Amazon Marketplace), as well as Walmart, Vitacost, Chewy, Right Stuff, Holabird Sports, Pokemon Center, and Lane Bryant. Many of the purchases Ms. Arrington made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, in August 6, 2019, she purchased Trinity Seven Manga Volume 15.5 for $9.74 plus shipping from RightStuffAnime, a price equal to the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace inclusive of shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Additionally, because she regularly shops from an Amazon third-party seller on its own website and on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Arrington has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

SECOND AMENDED CLASS ACTION COMPLAINT - 34
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

### 11.   New Hampshire

78.     Mary Elliot is a resident of Fremont, New Hampshire. She regularly shops online on websites like Puritan's Pride (a third-party seller on Amazon Marketplace), as well as Chewy, CVS, JC Penney, Kohl's, Macy's, Old Navy, Walgreen's and Woot. Many of the purchases Ms. Elliot made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on December 11, 2019, she purchased CeraVe Daily Moisturizing Lotion for normal to dry skin 12 ounce online from CVS for $13.35 (with no added shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who offered free shipping. And on April 8, 2020, she bought online from Kohl's Burt's Bees Rosemary & Lemon Hand Cream 1 ounce for $5.39 (with no added shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who offered free shipping. Both Amazon sellers offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Additionally, because she regularly shops from an Amazon third-party seller on its own website and on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Elliot has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 12.   Pennsylvania

79.     Heather Geesey is a resident of Dover, Pennsylvania. She regularly shops online on websites like BuyWow, and Squid Socks, (both third-party sellers on Amazon Marketplace), as well as Allivet, Home Depot, DHC, and Petflow. Many of the purchases Ms. Geesey made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. These purchases include products she purchased from Amazon's third-party sellers on other platforms. For example, on March 27, 2019, she purchased from Wow Apple Cider Vinegar Shampoo +

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292  206.623.0594 FAX

One Wow Hair Conditioner from BuyWow on its own website for $ 29.95 (with no added shipping), a price slightly higher than the price Amazon third-party seller BuyWow concurrently offered that product on Amazon Marketplace, where it also offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because she regularly shops from Amazon third-party sellers on their own website and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Geesey has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**13.    Tennessee**

80.    Steve Mortillaro is a resident of Nashville, Tennessee. He regularly shops online on websites like Bariatric Choice (a third-party seller on Amazon Marketplace), as well as Best Buy, Target, and Walmart. Many of the purchases Mr. Mortillaro made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products, including at least one product he purchased from an Amazon third-party seller on another platform. For example, on June 5, 2019, Mr. Mortillaro purchased Bariatric Choice once daily bariatric multivitamin, 45 mg of iron from Bariatric Choice on its own website for $29.95 with free shipping, a price equal to the price Amazon third-party seller Bariatric Choice concurrently offered that product on Amazon Marketplace, who also offered free shipping. On June 22, 2017, he purchased an iRobot Roomba 690 Wi-Fi Connected Vacuuming Robot from Bed Bath & Beyond for $374.99, a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because he regularly shops from an Amazon third-party seller on its own website and on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Mortillaro has been injured and

will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**14.    Texas**

81.    Chaunda Lewis is a resident of Savannah, Texas. She regularly shops online on websites like Walmart, Sam's Club, Bath Body Works, and Kroger. Many of the purchases Ms. Lewis made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on November 9, 2018, she purchased from Bath Body Works: Room Perfume Spray Japanese Cherry Blossom for $6.00 ($10.94 inclusive of shipping), a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace inclusive of shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for this product. Additionally, because she regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Lewis has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

82.    Adrian Hennen is a resident of Carrollton, Texas. He regularly shops online on websites like Target and Best Buy. Many of the purchases Mr. Hennen made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on March 21, 2020, he purchased a PNY CS900 240GB 2.5" SATA III Internal Solid State Drive online from Best Buy for in-store pick-up for $29.99, a price equal to the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who offered free shipping. The same day, he also purchased online from Best Buy for in-store pick-up an AMD Ryzen 5 3600 Six-Core 3.6 GHz Socket AM4 for $199.99, a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

resulted in a lower market price for this product. Additionally, because he regularly shops on eBay and Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Hennen has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 15. Utah

83.    Glenda R. Hill is a resident of Ivins, Utah. She regularly shops online on websites like 4USports (a third-party-seller on Amazon Marketplace), as well as ShoeDazzle, Fabric.com, and ZipperStop. Many of the purchases Ms. Hill made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, On January 22, 2020, she purchased from Fabric.com Dritz Home 44403 Cover Buttons for $6.06 (with no added shipping cost), a price higher than the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who also offered free shipping. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Additionally, because she regularly shops from an Amazon third-party seller on its own website and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Hill has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 16. Vermont

84.    Gail Murphy is a resident of Shelburne, Vermont. She regularly shops online on websites like OWC (a third-party seller on Amazon Marketplace) and Sam's Club. Many of the purchases Ms. Murphy made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. These purchases include products she purchased from an Amazon's third-party seller on another platform. For example, on April 21, 2018, she bought an OWC 2 x 8.0GB 1333MHz DDR3 SO-DIMM PC10600 Memory Upgrade Pin from OWC on its own website for

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

$154.99, a price equal to the price Amazon third-party seller OWC concurrently offered that product on Amazon Marketplace. It offered free shipping on both sites. On April 27, 2018, she purchased an OWC 2 x 8.0GB 1333MHz DDR3 SO-DIMM PC10600 204 Pin from OWC on its own website for $154.99, a price equal to the price Amazon third-party seller OWC concurrently offered that product on Amazon Marketplace, however while it offered free shipping on Amazon, it charged Ms. Murphy $168.65 inclusive of shipping. On June 23, 2018, she purchased an OWC 4 x 4.0GB 1333MHz DDR3 SO-DIMM PC10600 204 Pin from OWC on its own website for $139.97, a price equal to the price Amazon third-party seller OWC concurrently offered that product on Amazon Marketplace. It offered free shipping on both sites. On April 20, 2019, she purchased an OWC 1.0TB Mercury Electra 6G SSD 2.5" Serial-ATA 7mm Solid State Drive from OWC on its own website for $139.99, a price slightly higher than the price Amazon third-party seller OWC concurrently offered that product on Amazon Marketplace. It offered free shipping on both sites. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Additionally, because she regularly shops from an Amazon third-party seller on its own website and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Murphy has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 17. Washington

85.     Phyllis Huster is a resident of Bellevue, Washington. She regularly shops online on websites like Fanatics and Eddie Bauer (both third-party sellers on Amazon Marketplace), as well as Underarmor, Lowes, Home Depot, Instacart, NRS, Fred Meyer's, NHLshop, Lane Bryant, Ace Hardware, and REI. Many of the purchases Ms. Huster made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on June 18, 2020, she purchased an NRS Men's H2Core Silkweight Hoodie from NRS.com for $59.95 (with no added shipping cost), a price equal to the lowest price concurrently offered by an Amazon third-party seller on Amazon Marketplace, who also provided free shipping. Amazon's

anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Additionally, because she regularly shops from Amazon third-party sellers on their own websites and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Huster has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

### 18.   Wisconsin

86.     Gerry (Chip) Kochendorfer is a resident of Eau Claire, Wisconsin. He regularly shops online on websites like American Musical Supply (a third-party seller on Amazon Marketplace), as well as eBay, Walmart, Revzilla, Best Buy, Chewy, and Rite Aid. Many of the purchases Mr. Kochendorfer made on websites other than Amazon Marketplace are products that were also concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products, including at least one product he purchased from an Amazon third-party seller on another platform. For example, on June 19, 2019, he purchased a Casio CTK2550 61 Key Portable Keyboard Premium Package from American Musical Supply on its own website for $129.95, a price equal to the price Amazon third-party seller American Musical Supply concurrently offered that product on Amazon Marketplace. It offered free shipping on both sites. Amazon's anticompetitive price policies prevented the price competition that would have resulted in a lower market price for these products. Additionally, because he regularly shops from a third-party seller on its own website and on eBay and Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Kochendorfer has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

87.     Online retail should be "the most competitive industry in the world."[71] But Amazon's anticompetitive pricing policy severely restrains price competition by imposing a

---

[71] RILA letter at 3.

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

price floor for products sold through retail e-commerce channels other than Amazon Marketplace. This effect on competitors' prices is illustrated in the previous examples, where the price for each Class Product purchased on a competing platform is equal to or greater than the best price offered by Amazon's third-party sellers on Amazon Marketplace.

**B.      Defendant**

88.      Amazon is an online retailer giant with its principal headquarters in Seattle, Washington. Amazon sells directly to its retail customers on Amazon Marketplace. Amazon also maintains Amazon Marketplace, a platform for its two million third-party sellers, who also sell on Amazon Marketplace. Amazon contractually obligates its third-party sellers to adhere to the pricing policies challenged in this lawsuit.

89.      Amazon's third-party sellers' registration is handled on Amazon Marketplace, where Amazon also has maintained the agreements with its third-party sellers relevant to this lawsuit. It is believed, and therefore alleged, that substantially all of the misconduct alleged in this complaint occurred in or emanated from Amazon's headquarters and principal place of business in Seattle, Washington.

**V.      STATEMENT OF FACT**

**A.      Background**

90.      Amazon, the largest retailer in the U.S., is also the world's largest platform for third-party retailers, with whom Amazon competes in the sale of consumer retail goods.

91.      From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business, but check out from Amazon Marketplace and you can quickly find your business in bankruptcy. For example, Molson Hart, who sells toys on Amazon reports: "Were we to be suspended from selling on Amazon.com, it would probably take 3–6 months before we'd be bankrupt. We are not alone. This is typical for small to medium sized businesses which sell online today. In fact, most companies like our own, would probably go bust even faster."[72]

---

[72] *Supra* Hart.



92.     For the many third-party sellers, Amazon's 105 million U.S. Prime members are a big incentive to selling on Amazon Marketplace because these consumers are frequent online shoppers and likely to spend significant funds on Amazon Marketplace.[73] Prime membership is a paid subscription service with Amazon's retail customers, which entitles them to benefits, including free two-day shipping on Prime products.[74] According to a survey, *96% of all Prime members are more likely to buy products from Amazon Marketplace than any other e-commerce site*.[75] An estimated 20% of Amazon Prime members shopped on Amazon a few times per week, and 7% did so almost daily.[76] U.S. Prime members spend an average of $1,400 per year on Amazon Marketplace.[77] By selling on Amazon Marketplace, third-party sellers that qualify as Prime sellers have access to a uniquely large and highly motivated consumer group.

**1.     Amazon competes with its third-party sellers in the sale of retail goods.**

93.     Amazon collects payment on Amazon Marketplace for three categories of retail sales: (1) first-party sales where Amazon sells at retail products that it sources wholesale from a vendor or manufacturer (43% of all goods sold on Amazon Marketplace); (2) first-party sales of its own private-label products (1% of all goods sold on Amazon Marketplace) or (3) third-party sales where third-party sellers sell their products through Amazon and Amazon takes a commission (56% of all goods sold on Amazon Marketplace).[78]

---

[73] *Number of Amazon Prime members in the United States as of June 2019*, Statista, https://www.statista.com/statistics/546894/number-of-amazon-prime-paying-members/.

[74] *Id.*

[75] Kiri Masters, *89% Of Consumers Are More Likely To Buy Products From Amazon Than Other E-Commerce Sites: Study*, Forbes (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/#452623b04af1.

[76] *Supra Number of Amazon Prime members in the United States as of June 2019*.

[77] Average annual amount spent on Amazon according to U.S. Amazon Prime and non-Prime members as of March 2019, Statista, https://www.statista.com/statistics/304938/amazon-prime-and-non-prime-members-average-sales-spend/.

[78] Lesley Hensell, Amazon Sellers Are Losing Control of Pricing Due to "Standards for Brands, Webretailer, Nov. 8, 2021, https://www.webretailer.com/b/amazon-standards-for-brands/ (last visited Mar. 3, 2022); *see also* Amazon Percent of Units by Marketplace Sellers 2004-2021, Marketplace Pulse, https://www.marketplacepulse.com/stats/amazon/amazon-percent-of-units-by-marketplace-sellers-1 (estimating that third-party sellers' sales account for 56% of sales on Amazon Marketplace) (last visited Mar. 3, 2022); Aaron Cheris, Darrell Rigby & Suzanne Tager, *Dreaming of an Amazon Christmas*, BAIN & CO. (Nov. 9, 2017),

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

94.     Because Amazon's customers view Amazon's first-party offers on Amazon Marketplace "alongside independent third-party seller offers," the House subcommittee on antitrust concluded that the third-party sellers are "both [Amazon's] customers and competitors" on the online marketplace.[79] European regulators reached the same conclusion: German competition authorities, investigating Amazon Marketplace, found a "general competitive relationship exists between Amazon and the third-party sellers in the retail markets in all product categories."[80] And the Italian competition authority, Autorità Garante della Concorrenza e del Mercato ("AGCM"), found that "products offered by third-party sellers are presented on the same pages as those sold by Amazon itself" and "in competition with each other."[81]

95.     Amazon likewise internally refers to its third-party sellers as its "internal competitors."[82] In a letter to its shareholders, Amazon acknowledged the intense competition it faces from its co-conspirators on Amazon Marketplace, noting that third-party sellers "are kicking our first party butt. Badly."[83]

96.     By extending its virtual marketplace to include hundreds of millions of more unique products through third-party sellers, no other retailer or retail marketplace can match Amazon Marketplace's ability to provide products for virtually every imaginable search.[84] In Amazon's own words, "allowing third parties to offer products side-by-side" with Amazon's

---

https://www.bain.com/insights/retail-holiday-newsletter-2017-issue-2/ (estimating that Amazon's private label products are 2% of its first-party sales) (last visited Mar. 3, 2022).

[79] House Report at 86.

[80] *Amazon Removes Price Parity Obligation for Retailers on Its Marketplace Platform*, BUNDESKARTELLAMT (Federal Cartel Office of Germany), at 3 (Dec. 9, 2013) ("BKartA Decision"), http://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf%3F__blob%3DpublicationFile%26v%3D2.

[81] AGCM Report, ¶ 133, https://agcm.it/dotcmsdoc/allegati-news/A528_chiusura%20istruttoria.pdf.

[82] House Report at 16.

[83] Todd Haseltoneff, Here's Jeff Bezos' annual shareholder letter, CNBC (Apr. 11, 2019), https://www.cnbc.com/2019/04/11/jeff-bezos-annual-shareholder-letter.html (last visited Mar. 3, 2022).

[84] *Supra Minimum Viable Amazon.*



own catalog of at least 12 million products, makes Amazon "more attractive to customers," which draws "even more sellers" and adds to Amazon's "economies of scale[.]"[85]

97.   All products third-party sellers sell on Amazon Marketplace fall within the same categories of goods that Amazon also sells.[86] Since there is no limit to the number of sellers who can use Amazon Marketplace, typically multiple sellers sell the same item.[87] In many cases, Amazon and its third-party sellers sell the exact same product on Amazon Marketplace.[88] In such cases, Amazon uses an algorithm that pits Amazon and its competitors on Amazon Marketplace against each other to become the product's default seller (*i.e.*, winner of the Buy Box, where most sales are made).[89] To beat Amazon and become the Buy-Box winner, its competitors on Amazon Marketplace must have a lower price, good reviews, and in most cases, pay an added fee to have Amazon fulfill delivery.[90]

98.   To the extent there are any goods sold on Amazon Marketplace that do not compete with the goods Amazon sells, Amazon *potentially* competes for these sales.

99.   Amazon has the requisite desire because it routinely analyzes its competitors' sales on its marketplace to identify which additional products would be profitable for it to sell.[91]

100.   Amazon's vast infrastructure, such as its inventory management, fulfillment, return processing, and advertising, gives it the capacity to compete in every product category

---

[85] Amazon 2014 Annual Report, EX-99.1 (sec.gov), https://www.sec.gov/Archives/edgar/data/1018724/000119312515144741/d895323dex991.htm.

[86] Brian Connolly, *Amazon Product Categories - List of Best Selling Categories*, Junglescout.com (Jun. 10, 2021), https://www.junglescout.com/blog/amazon-product-categories/ (last visited Mar. 3, 2022).

[87] Eyal Lanxner, *The Amazon Buy Box: How It Works for Sellers, and Why It's So Important* (2021), https://www.bigcommerce.com/blog/win-amazon-buy-box/ (last visited Mar. 3, 2022).

[88] House Report at 249; Compl. ¶ 17, *State of Washington v. Amazon.com, Inc.*, No. 22-2-01281-1 (King Cty. Super. Ct. Jan. 26, 2022).

[89] *Supra The Amazon Buy Box: How It Works for Sellers, and Why It's So Important.*

[90] *Id.*

[91] House Report at 274-75.

SECOND AMENDED CLASS ACTION COMPLAINT - 44
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

permitted on its marketplace.[92] This allows Amazon to easily enter competition with any category of good sold on its marketplace.

101.   Amazon's accumulation of customer and seller data also gives it the capacity to compete with any third-party merchant. A former Amazon employee interviewed by the House subcommittee on antitrust explained:

> It's important to understand that Amazon has access to every piece of data on what products each customer has searched and purchased [or] not purchased. . . . With information about what customers have searched, Amazon is able to create customized marketing [and] targeting of products for the individual customer. "Is Amazon using a particular [third-party] seller's data here? No," but it is using all of the aggregate site data to develop a highly targeted marketing plan for each customer. Should Amazon choose to use that targeting information to focus [on] its own products, it can, while [third-party] sellers don't have access to similar data.[93]

102.   But the ability to compete more effectively as a retailer against its third-party sellers is not the only advantage Amazon's data gives it. Research by Google suggests that the ability for a seller to present its offers in a personalized setting is a valuable one, and that consumers are 40% more likely to spend more than they planned when in a personalized setting.[94] Amazon's data collection allows it to sell to its third-party sellers highly effective, personalized advertising that is tailored to each of Amazon's consumer customers. This data advantage has allowed Amazon to become the third-biggest digital advertising company behind Google and Facebook, hitting $31 billion in ad revenue in 2021.[95]

---

[92] Adam Levy, *Amazon's Third-Party Marketplace Is Worth Twice as Much as Its Own Retail Operations*, Motley Fool (Apr. 11, 2019), https://www.fool.com/investing/2019/03/07/amazons-third-party-marketplace-is-worth-twice-as.aspx (last visited Mar. 3, 2022).

[93] House Report at 268.

[94] https://www.thinkwithgoogle.com/consumer-insights/consumer-trends/personalized-shopping-spending-statistics/.

[95] Amazon's advertising revenue is $31 billion and growing. Here's everything we know about its booming ad business, Business Insider (April 4, 2022), https://www.businessinsider.com/inside-amazons-growing-ad-business-everything-we-know-2019-5?r=US&IR=T.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1

2

**2.    The MFN agreements are *per se* violations because they are agreements between horizontal competitors that restrain competition and raise prices in the online retail market in which Amazon and its third-party sellers compete.**

3

103.    The *per se* approach "permits categorical judgments with respect to certain

4

business practices that have proved to be predominately anti-competitive," so that courts "can

5

thereby avoid the 'significant costs' in 'business certainty and litigation efficiency' that a full-

6

fledged rule-of-reason inquiry entails."[96] As an archetypal example, an agreement among

7

"competing retailers that . . . reduces competition in order to increase price is, and ought to be,

8

*per se* unlawful."[97]

9

104.    Amazon's MFN agreements check all the boxes of a *per se* violation: they are

10

agreements between competing retailers that have the intent and effect of reducing online

11

competition and increasing online retail prices.

12

105.    A *per se* price fixing agreement does not require reciprocal restraints. For

13

example, in *Palmer v. BRG of Georgia,* the Supreme Court held that rival bar review providers

14

engaged in a *per se* price fixing agreement when they raised the price of the course offered by

15

one provider (the Georgia firm). The rivals agreed that the Georgia firm would pay its former

16

rival a commission on the price of each course it provided, which increased the price of its

17

course.[98] The agreement had no reported effect on the price of the bar review courses offered by

18

the former rival. Focusing solely on the anticompetitive effect on the Georgia bar review market

19

in which both parties formerly operated, the Court held that because the competitors' licensing

20

agreement "was formed for the purpose and with the effect of raising the price of the bar review

21

course," it was *per se* illegal.[99]

22

23

[96] *Northwest Wholesale Stationers v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 289 (1985) (quoting *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 343-44 (1983)).

24

[97] *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).

[98] 498 U.S. 46 (1990).

25

26

27

28

[99] *Id.* at 49 (quotation omitted). *See also Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United*, 1993 U.S. Dist. LEXIS 3446, at *38-40 (N.D. Ill. Feb. 26, 1993) ("Blue Cross has cited no case law to support its contention that only agreements to allocate markets whereby both parties benefit are <u>per se</u> illegal, and the court rejects this contention. . . . . Assuming Blue Cross entered an agreement whereby it agreed to stay out of the Illinois health insurance market, but Health Care did not reciprocally agree to stay out of the Wisconsin health insurance market, the net effect is an anticompetitive effect on the Illinois health insurance market. This is sufficient to

106.     Here, too, Amazon's MFN agreements are formed for the purpose and with the effect of raising prices in the online retail market in which Amazon and its third-party sellers compete. Like the *per se* price-fixing agreement between rivals in *Palmer*, Amazon's MFN agreements raise the price of the goods its rival third-party sellers sell. While the MFN agreements do not obligate Amazon contractually to raise its own online retail prices, it is the clear purpose and effect of these anticompetitive agreements to raise prices above a competitive level by eliminating substantial online competition and by allowing Amazon to sell its own retail goods at supracompetitive prices without losing significant sales.

107.     The MFNs play a pivotal role in the way that Amazon prices its Buy Box bid. MFNs remove from that calculus the substantial competitive pressure that third-party sellers could bring to the market if unbound by the MFNs. So, for example, whereas under current market conditions Amazon might win the Buy Box by selling a product for $100, in a competitive market it would need to lower its price to $85 to beat prices on its third-party sellers' own websites that were 15% below the prices they offer on Amazon Marketplace. By agreeing to forego that competition, Amazon and its co-conspirators maintain prices at supracompetitive levels, both on and off Amazon Marketplace.

108.     Like the spot-purchasing agreement that was deemed a *per se* violation in *United States v. Socony-Vacuum Oil Co.*, the purpose and effect of Amazon's MFN agreements is "to place a floor under the market—a floor that served the function of increasing the stability and firmness of market prices," rather than allowing market forces to set prices.[100] Because Amazon and its third-party sellers restrain competition, consumers have fewer choices and pay higher online prices than they would in a competitive market.

109.     Even if the MFN agreements were considered hybrid (vertical and horizontal) agreements between Amazon and its third-party sellers, no exceptional circumstances exist that might move these price-fixing agreements out of the *per se* category. For example, Amazon

---

render the agreement between Blue Cross and Health Care unlawful on its face for purposes of this motion.") (relying on *Palmer*).

[100] 310 U.S. 150, 222-23 (1940).



Marketplace does not operate as a dual-distribution model: third-party sellers do not sell Amazon's products, and Amazon and its MFN agreements do not enforce potentially procompetitive intrabrand restrictions on Amazon's own products.[101] Nor do Amazon and its third-party sellers use their MFN agreements to bring a new product to the market that otherwise would not reach the market unless they worked as described in their agreements (like an agreement among competing teams to organize a sports league).[102] Amazon and its third-party sellers do not need MFN agreements to sell goods online, or to operate an online retail marketplace. [103]

110.    eBay, for example, provides a very similar online retail marketplace, which, like Amazon Marketplace, transacts sales between consumers and third-party sellers, but without imposing MFN agreements. And German antitrust authorities investigating Amazon Marketplace (discussed below) found that Amazon's Price Parity provision "cannot be seen" as "an indispensable restriction" on its third-party sellers, but rather, as a restriction to protect "Amazon's large own-account [*i.e.*, first-party] share of sales as a competitor."[104] In a competitive market, third-party sellers would list their goods at lower prices on other platforms that charged lower (or no) fees,[105] and—facing price competition from third-party sellers—Amazon would also have to lower its own retail prices to compete.

---

[101] *See, e.g., AT & T Corp. v. JMC Telecom, LLC,* 470 F.3d 525, 531 (3d Cir. 2006); *see also* Vertical Restraints Guidelines, 50 Fed. Reg. 6263, 6265 (Dept. of Justice 1985) (notice) (recognizing that the dual distribution model can "lead to lower prices to consumers" through cost savings achieved by "more efficient planning, lower transaction costs, better control over performance, quicker implementation of marketing innovations, and better access to market information").

[102] *See, e.g., American Needle, Inc. v. National Football League,* 560 U.S. 183, 130 S. Ct. 2201, 2216-17, 176 L. Ed. 2d 947 (2010).

[103] *See C-E Minerals, Inc. v. Carbo Ceramics, Inc.,* 2012 U.S. Dist. LEXIS 198653, at *10 and *14 (N.D. Ga. Mar. 13, 2012) (enjoining enforcement of a non-compete provision contained within a supply contract and holding that the "fact that such a horizontal allocation agreement is contained within a vertical agreement does not save it" from *per se* analysis).

[104] BKartA Decision at 3.

[105] *Supra* Hart.



**3.** **German competition authorities found that Amazon's Price Parity restricted competition both as a horizontal price fixing agreement with its third-party sellers and by erecting a barrier to competition with Amazon Marketplace from other online retail marketplaces.**

111. When Amazon first introduced its MFN agreements in 2012, it quickly drew international scrutiny from antitrust regulators. Regulators in the U.K. and Germany concurrently launched investigations into the anticompetitive effects of Amazon's Price Parity. With a 30-40% share of the market for the online sales of goods in Germany at the time of the enforcement action, Amazon's marketplace had a lower market share than it currently has in the United States. Nevertheless, the German antitrust authority took action against Amazon for "the so-called price parity clause," also alleged here, which "largely prevented sellers on Amazon's Marketplace platform from offering their goods elsewhere online at a lower price," whether on "other e-commerce platforms" or on their "own online shops."[106]

112. Upon investigation, the German authority concluded that "Amazon and the third-party retailers are direct competitors" in e-commerce, and that "[t]he agreement of a price parity clause constitutes horizontal price-fixing."[107] The German authority explained that the MFN agreement was "not based on purely vertical agreements" precisely because "Amazon and the third-party retailers are direct competitors in the trading markets concerned," and "[t]he content of the agreement is precisely not the use by retailers of the platform service of a neutral online service provider in exchange for a fee. Rather, the aim of participating in the [Amazon] Marketplace is to make a joint integrated presentation of an entire product range, including the Amazon product range, with a single address and the resulting simplified navigation. It is therefore a *horizontal trade cooperation*."[108] The German regulators further explained that because Amazon "is a direct competitor" of the third-party seller, the agreement amounted to "horizontal price-fixing" even though only the third-party sellers committed to listing their

---

[106] BKartA Decision at 1-2.

[107] *Id.* at 2-3.

[108] *Id.* (emphasis added).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

goods at a particular price (the price it offered on Amazon Marketplace) across all online retail channels.[109]

113.    The German authority further concluded that the scope of that horizontal price-fixing agreement was market-wide: because "[a] general competitive relationship exists between Amazon and the third-party sellers in the retail markets in all product categories" and "the price parity clause is a hardcore restriction in all product categories."[110]

114.    As to impact, the German regulators found that Amazon's MFN agreements had the stark anticompetitive effect that economic literature predicts: reduced competition and higher prices. Because Amazon's MFN agreements ensure a uniform, all-in price to the end consumer, the "[p]rice parity clauses thus act as barriers to market entry for new competitors and hinder the expansion of existing competitors in the market" for online retail marketplace platforms by "neutrali[zing]" the "major competitive parameter – the fees for platform services – . . . more favourable fees cannot be translated into more favourable prices for final customers."[111] The inevitable result is higher prices, fewer consumers, and fewer online retail marketplaces entering the market to compete against Amazon. "According to a poll of 2,500 online retailers carried out by" the German authority, the Price Parity "has also resulted in significant price increases to e-commerce."[112]

115.    As a result of the German authority's findings, as well as coordinated efforts by the U.K.'s Office of Fair Trading, Amazon ultimately abandoned its Price Parity in 2013 throughout the EU. In the United States, however, it has continued to employ its MFN agreements to the detriment of Plaintiffs and the Class.

---

[109] *Id.* This is consistent with *Palmer v. BRG*, where the Supreme Court implicitly rejected the notion that horizontal price restraints are necessarily reciprocal, when it held that rival bar review providers' exclusive licensing agreement—which increased only one company's price—was a *per se* illegal price-fixing agreement. 498 U.S. 46 (1990).

[110] *Id.* at 3.

[111] BKartA Decision at 3.

[112] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

### 4. Amazon charges high seller fees that raise online prices of consumer goods on and off Amazon Marketplace.

116.   Because of the fees it charges its third-party sellers, Amazon Marketplace is hugely profitable for Amazon. Amazon's profit margin on its seller service fees is significantly higher than the margin on its own retail sales on Amazon Marketplace.[113] Amazon takes a significant percentage of each sale by its third-party sellers plus additional charges to store and ship the inventory of the sellers that use the FBA service.[114] Because of this, financial analysts at Evercore ISI recently valued Amazon's third-party services at more than $250 billion, while giving its in-house retail operations a value of just $120 billion[115]

117.   The retailer's relationship with Amazon begins with a modest $40 registration fee that lets it reach 95 million unique visitors per month in the United States.[116] But sellers "have to play by Amazon's rules, and Amazon.com isn't just a marketplace, it's also a seller."[117] Amazon charges a commission ("referral fees") for each item sold on their platform, typically around 15%.[118] Amazon also charges a per-item fee or a monthly subscription and it charges the seller the lesser of $5 or 20% of the price as a fee for any refunds when a shopper returns the product.[119] Optionally, and for an additional fee, under FBA, Amazon will store, pick, pack, ship orders, and manage customer service and returns. Sellers who enroll in FBA qualify for Amazon Prime and free shipping eligible orders, otherwise most sellers must join a waitlist to join Seller Fulfilled Prime, which commits sellers to fulfill orders with two-day delivery at no additional

---

[113] Adam Levy, *Amazon's Third-Party Marketplace Is Worth Twice as Much as Its Own Retail Operations*, Motley Fool (Apr. 11, 2019), https://www.fool.com/investing/2019/03/07/amazons-third-party-marketplace-is-worth-twice-as.aspx.

[114] *Id.*

[115] *Id.*

[116] Amazon Services Registration Page, https://services.amazon.com/sem-landing.html?ref=pd_sl_2thvswwc79_b&hvdev=c&ld=SEUSSOABING-B20000SC-D&hvadid=78615157546872&hvqmt=p&tag=mh0b-20&hvbmt=bb.

[117] *Supra* Zeibak.

[118] David Hamrick, *Amazon FBA Fees, How They Work, and How to Profit as a Seller*, Jungle Scout (Feb. 7, 2020), https://www.junglescout.com/blog/amazon-fba-fees/.

[119] *Id.*



charge for Prime customers.[120] Accepting FBA services also greatly increases the likelihood that Amazon's algorithm will select the seller's product for the coveted Amazon Buy Box.[121] Meanwhile, sellers' enrollment in FBA is a win for Amazon, who never takes title to the third-party seller's inventory,[122] yet enjoys a steady revenue from its sellers, who do all the merchandising and take on the inventory risk.[123]

118.    Unlike subscription fees to access the platform, sellers do not pay referral fees up-front, but instead Amazon takes them out of the sellers' account with Amazon after they make the sale. And Amazon charges higher referral fees for those item categories where it has a significant dominance in the e-commerce market, *i.e.*, kitchen and dining products, home improvement tools, batteries, golf, skin care, cleaning supplies, books, music, and videos, and men's athletic shoes.[124]

---

[120] *Reach hundreds of millions of Amazon customers worldwide-fast*, Amazon Seller Central, https://sellercentral.amazon.com/; *Sell products with the Prime badge directly from your warehouse*, Amazon Seller Central, https://services.amazon.com/services/seller-fulfilled-prime.html.

[121] *Supra* Zeibak.

[122] Irwin Decl., ¶ 5.

[123] Daphne Howland, *Amazon Caves on Seller Pricing*, Retail Dive (Mar. 13, 2019), https://www.retaildive.com/news/amazon-caves-on-seller-pricing/550388/.

[124] *Amazon FBA Fees, How They Work, and How to Profit as a Seller*; Corey McNair, *Top 10 US Ecommerce Companies in 2018*, eMarketer (Sep. 17, 2018), https://www.junglescout.com/blog/amazon-fba-fees/#all-fees, https://www.emarketer.com/content/top-10-us-ecommerce-companies-in-2018.

1
2
3
4
5
6
7
8
9
10
11
12
13



14 Higher fees make it more difficult and costly for third-party sellers to compete with Amazon in

15 these categories of goods. This gives Amazon an immense competitive advantage over its third-

16 party sellers on and off Amazon Marketplace in areas where it already dominates and it

17 magnifies Amazon's already formidable power to control market prices, especially in the

18 categories of goods where it has the most market share.

19      119.    The fees Amazon charges make it difficult to compete on Amazon Marketplace in

20 any category. "Every year it's been a ratchet tighter," said Bernie Thompson, a top seller of

21 computer accessories whom Amazon has highlighted in its marketing to other sellers. "Now you

22 are one event away from not functioning."[125] Between 2015 and 2018, Amazon's revenue from

23 third-party seller fees grew from $16 billion to $43 billion, outpacing both the overall growth of

24 Amazon's retail sales, and the growth of sales made by third-party sellers on Amazon

25 Marketplace.[126]

26

27      [125] Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, NYT
(Dec. 19, 2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html.

28      [126] *Supra* Mitchell.



120.    "Amazon collects 27 cents of each dollar customers spend buying things its merchants sell, a 42 percent jump from five years ago, according to Instinet, a financial research firm. That does not include what companies pay to place ads on Amazon, a business that Wall Street considers as valuable as Nike." [127]

121.    On-platform advertising is another cost that sets Amazon apart from other platforms. Amazon is the third largest provider of digital advertising, behind only Google and Facebook.[128] Investors expect its $10 billion advertising sales[129] to jump $28.4 billion over the next five years.[130] (By comparison, Walmart's ad offerings to its third-party sellers are at the nascent stage.[131]) According to John Denny, who ran e-commerce for the drink company Bai, companies used to believe that if they had a great product, it would show up in Amazon's search results, and sales would follow. "Those days are over," Mr. Denny said. "There are no lightning strikes on Amazon anymore." [132] Paid advertising works much like Google search ads.[133] When customers conduct a search on Amazon Marketplace, they receive a combination of organic results (based on relevance) and sponsored listings (results given to consumers because the brand or seller paid for a specific search term).[134] In other words, Amazon rewards its advertisers by dedicating more search space to sponsored advertising instead of organic search results, meaning

---

[127] *Supra* Weise.

[128] Eugene Kim, *Amazon quietly removes promotions of its own products as calls for tech regulation escalate*, NBC (Apr. 3, 2019), https://www.nbcnews.com/tech/tech-news/amazon-quietly-removes-promotions-its-own-products-calls-tech-regulation-n990666?cid=public-rss_20190410.

[129] Nicole Perrin, *Amazon Advertising 2019. Growth and Performance Are Strong at the No. 3 US Digital Ad Seller*, Emarketer (Nov. 7, 2019), https://www.emarketer.com/content/amazon-advertising-2019.

[130] Lara O'Reilly and Laura Stevens , *Amazon.com: Emerges as Advertising Giant*, Market Screener, (Nov. 27, 2018), https://www.marketscreener.com/AMAZON-COM-12864605/news/Amazon-com-Emerges-as-Advertising-Giant-27665223/.

[131] Tara Johnson, Selling on Walmart: Vendor vs. Third Party vs. Hybrid, Tinuiti (JUN 26, 2020), https://tinuiti.com/blog/walmart/selling-on-walmart-vendor-vs-third-party-vs-hybrid/.

[132] *Supra* Weise.

[133] *Supra* Whitney.

[134] The Badger, *Organic vs Paid Search on Amazon [Infographic]*. Adbadger (Mar. 19, 2019),https://www.adbadger.com/blog/organic-vs-paid-search-amazon/.

that advertised products have priority over results based on customer satisfaction.[135] For many Amazon sellers, placing advertisements on Amazon Marketplace is necessary to getting or maintaining a high ranking on the platform. That means that Amazon's third-party sellers must pay more money to sell the same products. For example, on a $150 product, Amazon charges Molson Hart's company a $17.58 advertising fee to appear in Amazon's search results.[136]

122.    "It's increasingly pay-to-play," said Melissa Burdick, a 10-year Amazon veteran who now advises major consumer brands.[137] Quartile tested the importance of on-platform ads in 2018 when it stopped running ads on Amazon for 750 popular products and found that sales shrank by 24%.[138] The effect only increased over time. After 10 weeks, sales of the products without ads had tumbled 55%.[139]

123.    Amazon also charges sellers fees for some types of customer reviews.[140] All of these added fees mean that sellers' prices go up on Amazon Marketplace, and by virtue of Amazon's pricing policies, other platform as well. Some third-party sellers report giving Amazon 40% or more for each transaction, an increase from 20% just a few years ago.[141]

124.    Market analyst Simeon Siegel notes that "although every unit sold through 3P . . . comes at lower reported revenue[,] . . . the collected fees flow through at much higher margin rates," meaning that Amazon's gross margin continues to grow even when selling fewer of its own goods.[142] For example, Amazon generated $43 billion in third-party seller service revenues

---

[135] *Supra* Hart.

[136] *Id.*

[137] *Supra* Weise.

[138] *Id.*

[139] *Id.*

[140] *Id.*; *What is the Early Reviewer Program?* Amazon, https://www.amazon.com/gp/help/customer/display.html?nodeId=202094910.

[141] *Supra Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

[142] *Supra* Howland.



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

in 2018, which accounted for the second-largest revenue segment of the online retail platform, after Amazon's own retail product sales.[143]

125.    Collectively, the seller fees Amazon charges are substantial and built into the prices its sellers charge their customers for products purchased on Amazon Marketplace. Because Amazon's pricing policies do not permit its sellers to sell at lower prices on other platforms, these fees are also baked into the prices they offer on other platforms through Amazon's aggressive enforcement of its price restraint. To ensure compliance, Amazon's "automated system continually checks and informs the seller within 15 minutes if a violation has occurred."[144] If Amazon finds that a seller violated this restraint, it issues a policy warning in the seller's central account.[145] Violations could result in removal of the seller's product listing or suspension of the seller's account.[146] It was reported that "Amazon even checks [the seller's] listings for similar products that are differently described, by color or size, for example. In other words, there's no hiding place."[147] As one advisor phrased it, "[I]f you get caught, Amazon won't hold back from enforcing penalties or suspensions."[148] Jarvin Karnani, who has been selling on Amazon Marketplace for two years, told the FTC, "[I]f Amazon suspends you, it's like a death knell . . . [W]hen Amazon shuts you off, they sit on your money for 90 days and there's

---

[143] J. Clement, *Percentage of paid units sold by third-party sellers on Amazon platform as of 4th quarter 2019*, Statista (Jan. 31, 2020), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

[144] Rupert Heather, *The Little-Known Amazon Pricing Rule that Would Burn Your Business*, Xsellco, https://www.xsellco.com/resources/amazon-pricing-rule-burn-business/.

[145] *Id.*

[146] Sarah Sayed, *5 Pricing Do's and Don'ts on Amazon and Walmart Marketplace*, Worldfirst Blog (Apr. 11, 2018), https://www.worldfirst.com/us/blog/selling-online/5-pricing-dos-donts-amazon-walmart-marketplace/. Amazon's contracts with its third-party sellers are confidential. Plaintiffs therefore rely on publicly available third-party sources for their content.

[147] *Supra* Heather.

[148] *Supra* Sayed.

nothing you can do."[149] To ensure compliance with Amazon's price policies, some sellers have come to rely on an external service to replicate their prices across multiple marketplaces.[150]

> **5.   Amazon knowingly manipulates online prices through its MFN agreements despite warnings from antitrust regulators about their anticompetitive effect.**

126.    "A staggering number (82%) of consumers cited price as a very important factor when buying a product on Amazon."[151] But Amazon's Price Parity had the effect of *reducing* price competition. Third-party sellers, who would have sold their products for less, for example, on their own websites (*e.g.*, by avoiding Amazon's estimated 15% fee),[152] were prevented from selling at lower prices.[153]

127.    Amazon came under fire for its Price Parity in December 2018, when Senator Blumenthal called for an FTC investigation of the practice.[154] As noted, Amazon withdrew this very practice in Europe years before under pressure from British and German regulators.[155] In response to the Blumenthal letter, Amazon also quietly withdrew its Price Parity in the U.S. in March of 2019.[156] At the time, Dani Nadel, president of Feedvisor, a company that advises Amazon sellers, expected it to be a watershed moment that would lead "the greater e-commerce

---

[149] Spencer Soper & Ben Brody, *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

[150] *Supra* Heather.

[151] Catie Grasso, *Amazon Pricing Strategy: How Much Should You Sell a Product For?*, Feedadvisor (Jan. 31, 2020), https://feedvisor.com/resources/marketplace-fees-policies/amazon-pricing-strategy/.

[152] *What it costs to sell on Amazon in 2018*, Xsellco, https://www.xsellco.com/resources/amazon-seller-fees-2018/; *supra* Hart ("Amazon takes a 15% commission on every product we sell on their website. We don't have this fee when we sell toys on our own website, so we could sell our products for 15% less and make roughly the same amount of money as we do on Amazon.").

[153] Letter from Senator Richard Blumenthal to Josephs Simons, Federal Trade Commission Chair (Dec. 19, 2018), https://www.blumenthal.senate.gov/imo/media/doc/12.19.18%20-%20DOJ%20-%20Price%20Parity.pdf.

[154] *Id*.

[155] *Id.*

[156] Catherine Shu, *Amazon Reportedly Nixes Its Price Parity Requirement for Third-Party Sellers in the U.S.*, Tech Crunch (Mar. 11, 2019), https://techcrunch.com/2019/03/11/amazon-reportedly-nixes-its-price-parity-requirement-for-third-party-sellers-in-the-u-s/.

SECOND AMENDED CLASS ACTION COMPLAINT - 57
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

landscape" to be "much more dynamic."[157] Likewise, David Simnick, co-founder and CEO of Soapbox, a Washington, D.C.-based soap and shampoo maker that sells on Amazon, reported that when he learned that Amazon was revoking its Price Parity, "I almost did a back flip in the hotel gym."[158]

128.    But the watershed moment never came. Amazon continues to punish retailers who price lower on other sites.[159] Despite Amazon's official withdrawal of the Price Parity in the United States in 2019, the Feedadviser website reported the following year that "many sellers are still operating by the price parity rule *in fear that their account will be impacted as a result*."[160]

129.    Like the Price Parity, Amazon's current MFN agreement, the Fair Pricing provision likewise penalizes sellers who sell their products at a higher price on Amazon Marketplace by removing the product from the Buy Box, suspending shipping options, and terminating selling privileges.[161] Outside the Buy Box, products are overlooked by algorithms determining which products shoppers see on the platform.[162]

130.    When Amazon discovers that a third-party seller offers the same product on another site at a lower price, it sends a pricing alert that warns the seller that its product is no longer eligible for the Buy Box. The effect is chilling for most third-party sellers, who cannot afford to jeopardize their sales on Amazon by offering better deals on other sites.[163] Jason Boyce, a former Amazon third-party seller, who now runs a consulting firm, Avenue 7 Media, instructs clients to offer the same prices on all sites to avoid losing prominence on Amazon even if they

---

[157] *Supra* Howland.

[158] *Supra* Gonzalez.

[159] *Supra* Hart; Gonzalez.

[160] *Supra Amazon Pricing Strategy: How Much Should You Sell a Product For?* (emphasis added).

[161] *Supra* Gonzalez.

[162] *Supra Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

[163] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

can afford to sell for less on other sites. He explains: "Amazon is in control of the price, not the merchant."[164]

131.    For example, retailer David Simnick reports that his sales plunge as much as 40 or 50 percent a day when his listings lose the Buy Box, and that he can reclaim the Buy Box only if he tweaks its pricing either at Amazon Marketplace or at the cheaper retailer, so that both offerings are priced equally.[165] He said that despite the withdrawal of Amazon's Price Parity, his company had about six different products removed from the Buy Box option when it sold some of the same products at Target for $1 less.[166]

132.    Molson Hart, whose company, Viahart, sells toys online, says that 98% of its sales come from Amazon Marketplace and that other platforms like eBay and Walmart account for less than 2% of his company's revenue.[167] He confirmed that even after Amazon officially ended its Price Parity, it continued to punish sellers who list prices on other websites for less than the price on Amazon: "If we sell our products for less on channels outside Amazon and Amazon detects this, our products will not appear as prominently in search and, if you do find them, they will lose their prime check mark and with that, their sales."[168]

**6.    Amazon and its third-party sellers also directly cause consumers to overpay for goods purchased from non-conspirators at prices inflated by Amazon's MFN agreements.**

133.    Revenue from Amazon's third-party sellers on Amazon Marketplace alone represents about a third of all U.S. ecommerce retail revenue. Its anticompetitive agreements with its sellers reduces the collective market share these sellers would otherwise acquire outside of Amazon Marketplace. It also shields both Amazon and its non-conspiring competitors in the ecommerce market, *e.g.*, Walmart, from the more vigorous price competition that would otherwise have occurred. By driving Class Products to supercompetitive prices, Amazon has

---

[164] *Id.*

[165] *Supra* Gonzalez.

[166] *Id.*

[167] *Supra* Soper & Brody.

[168] *Supra* Hart.

1    directly injured and continues to injury Plaintiffs and Class members on whichever platforms

2    they shop for Class Products.

3         134.    Online retailers primarily compete for market share for Class Products by offering

4    consumers the lowest price in the market.[169] Across multiple platforms, U.S. ecommerce retailers

5    have engaged in intense item-by-item price competition in recent years.[170] Numerous studies

6    throughout the Class Period confirm the tendency of competing online retailers to follow the

7    price leader (usually Amazon Marketplace). For example, the Boston-based e-commerce

8    analytics firm, Profitero, found that Walmart's online pricing averaged just 2.9% higher than

9    Amazon Marketplace, based on a review of prices between June and August 2017 of more than

10   52,000 exactly matched, in-stock products across 13 categories, including beauty, toys & games,

11   electronics and pet supplies.[171]  Profitero subsequently analyzed daily prices of 21,939 beauty,

12   grocery and household supplies products collected from September 1, 2017, to November 30,

13   2017, and found on average only a 1.8% difference between Walmart's and Amazon

14   Marketplace's prices for grocery, and in the beauty category prices on Jet.com were within 1.4%

15   of Amazon prices.[172] A study in late 2018 of 100,000 products found that Walmart's online

16   prices average just 2.3% higher than Amazon Marketplace's and that it edged out Amazon

17   Marketplace in home storage and baby categories with prices averaging 0.7% and 0.3% less than

18   Amazon Marketplace.[173] A 12-week study in 2019 found that Kroger's online prices averaged

---

[169] Mike Black, *How Online Price Wars Are Threatening Brands*, Profitero (Apr. 26, 2018), https://www.profitero.com/2018/04/how-online-price-wars-are-threatening-brands/.

[170] *Supra* Souza.

[171] Jannie Cahill, *New Profitero Study Reveals Amazon is Winning the Online Price War – But Walmart is on the Offensive*, Profitero (Oct. 30, 2017), https://www.profitero.com/2017/10/new-profitero-study-reveals-amazon-is-winning-the-online-price-war-but-walmart-is-on-the-offensive/.

[172] Jannie Cahill, *Walmart Online Grocery Prices Edge Closer to Amazon, Intensifying the Grocery Wars*, Profitero (Feb. 27, 2018), https://www.profitero.com/2018/02/walmart-online-grocery-prices-edge-closer-to-amazon-intensifying-the-grocery-wars/.

[173] Andria Cheng, *Walmart May Be Catching Up To Amazon On Prices But Still Has A Ways To Go, Study Shows*, Forbes (Nov. 9, 2018), https://www.forbes.com/sites/andriacheng/2018/11/09/amazon-holiday-ecommerce-walmart-target-kroger-grocery-home-depot/#121f7ade2521.

SECOND AMENDED CLASS ACTION COMPLAINT - 60
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

only 1.6% higher than Amazon Marketplace.[174] In the pet category, Chewy averaged just 0.4% more expensive than Amazon Marketplace, Walmart priced its music CDs online on average just 0.5% over Amazon Marketplace's, and Target priced its beauty products on average just 2.2% more than Amazon Marketplace.[175]

135.    Former Amazon employees credit Amazon for driving this type of competition by employing an algorithm to match or beat prices from other websites at the product's lowest price per unit even if the competing retailer offers the product in a bulk size.[176] Amazon's third-party sellers can also drive market prices. In one example, reported by Profitero, a third-party seller on Amazon Marketplace triggered an online price war that resulted in a dog-food brand losing 33% of its price value in just six days.[177]



136.    Amazon's non-conspiring competitors compete on price largely by matching or coming close to the lowest ecommerce market prices. By stifling competition from its third-party

---

[174] *Supra* Souza.

[175] *Id.*

[176] *Supra* Del Rey.

[177] *Supra* Black.

sellers, whose sales represent about a third of all ecommerce revenue generated in the United

States, Amazon significantly reduced the competitive pressure on itself and its outside rivals,

resulting in supracompetitive ecommerce market prices for Class Goods and injuring Plaintiffs

and Class members who purchase Class Goods.

**B.    Amazon's two million third-party sellers agreed under Amazon's former Price Parity not to offer their products to U.S. customers at a lower price through any competing retail e-commerce channels.**

137.    Amazon is a retailer that competes with its two million third-party sellers in the

online sale of consumer goods. These third-party sellers also sell on other websites, like eBay,

Walmart, or the seller's own website, like Molson Hart's company, Viahart. Under Amazon's

Price Parity, Amazon and its third-party sellers agreed that sellers would not sell their goods

through other ecommerce channels at a price lower than they sold them on Amazon Marketplace.

138.    The problem with Amazon's MFN agreements is that they penalize discounts,

which can "soften price competition[] and lead to higher prices."[178]

139.    Amazon regularly monitors retail e-commerce prices offered to U.S. customers

both by its external competitors and its third-party sellers.[179] As part of that monitoring, Amazon

regularly enforced its Price Parity, often within 15 minutes of discovering a price differential,

and the enforcement and threat of enforcement has regularly prevented its sellers from offering

lower prices through competing retail e-commerce channels.[180]

140.    This not only eliminated lowered priced alternatives for consumers, it created a

false consumer perception, fostered by the anticompetitive MFN agreements, that prices on

Amazon Marketplace are lower than on other online retail outlets.

---

[178] Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs* 127 YALE L.J. 2176, 2179 (2018).

[179] *Supra* Sayed; *Amazon Pricing Strategy: How Much Should You Sell a Product For?*

[180] *Supra* Heather.



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

**C. Amazon's two million third-party sellers agree under Amazon's current Fair Pricing provision that selling at a lower price through competing retail e-commerce channels will subject them to costly penalties.**

141.   Like the Price Parity, the current Fair Pricing provision creates significant financial disincentives to any sellers who dare to offer lower prices outside Amazon Marketplace. For example, suspension or termination could bankrupt a seller, and ineligibility for the Buy Box may reduce a seller's revenue from the product by as much as 40%.[181] The only way sellers can regain eligibility for the Buy Box or otherwise void the penalty is by bringing their products' prices on the competing retail e-commerce channels into price parity with their listings on Amazon Marketplace, just as Amazon's former Price Parity required.[182]

142.   Like its previous MFN agreement, Amazon regularly enforces its Fair Pricing provision, which has the same impact as its former Price Parity. In recognition of this, third-party sellers continue to maintain price parity across their online platforms.[183]

**D. Amazon's MFN agreements reduce price competition and cause consumers to pay more.**

143.   Unlike dual distribution business models where a manufacturer or franchiser is establishing price rules for distributors of its own brand products and secondarily competing with other distributors in sales of such products, Amazon's MFN agreements do not operate as intrabrand restraints. Even if brands do not choose to distribute their products through Amazon Marketplace (like Nike and Birkenstock), their products end up there anyway because Amazon actively recruits unauthorized sellers to supply Amazon or to sell the brands' products as a third-party seller.[184] Amazon's MFN agreements establish a uniform price policy for all goods sold on

---

[181] *Supra Amazon Pricing Strategy: How Much Should You Sell a Product For?*; Gonzalez; Hart.

[182] *Supra* Gonzalez.

[183] *Supra Amazon Pricing Strategy: How Much Should You Sell a Product For*?

[184] Shaoul Sussman, *How Amazon's Pricing Policies Squeeze Sellers and Result in Higher Prices for Consumers*, ProMarket, August 23, 2019, https://promarket.org/2019/08/23/how-amazons-pricing-policies-squeeze-sellers-and-result-in-higher-prices-for-consumers/. *Why Nike and Birkenstock Are Cautionary Tales for Brands on Amazon*, Buy Box Experts (Jul. 10, 2018), https://www.buyboxexperts.com/blog/why-nike-and-birkenstock-are-cautionary-tales-for-brands-on-amazon/.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1   Amazon Marketplace without regard to the source of the products or the brand or

2   manufacturers' own pricing preferences or distribution policies.

3       144.    And they do not offer pro-competitive benefits of intrabrand policies by

4   encouraging competition between competing manufacturers of the same types of goods. Instead,

5   Amazon's MFN agreements usurp brands' ability to manage and distribute their own branded

6   products and thereby thwart the very competition (*i.e.*, between brands) that antitrust laws are

7   primarily designed to protect.

8       145.    Agreements between competitors to restrain price, like Amazon's MFNs,

9   discourage inter-brand competition because they disrupt the principal basis on which brands

10   compete: price.

11       146.    Absent Amazon's anticompetitive price policies, third-party sellers would

12   have set a lower price on a platform with lower fees than Amazon or an even lower price on the

13   seller's own website. Consumers, who purchased the same products offered by Amazon's third-

14   party sellers, were injured because they purchased at prices artificially inflated by Amazon's

15   anticompetitive price policies. For example, a customer who purchased a $150 toy on Viahart

16   (the same price concurrently offered at Amazon) paid $37 more for the toy than if the seller was

17   able to sell the product for $37 less on its own website, while making the same profit.[185]

18   Amazon's MFN agreements have a broad reach, encompassing virtually all consumer products.

19   Consumers who make purchases from competing retail e-commerce channels of any of the

20   hundreds of millions of Class Products concurrently offered at Amazon Marketplace are

21   reasonably likely to be injured in the future by these agreements.

22       147.    The following six charts illustrate the effect[186]:

23

24

25

26      [185] *Id.*

27      [186] The sources of each of the charts are Amazon.com, eBay, Walmart, and other retailer website identified in the charts (retrieved March 5, through March 18, 2020). Note: N/A means

28   that the product is not sold in that marketplace. Shipping is free for all the instances considered.

SECOND AMENDED CLASS ACTION COMPLAINT - 64
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

148.     The average price of men's athletic shoes in the last decade has ranged between $40 and $50.[187] Recent prices of third-party sellers on Amazon Marketplace and other platforms for several products were within this range and the sellers did not vary them across multiple platforms:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|----------|---------|--------|---------|------|-------------|
| Orva Stores | Skechers Men's Equalizer Pesistent Slip-On, Charcoal/Black | $49.95 | $49.95 | N/A | N/A |
| Shoebacca | Diadora Mens Titan Premium Running Sneakers, Blue/Pink | $39.95 | $39.95 | $39.95 | $39.95 |
| | Diadora Mens Kick Casual Sneakers, White, Grey or Black | $39.95 | $39.95 | $39.95 | $39.95 |
| | Diadora Mens N.92 Casual Sneakers, Grey | $39.95 | $39.95 | $39.95 | N/A |
| | Diadora Mens N-6100-4 Running Shoes, Blue | $39.95 | $39.95 | $39.95 | N/A |

149.     Recent prices of third-party sellers on Amazon Marketplace and other platforms had virtually identical prices for several golf ball products across multiple platforms:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|----------|---------|--------|---------|------|-------------|
| Greater Golf Express | Volvik 2020 Magma Golf Balls, 12-Pack | $39.99 | $39.99 | $39.99 | $39.99 |
| CaddiesShack | Bridgestone Tour B330-S Golf Balls, 12-Pack | $34.99 | $34.99 | $34.99 | $34.99 |
| | Volvik S4 White Color Golf Balls, 12-Pack | $44.38 | $44.95 | $44.99 | N/A |
| Golf Ball Divers | Titleist Pro V1 AAA Golf Balls, Used, 36-Pack | $39.99 | $39.99 | N/A | N/A |
| | Bridgestone Golf Precept Laddie Extreme Golf Balls, Used, 36 Pack | $29.99 | $29.99 | N/A | N/A |

150.     In 2018, AmazonBasics, Amazon's private label, was the leading online brand for disposable batteries, accounting for 26% of the e-commerce market.[188] Recent prices third-party sellers of several battery products on Amazon Marketplace and other platforms were virtually identical to the prices on Amazon Marketplace or higher on external platforms:

[187] Athletic Footwear - United States. Retrieved March 11, 2020, from https://www.statista.com/outlook/11020000/109/athletic-footwear/united-states.

[188] Jan Conway, *Market share for largest household battery manufacturers sold online in 2018*, Statista, https://www.statista.com/statistics/718199/online-market-share-household-batteries.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Pharmapacks | Eveready Super Heavy Duty Batteries, AAA, 4 Each | $3.36 | $3.36 | $5.04 | N/A |
| Chrome Batteries | 12V 7AH Sealed Lead Acid (SLA) Battery | $21.80 | $21.80 | $29.90 | $21.90 |
| East Coast Photo | Synergy Digital AA NIMH 2800mAh Rechargeable Batteries, Pack of 4 | $12.55 | $12.55 | N/A | $12.55 |
| | DogWatch DG-8000 Large Gray Dog Collar Battery | $8.95 | $8.95 | N/A | $8.95 |
| | Dantona ULA100AAB Alkaline, AA, Pack of 100 | $33.95 | $33.95 | N/A | $33.95 |

151.     Amazon sells over 1.1 million home improvement products per year, with a revenue of $6.1 billion in 2017.[189] Recent prices by third-party sellers on Amazon Marketplace and other platforms were unvaried for several home improvement products across multiple platforms:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Mix Wholesale | Cauldham 5 Pack Solid Kitchen Cabinet Arch Pulls Handles (3-3/4" Hole Centers) - Curved Drawer/Door Hardware - Style T750 - Matte Black | $13.99 | $13.99 | N/A | $13.99 |
| | Cauldham Heavy-Weight Bin Cup Drawer Pulls (3" Hole Centers) - Classic Kitchen Cabinet Door Handle Hardware - Style B350 - Oil Rubbed Bronze | $14.99 | $14.99 | N/A | $14.99 |
| | Cauldham 5 Pack Solid Kitchen Cabinet Knobs Pulls (1" Square) - Transitional Dresser Drawer/Door Hardware - Style S685 - Satin Nickel | $14.99 | $14.99 | N/A | $14.99 |
| Ron's Home and Hardware | WV15TV 1.5 In. Chip Brush, Pack of 36 | $21.37 | $21.37 | N/A | N/A |
| Southfork Homecenter | ProSource Single And Utility Unitrack Shelf Bracket, 8 In L X 2-1/2 In W 1.8 Mm Thick, Steel, White | $9.38 | $9.38 | N/A | N/A |

152.     Kitchen and dining is another leading product category, accounting for 39% of all Amazon sales in the United States as of January 2019.[190] Recent prices on Amazon Marketplace and other platforms for several kitchen and dining products were virtually indistinguishable:

---

[189] J Clement, *US Amazon sales in selected retail product sectors 2017*, Statista, https://www.statista.com/statistics/709493/us-amazon-sales-selected-retail-sectors/.

[190] Jay Clement, *Leading product categories purchased by Amazon shoppers in the United States as of February 2019* (Aug. 9, 2019), Statista, https://www.statista.com/statistics/1086637/amazoncom-3p-seller-metrics-usa/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|----------|---------|--------|---------|------|-------------|
| eKitchenWorld | Lodge 5 Inch Square Cast Iron Skillet | $15.40 | $15.40 | $15.40 | $15.40 |
| | Ginsu Essential Dishwasher Safe 6 Piece Steak Knife Set | $19.94 | $19.94 | $19.94 | $19.94 |
| BigKitchen | GreenPan Paris 3 Quart Non-Stick Dishwasher Safe Ceramic Covered Sauce Pan | $52.41 | $52.41 | N/A | N/A |
| Zwilling J.A. Henckels | Demeyere Industry 5-Ply 8-inch Stainless Steel Traditional Nonstick Fry Pan | $79.95 | $79.95 | $79.95 | $79.99 |
| Gourmet Forte | Kai Pure Komachi 2 3pc Prep Knife Set | $22.95 | $22.95 | N/A | N/A |

153.    Cleaning supplies is another top selling product category on Amazon Marketplace. Recent prices on Amazon Marketplace and other platforms for several cleaning products were virtually indistinguishable:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|----------|---------|--------|---------|------|-------------|
| Microfiber Products | Microfiber Mop Kit for All Floor Types 100% Green Clean | $28.95 | $28.95 | N/A | N/A |
| | 18" Aluminum Commercial Mop Hardware | $29.95 | $29.95 | N/A | N/A |
| Ron's Home and Hardware | Armaly Brands 00009 Proplus Heavy-Duty Utility Sponge, 12-Pack | $30.37 | $38.95* | N/A | N/A |
| Southfork Homecenter | Continental Commercial Swivel Snap C702048 Dust Mop Frame 48 in | $13.97 | $13.97 | $13.97 | N/A |

**E.    Through combination or conspiracy with its third-party sellers, Amazon has a monopoly in the relevant markets.**

154.    Amazon Marketplace has a monopoly in the U.S. retail e-commerce market or Online Retail Marketplaces Market (defined below), as demonstrated by its power to control prices of a vast number of goods offered for sale in the U.S. retail e-commerce market and through online retailer marketplaces. Its pricing policies support monopoly power "because people who prefer to shop on Walmart [or other sites] end up having to pay a higher price."[191] Many third-party sellers have foregone selling on other platforms just to avoid conflicts under Amazon's pricing policy. For example, Jason Boyce, who advises online sellers, said of a health care supply company he advises: "My client cut off Walmart — Walmart! — because it was hurting their Amazon business," Mr. Boyce said. "If that's not monopoly power, I don't know what is."[192] Sally Hubbard, a former assistant attorney general of New York and current director of enforcement strategy with Open Markets Institute, a think tank that advocates for more

---

[191] *Supra Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

[192] *Supra* Weise.

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

aggressive policing of competition laws, agrees: "You ask anybody who knows anything about Amazon, and they will say yes, Amazon has the ability to control prices in some respects. And it certainly has the ability to exclude competition."[193] Similarly, Lina Khan, whom the House of Representative's antitrust subcommittee hired as its counsel, opines that it is important to distinguish between Amazon's innovations and its abuse of market power: "We as a society can live in a world of internet commerce without resigning ourselves to all that commerce being mediated by Amazon."[194]

155.    "They control everything," explained a baby products retailer that formerly sold on Amazon Marketplace.[195]  "If they don't want an item on there, they can decide that. If they only want one seller to sell something, they can set that rule."[196]  As another example of Amazon's power over its third-party sellers, Amazon imposed a great deal of financial strain on many third-party payers, accustomed to more immediate payment from consumers, when it rolled out a "pay by Invoice" policy in 2018 that permitted business customers 30 days to pay for products purchased on the Amazon.com platform.[197] One third-party seller complained that Amazon's policy uses the third-party sellers "to finance the growth" of its own business customers.[198] Jerry Kavesh, the CEO of 3P Marketplace Solutions, a consulting firm for the Amazon marketplace, explained why this placed an unfair burden on third-party sellers: "This new policy at least doubles the cash a small seller needs to have on hand in order to operate, which many small firms simply do not have and do not have the ability to access.[199] He predicted

---

[193] Ben Unglesbee, *Is Amazon on a collision course with the government?*, RetailDive (Sept. 30, 2019), https://www.retaildive.com/news/is-amazon-on-a-collision-course-with-the-government/563622/.

[194] *Id.*

[195] *Supra* Mitchell.

[196] *Id.*

[197] Eugene Kim, *Some Amazon sellers are outraged over a new payment policy designed to attract more corporate buyers,*" CNBC (Aug. 21, 2018). https://www.cnbc.com/2018/08/21/amazon-corporate-buyers-longer-terms-some-sellers-upset.html.

[198] *Id.*

[199] *Id.*



that it "could put sellers in a cash bind, where they may not be able to pay suppliers and employees, which is problematic at best, and worst could put them out of business."[200]

156.    Amazon Marketplace achieved market dominance at least in part through the contractual controls it exercises over the prices its third-party sellers can offer products through competing retail e-commerce channels.

157.    Amazon's price policies are injurious to market competition. Consumers pay inflated prices for products that are protected from competitive pricing by Amazon's anticompetitive pricing policies. Amazon's dominance is durable. No other competing retailers have comparable infrastructure, inventory, customer base, search or data advantages to challenge Amazon in the ecommerce market.

158.    "[C]ompanies that once drew sufficient consumer traffic from search engines to their own sites are now compelled to become vendors or sellers on Amazon's platform—or forego access to a majority of online shopping traffic."[201] This "gives it an unprecedented degree of structural power in the economy."[202] As early as 2016, the internet-marketing firm BloomReach Inc. found that 55% of those surveyed first start with Amazon when searching for products.[203] Consumer preference for Amazon Marketplace as a starting point has only increased with time. A survey conducted by Feedadviser in 2019 found that 66% of consumers start their search for new products on Amazon Marketplace and 74% start there when they are ready to buy a specific product.[204] Because so many consumers start their shopping on Amazon, Amazon holds valuable and often unique data on consumers' search and product browsing history. This allows the creation of consumer and household profiles, and the targeting of advertising by sellers that use the platform in a way that is not possible on new or smaller rivals.

---

[200] *Id.*

[201] *Id.*

[202] *Id.*

[203] Spencer Soper, *More than 50% of Shoppers Turn First to Amazon in Product Search*, BLOOMBERG, Sept. 26, 2016, https://www.bloomberg.com/news/articles/2016-09-27/more-than-50-of-shoppers-turn-first-to-amazon-in-product-search.

[204] Feedadvisor, *The 2019 Amazon Consumer Behavior Report*, https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf.

SECOND AMENDED CLASS ACTION COMPLAINT - 69
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX



159.    With over 340 million products and two million sellers on Amazon Marketplace,

Amazon has unparalleled inventory. Its sprawling network of over 100 warehouses is scattered

across the United States.[205] Amazon has now surpassed DHL to become the world's largest

---

[205] Nate Rattner and Annie Palmer, *This map shows how Amazon's warehouses are rapidly expanding across the country*, CNBC (Jan. 19, 2020), https://www.cnbc.com/2020/01/19/map-of-amazon-warehouses.html.

SECOND AMENDED CLASS ACTION COMPLAINT - 70
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

provider of shipping and fulfillment services, giving it a vast edge over its competitors in the distribution of products.[206] Amazon delivers the majority of its own packages.[207]

160.     The sheer size of Amazon's first-party retail operations allows it to offer the full suite of entire digital sales infrastructure to third-party sellers, such as inventory management, fulfillment, return processing, and advertising.[208] Lacking that scale, Amazon's rivals like Walmart and Target, who also offer third-party marketplaces, cannot truly compete.[209] And by selling more services, Amazon generates greater profits from the sales of third-party sellers than its competitors can on their online marketplaces.[210]

161.     The Amazon Marketplace accounts for more than half of all retail e-commerce in the United States, and its closest competitor accounts for only 7.1% of online retail sales.[211] This along with direct evidence of Amazon's power to raise prices and exclude competition support monopoly power.

162.     Alternatively, at a minimum, Amazon has a monopoly in the ecommerce submarkets where Amazon Marketplace has a monopoly share of those markets ("Identified Submarkets"), including:

        a.   Batteries (97%),

        b.   Kitchen and Dining (94%),

        c.   Musical Instruments & Karaoke (94%),

        d.   Home Improvement Tools (93%),

        e.   Automotive (92%),

---

[206] *Supra* Weise.

[207] Emma Cosgove, *Amazon Logistics parcel volume will surpass UPS and FedEx by 2022*, Retail Dive, (Dec. 16, 2019), https://www.retaildive.com/news/amazon-logistics-volume-surpass-ups-fedex-2022-morgan-stanley/569140/.

[208] *Supra* Statt.

[209] *Id.*

[210] *Id.*

[211] Blake Droesch, *Amazon dominates US ecommerce, though its market share varies by category*, eMarketer (Apr. 27, 2021), https://www.emarketer.com/content/amazon-dominates-us-ecommerce-though-its-market-share-varies-by-category.

f.  Golf (92%),

g.  Skin Care (91%),

h.  Health (91%),

i.  Cleaning Supplies (88%),

j.  Sports, Fitness & Outdoors (87%),

k.  Party, Arts & Crafts (86%),

l.  Household Essentials (83%),

m.  Office (83%),

n.  Home Improvement (82%),

o.  Electronics (82%),

p.  Toys & Video Games (81%),

q.  Personal Care (81%),

r.  Men's Athletic Shoes (74%),

s.  Beauty (73%),

t.  Home (72%),

u.  Appliances (70%),

v.  Jewelry & Accessories (70%),

w.  Pets (68%),

x.  Baby (68%), and

y.  Furniture (54%)

**F.  Alternatively, Amazon has attempted to monopolize the relevant markets through its MFN agreements with its third-party sellers.**

163.  Amazon, inclusive of its third-party sellers, has over 50% of all online sales of consumer goods; compared to a meager 21% *combined* share of the next nine biggest online retailers.[212] Amazon Marketplace has the power to control retail e-commerce prices generally in the United States and demonstrates this power by setting a floor price for products sold anywhere

---

[212] House Report at 255; *Supra Amazon Now Has Nearly 50% of US Ecommerce Market*.

SECOND AMENDED CLASS ACTION COMPLAINT - 72
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1   online by its two million third-party sellers. Amazon Marketplace's 90% share of the Online

2   Retail Marketplaces Market likewise demonstrates its monopoly power.

3        164.   Amazon Marketplace has achieved this market power at least in part by enforcing

4   its MFN agreements.

5        165.   Setting a floor price for products sold through competing retail e-commerce

6   channels is anticompetitive and causes consumers to overpay in their online purchases.

7        166.   Alternatively, if through the MFN agreements, Amazon Marketplace does not

8   already exercise monopoly power in the relevant markets, it has a dangerous probability of

9   achieving a monopoly through its internet dominance and injurious price policies.

10   **G.**    **Amazon is the subject of a government investigation for possible antitrust violations, including whether it uses its relationship with its third-party sellers to harm**

11        **competition.**

12        167.   As a result of the German authority's findings, as well as coordinated efforts by

13   the U.K.'s Office of Fair Trading, Amazon ultimately abandoned its Price Parity Clause

14   throughout the EU. But it continued to enforce this provision in the U.S. market until March

15   2019, when it withdrew the provision in response to the threat of an investigation by the FTC.

16        168.   But it did not stop enforcing its MFN agreements or assuage concerns by

17   government investigators. In 2019, the Washington Post reported that the FTC planned to

18   investigate Amazon as part of a broad investigation into the large technology companies.[213] This

19   follows an earlier announcement that the FTC had established a special task force to monitor the

20   big tech companies and to investigate "any potential anticompetitive conduct in those markets,

21   and tak[e] enforcement actions when warranted." [214] According to Gene Kimmelman, the

22   president of Public Knowledge, a Washington-based consumer advocacy group: "This should be

23

24

25

26       [213] Tony Romm, *Amazon could face heightened antitrust scrutiny under a new agreement between U.S. regulators*, Wash. Post (Jun. 1, 2019) https://www.washingtonpost.com/

27   technology/2019/06/02/amazon-could-face-heightened-antitrust-scrutiny-under-new-agreement-between-us-regulators/.

28       [214] *Id.*

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

a wake-up call to both Google and Amazon to behave themselves because it at least shows that the Justice Department and FTC are thinking about them."[215]

169.   Vox reported that the FTC started questioning some of Amazon's competitors about its business practices, according to someone briefed on the discussions.[216] Bloomberg reported that FTC investigators began interviewing Amazon's third-party sellers last fall as part of a sweeping probe to determine whether Amazon is using its market power to hurt competition.[217] According to reports, investigators are skeptical that shoppers and suppliers have real alternatives to Amazon.[218]

170.   In 2019, the House subcommittee on antitrust conducted an extensive investigation of Amazon's pricing policies governing third-party sellers. The resulting House Report concluded that "Amazon has a history of using MFN clauses to ensure that none of its suppliers or third-party merchants can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[219]

171.   The House Report rejected Amazon's claims that it competes with brick-and-mortar retailers, outside the Online Retail Sales Market, explaining that "[t]his approach is inconsistent with evidence gathered by Subcommittee staff, conventional antitrust analysis of relevant product markets, and common sense."[220] The House Report further highlighted the FTC's recent conclusion that a "relevant market may be divided by channel of sale, resulting in separate markets for brick-and-mortar sales and online sales."[221]

---

[215] *Id.*

[216] Jason Del Rey, *Amazon may soon face an antitrust probe. Here are 3 questions the FTC is asking about it.*, Vox (Jun. 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/amazon-ftc-antitrust-investigation-prime.

[217] *Supra* Soper & Brody.

[218] *Id.*

[219] House Report at 295.

[220] House Report at 255.

[221] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

172.    The House Report also concluded that "Amazon functions as a gatekeeper for ecommerce."[222] Further, "Amazon has monopoly power" over most third-party sellers that feel they "cannot turn to alternative marketplaces, regardless of how much Amazon may increase their costs of doing business or how badly they are treated."[223]

173.    Additionally, the House Report found that "Amazon also enjoys significant market power over online consumers" that "is durable and unlikely to erode in the foreseeable future."[224] This durable market power reflects significant barriers to entry that include: "(1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery."[225]

174.    Relatedly, after a two-year investigation into Amazon's method of awarding Buy Box winners on its marketplace, the Italian competition authority imposed a € 1.1-billion fine, based on its conclusion that Amazon abused its dominant position in the Online Retail Marketplaces Market.[226] Amazon also entered into a consent decree with the Washington Attorney General and agreed to a penalty in connection with the Washington Attorney General's investigation into horizontal price-fixing under the "Sold by Amazon" program, which allowed Amazon to agree on price with third-party sellers, rather than compete with them.[227]

---

[222] *Id.* at 256.

[223] *Id.* at 257.

[224] *Id.* at 259-60.

[225] *Id.* at 260.

[226] Steve Dent, *Italian regulator fines Amazon $1.28 billion for abusing its market dominance*, Engadget (Dec. 9, 2021), https://www.engadget.com/italy-fines-amazon-for-abuse-of-dominant-position-085244332-085736675.html.

[227] Press Release, *AG Ferguson investigation shuts down Amazon price-fixing program nationwide*, Washington State Attorney General's Office, (Jan. 26, 2022), https://www.atg.wa.gov/news/news-releases/ag-ferguson-investigation-shuts-down-amazon-price-fixing-program-nationwide (last visited Feb. 23, 2022).

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

# VI.   INTERSTATE TRADE AND COMMERCE

175.   Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells goods on its own behalf and as a platform for its third-party sellers across, and without regard to, state lines.

# VII.   RELEVANT MARKETS

176.   Plaintiffs' *per se* claims do not require them to prove anticompetitive impact in the relevant market. For purposes of Plaintiffs' remaining claims, the antitrust injuries alleged herein, including harm to consumers who purchase products online that are concurrently offered on Amazon Marketplace, have occurred in a) the U.S. retail e-commerce market, b) the Identified Submarkets within that market, or c) the Online Retail Marketplace Market.

### 1.   U.S. retail ecommerce market and Identified Submarkets are relevant markets to assess Amazon's anticompetitive MFNs.

177.   Government agencies, economists, customers and retailers alike recognize the retail ecommerce market as a distinct market within the U.S. retail market. Industry recognition of a distinct ecommerce retail market is relevant because economic actors usually have accurate perceptions of economic realities and the parties active in the market understand its function and demarcation.

178.   For example, the U.S. Census Bureau defines ecommerce as "[t]he sale of goods and services where the buyer places an order, or the price and terms of the sale are negotiated over an Electronic Data Interchange, the Internet, or any other online system (extranet, e-mail, instant messaging)." The market also includes mobile shopping.[228] It has collected data on ecommerce sales since 1998.[229] In 2002, it began compiling E-STATS, statistics "devoted exclusively to 'Measuring the Electronic Economy,'"[230] and it publishes quarterly ecommerce reports.[231] More recently, the Census Bureau released a supplemental data table on retail e-

---

[228] J. Clement, Statista, *E-commerce in the United States - Statistics & Facts*, Mar, 12, 2019, https://www.statista.com/topics/2443/us-ecommerce/.

[229] https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[230] https://www.census.gov/programs-surveys/e-stats.html.

[231] https://www.census.gov/retail/ecommerce/historic_releases.html.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

commerce by type of retailer to enhance "understanding of where consumers are shopping online" and "provide an overview of trends in retail and e-commerce sales."[232] Census data are also available for e-commerce sales by type of product.[233] Similarly, the Bureau of Labor Statistics Producer Price Index (PPI) program separately tracks the ecommerce industry group, which includes both electronic shopping and auctions.[234] According to a publication by the U.S. Bureau of Labor Statistics, ecommerce retailers typically maintain lower margins than brick-and-mortar stores because of lower overhead costs associated with preserving store appearance, *e.g.*, décor and store maintenance.[235] Because they do not have the same overhead, the publication finds that online retailers can provide more competitive prices, whereas brick-and-mortar stores, on the other hand, offer consumers immediate gratification and personalized service.[236] On the other hand, data from the U.S. Census Bureau, indicated that brick and mortar stores require less advertising and that on average, ecommerce and mail-order retailers spent three times as much as store retailers on advertising and promotions per dollar of sales.[237]

179.    Ecommerce has unique characteristics, including the marketing and distribution of products. Economists recognize that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[238] An online channel has distinct characteristics from a physical channel.[239] Ecommerce has a superior method of transmitting information, effective asynchronous communication, greater flexibility in dealing with

---

[232] https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce

[233] *Id.*

[234] Lana Borgie, *Trends in producer prices between e-commerce and brick-and-mortar retail trade establishments*, Prices & Spending Vol. 3, No. 18, Aug. 2014, https://www.bls.gov/opub/btn/volume-3/pdf/trends-in-producer-prices-between-e-commerce-and-brick-and-mortar-retail-trade-establishments.pdf.

[235] *Id.* at 3.

[236] *Id.* at 2-3.

[237] *Id.* at 3-4 and n.8.

[238] Forsythe, S.M., & Shi, B. (2003). *Consumer patronage and risk perceptions in Internet shopping.* Journal of Business Research 56, 867–875 at 874.

[239] Katawetawaraks, C., & Wang, C. H. (2011). *Online Shopper Behavior: Influences of Online Shopping Decision.* Asian Journal of Business Research, 1(2), 66-74.



information, with far greater interactivity and search capability.[240] "Despite the relative inefficiency of delivering goods directly to the home," ecommerce leads to unique cost savings because "supplying direct to the consumer is less expensive than doing so through a store."[241] Ecommerce retail businesses avoid the costs "of handling within the store (unpacking, stocking and maintaining shelves, and such), theft (which can easily account for 3 percent of the sales of a retailer), rent (low-cost distribution centers replace expensive urban or suburban real estate), and selling costs (automated and tele-sales replace relatively expensive in-store salespeople)."[242] Consumers similarly benefit from greater "information about available goods and services, and services; an improvement in access to these goods; and the ability to customize goods to fit the tastes of buyers."[243] Economists also recognize that the physical location of the business operating within ecommerce becomes less relevant because the ecommerce market "facilitates production and distribution across borders ... and can assist in opening markets that were previously closed."[244] The lower transaction costs and production costs also facilitate easier entry into the market and increase competition.[245] Demand side preferences also make online retailing unique in terms of certain factors such as convenience and price.[246] Because competing offers are "just a few clicks away on the Internet, online consumers can more easily compare different

---

[240] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce*, JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 15, No.1 (Winter 2001) at 5, https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/Economics%20and%20Electronic%20Commerce.pdf; *see also* David VanHoose, ECOMMERCE ECONOMICS (Routledge 2nd Ed. 2011); http://cw.routledge.com/textbooks/vanhoose/.

[241] *Id.*

[242] *Id.* at 5-6.

[243] *Id.* at 6-7.

[244] Andrew D. Mitchel, *Towards Compatibility: The Future of Electronic Commerce within the Global Trading System*, J Int Economic Law (2001) 4 (4): 683.

[245] *Id.*

[246] Tracey Wallace, The 2018 Omni-Channel Retail Report: Generational Consumer Shopping Behavior Comes Into Focus, https://www.bigcommerce.co.uk/blog/omni-channel-retail/#developing-your-omni-channel-strategy; *see also* Isabel P. Enrique and Sergio Romàn, *The Influence of Consumers' Cognitive and Psychographic Traits on Perceived Deception: A Comparison Between Online and Offline Retailing Contexts*, J Bus Ethics (2014) 119:405–422 (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

alternatives before buying with lower search cost than offline consumers."[247] Online shoppers can also more easily put off purchases decisions until they are ready to buy because they have not invested in travel time and do not face the pressure from the salespeople that shoppers in brick and mortar stores experience.[248]

180.    Yale economist Fiona Morton notes that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[249] The combination of these attributes "tend to generate concentrated markets, or market structures containing few firms," and "the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[250]

181.    The Stigler Committee on Digital Platforms, on which Ms. Morton also serves as the chair of the Subcommittee on Market Structure and Antitrust, reports that "[t]raditional brick-and-mortar stores and online platforms differ greatly in their advertising and personalization capabilities."[251] Online retailers "almost always require account creation for purchasing, verify this information for each transaction, and have direct or easy access to detailed non-shopping information about their customers."[252] This account creates a digital identity, which incorporates select data on age, sex, address, email address, preferences, and, potentially, more information.[253] By comparison, physical shops tend not to force shoppers to identify themselves—and indeed

---

deception associated with online vis- à-vis in-store shopping, indicating that they need to be considered as distinct experiences for the customer).

[247] *Supra* Isabel P. Enrique and Sergio Romàn at 408.

[248] *Id.*

[249] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf.

[250] *Id.*

[251] Stigler Committee on Digital Platforms (Sep. 16, 2019), https://research.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf at 45.

[252] Stigler Committee on Digital Platforms at 45.

[253] *Id.* at 54.

consumers who use cash, credit cards with chips or phone payment apps do not identify themselves to the store.[254] In addition to the data the online retailers collect, data intermediaries also collect consumers' information that they then sell. Consumers on the internet leave numerous traces of their activities across a broad range of applications, and the emergence of the Internet of Things means that platforms have access to yet more data generated by home appliances, cars, and other devices, *e.g.*, tracking eye movement, mouse movement, body movement, and body position.[255] Advances in data mining and artificial intelligence enable firms to learn more from data than was conceivable a few decades ago.[256] The digital identities online retailers and others create help them identify and tag users to the data they generate, permitting the collection and analysis of vast amounts of data on individual behavior. This ability to merge a consumer's purchase history with other detailed information about their customers' lives from other consumer data sources gives online platforms a distinct advantage over in-store retailers to design targeted advertising for particular consumers, based on many aspects of their lives beyond their historical shopping habits.[257] Lina M. Khan agrees: "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store--precisely because the type of behavior that online firms can track is far more detailed and nuanced."[258]

182.    Large platform operators like Amazon operate other services (for example, Prime video, Goodreads, Kindle books) that allow them to collect different dimensions of data on a consumer (for example, identity, location, and purchase intent) which give faster intelligence on competitive threats and superior insights into what firms they should block, which they should

---

[254] *Id.* at 45; *How Does the Chip in My Credit Card Work?* Ascent (Nov 20, 2018), https://www.fool.com/the-ascent/credit-cards/articles/how-does-the-chip-in-my-credit-card-work/.

[255] *Id.* at 48.

[256] *Id.*

[257] *Id.* at 45. *See also id.* at 232 ("It is not evident from Amazon's privacy policies that there are limits on the company's ability to purchase data from a third party like Fitbit, to aggregate that database with Amazon's own data, and then to identify particular kinds of consumers (*e.g.*, long-distance runners) on that basis.").

[258] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 764 (2017).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

buy, and how they should grow strategically.[259] The Stigler Committee on Digital Platforms

reports: "This gives the platform an advantage over a rival entrant considering the same set of

opportunities, and increases their abilities to exclude such rivals."[260]

183.    U.S. retailers recognize the online market as a separate economic entity.

Established large retailers, *e.g.*, Walmart, Target, and Costco, have an online presence, but focus

their efforts overwhelmingly on their physical stores. For example, in 2017, ecommerce

accounted for only 5.5% of revenue for Target,[261] 4% for Costco,[262] and 3% for Walmart.[263]

Only 28% of small businesses sell online.[264] Online retailers commonly advertise only online,

whereas store retailers advertise both on and offline.[265] Unlike brick and mortar stores,

ecommerce retailers do not have a way to take payment by cash or checks.[266] Brick and mortar

stores typically provide customer service in-store to respond to questions about product

offerings, whereas customer service for ecommerce retail is typically less comprehensive or

effective.[267]

184.    U.S. Consumers distinguish between ecommerce and brick-and-mortar shopping

markets. As a practical matter, the ecommerce market requires access, usually through a personal

---

[259] *Id.* at 75.

[260] *Id.*

[261] Nat Levy, *Target's digital sales grew 10X faster than in-store sales in 2018, as retailer adjusts to battle Amazon*, Geekwire, Mar. 5, 2019, https://www.geekwire.com/2019/targets-digital-sales-grew-10x-faster-store-sales-2018-retailer-adjusts-battle-amazon/.

[262] *Trefis Team, How Much Of Wal-Mart's Revenue Will Come From E-Commerce In 2020?*, Forbes, Nov. 27, 2017, https://www.forbes.com/sites/greatspeculations/2017/11/27/how-much-of-wal-marts-revenue-will-come-from-e-commerce-in-2020/#454ed14359f2.

[263] E-commerce accounts for 4% of Costco's sales and is growing 12%, https://www.digitalcommerce360.com/2017/03/06/e-commerce-accounts-4-costcos-sales-growing-12/.

[264] Jia Wertz, *How Brick-And-Mortar Stores Can Compete With E-Commerce Giants*, Forbes, May 17, 2018, https://www.forbes.com/sites/jiawertz/2018/05/17/how-brick-and-mortar-stores-can-compete-with-e-commerce-giants/#4be14a943cc0.

[265] Anna Johansson, *6 Fundamental Differences Between E-Commerce & Brick-and-Mortar Stores*, RetailNext, https://retailnext.net/en/blog/6-fundamental-differences-between-e-commerce-brick-and-mortar-stores/.

[266] *Id.*

[267] *Id.*



computer, smart phone or tablet, and most, but not all U.S. consumers have access to this market.[268] According to a Pew Research Center study in 2016, 64% of U.S. consumers prefer shopping in physical stores, and when purchasing something for the first time, 84% of U.S. consumers found it important to be able to ask questions about what they are buying or to buy from sellers they are familiar with, and 78% think it is important to be able to try the product out in person, where physical stores have an advantage over ecommerce.[269]

185.     Ecommerce attracts a younger demographic. A 2017 survey by Statista found that 67% of Millennial shoppers preferred to search and purchase on ecommerce sites rather than in store, while only 28% of seniors do.[270] Online retailers offer a broader selection and a larger inventory than offline retailers do. Consumers can shop online 24/7 and locate hard-to-find items more easily than they could by searching physical stores.[271] Online retail provides greater convenience to consumers who can order products from any location without having to find a brick-and-mortar store selling the specific product with the specific desired attributes and the desired quantity.[272] Shopping in physical stores offers more social interaction and socializing with other shoppers and it is faster and easier to return a defective or unwanted product in-store rather than shipping back to an online retailer.[273] The following graphic summarizes the key differences between markets from the consumers' perspective:[274]

---

[268] Aaron Smith and Monica Anderson, *Online Shopping and E-Commerce, Pew Research Center*, Dec. 19, 2016, https://www.pewresearch.org/internet/2016/12/19/online-shopping-and-e-commerce/.

[269] *Id.*

[270] Clement, J. U.S. online shopping preference 2017, by age group, Aug. 12, 2019, https://www.statista.com/statistics/242512/online-retail-visitors-in-the-us-by-age-group/.

[271] Susan Ward, *Brick and Mortar Stores vs Online Retail Sites*, Jun. 25, 2019, https://www.thebalancesmb.com/compare-brick-and-mortar-stores-vs-online-retail-sites-4571050; https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[272] *Id.*

[273] *Supra* Ward.

[274] Rose Leadem, *67 Fascinating Facts About Ecommerce vs. Brick and Mortar (Infographic)*, Dec. 30, 2017, https://www.entrepreneur.com/article/306678.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX



186.     Ecommerce stores have a distinctly different look and feel to customers than markets that rely on a different chain of distribution, *e.g.*, in-store purchases, mail-order or purchases made from traveling sales staff. Typically, with a few clicks or a simple voice command, an ecommerce retailer will send the product directly to the consumers without any interaction with sales staff.

SECOND AMENDED CLASS ACTION COMPLAINT - 83
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

187.    For purposes of their rule of reason and monopoly claims, Plaintiffs allege that the relevant market in which to assess the impact of Amazon's conduct is the U.S. retail ecommerce market as a whole. In the alternative, the relevant markets are the U.S. ecommerce retail market for the sales of the Identified Submarkets, where Amazon has a dominant share of the online market.

188.    Amazon's restraints on competition directly impact the U.S. retail ecommerce market and each of the Identified Submarkets as alleged herein.

**2.      The two-sided Online Retail Marketplace Market is another relevant market to assess whether Amazon's MFN agreements have had an anticompetitive impact.**

189.    Amazon's MFN agreements not only raise consumer prices and reduce competition with existing and potential online retailers, they also act as barriers to prevent existing online retail marketplace operations from expanding or potential rivals from entering the market.

190.    The Italian competition authority, Autorità Garante della Concorrenza e del Mercato ("AGCM") recently fined Amazon $1.3 billion for its use of a biased algorithm that suppressed offers from third-party sellers that Amazon disfavored because they chose not to enroll in Amazon's Fulfilled by Amazon.[275] For purposes of its enforcement action, the AGCM defined the relevant market as the market for intermediation services on online marketplaces.[276]

191.    An online "marketplace," as distinguished from a retailer's proprietary website, "allows consumers to access the offer of goods of one or more product categories by a plurality of sellers and the latter to offer their products online to an often very large audience of consumers."[277] An intermediation service, as used by the AGCM and alleged here by Plaintiffs, refers to the business of a two-sided platform that brings together consumers and sellers and can resolve transactions without redirecting them elsewhere.[278]  In economic theory, a two-sided

---

[275] AGCM Report, ¶ 883.

[276] *Id.* ¶¶ 508-21.

[277] *Id.* ¶ 38.

[278] *Id.* ¶¶ 38-46.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

platform is characterized by the presence of network effects: its usefulness for users on one side of the platform increases as the number of users on the other side increases (in this case consumers and sellers occupy respective sides of Amazon Marketplace's two-sided platform).[279] As described below, online retail marketplaces are characterized by their network effects.

192.    This market (identified in this Complaint as the "Online Retail Marketplace Market"), comprising of online platforms that allow consumers to purchase retail products listed by multiple independent sellers without having to leave the platform, is therefore another relevant market where the anticompetitive effects of Amazon's MFNs are felt. The Online Retail Marketplace Market necessarily excludes the following retail sales:

a.  Offline sales because "the physical channel for the sale of products to end consumers is not considered replaceable with online sales" or "intermediation services offered by marketplaces" in "e-commerce";[280]

b.  Sales on proprietary online sites managed directly by retailers because of the "significant differences" from "the perspective of the retailer" between "the exercise of the online sales activity through a platform and the construction and management of a website owned with ecommerce functionality";[281]

c.  Sales on social media or a price comparison service because the sales transactions are not realized on the original platform, but rather require the consumer to be redirected "to sellers' websites or to marketplaces";[282] and

d.  Sales on specialized marketplace platforms that offer a selection of products in a limited category because they only serve "the needs of consumers looking for a specific product and a targeted purchase" and attract only a small fraction of the third-party sellers that sell on broader "horizontal markets," like Amazon's.[283]

---

[279] *Id.* ¶ 41.

[280] *Id.* ¶ 522.

[281] *Id.* ¶ 532.

[282] *Id.* ¶ 565.

[283] *Id.* ¶¶ 81, 84.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

193.    Amazon's anticompetitive conduct has allowed it to maintain or increase its market share of the Online Retail Marketplace Market, which is estimated to be as high as 90% of all U.S. online marketplace sales.[284]

194.    For many U.S. consumers online shopping is virtually synonymous with Amazon. Before making a purchase, 82% of consumers check prices from Amazon, 79% check Amazon's reviews, and 74% of U.S. consumers go directly to Amazon when they are ready to purchase a specific product.[285]

   a.    **Online retail marketplaces, like Amazon Marketplace, have powerful network effects.**

195.    Online retail marketplaces like Amazon Marketplace, benefit from powerful network effects. "Network effect" refers to any situation in which the value of a product, service, or platform depends on the number of buyers, sellers, or users who use that product, service, or platform.[286] Indirect network effects occur when there are two types of users and the benefit of the platform increases for one user group as the membership of other group increases. As applied here, the more consumers who use Amazon Marketplace to shop, the greater the benefit to sellers using the platform to make retail sales, and conversely, the more sellers that join Amazon Marketplace, the greater the benefit to consumers using the platform to make retail purchases.

196.    Amazon Marketplace is the prototypical example of strong indirect network effects. Amazon' consumer base of hundreds of millions of customers makes it indispensable to third-party sellers, and its 2 million active third-party sellers help to secure its customers' loyalty, who cannot find the breadth of products that Amazon's marketplace offers anywhere else.

---

[284] House Report at 255.

[285] The 2019 Amazon Consumer Behavior Report, https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf at 14-15.

[286] Tim Stobierski, *What are network effects?*, Harvard Business School Online (Nov. 12, 2020), https://online.hbs.edu/blog/post/what-are-network-effects (last visited Feb. 23, 2022).

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

197.   As a first-party retailer, Amazon sells 12 million unique products on its marketplace—not including books, media, wine, and services.[287] Third-party sellers greatly expand the number of unique products offered on Amazon Marketplace by offering 340 million products.[288]

        **b.**    **Amazon does not face any serious competitive threat to its dominance in the Online Retail Marketplace Market.**

198.   Amazon's size alone is direct evidence of its market power. Amazon's market capitalization is currently $1.553 trillion.[289] By that measure, Amazon is the world's fifth-biggest company.

199.   Online big box stores do not pose a credible threat to Amazon Marketplace. While they may have a significant number of visitors to their website, they cannot compete with the broad catalogue of goods available on online retail marketplaces or the marketplaces' ability to deliver to their customers.[290] Because "most marketplaces launched by retailers" do not invest in the infrastructure necessary to offer a sufficiently broad category of goods, they "fail to generate significant sales volume."[291] For example, Best Buy launched its marketplace in the U.S. in 2011, only to shut it down five years later because of "customer confusion over marketplace purchases."[292] Jeff Shelman, Best Buy spokesperson, explained that its customers were confused by Best Buy's "inability to offer in-store pickup for items offered for sale by third-party merchants," and by "the fact that customers could not return marketplace items to Best Buy's retail stores."[293]

---

[287] *How many products does Amazon carry?*, Retail TouchPoints, https://www.retailtouchpoints.com/resources/how-many-products-does-amazon-carry (last visited Feb. 23, 2022).

[288] 15 Amazon Statistics You Need to Know in 2022, repricerexpress.com, https://www.repricerexpress.com/amazon-statistics/.

[289] https://companiesmarketcap.com/amazon/marketcap/ (last visited Feb. 23, 2022).

[290] *Retailers Do Not Need Marketplaces*, Marketplace Pulse (Nov. 14, 2018), https://www.marketplacepulse.com/articles/retailers-do-not-need-marketplaces.

[291] *Id.*

[292] *Id.*

[293] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

200.    The anticompetitive effects of Amazon's MFN agreements must also take into consideration of the market advantages that Amazon already enjoys by virtue of being one of the first online retail marketplaces and through its early recognition of the value of gathering consumer data.

201.    The U.S. House subcommittee itself recognized that "large technology firms" like Amazon "maintain market power in part because it is not easy for users to switch away from the incumbent's technology."[294] For example, a third-party merchant cannot easily download and migrate its ratings and reviews from Amazon Marketplace and would instead have to start without ratings and reviews on a new platform.[295] The difficulty users face with switching away from Amazon's technology causes both consumers and third-party sellers to stick with Amazon even though they may prefer an Amazon rival.[296]

202.    Other Big Tech companies have failed to challenge Amazon's dominance. After attracting fewer than 8,000 sellers even with the promise of eliminating seller commissions,[297] Google exited the online marketplace market in 2021.[298]

203.    Nor does the specialized ecommerce platform, Shopify, pose as risk to Amazon Marketplace's dominance. As recently confirmed by CEO Tobi Lütke, Shopify has no current intention of competing with Amazon in the Online Retail Marketplaces Market.[299] Instead Shopify helps online retailers to build their own online store, but it does not help them reach customers, and conversely Shopify's consumer-facing app does not even allow consumers to

---

[294] House Report at 41.

[295] *Id.* at 42.

[296] *Id.* at 41-42.

[297] *Google Shopping Is Not Attracting Sellers Despite 0% Fees*, Marketplace Pulse (Sep. 30, 2020), https://www.marketplacepulse.com/articles/google-shopping-is-not-attracting-sellers-despite-0-fees.

[298] *Google Promised a Marketplace but Then Gave Up-*, Marketplace Pulse (Aug. 19, 2021), https://www.marketplacepulse.com/articles/google-promised-a-marketplace-but-then-gave-up.

[299] *Shopify Won't Build a Marketplace*, Marketplace Pulse (Apr. 6, 2021); Lucy Carney, *Shopify vs Amazon: Which Platform Should You Use?* (February 23, 2022), https://www.websitebuilderexpert.com/ecommerce-website-builders/comparisons/shopify-vs-amazon/https://www.marketplacepulse.com/articles/shopify-wont-build-a-marketplace.

SECOND AMENDED CLASS ACTION COMPLAINT - 88
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

search  for products across Shopify stores.[300] "Merchants are not a point of leverage for Shopify to build a consumer brand, explains Ben Thompson at Stratechery, "they are Shopify's reason to exist, and no growth hack is going to change that[.]"[301]

204.    Sally Hubbard, former New York Assistant Attorney General and current Director of Enforcement Strategy at the Open Markets Institute, observes, consumers "benefit from robust competition, open markets, and a de-concentrated economy," where "the best rise to the top because of merit, not because powerful gatekeepers control who gets to succeed."[302]

205.    In China, for example, where Amazon withdrew from the market because of the fierce competition it faced, consumers have many innovative options for online shopping.[i] Most Chinese sites offer next-day shipping, which Amazon Marketplace struggles to provide.[303] Payment for Chinese e-commerce is also commonly held in an escrow and then released once the delivery occurs, eliminating many disputes related to shipping.[304] Online sites in China provide shoppers extensive product suggestions based on machine learning, allow consumers to skip time-consuming credit card transactions by using mobile payment, and permit consumers to avoid the chaos of China's equivalent of Black Friday by paying a security deposit to reserve products at the sales price weeks before the sale occurs.[305] And built-in online chat forums allow consumers to bargain with online sellers.[306]

206.    In a competitive market, U.S. consumers would likely benefit from similar innovations. But facing no serious competition in the Online Retail Marketplace Market, Amazon does not innovate: "The feedback Amazon gathered over the years is that it doesn't need to do

---

[300] *Shopify's Almost-Marketplace Called Shop*, Marketplace Pulse (Apr. 29, 2020), https://www.marketplacepulse.com/articles/shopifys-almost-marketplace-called-shop.

[301] *Id.*

[302] Amazon Is a Monopoly, an Interview With Sally Hubbard - Marketplace Pulse (Aug. 6, 2019), https://www.marketplacepulse.com/articles/amazon-is-a-monopoly-an-interview-with-sally-hubbard.

[303] *The Real Difference Between China and US E-Commerce*, Enleaf, https://enleaf.com/the-real-difference-between-china-and-us-e-commerce/.

[304] *Id.*

[305] *Supra* Kaur.

[306] *Supra The Real Difference Between China and US E-Commerce.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

more than it already does," and instead it "spends most of its resource" on fortifying its monopoly power.[307] This includes Amazon's enforcement of MFNs to prevent price competition with the products it sells as part of its first-party retail sales.

207.    Eliminating Amazon's anticompetitive pricing policies would not lead to any discernible negative indirect network effects under the circumstances described herein. For example, unlike credit-card transaction platforms, allowing third-party sellers to compete on price through competing retail e-commerce channels would not reduce the money available to pay rebates or rewards to consumers because Amazon does not pay rebates or rewards to its retail customers.

208.    Amazon also does not need the contested price policies to prevent free riding from third-party sellers. Amazon already collects substantial fees from them and prevents free-riding by generally prohibiting third-party merchants from communicating directly with customers on Amazon Marketplace.[308]

209.    Nor are they needed to combat free riding from consumers. Many regular Amazon customers already pay substantial fees for their Prime membership, and Amazon dominates consumers' online searches of retailer websites, creating an "information bottleneck" that prevents many consumers from ever receiving competitive price information from other sources.[309]

210.    In fact, Amazon can point to no legitimate considerations that countervail the propriety of the monetary and injunctive relief that Plaintiffs seek.

## VIII.   CLASS ACTION ALLEGATIONS

211.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal law and pursuant to California's antitrust law on behalf of the members of the following Classes:

---

[307] *Supra Minimum Viable Amazon*.

[308] *Supra* Hart; Irwin Decl., Ex. A at 6 (¶ 14).

[309] RILA letter at 3.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

**National Class:** All persons who, on or after March 19, 2016, purchased through any other retail e-commerce channel in the United States other than Amazon Marketplace one or more products concurrently offered for sale by Amazon's third-party sellers on Amazon Marketplace.

**California Class**: All persons who, on or after March 19, 2016, purchased in California through any other retail e-commerce channel in the United States other than Amazon Marketplace one or more products concurrently offered for sale by Amazon's third-party sellers on Amazon Marketplace.

212.   Excluded from the Classes are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

213.   The identity of all products encompassed within the National and California Classes' definition, *i.e.*, Class Products, are readily identifiable from information and records maintained by Defendant. The identity of the members of the Classes and their records of Class Product purchases is readily available through multiple sources that record online purchases, including Class members' own records of online transactions and payment, the records of the online retailers from whom the Class Products were purchased, and Class members' and online retailers' records of payment through PayPal, credit cards and other financial institutions.

214.   **Numerosity:** Members of the Classes are so numerous that joinder is impracticable. Plaintiffs believe that there are tens of millions of members of the National Class (if not more), geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. Plaintiffs believe that there are millions of members of the California Class (if not more), such that joinder of all California Class members is likewise impracticable.

215.   **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Classes.

216.   **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Classes both fairly and adequately. They have retained counsel competent and

SECOND AMENDED CLASS ACTION COMPLAINT - 91
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Classes, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

217.    **Commonality:** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Classes and because Class members share a common injury. Thus, determining damages with respect to the Classes as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Classes are inherent in Defendant's wrongful conduct because the overcharge injuries incurred by Plaintiffs and each member of the proposed Classes arose from the same anticompetitive conduct alleged herein.

218.    There are common questions of law and fact specific to the Classes that predominate over any questions affecting individual members, including:

(a)    Whether Defendant and its third-party sellers unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing under Amazon's former Price Parity that third-party sellers would not sell their products to buyers through competing retail e-commerce channels at a price lower than what they offered at Amazon Marketplace;

(b)    Whether Defendant and its third-party sellers unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing that third-party sellers would be penalized under Amazon's current Fair Pricing provision if they offered their products to buyers through competing retail e-commerce channels at a lower price than what they offered at Amazon Marketplace;

(c)    Whether Defendant has unlawfully monopolized, attempted to monopolize, or conspired to monopolize any of the relevant markets asserted herein, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

(d)    Whether Defendant engaged in a *per se* violation of California's antitrust law;



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

1      (e)     Whether competition in the relevant markets has been restrained and

2  harmed by Amazon's conspiracy, monopolization, or attempted monopolization, of these

3  markets;

4      (f)     Whether consumers and Class members have been damaged by

5  Defendant's conduct;

6      (g)     The amount of any damages; and

7      (h)     The nature and scope of injunctive relief necessary to restore a

8  competitive market.

9      219.   **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad

10  of individual actions for the conduct complained of were undertaken, there likely would be

11  inconsistent or varying results. This would have the effect of establishing incompatible standards

12  of conduct for the Defendant. Certification of Plaintiffs' proposed Classes would prevent these

13  undesirable outcomes.

14      220.   **Injunctive relief:** By way of its conduct described in this complaint, Defendant

15  has acted on grounds that apply generally to the proposed Classes. Accordingly, final injunctive

16  relief is appropriate respecting the Classes as a whole.

17      221.   **Predominance and superiority:** This proposed class action is appropriate for

18  certification. Class proceedings on these facts and this law are superior to all other available

19  methods for the fair and efficient adjudication of this controversy, given that joinder of all

20  members is impracticable. Even if members of the proposed Classes could sustain individual

21  litigation, that course would not be preferable to a class action because individual litigation

22  would increase the delay and expense to the parties due to the complex factual and legal

23  controversies present in this matter. Here, the class action device will present far fewer

24  management difficulties, and it will provide the benefit of a single adjudication, economies of

25  scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be

26  ensured.

27

28



## IX.    ANTITRUST INJURY

222.    During the Class Period, Plaintiffs and Class members directly purchased Class Products, *i.e.*, they directly purchased—through a retail e-commerce channel other than Amazon Marketplace—products Amazon's third-party sellers concurrently offered for sale on Amazon Marketplace. Because of Defendant's anticompetitive conduct, Plaintiffs and Class members were forced to pay more for Class Products than they would have if Amazon had permitted its third-party sellers to engage in price competition outside Amazon Marketplace and/or were forced to pay more because of Amazon's unlawful monopoly. Defendant therefore has caused Plaintiffs and Class members to suffer overcharge damages. Because Defendant continues to enforce its anticompetitive Fair Pricing provision and use its MFN agreements to monopolize the relevant markets, Plaintiffs and Class members are reasonably likely to incur future overcharges for Class Products. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of federal and state antitrust laws, including its anticompetitive agreements with its third-party sellers, its monopolization, or its attempted monopolization of the relevant markets, as alleged herein.

223.    Defendant, through its unlawful conduct alleged herein, increased prices offered through competing retail e-commerce channels, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges. Plaintiffs and Class members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices caused by Defendant's anticompetitive activity. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Amazon's anticompetitive conduct is stopped, Plaintiffs and the Class will incur future overcharges in their direct purchases of Class Products.

SECOND AMENDED CLASS ACTION COMPLAINT - 94
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

# X.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION
VIOLATION OF THE SHERMAN ACT
(15 U.S.C. § 1) *PER SE***

224.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

225.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

226.    Defendant's third-party sellers are its retail competitors in the relevant markets. Amazon is also a manufacturer and sells its own brands of goods that compete with goods its third-party sellers offer, but the agreements at issue in this lawsuit are not intrabrand agreements. Amazon does not supply goods to any of its sellers that they then sell at retail.

227.    Amazon's MFN agreements are not to be confused with a vertical restraint between a manufacturer and its distributor to set minimum resale prices. That Defendant and its third-party sellers both sell on Amazon Marketplace does not alter the fact that both Defendant and its third-party sellers perform similar functions in the sale of comparable goods. Amazon's third-party sellers do not act as distributors or retailers of goods produced by Amazon. Amazon provides a common market platform that facilitates sales, but it does not stand on a different level from its third-party sellers in the distribution of their goods. By conditioning third-party sellers' access to customers on Amazon Marketplace on an agreement not to compete on price outside of the platform, Amazon engages in a purely horizontal restraint on trade with its competitors at the same level of distribution in the market. Stated otherwise, Amazon relies on its platform agreement as the means of entering into a horizontal price-fixing agreement with its third-party sellers. A *per se* analysis applies to restraints of this nature.

228.    As a retail e-commerce seller, Defendant directly offers for sale a broad range of goods on Amazon Marketplace. On information and belief, all products offered by third-party sellers on Amazon Marketplace are reasonably interchangeable with one or more products that Defendant directly sells on Amazon Marketplace, such that there is cross-elasticity of demand between Defendant's products and the products that its third-party sellers offer on Amazon Marketplace. Stated otherwise, all products sold by third-party sellers on Amazon Marketplace

compete with one or more of Defendant's own products that it also sells on Amazon Marketplace, or, alternatively, as the "Everything Store," Amazon is a current or potential competitor with all third-party sellers in the ecommerce retail market.

229.    Class Products (*i.e.*, the same products offered by Defendant's third-party sellers on Amazon Marketplace but purchased through competing retail e-commerce channels) are therefore reasonably interchangeable with products sold directly by Defendant on Amazon Marketplace, such that there is cross-elasticity of demand between Defendant's products and Class Products.

230.    Plaintiffs do not believe it is necessary to prove market impact for purposes of their horizontal price-fixing claim. To the extent one is required, the relevant product markets are defined herein.

231.    To the extent required, the relevant geographic market is the entire United States.

232.    In violation of Section 1 of the Sherman Antitrust Act, Defendant entered into horizontal agreements with its two million third-party sellers on Amazon Marketplace concerning the price they were allowed to sell their products in the United States. Specifically, Defendant and its contractual partners unlawfully agreed under Amazon's former Price Parity that third-party sellers will not offer their products to their customers in the U.S. e-commerce market at a price lower than the price they offer them on Amazon Marketplace. Under Amazon's current Fair Pricing provision, Defendant and its contractual partners likewise unlawfully agree that any third-party seller, who offers its products to its customers at a price lower than the price it offers them on Amazon Marketplace, will be subject to severe penalties, including rendering the seller's products ineligible for Amazon's Buy Box or suspending or terminating the seller's account with Amazon. These unlawful agreements have unreasonably restrained price competition among retailers for online sales of consumer goods and had the effect of establishing a floor price for Class Products. This combination is *per se* unlawful price-fixing.

233.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Class Products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.



234.    Plaintiffs and Class members are direct purchasers because they directly purchase Class Products, whose retail price is inflated as a direct result of Amazon's anticompetitive agreements with its two million third-party sellers.

235.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

**SECOND CAUSE OF ACTION**
**VIOLATION OF 15 U.S.C. § 1**
**(ALTERNATIVE TO *PER SE*)**

236.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein. This Count is brought in the alternative if the conduct at issue is not a *per se* violation.

237.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

238.    The agreements to fix the online price of products sold outside of Amazon Marketplace—have harmed competition in the relevant markets defined herein and caused prices to be higher in those markets than the prices would have been without the agreements between Defendant and its third-party sellers.

239.    The agreements have an open and obvious adverse effect on competition. By forcing its third-party sellers to raise prices on other platforms, Amazon limits the number of meaningful choices consumers have in the sale of Class Products.

240.    Amazon's MFN agreements have actual detrimental effects, *i.e.*, less competitive pricing, fewer consumer choices, and reduced innovation in online shopping.

241.    An observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

242.    Defendant and its third-party sellers did not act unilaterally or independently, or in their own economic interests, when entering into the agreements. The agreements, and their enforcement substantially, unreasonably, and unduly restrain trade in the relevant markets, and harmed Plaintiffs and the Class thereby.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

243.    Defendant is liable for the creation, maintenance, and enforcement of the agreements under a "quick look" or rule of reason standard.

244.    Defendant possesses market power in the relevant markets with over 50% of the online retail marketplace, more than 50% share of the Identified Submarkets, and as much as 90% of the Online Retail Marketplaces Market. That Amazon has market power is also evident from the power it has to raise prices above those that would be charged in a competitive market.

245.    Amazon also has unique advantages that allow it to exercise market power. It controls 66% of all online product searches for first time purchases and 74% for goods previously purchased. It has a much larger inventory than any of its competitors. It has a vast digital advantage over its competitors, having amassed detailed consumer preferences and behavior over decades from its 200 million unique monthly customers. And it has a superior infrastructure that provides support fast shipping at lower cost.

246.    Amazon's relationship with its third-party sellers is further evidence of its market power. It has the power to dictate and arbitrarily change the rules by which its third-party sellers have access to Amazon Marketplace, *e.g.*, extending the amount of time that business buyers have to pay third-party sellers, deciding what products they can sell and whether they can participate as vendors or third-party sellers, and bends the search results rules to promote its FBA and  sponsored advertising services. Amazon charges them exorbitant fees that give Amazon a competitive advantage over its third-party sellers and uses their supplier information to contract directly with the supplier and their customer information to decide what areas to focus its retail or product developments.

247.    There is no legitimate, pro-competitive business justification for Amazon's MFN agreements or any justification that outweighs their harmful effect. Even if a conceivable justification exists, the agreements are broader than necessary to achieve such a purpose.

248.    Plaintiffs and members of the Class were injured in their business or property by paying higher prices for Class Products than they would have paid in the absence of Defendant's unlawful conduct.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION**
**(15 U.S.C. § 2)**

249.  Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

250.  Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

251.  Through Amazon Marketplace, Amazon possesses market power in the relevant markets as demonstrated by its market share and its ability to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow it to exercise and maintain market power, *e.g.*, search, inventory, data, and infrastructure dominance. Amazon's market power is also demonstrated by the exorbitant fees it charges its third-party sellers and the power to adopt and enforce rules on the platform that benefit itself and jeopardize its third-party sellers' businesses.

252.  Defendant has willfully acquired its monopoly power in the relevant markets by unlawful and improper means, including through its enforcement of its MFN agreements. These provisions establish a price floor based on the seller's price listing on Amazon Marketplace. By requiring its two million third-party sellers to apply a price floor on all other retail e-commerce channels, Defendant largely immunizes Class Products from competitive pricing in the relevant market and causes Class Products to be sold at supracompetitive prices.

253.  Plaintiffs and Class members are direct purchasers because they directly purchase Class Products through a U.S. e-commerce retail channel that competes with Amazon Marketplace.

254.  Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Class Products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

255.  Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

SECOND AMENDED CLASS ACTION COMPLAINT - 99
Case No. 20-cv-00424-RAJ
010888-11/1873499 V2

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT –**
**ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2)**

256.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

257.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

258.    If Defendant does not already have a monopoly in the relevant markets, it has attempted to monopolize these markets.

259.    Through enactment of the pricing policies challenged herein—Amazon's MFN agreements—Defendant has demonstrated its intent to control online prices of virtually every consumer good offered in the U.S. retail e-commerce market.

260.    Through its enforcement of its MFN agreements, Defendant has furthered its goal of controlling prices of virtually every consumer good offered in the relevant markets.

261.    Based on its current market power and its gatekeeper status, there is a dangerous probability that Defendant will succeed in monopolizing the relevant markets.

262.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Class Products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

263.    Plaintiffs and Class members are direct purchasers because they directly purchase Class Products that are inflated as a direct result of Amazon's anticompetitive conduct.

264.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT –**
**CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2)**

265.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

266.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

267.    Through their MFN agreements, Amazon and its third-party sellers have combined or conspired to create or maintain or attempt to create or maintain Amazon

Marketplace's monopoly power in the relevant markets. The MFN agreements facilitate Amazon Marketplace's monopoly power both by raising prices on potentially millions of online retail sites that compete with it and by suppressing competition from competing online marketplaces (like eBay and Walmart) by eliminating the benefit of lowering seller fees to compete in the online marketplaces market.

268. Amazon has taken steps in furtherance of the conspiracy by entering into MFN agreements with each of its third-party sellers and enforcing the MFN provisions to penalize sellers that offer their goods at a lower price on online sites other than Amazon Marketplace. Amazon's co-conspirators have taken steps in furtherance of the conspiracy by entering into the MFN agreements and refraining from lowering their prices on online retail sites that compete with Amazon Marketplace even when it would be in their independent economic self-interest to lower their prices on other sites to gain more profit.

269. The purpose and effect of the MFN agreements is to prevent price competition with Amazon Marketplace. Because Amazon and its third-party sellers agreed to restrain competition with Amazon Marketplace, they share a specific intent to establish or maintain Amazon Marketplace's monopoly power.

270. Amazon Marketplace possesses monopoly power in the relevant markets, as demonstrated by its share of these markets and its ability to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow Amazon Marketplace to exercise and maintain market power, *e.g.*, search, inventory, data, and infrastructure dominance.

271. Defendant and its third-party sellers have harmed Plaintiffs and the proposed class by raising prices artificially on sites that compete with Amazon Marketplace.

272. Defendant and its co-conspirators have willfully acquired or attempted to acquire monopoly power for Amazon Marketplace in the relevant markets by unlawful and improper means, including through its enforcement of its MFN agreements. These provisions establish a price floor based on the seller's price listing on Amazon Marketplace. By agreeing to apply a price floor on all other retail e-commerce channels, Defendant and its third-party sellers largely

immunize Amazon Marketplace from competitive pricing in the relevant markets and causes

Class Products to be sold at supracompetitive prices.

273.    Plaintiffs and the Class members have been injured and will continue to be

injured in their businesses and property by paying more for Class Products than they would have

paid or would pay in the future in the absence of Defendant's unlawful acts.

274.    Plaintiffs and Class members are direct purchasers because they directly purchase

Class Products from Amazon's co-conspirator third-party sellers at prices that are inflated as a

direct result of Amazon and its co-conspirators' anticompetitive conduct.

275.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing

violations alleged in this Complaint.

## SIXTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,
### CAL. BUS. & PROF. CODE § 16700, ET SEQ.
### (*PER SE* VIOLATION ON BEHALF OF THE CALIFORNIA CLASS)

276.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

277.    Plaintiff Christian Sabol brings this Cartwright Act claim on his own behalf and

on behalf of each member of the proposed statewide Class of California purchasers, as described

above.

278.    The California Business & Professions Code generally governs conduct of

corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs

antitrust violations in California.

279.    California policy is that "vigorous representation and protection of consumer

interests are essential to the fair and efficient functioning of a free enterprise market economy,"

including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

280.    A trust in California is any combination intended for various purposes, including

but not limited to creating or carrying out restrictions in trade or commerce, increasing the price

of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720.

281.    Defendant has entered a trust with its co-conspirator third-party sellers in restraint of trade by increasing the price of merchandise to establish a minimum price below which the third-party sellers may not sell a commodity in violation of § 16720.

282.    Every trust to restrain trade in California is *per se* unlawful except as provided by the Code. *Id.* at § 16726. No exceptions apply to Defendant's conduct.

283.    Members of the California Class purchased Class Products in California within the Class Period. But for Amazon's conduct set forth herein, the price of Class Products would have been lower, in an amount to be determined at trial.

284.    Members of the California Class were injured in their business or property, with respect to purchases of Class Products and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

## JURY TRIAL DEMANDED

285.    Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A.    The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;



HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

C.  Adjudication that the acts alleged herein constitute monopolization or attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.  Adjudication that the acts alleged herein violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*;

E.  Actual damages and treble damages, and such other relief as provided by the statutes cited herein;

F.  Pre-judgment and post-judgment interest on such monetary relief;

G.  Equitable relief requiring that Amazon cease the abusive, unlawful, and anti-competitive practices described herein (including pursuant to federal antitrust law: *see, e.g.*, 15 U.S.C. § 26);

H.  The costs of bringing this suit, including reasonable attorneys' fees; and

I.  All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

DATED: April 11, 2022          Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By   */s/ Steve W. Berman*
Steve W. Berman (WSBA No. 12536)
/s/ Barbara A. Mahoney
Barbara A. Mahoney (WSBA No. 31845)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

KELLER ROHRBACK L.L.P.

By:   */s/ Derek W. Loeser*
Derek W. Loeser (WSBA No. 24274)
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Dloeser@kellerrohrback.com



KELLER LENKNER LLC

Zina G. Bash (pro hac vice)
111 Congress Avenue, Suite 500
Austin, TX, 78701
Telephone: (512) 690-0990
E-mail: zina.bash@kellerlenkner.com

Warren D. Postman (pro hac vice)
Albert Y. Pak (pro hac vice)
1100 Vermont Avenue, N.W., 12th Floor
Washington DC, 20005
Telephone: (202) 918-1123
E-mail: wdp@kellerlenkner.com
E-mail: albert.pak@kellerlenkner.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____/s/ Alicia Cobb_____
Alicia Cobb, WSBA # 48685
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Email: aliciacobb@quinnemanuel.com

Steig D. Olson (pro hac vice)
David D. LeRay (pro hac vice)
Nic V. Siebert (pro hac vice)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Email: steigolson@quinnemanuel.com

Adam B. Wolfson (pro hac vice)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Email: adamwolfson@quinnemanuel.com

*Attorneys for Plaintiffs and the Proposed Class*



## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2022, a true and correct copy of the foregoing was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

<u><em>/s/ Steve W. Berman</em></u><br>
Steve W. Berman

---

[i] Arjun Kharpa, *Amazon is shutting down its China marketplace business. Here's why it has struggled.* CNBC (Apr. 19, 2019), https://www.cnbc.com/2019/04/18/amazon-china-marketplace-closing-down-heres-why.html.



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX