The Honorable John H. Chun

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   DEBORAH FRAME-WILSON, *et al*., on
behalf of themselves and all others similarly
11   situated,

12                        Plaintiffs,

13        vs.

14   AMAZON.COM, INC., a Delaware
corporation,
15

16                        Defendant.

17

No. 2:20-cv-00424-JHC

THIRD AMENDED COMPLAINT

**<u>DEMAND FOR JURY TRIAL</u>**

**[PUBLIC VERSION]**

18
19
20
21
22
23
24
25
26
27
28

THIRD AMENDED COMPLAINT
Case No. 20-cv-00424-JHC
010888-11/2577616 V1



## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

    A.    Summary of Amendments ..................................................................... 1

    B.    Amazon's Relationship With Its Third-Party Sellers ........................... 2

    C.    Amazon's MFN Agreements Improperly Restrains Competition ........... 5

    D.    Through Their MFN Agreements, Amazon And Its Third-Party
        Sellers Combine to Confer Amazon Marketplace's Monopoly Power ................. 20

    E.    Identity of Class Products ..................................................................... 25

    F.    The Economic Impact of Amazon's Anticompetitive Conduct .............. 26

II.   JURISDICTION ................................................................................................. 29

III.  VENUE ............................................................................................................... 30

IV.  PARTIES ............................................................................................................ 30

    A.    Plaintiffs ............................................................................................... 30

    B.    Defendant ............................................................................................. 36

V.   STATEMENT OF FACT .................................................................................... 37

    A.    Background ........................................................................................... 37

        1.    Amazon is a powerful market participant in online retail
            sales and marketplaces. ............................................................ 37

        2.    German competition authorities found that Amazon's Price
            Parity restricted competition both as a horizontal price
            fixing agreement with its third-party sellers and by erecting
            a barrier to competition with Amazon Marketplace from
            other online retail marktplaces. ............................................... 40

        3.    Amazon charges high seller fees that raise online prices of
            consumer goods on and off Amazon Marketplace ..................... 42

        4.    Amazon knowingly manipulates online prices through its
            MFN agreements despite warnings from antitrust regulators
            about their anticompetitive effect .......................................... 47

    B.    Amazon's MFN Agreements Reduce Price Competition And Cause
        Consumers to Pay More. ...................................................................... 50

C.  Through Combination or Conspiracy With Its Third-Party Sellers,
Amazon Has a Monopoly in The Relevant Markets .................................. 53

D.  Alternatively, Amazon Has Attempted to Monopolize The Relevant
Markets Through MFN Agreements With Its Third-Party Sellers ........................ 58

E.  Amazon is The Subject of a Government Investigation For Possible
Antitrust Violations, Including Whether it Uses Its Relationship With
Its Third-Party Sellers to Harm Competition ...................................... 59

VI.  INTERSTATE TRADE AND COMMERCE ........................................................ 60

VII.  RELEVANT MARKETS ........................................................................ 61

A.  U.S. Retail Ecommerce Market And Identified Submarkets Are
Relevant Markets to assess amazon's anticompetitive MFN
Agreements .................................................................................. 61

B.  The Two-Sided Online Retail Marketplace Market is Another
Relevant Market to Assess Whether Amazon's MFN Agreements
Have Had an Anticompetitive Impact .................................................. 68

1.  Online retail marketplaces, like Amazon Marketplace, have
powerful network effects .......................................................... 70

2.  Amazon does not face any serious competitive threat to its
dominance in the Online Retail Marketplace Market. ............................. 71

VIII.  CLASS ACTION ALLEGATIONS ............................................................ 74

IX.  ANTITRUST INJURY ......................................................................... 77

X.  CAUSES OF ACTION .......................................................................... 78

FIRST CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 1 .......................................... 78

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT –
MONOPOLIZATION (15 U.S.C. § 2) .......................................................... 81

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT –
ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) .......................................... 82

FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT –
CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2) ........................................... 83

JURY TRIAL DEMANDED ........................................................................ 85

PRAYER FOR RELIEF ............................................................................ 85

THIRD AMENDED COMPLAINT - ii
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1       Plaintiffs allege the following on personal knowledge as to themselves and their own acts,

2   and on information and belief with respect to all other matters based on the investigation made by

3   their attorneys and experts in the field of antitrust economics.

## I.       INTRODUCTION

### A.       Summary of Amendments

6       1.       The Court has now twice denied Amazon.com, Inc.'s ("Amazon") motion to dismiss

7   Plaintiffs' monopoly claims asserted under Section 2 of the Sherman Act and Plaintiffs' rule-of-

8   reason-price-fixing claim under Section 1 of the Sherman Act, but previously granted Amazon's

9   motion to dismiss Plaintiffs' horizontal price-fixing claims under the Sherman Act and under the

10  Cartwright Act. In their Third Amended Complaint, Plaintiffs do not seek to revive their dismissed

11  claims. Instead, they seek to narrow their class definition (§§ I.E and VII) and add factual

12  allegations concerning agreements that Amazon used to continue to restrain competition with other

13  online retail marketplaces, and to prevent sellers from selling at lower prices outside of Amazon

14  Marketplace even after Amazon removed its express Price Parity Clause in March 2019. (§§ I.C

15  and V.C.).

16      2.       Amazon's former Price Parity Clause is a platform most favored nations clause

17  (MFN). It expressly prohibited sellers from selling at lower prices through any other ecommerce

18  channel. Economists widely recognize that such restraints are anticompetitive and increase retail

19  prices because they (i) prohibit sellers from selling at lower prices on platforms that charge them

20  lower fees, and (ii) restrain competition between platforms, in that lowering platform fees is no

21  longer an effective means for platforms to grow market share by attracting lower retail prices. As

22  the Court previously recognized, to violate antitrust laws, Amazon's platform MFNs need not be

23  expressly stated, they may also operate implicitly, such as when Amazon removes a seller's product

24  from Amazon's "Buy Box," or terminates a sellers' selling privileges in response to a lower price

25  outside of Amazon Marketplace.[1] Each additional agreement Plaintiffs challenge likewise operates

26  to stifle sellers' price competition outside of Amazon Marketplace, including removing sellers'

27

28      [1] *Frame-Wilson v. Amazon.Com, Inc.*, 664 F. Supp. 3d 1198, 1209 (W.D. Wash. 2023); *De Coster v. Amazon.com, Inc.*, 2023 WL 372377, at *5-6 (W.D. Wash. Jan. 24, 2023).

products from the Buy Box and terminating or threatening to terminate selling privileges. Similarly, in its own enforcement action against Amazon, the Federal Trade Commission alleges that Amazon's use of the very MFN agreements that Plaintiffs here challenge violates the Sherman Act and the FTC Act because the policies stifle price competition outside of Amazon, tend to create an artificial price floor for products sold online, and prevent rival marketplaces from growing by offering lower prices.[2]

## B. Amazon's Relationship With Its Third-Party Sellers

3.     Amazon and its third-party sellers are all online retailers and horizontal competitors in the online retail market. Amazon operates its own retail business, selling directly to its online customers on Amazon Marketplace. Amazon operates Amazon Marketplace both as a platform for its own retail sales business and as a "two-sided platform."[3] Amazon designed its platform so that many "sellers, in addition to Amazon, may list the same product for sale from a single product page on" Amazon Marketplace.[4] This arrangement gives sellers access to millions of buyers and gives buyers access to millions of sellers.[5] Amazon likens its marketplace to "an online mall where independent merchants display their products to people perusing the website."[6] Consumers may purchase from any seller on Amazon Marketplace, including Amazon, but they make payment directly to Amazon. Amazon takes a commission with each sale and sellers often pay additional fees for other services.

4.     As the largest retail seller on Amazon Marketplace, Amazon sells approximately 12 million unique products, covering a wide range of consumer goods.[7] Amazon's own retail

---

[2] *See Federal Trade Commission v. Amazon.com, Inc.*, Case No. 23-cv-01495-JHC, Dkt. No. 114 (Complaint), ¶¶ 7, 17-19, 236, 262-324, and Counts I-VI.

[3] *See, e.g.,* Marc Rysman, "The Economics of Two-Sided Markets", *Journal of Economic Perspectives*, Vol. 23, No. 3 (Summer 2009), pp. 125-143, p. 125 ("Broadly speaking, a two-sided market is one in which 1) two sets of agents interact through an intermediary or platform, and 2) the decisions of each set of agents affects the outcomes of the other set of agents, typically through an externality… a successful payment card requires both consumer usage and merchant acceptance, where both consumers and merchants value each others' participation.").

[4] Declaration of Ella Irwin, Director of Marketplace Abuse at Amazon (Jul. 13, 2018), *Kangaroo Mfg., Inc. v. Amazon.com*, Case No. 17-cv-1806SPL (D. Ariz.), Dkt. No. 75 (Irwin Decl.), ¶ 3.

[5] Declaration of Nicholas Denissen, Amazon's Vice President of Marketplace Business (Jun. 30, 2017), *Oberdorf v. Amazon.com*, Case No. 16-cv-1127MWB (M.D. Pa.), Dkt. No. 31 (Denissen Decl.), ¶ 5.

[6] *Id.*

[7] How Many Products Does Amazon Actually Carry? And in What Categories?, Business Wire (Jun. 14, 2016), https://www.businesswire.com/news/home/20160614006063/en/How-Many-Products-Does-Amazon-Actually-Carry-And-in-What-Categories.

customers overlap with those of its third-party sellers, and often Amazon and its third-party sellers offer the very same product.[8] As an example, Amazon sells Apple watches on Amazon Marketplace, while at the same time an Amazon third-party seller, like Adorama, may also sell the exact same models on Amazon Marketplace as Amazon itself. In other instances, Amazon and its third-party sellers offer similar products that likewise compete for consumers of the same product category.

5.     As a retailer, Amazon has many competitive advantages over the third-party sellers, with whom it competes in the sale of goods on and off Amazon Marketplace. One critical advantage is the absence of seller and advertising fees that it charges them to compete on its platform. These fees add significantly to third-party sellers' cost of doing business on Amazon's platform. For example, one retailer, Molson Hart, reports that a $150 item sold on Amazon would make his company the same profit as an item sold for $37 less on his company website:

> We designed, manufactured, imported, stored, shipped the item, and then we did customer service. Amazon hosted some images, swiped a credit card, and got $40 [for a $150 toy].
>
> This is the core problem. Were it not for Amazon, this item would be $40 cheaper. And this is how Amazon's dominance of the industry hurts consumers.[9]

6.     Because Amazon third-party sellers must factor in these fees when setting their prices on Amazon Marketplace, this substantially reduces the price competition Amazon's own retail business faces from competing sellers on Amazon Marketplace. So, in the previous example, Adorama can sell the same watch as Amazon for $300, but whereas that sales price nets Amazon the full $300, Adorama may only receive about $255 after Amazon takes its commission and fees.

7.     Many Amazon third-party sellers also sell on other online marketplaces that offer more favorable terms for their sellers. For example, eBay typically charges lower seller fees than Amazon. As the following examples illustrate, all in, Amazon charges its third-party seller about 23% to sell a $30 book, while eBay charges 16%, and Amazon charges its third-party seller 31%

---

[8] Irwin Decl., ¶ 5.

[9] Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, Medium, https://medium.com/swlh/amazon-needs-a-competitor-and-walmart-aint-it-5997977b77b2 (Hart).

to sell a $15 DVD, while eBay charges 21% to sell on its platform:[10] In a competitive market, a third-party seller could capitalize on eBay's lower seller fees by lowering the third-party seller's prices for books and DVDs on eBay, and increasing its sales (on eBay) as a result.

| Example 1: Books | | |
|---|---|---|
| **Sale Price** | $30.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $3.40 | $4.50 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $1.17 | $0.00 |
| Total Fees | $4.87 | $6.84 |
| Total Profit | $25.13 | $23.16 |
| Profit Margin | 83.77% | 77.20% |

| Example 2: DVDs | | |
|---|---|---|
| **Sale Price** | $15.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $2.12 | $2.25 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $0.75 | $0.00 |
| Total Fees | $3.16 | $4.59 |
| Total Profit | $11.85 | $10.41 |
| Profit Margin | 78.97% | 69.40% |

---

[10] Max Godin, *Selling on Amazon vs eBay – Discover Which is Better and Why*, Crazylister (May 15, 2018), https://crazylister.com/blog/selling-on-amazon-vs-ebay/.

THIRD AMENDED COMPLAINT - 4
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

8.    But Amazon and its third-party sellers contractually agree not to engage in this competition. Sellers enter into these MFN agreements when they register with Amazon Marketplace and "agree[] to the terms of the Amazon Services Business Solutions Agreement (BSA) and the policies incorporated in that agreement."[11] The BSA establishes rules for selling on Amazon Marketplace, and any seller holding an Amazon Seller Account must adhere to them.[12] One such rule is that sellers will not offer their products on competing marketplaces for a lower price than they offer on Amazon.

C.    **Amazon's MFN Agreements Improperly Restrains Competition**

9.    Amazon has used different tools to implement its MFN agreements over time. Before March 2019, the MFN contained in the BSA was an express "Price Parity" provision, governing the price of products the seller offered for sale through its or any of its affiliates' other retail channels other than physical stores.[13] The Price Parity required that sellers:

> maintain parity between the products you offer through Your Sales Channels and the products you list on any Amazon Site by ensuring that … the purchase price and every other term of sale … is at least as favorable to Amazon Site users as the most favorable terms via Your Sales Channels (excluding consideration of Excluded Offers).[14]

10.    Despite the recognition by multiple regulators of the anticompetitive nature of Amazon's Price Parity, Amazon continued to enforce that clause in the United States for six more years, until March 2019. Then, under threat of an investigation by the Federal Trade Commission (FTC), Amazon finally withdrew its Price Parity in the United States.[15]

11.    Despite making this particular change, Amazon has maintained without change its overarching policy of preventing sellers from offering lower prices elsewhere. As Amazon's documents make clear, the purpose of the change was to deflect potential antitrust liability. Amazon's decision to withdraw the Price Parity Clause led to "confusion over what the removal of

---

[11] Irwin Decl., ¶ 4.

[12] *Amazon Pricing Policy*, Feedadvisor, https://feedvisor.com/university/amazon-pricing-policy/.

[13] Irwin Decl., Ex. A at 14 and 18 (section S-4 Parity with Your Sales Channel).

[14] *Id.*, Ex. A at 18.

[15] *See, e.g.*, Greg Magana, *Amazon is ending its restrictive pricing practice*, Business Insider (Mar. 13, 2019), https://www.businessinsider.com/amazon-ends-restrictive-pricing-parity-2019-3.

**HAGENS BERMAN**

the policy meant to our Selling Partners."[16] Some sellers "thought that the removal of the policy meant that there was no longer any price competitiveness requirements[.]"[17] Amazon's response was swift: "We worked with reporters on background to make clear that our expectations and policies have not changed, but did not go on record as we had competing strategic interests."[18]

12.    Those "competing strategic interests" were blunting the threat of regulatory action by the U.S. government, while simultaneously ensuring that Amazon's anticompetitive strategy continued. Even as Amazon "propose[d] to tighten [its] pricing rules" in order throttle competition from non-Amazon retailers, it recognized that both the "media and selling partners may claim that the removal of the clause was not only trivial but a trick and an attempt to garner goodwill with policymakers amid increasing competition concerns."[19]

13.    Neither backlash from the media nor third-party sellers deterred Amazon's plan. Instead of abandoning its price parity restrictions, Amazon quietly improved its Buy Box eligibility algorithm to further tighten pricing restrictions. "As planned, these action[s] will require [sellers] to match external prices in order to have their offers available through the Amazon store."[20] Although Amazon continued to communicate that it would require parity to sellers, it hid the method it planned to use to achieve that goal: "we do not recommend proactively communicating the tightening of our pricing rules."[21] That method was the "Select Competitor – Featured Offer Disqualification," or "SC-FOD" algorithm, which Amazon introduced in mid-2015 and which Amazon expanded as a tool for securing third-party sellers' price parity after it repealed the Price Parity Clause.

---

[16] CAAGLit-AMZ_01847634 (Brand Program PR Stress Test (April 2019)) at p.8. *See also* CAAGLit-AMZ_00210513 (IN 3P Pricing Affordability 2019 OP1) at p.10 (discussing SC-FOD and recognizing "that regulators may view" any corrective action that Amazon might take "when Sellers price higher on Amazon than other marketplaces" as "enforcing price parity," especially in EU and JP, where Amazon had already removed the Price Parity Clause).

[17] CAAGLit-AMZ_01847634 (Brand Program PR Stress Test (April 2019)) at p.8.

[18] *Id.*

[19] *Id.*

[20] *Id.* The sellers at issue in this specific document are brand sellers—and the policy under discussion was the ASB policy—but the operation of the SC-FOD was and is broader.

[21] *Id.* (emphasis in original).

THIRD AMENDED COMPLAINT - 6
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

14.      Amazon uses an algorithm to disqualify a seller's offer from winning the "Buy Box" if Amazon detects a price that is lower—even by a penny—for that product on any online store that Amazon designates as a "Select Competitor."[22] The "Buy Box" is the display from which a shopper can "Add to Cart" or "Buy Now" an Amazon-selected offer for a product. Elimination of the "Buy Box" button from the third-party seller's listing is devastating to the seller's business because, as Amazon internally estimated, 99% of all new units purchased were sold by the Featured Offer/Buy Box winners.[23] In fact, most buyers searching for a product on Amazon's marketplace will see a third-party seller's product only if it has the Buy Box. By forcing third-party sellers that violate its MFN agreements to try to sell their goods without the Buy Box, Amazon puts them at a significant competitive disadvantage.[24]

15.      Achieving price parity through the elimination of lower prices outside of Amazon Marketplace is the overarching goal of the SC-FOD, and Amazon punishes sellers if it finds lower prices off Amazon.[25] Amazon systematically communicates this policy to its sellers. For example, Amazon explains to sellers: "Let's say I'm shopping for a three-pack of Clorox wipes, . . . And let's say the price available outside Amazon for this item is $9.00. If I search for the same wipes on Amazon, and they are priced at $10.00, we consider that price to be un-competitive. For the product to be competitively priced, it would have needed to be priced at $9.00 or below on Amazon. In fact, we consider a price to be un-competitive even if it is one cent above the price available outside Amazon!"[26] Once Amazon deems an offer "un-competitive," it punishes the seller by taking away Buy Box access.[27]

---

[22] *See* CAAGLit-AMZ_02289543.

[23] *See, e.g.,* AMZN_PPC_0000000956 at p.4.

[24] Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, Bloomberg (Aug. 5, 2019) https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-sellers-that-offer-better-prices-on-walmart.

[25] *See* Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105, 109 (2016) (analyzing the anticompetitive effects of product-level platform MFNs, i.e. restraints on "price-setting monopoly seller[s]" that eliminate lower-priced options for the same product on any other platform).

[26] CAAGLit-AMZ_02289543 at Slide 3 (notes).

[27] *Id.* at Slide 6 (notes).

16.    When Amazon disqualifies a seller's offer from the Buy Box, it tells the seller that Amazon detected a lower price elsewhere and what that price is.[28] Amazon does not, however, tell the seller where it found the lower price. Amazon internally acknowledges, "we are deliberately providing limited information about how we generate competitor prices."[29] By keeping sellers in the dark about the source of the lower price, Amazon maintains a perpetual threat that—if the seller reduces their prices *anywhere* off of Amazon—Amazon will punish them.

17.    Amazon has continued to modify and expand its SC-FOD algorithm over time. Among other things, Amazon expanded the number of online stores that it monitored after it eliminated the Price Parity Clause from its Business Solutions Agreement.[30] As of two years ago, Amazon estimated that globally it regularly tracked nearly ███ price comparison points for purposes of implementing its MFN agreements.[31] This expansion increased the punitive aspects of the SC-FOD algorithm, by ensuring that more products were monitored and more sellers were penalized.

18.    Internally, Amazon acknowledges that the policy, while highly effective in preventing competition outside of Amazon Marketplace, does not *actually* reduce prices on Amazon: "Buy Box removal does not motivate Sellers to lower prices. And given that the lowest [external competitor] SIC price is higher than [the cost of goods] COGS+ fees on ███ of SIC uncompetitive 3P unique ASINs, we shouldn't expect that it would[.]"[32] Put simply, Amazon's fees are so high that sellers cannot reduce their prices on Amazon. Instead, they simply raise their prices elsewhere.

19.    Therefore, just like its Price Parity Clause, Amazon's SC-FOD punishes sellers for offering prices off Amazon that are lower than their prices on Amazon, even where their costs are lower through other online sales channels. That, in turn, limits the ability of competing platforms

---

[28] *Id.* at Slide 8.

[29] AMZN_PPC_0000003559 (Internal Press Release) at p.9.

[30] *See, e.g.*, CAAGLit-AMZ_03259346 ("In April, we reviewed and aligned on plan to improve price perception by expanding SC-FOD to all [Image Competitors] [world wide] ███████████████ [.]"); *see also* CAAGLit-AMZ_04000738 (historical list of external competitors).

[31] CAAGLit-AMZ_00213922 at p.2.

[32] CAAGLit-AMZ_00213922 at p.2.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    to offer retail prices lower than those on Amazon, hindering the growth of would-be rivals and

2    denying them the scale necessary to compete.

3        20.    But the SC-FOD is not Amazon's only current MFN agreement. Although Amazon

4    removed the Price Parity Clause from the Business Service Agreement in March 2019, it retained

5    other MFN agreements to further the same goals. For instance, the "Amazon's Standards for

6    Brands" ("ASB") program includes MFN agreements. The ASB program, introduced in 2018, is

7    incorporated by reference in the BSA.[33] The program prevents brand owners and their seller

8    representatives from offering a lower price off of Amazon than they offer on Amazon or allowing

9    their distributors to do so.

10        21.    For example, in June 2019, when Amazon realized that a third-party seller was

11    ████████████████████████ such as ███████████ and was "in violation of the Standards

12    for Brand Selling," an Amazon Director suggested removing the seller's products not only from

13    Buy Box eligibility but from the Offer Listings Page entirely, so "the selection for time being

14    wouldn't be buyable" at all. Amazon proceeded to do so and notified the seller that its offers had

15    been suppressed due to its failure to comply with ASB. When Amazon called the seller to ask why

16    it had not brought its prices off Amazon in-line with its on-Amazon prices, the seller assured

17    Amazon that "the low price offered by the other Retailer" ███████████████—"will be fixed

18    by Monday." Amazon informed the seller that its products were also offered for a lower price on

19    ███████ In response, the seller assured him that "they would discuss with their wholesale team and

20    get the price updated on ███████ and any other Retailers as well (by Monday)." Amazon was

21    pleased "to see the Brand was actively engaged/interested in correcting the issue"—which the brand

22    accomplished by causing other retailers to raise their prices for its products.[34]

23        22.    The penalties for violating this program are dire. Like the SC-FOD, sellers receive

24    "price alerts" with a warning from Amazon that show the product, the price on Amazon and the

25    price found elsewhere on the web without identifying the competing website.[35] Brand owners and

26

27        [33] *See, e.g.*, CAAGLit-AMZ_04282017 (BSA Version 13 (Apr 30-2018)) ("General Terms").

    [34] AMZN_PPC_0000002582 (email chain, ending Jun. 23, 2019) at pp.2-6.

28        [35] *Supra* Soper.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    their third-party seller representatives also face the further risk of losing "the opportunity to operate

2    as a seller in the Amazon store altogether" if they do not maintain price competitiveness.[36] Amazon

3    sets a price competitiveness and selection availability target of 95% for ████ of well-known

4    brands and has removed selling privileges for ████ of brands that failed to meet these targets.[37]

5    Sellers that sell at least ████ of the applicable brand's total sales on Amazon and generate at least

6    ████ in GMS, are required to meet Amazon's 95% price competitiveness requirement. While

7    ████ of such third-party sellers have met this criterium and continued to sell the brand products,

8    there are also ████ who fail to meet that standard. This loss of selling privileges is in addition to

9    losing the Buy Box. Amazon has internally recognized that its brand "Sellers live in constant fear

10    that their accounts will be suspended, or that top selling products will be removed, putting their

11    businesses and livelihoods at risk."[38]

12         23.    Similarly, Amazon's November 2021 clarification of its Seller Code of Conduct

13    reflects its MFN agreement. Like the ASB program, the Seller Code of Conduct is incorporated by

14    reference into Amazon's Business Solutions Agreement.[39] The former Price Parity Clause provided

15    that "any 'low price' guarantee, rebate or discount, any free or discounted products or other benefit

16    available as a result of purchasing one or more other products" must be "at least as favorable to

17    Amazon Site users as the most favorable terms upon which a product is offered or sold via Your

18    Sales Channels[.]"[40] Likewise, despite removing the Price Parity Clause in March 2019, Amazon's

19    "clarification" to sellers is that it "consider[s] it a violation of the Amazon Seller Code of Conduct

20    if off-Amazon rebates, discounts, and other schemes are designed to drive customers to products

21    that are listed and sold without those incentives on Amazon."[41]

22

23

24    [36] AMZN_PPC_0000001386 (Standards for Brands Selling in the Amazon Store).

25    [37] AMZN_PPC_0000001099 (data responsive to California Attorney General Interrogatory No. 33); CAAGLit-AMZ_00043698 (Amazon Standards for Brands Program Update—3/10/2021) at p.1; CAAGLit-AMZ_02037765 (Amazon Standards for Brands Program Update-10/20/2020) at p.2.

26    [38] CAAGLit-AMZ_01150094 (Empowering Brands Direct) at p.9.

27    [39] See, e.g., CAAGLit-AMZ_04282017 (BSA Version 13 (Apr 30-2018)) ("General Terms").

      [40] CAAGLit-AMZ_04282017 (BSA Version 13 (Apr 30-2018)), S-4.

28    [41] AMZN_PPC_0000000313 (Seller Code Conduct-Clarification of Amazon Policy on Rebates, Coupons, other Marketing Incentives 2021-11).

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

24.     Further, Amazon's Marketplace Fair Pricing Policy (introduced in November 2017 and incorporated by reference in the BSA) reflects its MFN agreement. The Marketplace Fair Pricing Policy states that, if a third-party seller engages in pricing practices with regard to "a marketplace offer that harms customer trust," Amazon may impose sanctions.[42] According to the policy, a third-party seller commits a "pricing practice that harms customer trust" if that merchant lists goods on a competing online retail platform at prices that are significantly below its Amazon list prices.[43]

25.     Amazon's MFN agreements have a clear overarching goal: ensure price parity. Since the advent of the Price Parity Clause and continuing today, Amazon requires sellers to keep prices off Amazon as high or higher than prices on Amazon. It does so by making the third-party seller's product ineligible for a feature (the "Buy Box" button) that would make the product the most visible and easiest to purchase among similar goods; removing the third-party seller's goods from Amazon's marketplace; suspending shipping options for the third-party seller's goods; and terminating or suspending the third-party seller's ability to have any goods sold on Amazon's marketplace.[44]

26.     Amazon uses the sanctions under its MFN agreements "as a way to penalize sellers that offer products at a lower price on competing sites."[45] For example, the suspension of a third-party seller's account has "dire consequences for the seller" and was cited by the Congressional Investigation as an "egregious example[]" of Amazon's bullying of third-party merchants.[46]

27.     By thus agreeing to manipulate online retail prices, Amazon and its online retail competitors violate Section 1 of the Sherman Act.

---

[42] Amazon Seller Central, *Amazon Marketplace Fair Pricing Policy*, https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&ref=efph_G5TUVJKZHUVMN77V_cont_521.

[43] *Id.* (stating that "[s]etting a price on a product or service [on Amazon] that is significantly higher than recent prices offered on *or off* Amazon" violates the "Fair Pricing" Policy. This is an MFN agreement because the third-party merchant is out of compliance with Amazon's policy if it competes with Amazon's platform by setting prices on competing platforms at a price lower than the price it sets on Amazon).

[44] *Id.*

[45] SUBCOMMITTEE ON ANTITRUST, COMMERCIAL, AND ADMINISTRATIVE LAW OF THE COMMITTEE ON THE JUDICIARY, 116th CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS, MAJORITY STAFF REPORT AND RECOMMENDATIONS ("House Report") at 296 (2020), https://democrats-judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

[46] *Id.* at 270.

28.     The outcome is the same both under Amazon's former Price Parity Clause and its current MFN agreements: sellers cannot freely price their goods according to their costs unless they want to forego sales on Amazon Marketplace. Those MFN agreements have two major anticompetitive effects.

29.     *First*, Amazon's MFN agreements restrain competition—lower prices—outside of Amazon Marketplace by punishing sellers who sell their products or allow their products to be sold for less off of Amazon.[47] Amazon has thereby insulated itself from horizontal price competition for the goods it sells as a retailer on its marketplace, allowing it to maintain supra-competitive prices for its goods. As the German competition authority found in its investigation of Amazon's marketplace, the point of Amazon's MFN agreements is to safeguard its significant market share of retail sales as a first-party seller against competition by third-party sellers. Specifically, the German competition authority concluded that Amazon's Price Parity Clause "cannot be seen" as "an indispensable restriction" on its third-party sellers, but rather, as a restriction to protect "Amazon's large own-account [*i.e.*, first-party] share of sales as a competitor."[48] But for Amazon's MFN agreements, third-party sellers would list their goods at lower prices on other platforms that charged lower (or no) fees,[49] and—facing price competition from third-party merchants—Amazon would also have to lower prices for its own goods to compete with the lower-priced, third-party-seller goods.

30.     *Second*, despite Amazon's own overpriced marketplace fees, its MFN agreements prevent Amazon Marketplace third-party sellers from diverting to consumers on other online retailers because Amazon compels third-party sellers to sell on Amazon at prices that meet or beat the prices available on other online retailers.

---

[47] In its 2013 report on Amazon's marketplace rules in Germany, BKartA determined that Amazon's price parity clause was a "hardcore restriction" on the third-party merchants' competition "in all product categories" sold in Amazon's marketplace. A "poll of 2,500 online retailers" conducted by BKartA further demonstrated that the price parity clause caused "significant price increases in e-commerce." *Amazon Removes Price Parity Obligation for Retailers on Its Marketplace Platform*, BUNDESKARTELLAMT (Federal Cartel Office of Germany), at 3 (Dec. 9, 2013) ("BKartA                  Decision"),                  http://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf%3F__blob%3DpublicationFile%26v%3D2.

[48] *Id.*

[49] *Supra* Hart.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

31.    *Third*, Amazon's MFN agreements neutralize Amazon's competition from other online retail marketplace operators (like eBay), allowing Amazon to continue to charge supra-competitive fees for the use of its marketplace even if its platform competitors offer lower marketplace fees. That is because third-party sellers incorporate fees into their list prices. Normally, competing marketplaces therefore would have an incentive to lower fees so that third-party sellers would post lower list prices and thereby attract more customers. But Amazon's MFN agreements prohibit or disincentivize lower list prices on competing marketplaces. These policies thus allow Amazon to avoid price competition from marketplaces with lower commissions, which protects Amazon's inflated fees. Competing marketplaces cannot expand to attract more business—and new marketplaces cannot enter the market to compete—by lowering fees and prices. This is consistent with the Germany authority's findings: It concluded that Amazon's Price Parity Clause had a direct anticompetitive "effect on [competing] Internet marketplace operators."[50] The "major competitive parameter—the fees for platform services—[was] neutralised by the price parity clause, since more favourable fees [could] not be translated into more favourable prices for final customers."[51] Amazon's Price Parity Clause therefore created a "barrier[] to market entry for new competitors and hinder[ed] the expansion of existing competitors in the [online retail marketplace] market," preventing competing marketplaces "from establishing a greater reach."[52]

32.    Amazon's MFN agreements act both as a restraint on the prices of third-party-seller goods to protect the supra-competitive prices of Amazon's retail goods, and also as a restraint on the fees of competing marketplaces to protect the supra-competitive fees of Amazon's own marketplace. Amazon's MFN agreements therefore cause Amazon customers to pay more for goods purchased on its marketplace than they would pay in a competitive market. Amazon's conduct has resulted in supra-competitive prices for all goods offered on Amazon's marketplace: those of third-party sellers and those of Amazon—prices that could not be maintained in the absence of Amazon's illegal MFN agreements.

---

[50] BKartA Decision at 3.

[51] *Id.*

[52] *Id.*

THIRD AMENDED COMPLAINT - 13
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

33.    Amazon's MFN agreements are not mere policies on paper. Amazon's massive price-surveillance group, the Competitive Monitoring Team, constantly crawls the internet, globally providing ███████ price comparisons" and ██████████ price comparisons."[53] This allows Amazon to regularly and aggressively enforce its MFN agreements against its sellers to ensure that they are not listing their goods at lower prices on other retail sites.

34.    Though Amazon's MFN agreements are burdensome, third-party sellers cannot afford to disobey them because Amazon has massive and durable market power, as discussed above. And, as the House subcommittee on antitrust found, Amazon's "market power is at its height in its dealings with third-party sellers"[54]; they feel "forced to be on Amazon" and believe that they "don't have a choice but to sell through Amazon."[55] In other words, in their view, it is a "must have" marketplace. And Amazon's customers have no incentive to flee Amazon because they typically cannot find better prices on rival marketplaces, even when those marketplaces' lower fees would suggest that their prices would be lower.

35.    Critically, outside of Amazon Marketplace, most third-party sellers have a separate retail business. Eighty percent of Amazon's third-party sellers also sell their products on other online retail websites that compete with Amazon Marketplace, most commonly on eBay, their own websites, or Walmart.[56]

---

[53] CAAGLit-AMZ_00213922 at p.2.

[54] House Report at 15.

[55] *Id.* at 87, 270.

[56] Rani Molla & Jason Del Rey, *A fifth of professional Amazon merchants sell more than $1 million a year — double the share from last year*, Vox (May 23, 2018), https://www.vox.com/2018/5/23/17380088/amazon-sellers-survey-third-party-marketplace-walmart-ebay; Catie Grasso, *The State of the Amazon Marketplace 2019*, Feedadvisor, (May 15, 2019), https://feedvisor.com/resources/amazon-trends/the-state-of-the-amazon-marketplace-2019/.

THIRD AMENDED COMPLAINT - 14
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

What Other Marketplaces Amazon's US Retailers Sell on (2019)

36.    The MFN agreements directly impact competition between Amazon and its third-party sellers, beginning with the "Buy Box," where most sales on Amazon Marketplace take place. In Amazon's own words, all sellers may "compete for the Buy Box, which is awarded to the best performing seller. Amazon may win the Buy Box like any other seller."[57]

37.    When consumers log onto Amazon Marketplace, they conduct a search for a good or a specific product (like "Chapstick" or "lip balm"). Amazon Marketplace applies an algorithm that analyzes the hundreds of millions of product offerings on its site and returns ranked search results responsive to that search. The top-ranking offer occupies the Buy Box and is prominently displayed in the search results on the right side of the product detail page. By clicking on the Buy Box (typically identified by the signal "buy now" or "add to cart") on this page, the customer purchases from the seller with the winning offer. To view all other offers, the customer usually must leave the product detail page and scroll through the offer listing pages, which typically provide offers from sellers with higher prices, slower delivery times, or lower approval ratings than the Buy Box winner, as the following images illustrate:[58]

---

[57] Irwin Decl., ¶ 13.

[58] *How to Win the Buy Box on Amazon: Ecommerce's Most Exclusive Neighborhood,* Big Commerce: https://www.bigcommerce.com/blog/win-amazon-buy-box/#what-is-the-amazon-buy-box.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23  38.    On mobile devices, the Buy Box has even greater importance. It features the Buy

24  Box directly under the product image without identifying any other sellers or showing app users

25  the option of viewing the offer listing page, as the following image illustrates:[59]

26
27
28

---

[59] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21    39.    Consumers regularly rely on Amazon's selection of the Buy Box winner, where

22 virtually all sales occur.[60]

23    40.    As a result of the above, Amazon's MFN agreements harm competition and cause

24 consumers to pay higher prices than they would in a competitive market both (1) for goods listed

25 by third-party sellers on Amazon's marketplace; and (2) for goods listed by third-party sellers on

26 other platforms, including marketplaces and single-merchant websites. The loss of competition also

27

28    ────────────
     [60] Emily Sullivan, *Winning the Amazon Buy Box [Algorithm Tips for 2024]*, TINUTI (Oct. 24, 2023),
     https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

represents the loss of quality and innovation that a competitive market fosters. Existing marketplaces cannot expand by competing on price and new marketplaces cannot enter the market to compete on price.

41.    The outcome is the same both under the Price Parity Clause and its current MFN agreements: sellers cannot freely price their goods according to their costs unless they want to forego sales on Amazon Marketplace. And in many cases, they must raise their prices or forego discounting on other sites to comply with Amazon's MFN agreements.

42.    Amazon cannot justify its price restraint as a potentially permissible restraint on intrabrand competition (like a minimum resale agreement between a manufacturer and its distributors). Contractually, Amazon disclaims "any partnership, joint venture, agency, franchise, sales representative, or employment relationship between" it and its third-party sellers.[61] Amazon also does not supply any products to its third-party sellers for resale, nor does Amazon enforce the MFN agreements at the request of brand manufacturers in furtherance of intrabrand competition. On the contrary, the MFN agreements apply to all goods third-party sellers sell, including brands that compete with each other. These agreements directly restrain online competition between Amazon, for example, in its sale of Hanes, Jockey, and AmazonBasic undershirts, and third-party sellers of Hanes or Jockey undershirts.

43.    Walmart operates its own competing online marketplace platform. Many of Amazon's third-party sellers also sell there and incur fewer fees. For example, an account manager—a free service on Walmart—costs $1600 per month + 0.3% of total sales on Amazon, capped at $5,000 per month.[62] Amazon added this service (and the additional fee) to address the often-cited complaint from its third-party sellers that Amazon's largely faceless organization makes it impossible for them to navigate glitches and changing rules.[63] About 94% of third-party sellers rely on storage, packaging and delivery by Amazon (Fulfillment by Amazon or FBA), and until

---

[61] Irwin Decl., Ex. A at 6 ¶ 13.

[62] Strategic Account Services-Core, Amazon, https://sell.amazon.com/programs/paid-services.html?ref_=asus_soa_rd&.

[63] Hillary Milnes, *Amazon is chasing growth and shifting resources to third-party sellers*, Digiday (Jan. 31, 2019), https://digiday.com/marketing/amazon-chasing-growth-shifting-resources-third-party-sellers/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

2020, Walmart had no equivalent of this service.[64] One non-service related cost to FBA sellers is a $0.20 per unit cost to provide individual sku stickers—otherwise Amazon will store a seller's products with other sellers' inventory, and "if other sellers have sent in a counterfeit product or used-condition product that they are trying to pawn off as a new-condition product, now the new seller may get itself into trouble with Amazon for selling a problematic product to a customer even if it was technically not their product."[65] Walmart has no equivalent fee.

44.    Amazon also charges its third-party sellers optional advertising fees to ensure that their products show up when customers search for their products on Amazon Marketplace. "Those fees make it harder" for sellers to lower their "prices on Amazon; instead, sellers are likely to raise their prices elsewhere."[66] Walmart's on-platform advertising service, which just began in 2020, is neither as extensive as Amazon's nor, because of the relatively small number of sellers and products, as necessary to make sellers' products visible.[67] Amazon's third-party sellers could therefore profitably lower their prices on Walmart's platform if not restrained by Amazon. And in fact, Walmart routinely does field requests from third-party sellers to raise prices on its marketplace because they worry that a lower price on the Walmart platform will jeopardize their sales on Amazon Marketplace.[68]

45.    Many of the 2.3 million retailers who sell on Amazon Marketplace do so reluctantly. "Virtually every manufacturer and retailer of consumer goods in America faces [the] same predicament," explained Stacy Mitchell, co-director of Institute for Local Self-Reliance, in recent testimony to the House of Representatives' Judiciary Committee.[69] "In order to reach more than

---

[64] Melissa Repko, Walmart steps up competition with Amazon by fulfilling orders for third-party vendors, CNBC (Feb. 25, 2020), https://www.cnbc.com/2020/02/25/walmart-wants-to-make-it-easier-for-third-party-vendors.html.

[65] James Thompson, *Amazon Selling Pitfalls Even the Savviest Sellers Forget*, Big Commerce, https://web.archive.org/web/20220706062103/https://www.bigcommerce.com/blog/amazon-selling-pitfalls-problems/#fulfillment-by-amazon.

[66] Nick Statt, *Amazon price alerts are leading sellers to raise prices on Walmart or risk losing perks*, The Verge, (Aug. 5, 2019), https://www.theverge.com/2019/8/5/20755342/amazon-marketplace-antitrust-sellers-raise-prices-walmart-competition-ftc.

[67] *Why Walmart is the Next Blue Ocean Opportunity for Ecommerce Marketers* (May 13, 2020), TINUITI, https://tinuiti.com/blog/walmart/why-walmart-is-the-next-blue-ocean-opportunity-for-ecommerce-marketers/.

[68] Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, Bloomberg (Aug. 5, 2019) https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-sellers-that-offer-better-prices-on-walmart.

[69] Testimony of Stacy F. Mitchell, Co-Director Institute for Local Self-Reliance, (Jul. 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-MitchellS-20190716.pdf.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

half of the online market, they have to sell through a platform operated by one of their most aggressive and formidable competitors," which she describes as "a bitter pill."[70] Amazon's ownership of the largest retail marketplace platform gives it the necessary leverage to restrain its third-party sellers from competing anywhere else on price. Almost half of Amazon's third-party sellers generate 81% to 100% of their revenues from sales on Amazon Marketplace.[71] As its third-party seller, Molson Hart, succinctly puts it: "[W]e have nowhere else to go and Amazon knows it."[72]

46.    By enforcing MFN agreements that prohibit or disincentivize millions of third-party sellers from competing on price outside Amazon Marketplace, Amazon engages in a price-fixing scheme that broadly and anticompetitively impacts virtually all products offered for sale in the U.S. retail e-commerce market. There has been no greater harm from a price fixing scheme in U.S. antitrust history.

**D.    Through Their MFN Agreements, Amazon And Its Third-Party Sellers Combine to Confer Amazon Marketplace's Monopoly Power**

47.    Section 2 of the Sherman Act prohibits combinations and conspiracies to monopolize. Through their MFN agreements, Amazon combines or conspires with its third-party sellers to create and maintain Amazon Marketplace's monopoly power. This exercise of monopoly power hurts consumers. Were it not for these anticompetitive MFN agreements, the e-commerce market price for products sold by Amazon's third-party sellers would be substantially cheaper and the market would provide more competition, consumer choice and innovation in online retail shopping.

48.    Amazon is "the world's largest online retailer."[73] Its market valuation recently rose to $1.5 trillion, "more than that of Walmart, Target, SalesForce, IBM, eBay, and Etsy combined."[74]

---

[70] *Id.*

[71] Stephanie Chevalier, *Percentage of e-commerce revenue from Amazon sales according to Amazon marketplace sellers in 2018*, Statista (Feb 16, 2023), https://www.statista.com/statistics/886918/amazon-revenue-share-of-amazon-sellers/

[72] *Supra* Hart.

[73] Irwin Decl., ¶ 2.

[74] Antitrust Subcommittee Chair Cicilline Statement for Hearing on "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," U.S. House of Representatives Judiciary

1    Amazon Marketplace captures around 90% of all online marketplace sales.[75] By comparison,

2    Amazon's two closest competitors in online marketplaces, Walmart and eBay, account for only

3    7.1% and 4.3%, respectively, of online retail sales revenue and are only peripheral players in the

4    online retail marketplace market.[76]

5         49.    The figures below also show Amazon Marketplace's dominant position in the online

6    retail market and how its conduct can affect the whole e-commerce sector.

7         50.    The U.S. e-commerce market is dominated by Amazon Marketplace, which

8    accounts for over half of all online retail sales.[77]



Leading U.S. Online Marketplaces (2018)

51.    Amazon Marketplace's market share has been increasing, as shown by the growth

of its sales.[78]

---

Committee    Democrats,    Press    Release    (Jul.    29,    2020),    https://democrats-judiciary.house.gov/
news/documentsingle.aspx?DocumentID=3199.

[75] Amazon Marketplace is 25% of US E-commerce.

[76] Blake Droesch, *Amazon dominates US ecommerce, though its market share varies by category*, eMarketer (Apr. 27, 2021), https://www.emarketer.com/content/amazon-dominates-us-ecommerce-though-its-market-share-varies-by-category.

[77] House Report at 255.

[78] Daniela Coppola, *Amazon marketplace sales in the United States from 2016 to 2019*, Statista (Feb 13, 2024), https://www.statista.com/statistics/882919/amazon-marketplace-sales-usa/.



52.     Third-party sellers account for the majority of sales on Amazon Marketplace[79]



53.     Amazon Marketplace has obtained monopoly power in the U.S. retail e-commerce market, as demonstrated by its power to set the prevailing prices of the vast majority of consumer goods offered for sale on the internet and that it exercises extraordinary control over millions of its online retail competitors.

[79] Laureen Thomas & Courtney Reagan, *Watch out, retailers. This is just how big Amazon is becoming*, CNBC, www.cnbc.com/2018/07/12/amazon-to-take-almost-50-percent-of-us-e-commerce-market-by-years-end.html.

54.     Amazon Marketplace dominates online retail sales in numerous product categories. For example, in 2018, tracking the number of online purchases across 100 million devices from 500 different e-commerce retailers and marketplaces, market analyst, Jumpshot, found that Amazon Marketplace had a 97% share of online battery purchases, 94% share of online kitchen and dining product purchases, a 93% share of online home improvement tool purchases, a 92% share of online golf-related product purchases and a 91% share of online skin care product purchases.[80]

55.     In a 2019 report, Jumpshot found that Amazon Marketplace had over 50% market share—the presumptive threshold for monopolies—in 18 categories:[81]



56.     Because Amazon Marketplace accounts for over 50% of online sales in the U.S., it has monopoly power in that market. In the alternative, Amazon has minimally obtained monopoly power in the product category submarkets with U.S. online retail markets, where its market share exceeds 50%.

---

[80] Amy Gresenhues, *Amazon Owns More Than 90% Market Share Across 5 Different Product Categories [Report]*, Marketing Land (May 31, 2018), https://martech.org/amazon-owns-more-than-90-market-share-across-5-different-product-categories-report/.

[81] 2019 Jumpshot report, Losers Brands and Retailers Who Couldn't Make It Happen in 2018 at 21.

57.    Amazon, by conspiracy or combination with its third-party sellers, has willfully acquired its monopoly power in the U.S. retail e-commerce market or these identified U.S. online retail Submarkets through anticompetitive conduct, including enforcement of its MFN agreements, thereby causing supracompetitive prices for Class Products in the U.S. retail e-commerce market. Such conduct is an abuse or attempted abuse of monopoly power in violation of Section 2 of the Sherman Act.

58.    If Amazon does not already have a monopoly in the U.S. retail e-commerce market, there is a dangerous probability that it will achieve one because sales on Amazon Marketplace account for nearly half of all retail e-commerce sales in the United States. Alex Sheppard at the New Republic explained a few years ago: "If Amazon now controls the pricing in the book industry, just imagine what it can do in the broader world of retail."[82]

59.    Amazon's dominance not only increases online prices, it also reduces consumer choices and prevents more innovative online shopping marketplaces from competing in the United States. "The concept of shopping Amazon built - a search bar with infinite selection - doesn't have the excitement and inspiration of some of the more modern e-commerce models, especially those in China."[83] For instance, both Amazon and Alibaba use machine learning to recognize patterns in shopping behavior, but whereas Amazon generally limits its suggestions to items similar to the ones the customer previously bought or things that other customers, searching for the same item, also bought, Alibaba provides a much more extensive and innovative list of suggestions.[84]

60.    But Amazon Marketplace does not need to innovate to attract or retain its customers. By manipulating online prices through their MFN agreements, Amazon and its third-party sellers create barriers to competition with other existing or potential online marketplace operators that cannot rely on price competition to gain a share of the online retail marketplace market.

---

[82] Alex Sheppard, *How Amazon Is Changing the Whole Concept of Monopoly*, New Republic (Jun. 19, 2017), https://newrepublic.com/article/143376/amazon-changing-whole-concept-monopoly.

[83] *Minimum Viable Amazon*, Marketplace Pulse (Jan. 21, 2021), https://www.marketplacepulse.com/articles/minimum-viable-amazon.

[84] Dashveenjit Kaur, Techwire Asia (Jan. 28, 2021), *China vs. US e-commerce – How they're very different*, https://techwireasia.com/2021/01/china-vs-us-e-commerce-how-theyre-very-different/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

61.    Plaintiffs on their own behalf and that of similarly situated consumers, seek monetary recovery and injunctive relief for harm caused by Amazon's violations of federal antitrust law—harm that persists and will not abate unless Amazon is stopped. When Plaintiffs originally filed this lawsuit, Amazon's mandatory arbitration clause prevented them from asserting injuries arising from their purchases on Amazon Marketplace. Now that Amazon has changed its policy, Plaintiffs are free to assert such claims, *e.g.*, through the class claims asserted in the related *De Coster* action, where a proposed class of consumers who purchase on Amazon Marketplace also assert Sherman Act claims against Amazon arising from its anticompetitive MFN agreements.[85] Claims asserted in the current action, however, solely address overcharge injuries that Amazon's MFN agreements have caused on online retail sites that compete with Amazon Marketplace.

## E.    Identity of Class Products

62.    Amazon injured Plaintiffs and members of the Class (defined below) when they overpaid for products at prices inflated by Amazon's anticompetitive conduct.

63.    As alleged above, Amazon's MFN agreements with its 2.3 million third-party sellers are not mere policies on paper. Amazon's massive price-surveillance group, the Competitive Monitoring Team, constantly crawls the internet, globally providing "███████ price comparisons" and "███████████ price comparisons."[86] This allows Amazon to enforce its MFN agreements regularly and aggressively against its sellers to ensure that they are not listing their goods at lower prices on other retail sites.

64.    Amazon's MFN agreements neutralize Amazon's competition from other online retail marketplace operators (like eBay and Walmart), allowing Amazon to continue to charge supra-competitive fees for the use of its marketplace even if its platform competitors offer lower marketplace fees. That is because third-party sellers incorporate fees into their list prices. Normally, competing marketplaces therefore would have an incentive to lower fees so that third-party sellers would post lower list prices and thereby attract more customers. But Amazon's MFN agreements prohibit or disincentivize lower list prices on competing marketplaces. These policies thus allow

---

[85] *De Coster, et al. v. Amazon.com, Inc.*, 2:21-cv-00693-RSM (W.D. Wash.).

[86] CAAGLit-AMZ_00213922 at p.2.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    Amazon to avoid price competition from marketplaces with lower commissions, which protects

2    Amazon's inflated fees. Competing marketplaces cannot expand to attract more business—and new

3    marketplaces cannot enter the market to compete—by lowering fees and prices.

4         65.    This is consistent with the Germany authority's findings: It concluded that

5    Amazon's Price Parity Clause had a direct anticompetitive "effect on [competing] Internet

6    marketplace operators."[87] The "major competitive parameter—the fees for platform services—

7    [was] neutralised by the price parity clause, since more favourable fees [could] not be translated

8    into more favourable prices for final customers."[88] Amazon's Price Parity Clause therefore created

9    a "barrier[] to market entry for new competitors and hinder[ed] the expansion of existing

10   competitors in the [online retail marketplace] market," preventing competing marketplaces "from

11   establishing a greater reach."[89]

12        66.    To qualify as a Class Product, the product must be (i) purchased from a third-party

13   seller on the eBay or Walmart online retail marketplace, (ii) concurrently offered by Amazon's

14   third-party sellers on Amazon Marketplace, and (iii) monitored by Amazon as part of its

15   competitive price monitoring.

16   **F.    The Economic Impact of Amazon's Anticompetitive Conduct**

17        67.    Amazon's MFN agreements with its third-party sellers suppressed competition and

18   caused supracompetitive prices. Without the MFN agreements, third-party sellers would have set

19   lower prices on marketplaces and retail channels that offered lower fees. Consumers buying through

20   non-Amazon channels would have paid less for goods purchased through these channels.

21        68.    As an example, considering an average industry markup of 38.9% on books, music

22   and video, if it costs the seller $1 to buy a CD from a distributor, it would charge $1.39 on its own

23   website. If the retailer also sells through Amazon and eBay, they would also incur a minimum fee

24   of 15% from Amazon and 12% from eBay.[90] To maintain the same markup, the retailer would list

25   the product on Amazon at $1.63 and $1.58 on eBay. Because Amazon requires its third-party seller

---

[87] BKartA Decision at 3.

[88] *Id.*

[89] *Id.*

[90] eBay, https://www.ebay.com/help/selling/fees-credits-invoices/fees-business-sellers?id=4122.

**HAGENS BERMAN**

1   to set its lowest price on Amazon Marketplace, it would sell its CD on all sites for $1.63. Customers

2   who could buy at a cheaper price outside of Amazon Marketplace overpay by 3.5% on eBay and

3   17.6% on the seller's own website, assuming fees on other marketplaces would remain the same

4   without the MFN agreements in place.[91]

5       69.    The impact is even more severe due to the MFN agreements' effect on competition

6   between marketplaces. Without Amazon's MFN agreements, marketplaces can compete for

7   business by offering lower fees. This allows third-party sellers to play the marketplaces against

8   each other by setting lower prices on, and drawing more consumers to, the marketplace with the

9   lowest fee. Under Amazon's MFN agreements, other marketplaces' incentive to lower fees does

10  not exist because third-party sellers on those other marketplaces, who also sell on Amazon

11  Marketplace, cannot lower their prices below their price on Amazon's Marketplace. For example,

12  eBay's 12% fee would be even lower if the MFN agreement did not exist, because eBay would

13  have an incentive to lower its fees in order to lower its third-party sellers' prices and make more

14  sales.

15      70.    Amazon's MFN agreements also reduce third-party sellers' incentive to sell on

16  another marketplace in addition to Amazon (i.e., "multi-home") at all, both because the agreements

17  prevent sellers from lowering their prices on lower-cost (lower-fee) marketplaces and because the

18  agreements cause other marketplaces to raise their costs (fees) closer to Amazon's. This further

19  reduces price and fee competition.

20      71.    The same analysis of the impact of Amazon's price restraint can be applied to each

21  of the principal categories of goods sold on Amazon Marketplace with varying input from

22  Amazon's and eBay's fees and the industry average markup.

23

24

25

26

27

28      [91] For ease of reference, Plaintiffs have rounded the prices to the nearest cent and the percentages to the nearest
    tenth of a percentage. They base their calculations, however, on numbers that are more exact.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| | Fees | | | | | |
|---|---|---|---|---|---|---|
| Category | Amazon Fees | eBay Fees | Markup | Own site $1 cost | Amazon $1 cost | eBay $1 cost |
| Books/Music/Video | 15% | 12.0% | 38.9% | $1.39 | $1.63 | $1.58 |
| Toys & Hobby | 15% | 9.15% | 78.6% | $1.79 | $2.10 | $1.97 |
| Computer/Consumer Electronics | 8% | 7.65% | 33.3% | $1.33 | $1.45 | $1.44 |
| Office equipment | 12% | 4.00% | 40.8% | $1.41 | $1.60 | $1.47 |
| Furniture & Home Furnishings | 12% | 9.15% | 40.8% | $1.41 | $1.60 | $1.55 |
| Health & Beauty | 12% | 9.2% | 400.0% | $5.00 | $5.65 | $5.50 |
| Food & Beverage | 12% | 9.15% | 29.9% | $1.30 | $1.47 | $1.43 |
| Auto & Parts | 12% | 8.15% | 18.7% | $1.19 | $1.35 | $1.29 |
| Kitchen & Dining | 15% | 9.15% | 80.0% | $1.80 | $2.12 | $1.98 |
| Home Improvement Tools | 15% | 9.15% | 49.3% | $1.49 | $1.76 | $1.64 |
| Men's Athletic Shoes | 17% | 9.2% | 150.0% | $2.50 | $2.99 | $2.75 |
| Skin Care | 15% | 9.15% | 400.0% | $5.00 | $5.88 | $5.50 |
| Batteries | 15% | 9.15% | 33.3% | $1.33 | $1.57 | $1.47 |
| Golf | 15% | 9.15% | 62.6% | $1.63 | $1.91 | $1.79 |
| Cleaning Supplies | 15% | 9.15% | 29.9% | $1.30 | $1.53 | $1.43 |
| Other | 15% | 9.2% | 80.0% | $1.80 | $2.12 | $1.98 |

72.    Under this framework, and based on existing fee levels, Amazon's restraint has resulted in an average overcharge across all categories of 15.9 %for products sold on the third-party sellers' own websites and 5.6% for products sold on another online marketplace platform:

| Category | Amazon v. Other Two-Sided Platforms | Amazon v. Retailer's Own Website |
|---|---|---|
| Books/Music/Video | 3.5% | 17.6% |
| Toys & Hobby | 6.9% | 17.6% |
| Computer/Consumer Electronics | 0.4% | 8.7% |
| Office equipment | 9.1% | 13.6% |
| Furniture & Home Furnishings | 3.2% | 13.6% |
| Health & Beauty | 2.7% | 13.0% |
| Food & Beverage | 2.7% | 13.0% |
| Auto & Parts | 4.4% | 13.6% |
| Kitchen & Dining | 6.9% | 17.6% |
| Home Improvement Tools | 6.9% | 17.6% |
| Men's Athletic Shoes | 8.8% | 19.8% |
| **Average (All Categories)** | **5.6%** | **15.9%** |

Again, these overcharges underestimate the actual impact, because the fees on other marketplaces—and the prices sellers on those other marketplaces would charge as a result—would be lower without Amazon's MFN agreements.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

73.     This effect on other marketplaces' fees also means that the impact of Amazon's restraint on its third-party sellers and ultimately consumers is not limited to sales by multi-homing Amazon sellers, selling on other online sites. Because Amazon's platform MFN agreements cause supracompetitive marketplace fees throughout the Online Retail Marketplace Market, they artificially increase the cost of doing business for all U.S. online retail marketplace third-party sellers, even if those sellers do not sell on Amazon Marketplace and are not bound by Amazon's MFN agreements. And because marketplace fees are a significant component of the price consumers pay when they purchase from online retail marketplace sellers, Amazon causes Plaintiffs and Class members to overpay not only when they purchase Class Products from Amazon's co-conspiring third-party sellers, but also from non-conspiring third-party sellers on other marketplaces, like eBay and Walmart Marketplace.

74.     Amazon's restraint on competition has thus artificially inflated prices for Class Products and directly injured Plaintiffs and Class members, who overpaid for Class Products.

## II.    JURISDICTION

75.     This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

76.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

77.     Plaintiffs are residents of California, Florida, Georgia, Iowa, Maine, Nevada, Pennsylvania, Texas, Vermont, Virginia, Washington, and Wisconsin, who purchased consumer goods online. Plaintiffs were harmed and injured financially because of Defendant's conduct, as described further herein.

78.     This Court has personal jurisdiction over Amazon because Amazon has its principal headquarters in Washington, does business in Washington, directly or through agents, and has

THIRD AMENDED COMPLAINT - 29
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    registered with the Washington Secretary of State such that it has sufficient minimum contacts with

2    Washington.

3                                        **III.    VENUE**

4          79.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal

5    place of business is in this judicial district, and a substantial part of the events giving rise to the

6    claims occurred in this judicial district.

7                                       **IV.    PARTIES**

8    **A.    Plaintiffs**

9          80.    Deborah Frame-Wilson is a resident of Winchester, Virginia. She regularly shops

10   on U.S. online retail marketplaces that compete with Amazon Marketplace, like Walmart

11   Marketplace. Some products Ms. Frame-Wilson purchased on competing online retail marketplaces

12   are monitored by Amazon as part of its competitive price monitoring and were concurrently

13   available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products.

14   For example, around early February 2020, Ms. Frame-Wilson purchased a product that Amazon

15   monitors, an Auntie Mame DVD, online from lawbkstore, a third-party seller on Walmart for $9.99,

16   which was delivered on February 7, 2020. The same product was offered for sale by an Amazon

17   third-party seller from January 24 to February 7, 2020, concurrently with her estimated purchase

18   date. Amazon's anticompetitive price policies caused her to pay an inflated price for the product.

19   Additionally, because she regularly shops on Walmart Marketplace, where Amazon third-party

20   sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be

21   injured in the future. Ms. Frame-Wilson has been injured and will continue to be injured by paying

22   more for Class Products than she would have paid or would pay in the future in the absence of

23   Defendant's unlawful acts, as set forth herein.

24         81.    Christian Sabol is a resident of Redondo Beach, California. He regularly shops on

25   U.S. online retail marketplaces that compete with Amazon Marketplace, like Walmart Marketplace.

26   Some products Mr. Sabol purchased on competing online retail marketplaces are monitored by

27   Amazon as part of its competitive price monitoring and were concurrently available for sale by an

28   Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on July 15,

2019, he purchased a product that Amazon monitors, a set of BIC Classic Pocket Lighters, assorted colors, 5 ct. online from The Official BIC Store, a third-party seller on Walmart for $6.49 with no added shipping charge. On May 31, 2020, he purchased Nutrition Now PB8 Probiotic 120 Capsules online from PureFormulas Inc., a third-party seller on Walmart for $17.33 with no added shipping charge. And on July 30, 2019, he purchased Nutrition Now PB8 Acidophilus for Life Probiotic 120 Capsule from Venu, a third-party seller on Walmart for $14.99 with no added shipping charge. The same products were monitored by Amazon and concurrently offered for sale by Amazon third-party sellers on the dates Mr. Sabol made his purchases on Walmart. Amazon's anticompetitive price policies caused him to pay an inflated price for the products. Additionally, because he regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Sabol has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

82.     Samanthia Russell is a resident of Bougleasville, Georgia. She regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like eBay Marketplace. Some products Ms. Russell purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on July 24, 2017, she purchased a product that Amazon monitors, a Mad Gab Game Mattel Games 10+ 2-12 Players CFX4, online from livesincerely, a third-party seller on eBay for $9.64. The same product was offered for sale by an Amazon third-party seller on July 24, 2017, the same date when Ms. Russell made her purchase. Amazon's anticompetitive price policies caused her to pay an inflated price for the product. Additionally, because she regularly shops on eBay, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Russell has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

83.    Sheryl Holly-Taylor is a resident of Ocklawaha, Florida. She regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like eBay. Some products Ms. Holly-Taylor purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on September 8, 2018, she purchased a product that Amazon monitors, a Johnson Controls A19AAT-2C Freezer Temperature Controller, online from Lich-king, a third-party seller on eBay for $68.14. The same product was offered for sale by an Amazon third-party seller on September 8, 2018, the same date Ms. Holly-Taylor made her purchase. Amazon's anticompetitive price policies caused her to pay an inflated price for the product. Additionally, because she regularly shops on eBay, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Holly-Taylor has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

84.    Dave Westrope is a resident of Ankeny, Iowa. He regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like eBay. Some products Mr. Westrope purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on November 26, 2018, he purchased a product that Amazon monitors, 15A/20A tandem breaker, online from oldschoolelectric8, a third-party seller on eBay for $15.02. The same product was offered for sale by an Amazon third-party seller on November 26, 2018, the same date Mr. Westrope made his purchase. Amazon's anticompetitive price policies caused him to pay an inflated price for the product. Additionally, because he regularly shops on eBay, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Westrope has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

THIRD AMENDED COMPLAINT - 32
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

85.     Stacy Dutill is a resident of Waterville, Maine. She regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like Walmart. Some products Ms. Dutill purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, in approximately early April 2019, she purchased a product that Amazon monitors, Manna Pro 5 lb. Sho-Glo Supplement for Horses, online from Hayneedle, a third-party seller on the Walmart website for $24.26 with no added shipping charge. The product was delivered on April 6, 2019. The same product was offered for sale by an Amazon third-party seller from March 24 to April 6, 2019, concurrently with her estimated purchase date. Amazon's anticompetitive price policies caused her to pay an inflated price for the product. Additionally, because she regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Dutill has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

86.     Sarah Arrington is a resident of Las Vegas, Nevada. She regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like Walmart. Some products Ms. Arrington purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on June 19, 2017, she purchased a product that Amazon monitors, the ArtNaturals Aromatherapy Top-16, online from Art Naturals, a third-party seller on Walmart for $29.95. The same product was offered for sale by an Amazon third-party seller on June 19, 2017, the same date Ms. Arrington made her purchase. Amazon's anticompetitive price policies caused her to pay an inflated price for the product. Additionally, because she regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Arrington has been injured and will continue to be injured by paying more for Class

Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

87.     Heather Geesey is a resident of Dover, Pennsylvania. She regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like eBay. Some products Ms. Geesey purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on March 1, 2023, she purchased a product that Amazon monitors, a Samsung Galaxy SmartTag Bluetooth Tracker & Item Locator, online from simplecellllc (290476), a third-party seller on eBay for $21.15 with no added shipping charge. The same product was offered for sale by an Amazon third-party seller on March 1, 2023, the same date Ms. Geesey made her purchase. Amazon's anticompetitive price policies caused her to pay an inflated price for the product. Additionally, because she regularly shops on the eBay Marketplace, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Geesey has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

88.     Chaunda Lewis is a resident of Savannah, Texas. She regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like Walmart. Some products Ms. Lewis purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on October 18, 2020, she purchased a product that Amazon monitors, a Funko POP! Star Wars: The Mandalorian - 10" Mandalorian w/The Child, online from Mobile Advance, a third-party seller on Walmart for $48.99. The same product was offered for sale by an Amazon third-party seller on October 18, 2020, the state date Ms. Lewis made her purchase. Amazon's anticompetitive price policies caused her to pay an inflated price for the product. Additionally, because she regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Lewis has been injured and will continue to be

**HAGENS BERMAN**

injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

89.     Gail Murphy is a resident of Shelburne, Vermont. She regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like Walmart and Etsy. Some products Ms. Murphy purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on July 29, 2020, she bought five Mylar Trump Baby Balloons online from GOLDMETALSDEPOT813, a third-party seller on the Etsy website for $5 each. This is a product that Amazon monitors on the date of her purchase. On October 7, 2018, she bought a product that Amazon monitors, a HP 35S Scientific Calculator Programmable Calculator, online from DealsClick, a third-party seller on Walmart for $55.18. The same products were offered for sale by Amazon third-party sellers on the same dates Ms. Murphy made her purchases. Amazon's anticompetitive price policies caused her to pay an inflated price for the products. Additionally, because she regularly shops on Walmart and Etsy, where Amazon third-party sellers are also likely to sell and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Murphy has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

90.     Phyllis Huster is a resident of Bellevue, Washington. She regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like eBay. Some products Ms. Huster purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on August 19, 2018, she purchased a product that Amazon monitors, the Fractal Geometry of Nature, online from book_outlet (2305), a third-party seller on eBay for $30.81 with no added shipping charge. The same product was offered for sale by an Amazon third-party seller on August 19, 2018, the same date Ms. Huster made her purchase. Amazon's anticompetitive price policies caused her to pay an inflated price for the product. Additionally, because she regularly shops on eBay, where Amazon

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

third-party sellers are also likely to sell and because these sellers agree to Amazon's MFNs, she is likely to be injured in the future. Ms. Huster has been injured and will continue to be injured by paying more for Class Products than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

91.    Gerry (Chip) Kochendorfer is a resident of Eau Claire, Wisconsin. He regularly shops on U.S. online retail marketplaces that compete with Amazon Marketplace, like Walmart. Some products Mr. Kochendorfer purchased on competing online retail marketplaces are monitored by Amazon as part of its competitive price monitoring and were concurrently available for sale by an Amazon third-party seller on Amazon Marketplace, *i.e.*, Class Products. For example, on November 1, 2017, he purchased a product that Amazon monitors, a Snow Joe Ultra 18 Inch 15 Amp Single Stage Electric Snow Thrower with Headlights, online from VMInnovations, a third-party seller on Walmart for $172.28 with no added shipping charge. The same product was offered for sale by an Amazon third-party seller on November 1, 2017, the same date Mr. Kochendorfer made his purchase. Amazon's anticompetitive price policies caused him to pay an inflated price for the product. Additionally, because he regularly shops on Walmart, where Amazon third-party sellers are also likely to sell, and because these sellers agree to Amazon's MFNs, he is likely to be injured in the future. Mr. Kochendorfer has been injured and will continue to be injured by paying more for Class Products than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as set forth herein.

**B.    Defendant**

92.    Amazon is an online retailer giant with its principal headquarters in Seattle, Washington. Amazon sells directly to its retail customers on Amazon Marketplace. Amazon also maintains Amazon Marketplace, a platform for its two-million third-party sellers, who also sell on Amazon Marketplace. Amazon contractually obligates its third-party sellers to adhere to the pricing policies challenged in this lawsuit.

93.    Amazon's third-party sellers' registration is handled on Amazon Marketplace, where Amazon also has maintained the agreements with its third-party sellers relevant to this lawsuit. It is believed, and therefore alleged, that substantially all of the misconduct alleged in this

THIRD AMENDED COMPLAINT - 36
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    complaint occurred in or emanated from Amazon's headquarters and principal place of business in

2    Seattle, Washington.

3                              **V.      STATEMENT OF FACT**

4    **A.      Background**

5           **1.      Amazon is a powerful market participant in online retail sales and
                      marketplaces.**

6

7           94.     Amazon, the largest retailer in the U.S., is also the world's largest platform for third-

8    party retailers, with whom Amazon competes in the sale of consumer retail goods.

9           95.     The U.S. House Subcommittee on antitrust concluded that "Amazon functions as a

10   gatekeeper for ecommerce."[92] Further, "Amazon has monopoly power" over most third-party

11   sellers that feel they "cannot turn to alternative marketplaces, regardless of how much Amazon may

12   increase their costs of doing business or how badly they are treated."[93]

13          96.     Additionally, it found that "Amazon also enjoys significant market power over

14   online consumers" that "is durable and unlikely to erode in the foreseeable future."[94] This durable

15   market power reflects significant barriers to entry that include: "(1) network effects, which make it

16   difficult for another marketplace to achieve a comparable number of buyers and sellers;

17   (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and

18   (3) the steep costs of building a logistics network comparable in size and scope to Amazon's

19   massive international footprint in fulfillment and delivery."[95]

20          97.     From the third-party retailers' perspective, Amazon Marketplace is like Hotel

21   California, a lovely place to start or expand an online retail business, but check out from Amazon

22   Marketplace and you can quickly find your business in bankruptcy. For example, Molson Hart,

23   who sells toys on Amazon reports: "Were we to be suspended from selling on Amazon.com, it

24   would probably take 3–6 months before we'd be bankrupt. We are not alone. This is typical for

25

26   _____
        [92] House Report at 256.

27       [93] *Id.* at 257.

         [94] *Id.* at 259-60.

28       [95] *Id.* at 260.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    small to medium sized businesses which sell online today. In fact, most companies like our own,

2    would probably go bust even faster."[96]

3        98.    For the many third-party sellers, Amazon's 105 million U.S. Prime members are a

4    big incentive to selling on Amazon Marketplace because these consumers are frequent online

5    shoppers and likely to spend significant funds on Amazon Marketplace.[97] Prime membership is a

6    paid subscription service with Amazon's retail customers, which entitles them to benefits, including

7    free two-day shipping on Prime products.[98] According to a survey, *96%* of all Prime members are

8    more likely to buy products from Amazon Marketplace than any other e-commerce site.[99] An

9    estimated 20% of Amazon Prime members shopped on Amazon a few times per week, and 7% did

10   so almost daily.[100] U.S. Prime members spend an average of $1,400 per year on Amazon

11   Marketplace.[101] By selling on Amazon Marketplace, third-party sellers that qualify as Prime sellers

12   have access to a uniquely large and highly motivated consumer group.

13       99.    Amazon collects payment on Amazon Marketplace for three categories of retail

14   sales: (1) first-party sales where Amazon sells at retail products that it sources wholesale from a

15   vendor or manufacturer (43% of all goods sold on Amazon Marketplace); (2) first-party sales of its

16   own private-label products (1% of all goods sold on Amazon Marketplace) or (3) third-party sales

17   where third-party sellers sell their products through Amazon and Amazon takes a commission (61%

18   of all goods sold on Amazon Marketplace).[102]

19 ────────────────

[96] *Supra* Hart.

20   [97] *Number of Amazon Prime members in the United States as of June 2019*, Statista, https://www.statista
     .com/statistics/546894/number-of-amazon-prime-paying-members/.

21   [98] *Id.*

22   [99] Kiri Masters, *89% Of Consumers Are More Likely To Buy Products From Amazon Than Other E-Commerce
     Sites: Study*, Forbes (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-
     are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/#452623b04af1.

23   [100] *Supra* Number of Amazon Prime members in the United States as of June 2019.

24   [101] Average annual amount spent on Amazon according to U.S. Amazon Prime and non-Prime members as of
     March 2019, Statista, https://www.statista.com/statistics/304938/amazon-prime-and-non-prime-members-average-
     sales-spend/.

25   [102] Lesley Hensell, Amazon Sellers Are Losing Control of Pricing Due to "Standards for Brands, Webretailer, Nov.
26   8, 2021, https://web.archive.org/web/20220518023851/https://www.webretailer.com/b/amazon-standards-for-brands/
     (last visited April 25, 2024); *see also* Amazon Percent of Units by Marketplace Sellers 2004-2023, Marketplace Pulse,
27   https://www.marketplacepulse.com/stats/amazon/amazon-percent-of-units-by-marketplace-sellers-1 (estimating that
     third-party sellers' sales account for 61% of sales on Amazon Marketplace) (last visited April 25, 2024); Aaron Cheris,
     Darrell Rigby & Suzanne Tager, *Dreaming of an Amazon Christmas*, BAIN & CO. (Nov. 9, 2017),
28   https://www.bain.com/insights/retail-holiday-newsletter-2017-issue-2/ (estimating that Amazon's private label
     products are 2% of its first-party sales) (last visited Mar. 3, 2022).

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    100.    By extending its virtual marketplace to include hundreds of millions of more unique

2    products through third-party sellers, no other retailer or retail marketplace can match Amazon

3    Marketplace's ability to provide products for virtually every imaginable search.[103] In Amazon's

4    own words, "allowing third parties to offer products side-by-side" with Amazon's own catalog of

5    at least 12 million products, makes Amazon "more attractive to customers," which draws "even

6    more sellers" and adds to Amazon's "economies of scale[.]"[104]

7    101.    Amazon's vast infrastructure, such as its inventory management, fulfillment, return

8    processing, and advertising, gives it the capacity to compete in every product category permitted

9    on its marketplace.[105] This allows Amazon to easily enter competition with any category of good

10    sold on its marketplace.

11    102.    Amazon's accumulation of customer and seller data also gives it the capacity to

12    compete with any third-party seller. A former Amazon employee interviewed by the House

13    subcommittee on antitrust explained:

14            It's important to understand that Amazon has access to every piece
             of data on what products each customer has searched and purchased
15            [or] not purchased. . . . With information about what customers have
             searched, Amazon is able to create customized marketing [and]
16            targeting of products for the individual customer. "Is Amazon using
             a particular [third-party] seller's data here? No," but it is using all of
17            the aggregate site data to develop a highly targeted marketing plan
             for each customer. Should Amazon choose to use that targeting
18            information to focus [on] its own products, it can, while [third-party]
             sellers don't have access to similar data.[106]

19

20    103.    But the ability to compete more effectively as a retailer against its third-party sellers

21    is not the only advantage Amazon's data gives it. Research by Google suggests that the ability for

22    a seller to present its offers in a personalized setting is a valuable one, and that consumers are 40%

23

24

---

25    [103] *Supra* Minimum Viable Amazon.

26    [104] Amazon 2014 Annual Report, EX-99.1 (sec.gov), https://www.sec.gov/Archives/edgar/data/1018724/000119312515144741/d895323dex991.htm.

27    [105] Adam Levy, *Amazon's Third-Party Marketplace Is Worth Twice as Much as Its Own Retail Operations*, Motley Fool (Apr. 11, 2019), https://www.fool.com/investing/2019/03/07/amazons-third-party-marketplace-is-worth-twice-as.aspx (last visited Mar. 3, 2022).

28    [106] House Report at 268.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

more likely to spend more than they planned when in a personalized setting.[107] Amazon's data collection allows it to sell to its third-party sellers highly effective, personalized advertising that is tailored to each of Amazon's consumer customers. This data advantage has allowed Amazon to become the third-biggest digital advertising company behind Google and Facebook, hitting $31 billion in ad revenue in 2021.[108]

104.    Amazon third-party sellers do not need MFN agreements to sell goods online, nor does Amazon need them to operate an online retail marketplace. eBay, for example, provides a very similar online retail marketplace, which, like Amazon Marketplace, transacts sales between consumers and third-party sellers, but without imposing MFN agreements. And German antitrust authorities investigating Amazon Marketplace (discussed below) found that Amazon's Price Parity Clause "cannot be seen" as "an indispensable restriction" on its third-party sellers, but rather, as a restriction to protect "Amazon's large own-account [*i.e.*, first-party] share of sales as a competitor."[109] In a competitive market, third-party sellers would list their goods at lower prices on other platforms that charged lower (or no) fees,[110] and—facing price competition from third-party sellers—Amazon would also have to lower its own retail prices to compete.

**2.      German competition authorities found that Amazon's Price Parity restricted competition both as a horizontal price fixing agreement with its third-party sellers and by erecting a barrier to competition with Amazon Marketplace from other online retail marketplaces.**

105.    Amazon's first known MFN agreement, the Price Parity Clause, introduced in the U.S. in 2004, drew international scrutiny from antitrust regulators.[111] Regulators in the U.K. and Germany concurrently launched investigations into the anticompetitive effects of Amazon's Price Parity. With a 30-40% share of the market for the online sales of goods in Germany at the time of the enforcement action, Amazon's marketplace had a lower market share than it currently has in

---

[107] https://www.thinkwithgoogle.com/consumer-insights/consumer-trends/personalized-shopping-spending-statistics/.

[108] Here's the latest on Amazon's $31 billion ad business, which continues to grow despite the economic upheaval, Business Insider (Dec 27, 2022), https://www.businessinsider.com/inside-amazons-growing-ad-business-everything-we-know-2019-5?r=US&IR=T.

[109] BKartA Decision at 3.

[110] *Supra* Hart.

[111] CAAGLit-AMZ_03853422 (Aug. 24, 2010 letter from Amazon EU SARL to UK Office of Fair Trading) at p.21.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

the United States. Nevertheless, the German antitrust authority took action against Amazon for "the so-called price parity clause," also alleged here, which "largely prevented sellers on Amazon's Marketplace platform from offering their goods elsewhere online at a lower price," whether on "other e-commerce platforms" or on their "own online shops."[112]

106.    Upon investigation, the German authority concluded that Amazon's MFN agreements had the stark anticompetitive effect that economic literature predicts: reduced competition and higher prices. Because Amazon's MFN agreements ensure a uniform, all-in price to the end consumer, the "[p]rice parity clauses thus act as barriers to market entry for new competitors and hinder the expansion of existing competitors in the market" for online retail marketplace platforms by "neutrali[zing]" the "major competitive parameter – the fees for platform services – . . . more favourable fees cannot be translated into more favourable prices for final customers."[113] The inevitable result is higher prices, fewer consumers, and fewer online retail marketplaces entering the market to compete against Amazon. "According to a poll of 2,500 online retailers carried out by" the German authority, the Price Parity "has also resulted in significant price increases to e-commerce."[114]

107.    As a result of the German authority's findings, as well as coordinated efforts by the U.K.'s Office of Fair Trading, Amazon ultimately abandoned its Price Parity in 2013 throughout the EU.

108.    The Japan Fair Trade Commission reached virtually the same conclusions about the Price Parity Clause, which resulted in Amazon removing the parity provisions in that market in June 2017. It found that Amazon's "price parity clauses . . . negatively affect competition" by "limiting [sellers'] reduction of prices . . . via other sales channels[;] distorting competition among online shopping mall operators by . . . imposing those parity clauses to achieve the lowest price . . . of goods sold in its online shopping mall without making any competitive effort;" reducing "online shopping mall operators' incentive for innovation;" and hindering "new entrants as the reduction

---

[112] BKartA Decision at 1-2.

[113] BKartA Decision at 3.

[114] *Id.*



1    of fees charged by an online shopping mall operator for sellers does not result in these sellers'

2    reduction of prices[.]"[115]

3        109.    In the United States, however, Amazon has continued to employ its MFN

4    agreements to the detriment of Plaintiffs and the Class.

5        **3.    Amazon charges high seller fees that raise online prices of consumer goods on and off Amazon Marketplace.**

6        110.    Because of the fees it charges its third-party sellers, Amazon Marketplace is hugely

7    profitable for Amazon. Amazon's profit margin on its seller service fees is significantly higher than

8    the margin on its own retail sales on Amazon Marketplace.[116] Amazon takes a significant

9    percentage of each sale by its third-party sellers plus additional charges to store and ship the

10   inventory of the sellers that use the FBA service.[117] Because of this, financial analysts at Evercore

11   ISI recently valued Amazon's third-party services at more than $250 billion, while giving its in-

12   house retail operations a value of just $120 billion[118]

13       111.    The retailer's relationship with Amazon begins with a modest $40 registration fee

14   that lets it reach 95 million unique visitors per month in the United States.[119] But sellers "have to

15   play by Amazon's rules. And remember: Amazon.com isn't just a marketplace--it's also a

16   seller[.]"[120] Amazon charges a commission ("referral fees") for each item sold on their platform,

17   typically around 15%.[121] Amazon also charges a per-item fee or a monthly subscription and it

18   charges the seller the lesser of $5 or 20% of the price as a fee for any refunds when a shopper

19   returns the product.[122] Optionally, and for an additional fee, under FBA, Amazon will store, pick,

20

---

21   [115] Japan Fair Trade Commission, "Closing the Investigation on the Suspected Violation of the Antimonopoly Acts by Amazon Japan G. K.", June 1, 2017 ("Japan Fair Trade Commission Press Release"), www.jftc.go.jp/en/pressreleases/yearly-2017/June/170601.html.

22

23   [116] Adam Levy, *Amazon's Third-Party Marketplace Is Worth Twice as Much as Its Own Retail Operations*, Motley Fool (Apr. 11, 2019), https://www.fool.com/investing/2019/03/07/amazons-third-party-marketplace-is-worth-twice-as.aspx.

24   [117] *Id.*

     [118] *Id.*

25   [119] Amazon Services Registration Page, https://services.amazon.com/sem-landing.html?ref=pd_sl_2thvswwc79_

26   b&hvdev=c&ld=SEUSSOABING-B20000SC-D&hvadid=78615157546872&hvqmt=p&tag=mh0b-20&hvbmt=bb.

     [120] *Supra* Sullivan.

27   [121] Brian Connolly, *Amazon FBA Fees: How Much Does it Cost to Sell on Amazon in 2024?,* Jungle Scout (Apr. 12, 2024), https://www.junglescout.com/blog/amazon-fba-fees/.

28   [122] *Id.*

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

pack, ship orders, and manage customer service and returns. Sellers who enroll in FBA qualify for Amazon Prime and free shipping eligible orders, otherwise most sellers must join a waitlist to join Seller Fulfilled Prime, which commits sellers to fulfill orders with two-day delivery at no additional charge for Prime customers.[123] Accepting FBA services also greatly increases the likelihood that Amazon's algorithm will select the seller's product for the coveted Amazon Buy Box.[124] Meanwhile, sellers' enrollment in FBA is a win for Amazon, who never takes title to the third-party seller's inventory,[125] yet enjoys a steady revenue from its sellers, who do all the merchandising and take on the inventory risk.[126]

112.    Unlike subscription fees to access the platform, sellers do not pay referral fees up-front, but instead Amazon takes them out of the sellers' account with Amazon after they make the sale. And Amazon charges higher referral fees for those item categories where it has a significant dominance in the e-commerce market, *i.e.*, kitchen and dining products, home improvement tools, batteries, golf, skin care, cleaning supplies, books, music, and videos, and men's athletic shoes.[127]

---

[123] *Amazon FBA: Fulfillment services for your ecommerce business*, Amazon Seller Central, https://sell.amazon.com/fulfillment-by-amazon; *Sell products with the Prime branding directly from your warehouse*, Amazon Seller Central, https://services.amazon.com/services/seller-fulfilled-prime.html.

[124] *Supra* Sullivan.

[125] Irwin Decl., ¶ 5.

[126] Daphne Howland, *Amazon Caves on Seller Pricing*, Retail Dive (Mar. 13, 2019), https://www.retaildive.com/news/amazon-caves-on-seller-pricing/550388/.

[127] Dave Hamrick, *Amazon FBA Fees, How They Work, and How to Profit as a Seller*, Jungle Scout, (Feb 7, 2020) https://web.archive.org/web/20200717183616/https://www.junglescout.com/blog/amazon-fba-fees/#all-fees,%20https://www.emarketer.com/content/top-10-us-ecommerce-companies-in-2018; Corey McNair, *Top 10 US Ecommerce Companies in 2018*, eMarketer (Sep. 17, 2018), https://www.emarketer.com/content/top-10-us-ecommerce-companies-in-2018



Higher fees make it more difficult and costly for third-party sellers to compete with Amazon in these categories of goods. This gives Amazon an immense competitive advantage over its third-party sellers on and off Amazon Marketplace in areas where it already dominates and it magnifies Amazon's already formidable power to control market prices, especially in the categories of goods where it has the most market share.

113.    The fees Amazon charges make it difficult to compete on Amazon Marketplace in any category. "Every year it's been a ratchet tighter," said Bernie Thompson, a top seller of computer accessories whom Amazon has highlighted in its marketing to other sellers. "Now you are one event away from not functioning."[128] Between 2015 and 2018, Amazon's revenue from third-party seller fees grew from $16 billion to $43 billion, outpacing both the overall growth of Amazon's retail sales, and the growth of sales made by third-party sellers on Amazon Marketplace.[129]

---

[128] Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, NYT (Dec. 19, 2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html.

[129] *Supra* Mitchell.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

114.     "Amazon collects 27 cents of each dollar customers spend buying things its sellers sell, a 42 percent jump from five years ago, according to Instinet, a financial research firm. That does not include what companies pay to place ads on Amazon, a business that Wall Street considers as valuable as Nike." [130]

115.     On-platform advertising is another cost that sets Amazon apart from other platforms. Amazon is the third largest provider of digital advertising, behind only Google and Facebook.[131] Investors expect its $10 billion advertising sales[132] to jump $28.4 billion over the next five years.[133] (By comparison, Walmart's ad offerings to its third-party sellers are at the nascent stage.[134]) According to John Denny, who ran e-commerce for the drink company Bai, companies used to believe that if they had a great product, it would show up in Amazon's search results, and sales would follow. "Those days are over," Mr. Denny said. "There are no lightning strikes on Amazon anymore." [135] Paid advertising works much like Google search ads.[136] When customers conduct a search on Amazon Marketplace, they receive a combination of organic results (based on relevance) and sponsored listings (results given to consumers because the brand or seller paid for a specific search term).[137] In other words, Amazon rewards its advertisers by dedicating more search space to sponsored advertising instead of organic search results, meaning that advertised products have priority over results based on customer satisfaction.[138] For many Amazon sellers, placing advertisements on Amazon Marketplace is necessary to getting or maintaining a high ranking on

---

[130] *Supra* Weise.

[131] Eugene Kim, *Amazon quietly removes promotions of its own products as calls for tech regulation escalate*, NBC (Apr. 3, 2019), https://www.nbcnews.com/tech/tech-news/amazon-quietly-removes-promotions-its-own-products-calls-tech-regulation-n990666?cid=public-rss_20190410.

[132] Nicole Perrin, *Amazon Advertising 2019. Growth and Performance Are Strong at the No. 3 US Digital Ad Seller*, Emarketer (Nov. 7, 2019), https://www.emarketer.com/content/amazon-advertising-2019.

[133] Lara O'Reilly and Laura Stevens , *Amazon.com: Emerges as Advertising Giant*, Market Screener, (Nov. 27, 2018), https://www.wsj.com/articles/amazon-with-little-fanfare-emerges-as-an-advertising-giant-1543248561/.

[134] Tara Johnson, Selling on Walmart: Vendor vs. Third Party vs. Hybrid, Tinuiti (JUN 26, 2020), https://tinuiti.com/blog/walmart/selling-on-walmart-vendor-vs-third-party-vs-hybrid/.

[135] *Supra* Weise.

[136] Margot Whitney, *Complete Beginner's Guide to Advertising on Amazon*, WORDSTREAM (November 20, 2023), https://www.wordstream.com/blog/ws/2017/09/11/amazon-advertising.

[137] The Badger, *Organic vs Paid Search on Amazon [Infographic]*. Adbadger (Mar. 19, 2019), https://www.adbadger.com/blog/organic-vs-paid-search-amazon/.

[138] *Supra* Hart.

the platform. That means that Amazon's third-party sellers must pay more money to sell the same products. For example, on a $150 product, Amazon charges Molson Hart's company a $17.58 advertising fee to appear in Amazon's search results.[139]

116. "It's increasingly pay-to-play," said Melissa Burdick, a 10-year Amazon veteran who now advises major consumer brands.[140] Quartile tested the importance of on-platform ads in 2018 when it stopped running ads on Amazon for 750 popular products and found that sales shrank by 24%.[141] The effect only increased over time. After 10 weeks, sales of the products without ads had tumbled 55%.[142]

117. Amazon also charges sellers fees for some types of customer reviews.[143] All of these added fees mean that sellers' prices go up on Amazon Marketplace, and by virtue of Amazon's pricing policies, other platform as well. Some third-party sellers report giving Amazon 40% or more for each transaction, an increase from 20% just a few years ago.[144]

118. Market analyst Simeon Siegel notes that "although every unit sold through 3P . . . comes at lower reported revenue[,] . . . the collected fees flow through at much higher margin rates," meaning that Amazon's gross margin continues to grow even when selling fewer of its own goods.[145] For example, Amazon generated $43 billion in third-party seller service revenues in 2018, which accounted for the second-largest revenue segment of the online retail platform, after Amazon's own retail product sales.[146]

119. Collectively, the seller fees Amazon charges are substantial and built into the prices its sellers charge their customers for products purchased on Amazon Marketplace. Because

---

[139] *Id.*

[140] *Supra* Weise.

[141] *Id.*

[142] *Id.*

[143] *Id.*; *What is the Early Reviewer Program?* Amazon, https://www.amazon.com/gp/help/customer/display .html?nodeId=202094910.

[144] *Supra* Amazon Squeezes Sellers That Offer Better Prices on Walmart.

[145] *Supra* Howland.

[146] J. Clement, *Percentage of paid units sold by third-party sellers on Amazon platform as of 4th quarter 2019*, Statista (Jan. 31, 2020),
https://web.archive.org/web/20200310211521/https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Amazon's pricing policies do not permit its sellers to sell at lower prices on other platforms, these fees are also baked into the prices they offer on other platforms through Amazon's aggressive enforcement of its price restraint. To ensure compliance, Amazon's "automated system continually checks and informs the seller within 15 minutes if a violation has occurred."[147] If Amazon finds that a seller violated this restraint, it issues a policy warning in the seller's central account.[148] Violations could result in removal of the seller's product listing or suspension of the seller's account.[149] It was reported that "Amazon even checks [the seller's] listings for similar products that are differently described, by color or size, for example. In other words, there's no hiding place."[150] Jarvin Karnani, who has been selling on Amazon Marketplace for two years, told the FTC, "[I]f Amazon suspends you, it's like a death knell . . . [W]hen Amazon shuts you off, they sit on your money for 90 days and there's nothing you can do."[151] To ensure compliance with Amazon's price policies, some sellers have come to rely on an external service to replicate their prices across multiple marketplaces.[152]

### 4.    Amazon knowingly manipulates online prices through its MFN agreements despite warnings from antitrust regulators about their anticompetitive effect.

120.    "A staggering number (82%) of consumers cited price as a very important factor when buying a product on Amazon."[153] But Amazon's MFN agreements have the effect of *reducing* price competition. Third-party sellers, who would have sold their products for less, for example, on

---

[147] Rupert Heather, *The Little-Known Amazon Pricing Rule that Would Burn Your Business*, Xsellco, https://www.xsellco.com/resources/amazon-pricing-rule-burn-business/.

[148] *Id.*

[149] *Id.*

[150] *Supra* Heather.

[151] Spencer Soper & Ben Brody, *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

[152] *Supra* Heather.

[153] Catie Grasso, *Amazon Pricing Strategy: How Much Should You Sell a Product For?*, Feedadvisor (Jan. 31, 2020), https://feedvisor.com/resources/marketplace-fees-policies/amazon-pricing-strategy/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    their own websites (*e.g.*, by avoiding Amazon's estimated 15% fee),[154] were prevented from selling

2    at lower prices.[155]

3        121.    Amazon came under fire for its Price Parity Clause in December 2018, when Senator

4    Blumenthal called for an FTC investigation of the practice.[156] As noted, Amazon withdrew this

5    very practice in Europe years before under pressure from British and German regulators.[157] In

6    response to the Blumenthal letter, Amazon also quietly withdrew its Price Parity Clause in the U.S.

7    in March of 2019.[158] At the time, Dani Nadel, president of Feedvisor, a company that advises

8    Amazon sellers, expected it to be a watershed moment that would lead "the greater e-commerce

9    landscape" to be "much more dynamic."[159] Likewise, David Simnick, co-founder and CEO of

10   Soapbox, a Washington, D.C.-based soap and shampoo maker that sells on Amazon, reported that

11   when he learned that Amazon was revoking its Price Parity Clause, "I almost did a back flip in the

12   hotel gym."[160]

13       122.    But the watershed moment never came. Amazon continues to punish retailers who

14   price lower on other sites.[161] Despite Amazon's official withdrawal of the Price Parity Clause in

15   the United States in 2019, the Feedadviser website reported the following year that "many sellers

16   are still operating by the price parity rule *in fear that their account will be impacted as a result*."[162]

17       123.    Like the former Price Parity Clause, Amazon's current MFN agreements penalize

18   sellers who sell their products at a higher price on Amazon Marketplace by removing the product

19   [154] *What it costs to sell on Amazon in 2018*, Xsellco, https://web.archive.org/web/20180727232848/https://www.xsellco.com/resources/amazon-seller-fees-2018/; *supra* Hart ("Amazon takes a 15% commission on every product we sell on their website. We don't have this fee when we sell toys on our own website, so we could sell our products for 15% less and make roughly the same amount of money as we do on Amazon.").

21   [155] Letter from Senator Richard Blumenthal to Josephs Simons, Federal Trade Commission Chair (Dec. 19, 2018), https://www.blumenthal.senate.gov/imo/media/doc/12.19.18%20-%20DOJ%20-%20Price%20Parity.pdf.

22   [156] *Id.*

23   [157] *Id.*

24   [158] Catherine Shu, *Amazon Reportedly Nixes Its Price Parity Requirement for Third-Party Sellers in the U.S.*, Tech Crunch (Mar. 11, 2019), https://techcrunch.com/2019/03/11/amazon-reportedly-nixes-its-price-parity-requirement-for-third-party-sellers-in-the-u-s/.

25   [159] *Supra* Howland.

26   [160] Guadalupe Gonzalez, *You're No Longer Required to Sell Products for Less on Amazon. The Problem? If You Don't, You've Got Another Penalty Coming* (Mar. 13, 2019), https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html.

27   [161] *Supra* Hart; Gonzalez.

28   [162] *Supra* Amazon Pricing Strategy: How Much Should You Sell a Product For? (emphasis added).

**HAGENS BERMAN**

from the Buy Box, suspending shipping options, and terminating selling privileges.[163] Outside the

Buy Box, products are overlooked by algorithms determining which products shoppers see on the

platform.[164]

124.    When Amazon discovers that an external seller offers the same product on another

site at a lower price, it sends a pricing alert that warns the seller that its product is no longer eligible

for the Buy Box. The effect is chilling for most third-party sellers, who cannot afford to jeopardize

their sales on Amazon by offering better deals on other sites.[165] Jason Boyce, a former Amazon

third-party seller, who now runs a consulting firm, Avenue 7 Media, instructs clients to offer the

same prices on all sites to avoid losing prominence on Amazon even if they can afford to sell for

less on other sites. He explains: "Amazon is in control of the price, not the merchant."[166]

125.    For example, retailer David Simnick reports that his sales plunge as much as 40 or

50 percent a day when his listings lose the Buy Box, and that he can reclaim the Buy Box only if

he tweaks its pricing either at Amazon Marketplace or at the cheaper retailer, so that both offerings

are priced equally.[167] He said that despite the withdrawal of Amazon's Price Parity, his company

had about six different products removed from the Buy Box option when it sold some of the same

products at Target for $1 less.[168]

126.    Molson Hart, whose company, Viahart, sells toys online, says that 98% of its sales

come from Amazon Marketplace and that other platforms like eBay and Walmart account for less

than 2% of his company's revenue.[169] He confirmed that even after Amazon officially ended its

Price Parity, it continued to punish sellers who list prices on other websites for less than the price

on Amazon: "If we sell our products for less on channels outside Amazon and Amazon detects this,

---

[163] *Supra* Gonzalez.

[164] *Supra* Amazon Squeezes Sellers That Offer Better Prices on Walmart.

[165] *Id.*

[166] *Id.*

[167] *Supra* Gonzalez.

[168] *Id.*

[169] *Supra* Soper & Brody.

our products will not appear as prominently in search and, if you do find them, they will lose their prime check mark and with that, their sales."[170]

127.    Likewise, by stifling competition with online retail marketplace operators, Amazon raises marketplace fees for third-party sellers across the Online Retail Marketplaces Market, injuring Plaintiffs and Class members who purchase Class Goods.

**B.    Amazon's MFN Agreements Reduce Price Competition And Cause Consumers to Pay More.**

128.    Absent Amazon's anticompetitive price policies, third-party sellers would have set a lower price on a platform with lower fees than Amazon or an even lower price on the seller's own website. Consumers, who purchased the same products offered by Amazon's third-party sellers, were injured because they purchased at prices artificially inflated by Amazon's anticompetitive price policies. For example, a customer who purchased a $150 toy on Viahart (the same price concurrently offered at Amazon) paid $37 more for the toy than if the seller was able to sell the product for $37 less on its own website, while making the same profit.[171] Amazon's MFN agreements have a broad reach, encompassing virtually all consumer products. Consumers who make purchases from competing retail e-commerce channels of any of the hundreds of millions of Class Products concurrently offered at Amazon Marketplace are reasonably likely to be injured in the future by these agreements.

129.    The following six charts illustrate the effect:[172]

130.    The average price of men's athletic shoes in the last decade has ranged between $40 and $50.[173] Prices of third-party sellers on Amazon Marketplace and other platforms for several products were within this range and the sellers did not vary them across multiple platforms:

---

[170] *Supra* Hart.

[171] *Id.*

[172] The sources of each of the charts are Amazon.com, eBay, Walmart, and other retailer website identified in the charts (retrieved March 5, through March 18, 2020). Note: N/A means that the product is not sold in that marketplace. Shipping is free for all the instances considered.

[173] Athletic Footwear - United States. Retrieved March 11, 2020, from https://www.statista.com/outlook/11020000/109/athletic-footwear/united-states.

**HAGENS BERMAN**

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Orva Stores | Skechers Men's Equalizer Pesistent Slip-On, Charcoal/Black | $49.95 | $49.95 | N/A | N/A |
| Shoebacca | Diadora Mens Titan Premium Running Sneakers, Blue/Pink | $39.95 | $39.95 | $39.95 | $39.95 |
| | Diadora Mens Kick Casual Sneakers, White, Grey or Black | $39.95 | $39.95 | $39.95 | $39.95 |
| | Diadora Mens N.92 Casual Sneakers, Grey | $39.95 | $39.95 | $39.95 | N/A |
| | Diadora Mens N-6100-4 Running Shoes, Blue | $39.95 | $39.95 | $39.95 | N/A |

131.    Third-party sellers on Amazon Marketplace and other platforms had virtually identical prices for several golf ball products across multiple platforms:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Greater Golf Express | Volvik 2020 Magma Golf Balls, 12-Pack | $39.99 | $39.99 | $39.99 | $39.99 |
| CaddiesShack | Bridgestone Tour B330-S Golf Balls, 12-Pack | $34.99 | $34.99 | $34.99 | $34.99 |
| | Volvik S4 White Color Golf Balls, 12-Pack | $44.38 | $44.95 | $44.99 | N/A |
| Golf Ball Divers | Titleist Pro V1 AAA Golf Balls, Used, 36-Pack | $39.99 | $39.99 | N/A | N/A |
| | Bridgestone Golf Precept Laddie Extreme Golf Balls, Used, 36 Pack | $29.99 | $29.99 | N/A | N/A |

132.    In 2018, AmazonBasics, Amazon's private label, was the leading online brand for disposable batteries, accounting for 26% of the e-commerce market.[174] Third-party sellers' prices for several battery products on external platforms were virtually identical to, or higher than, the prices on Amazon Marketplace:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Pharmapacks | Eveready Super Heavy Duty Batteries, AAA, 4 Each | $3.36 | $3.36 | $5.04 | N/A |
| Chrome Batteries | 12V 7AH Sealed Lead Acid (SLA) Battery | $21.80 | $21.80 | $29.90 | $21.90 |
| East Coast Photo | Synergy Digital AA NiMH 2800mAh Rechargeable Batteries, Pack of 4 | $12.55 | $12.55 | N/A | $12.55 |
| | DogWatch DG-8000 Large Gray Dog Collar Battery | $8.95 | $8.95 | N/A | $8.95 |
| | Dantona ULA100AAB Alkaline, AA, Pack of 100 | $33.95 | $33.95 | N/A | $33.95 |

133.    Amazon sells over 1.1 million home improvement products per year, with a revenue of $6.1 billion in 2017.[175] Prices by third-party sellers on Amazon Marketplace and other platforms were unvaried for several home improvement products across multiple platforms:

---

[174] Jan Conway, *Market share for largest household battery manufacturers sold online in 2018*, Statista, https://www.statista.com/statistics/718199/online-market-share-household-batteries.

[175] Stephanie Chevalier, *US Amazon sales in selected retail product sectors 2017*, Statista, (Feb 16, 2023) https://www.statista.com/statistics/709493/us-amazon-sales-selected-retail-sectors/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Mix Wholesale | Cauldham 5 Pack Solid Kitchen Cabinet Arch Pulls Handles (3-3/4" Hole Centers) - Curved Drawer/Door Hardware - Style T750 - Matte Black | $13.99 | $13.99 | N/A | $13.99 |
| | Cauldham Heavy-Weight Bin Cup Drawer Pulls (3" Hole Centers) - Classic Kitchen Cabinet Door Handle Hardware - Style B350 - Oil Rubbed Bronze | $14.99 | $14.99 | N/A | $14.99 |
| | Cauldham 5 Pack Solid Kitchen Cabinet Knobs Pulls (1" Square) - Transitional Dresser Drawer/Door Hardware - Style S685 - Satin Nickel | $14.99 | $14.99 | N/A | $14.99 |
| Ron's Home and Hardware | WV15TV 1.5 In. Chip Brush, Pack of 36 | $21.37 | $21.37 | N/A | N/A |
| Southfork Homecenter | ProSource Single And Utility Unitrack Shelf Bracket, 8 In L X 2-1/2 In W 1.8 Mm Thick, Steel, White | $9.38 | $9.38 | N/A | N/A |

134.     Kitchen and dining is another leading product category, accounting for 39% of all Amazon sales in the United States as of January 2019.[176] Prices on Amazon Marketplace and other platforms for several kitchen and dining products were virtually indistinguishable:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| eKitchenWorld | Lodge 5 Inch Square Cast Iron Skillet | $15.40 | $15.40 | $15.40 | $15.40 |
| | Ginsu Essential Dishwasher Safe 6 Piece Steak Knife Set | $19.94 | $19.94 | $19.94 | $19.94 |
| BigKitchen | GreenPan Paris 3 Quart Non-Stick Dishwasher Safe Ceramic Covered Sauce Pan | $52.41 | $52.41 | N/A | N/A |
| Zwilling J.A. Henckels | Demeyere Industry 5-Ply 8-inch Stainless Steel Traditional Nonstick Fry Pan | $79.95 | $79.95 | $79.95 | $79.99 |
| Gourmet Forte | Kai Pure Komachi 2 3pc Prep Knife Set | $22.95 | $22.95 | N/A | N/A |

135.     Cleaning supplies is another top selling product category on Amazon Marketplace. Prices on Amazon Marketplace and other platforms for several cleaning products were virtually indistinguishable:

| Retailer | Product | Amazon | Walmart | eBay | Own Website |
|---|---|---|---|---|---|
| Microfiber Products | Microfiber Mop Kit for All Floor Types 100% Green Clean | $28.95 | $28.95 | N/A | N/A |
| | 18" Aluminum Commercial Mop Hardware | $29.95 | $29.95 | N/A | N/A |
| Ron's Home and Hardware | Armaly Brands 00009 Proplus Heavy-Duty Utility Sponge, 12-Pack | $30.37 | $38.95* | N/A | N/A |
| Southfork Homecenter | Continental Commercial Swivel Snap C702048 Dust Mop Frame 48 in | $13.97 | $13.97 | $13.97 | N/A |

---

[176] Daniela Coppola, *Leading product categories purchased by Amazon shoppers in the United States as of February 2019* (Jul 14, 2023), Statista, https://www.statista.com/statistics/639155/popular-amazoncom-sales-by-category/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**C.     Through Combination or Conspiracy With Its Third-Party Sellers, Amazon Has a Monopoly in The Relevant Markets**

136.    Amazon's MFN agreements restrain competition between online retailer marketplaces, causing higher online retail prices. These restraints allow Amazon to dominate the relevant markets.

137.    Amazon Marketplace has a monopoly in the U.S. retail e-commerce market or Online Retail Marketplaces Market (defined below), as demonstrated by its power to control prices of a vast number of goods offered for sale in the U.S. retail e-commerce market and through online retailer marketplaces. Its pricing policies support monopoly power "because people who prefer to shop on Walmart [or other sites] end up having to pay a higher price."[177] Many third-party sellers have foregone selling on other platforms just to avoid conflicts under Amazon's pricing policy. For example, Jason Boyce, who advises online sellers, said of a health care supply company he advises: "My client cut off Walmart — Walmart! — because it was hurting their Amazon business," Mr. Boyce said. "If that's not monopoly power, I don't know what is."[178] Sally Hubbard, a former assistant attorney general of New York and current director of enforcement strategy with Open Markets Institute, a think tank that advocates for more aggressive policing of competition laws, agrees: "You ask anybody who knows anything about Amazon, and they will say yes, Amazon has the ability to control prices in some respects. And it certainly has the ability to exclude competition."[179] Similarly, Lina Khan, whom the House of Representative's antitrust subcommittee hired as its counsel, opines that it is important to distinguish between Amazon's innovations and its abuse of market power: "We as a society can live in a world of internet commerce without resigning ourselves to all that commerce being mediated by Amazon."[180]

138.    "They control everything," explained a baby products retailer that formerly sold on Amazon Marketplace.[181] "If they don't want an item on there, they can decide that. If they only

---

[177] *Supra* Amazon Squeezes Sellers That Offer Better Prices on Walmart.

[178] *Supra* Weise.

[179] Ben Unglesbee, *Is Amazon on a collision course with the government?*, RetailDive (Sept. 30, 2019), https://www.retaildive.com/news/is-amazon-on-a-collision-course-with-the-government/563622/.

[180] *Id.*

[181] *Supra* Mitchell.

**HAGENS BERMAN**

want one seller to sell something, they can set that rule."[182] As another example of Amazon's power over its third-party sellers, Amazon imposed a great deal of financial strain on many third-party payers, accustomed to more immediate payment from consumers, when it rolled out a "pay by Invoice" policy in 2018 that permitted business customers 30 days to pay for products purchased on the Amazon.com platform.[183] One third-party seller complained that Amazon's policy uses the third-party sellers "to finance the growth" of its own business customers.[184] Jerry Kavesh, the CEO of 3P Marketplace Solutions, a consulting firm for the Amazon marketplace, explained why this placed an unfair burden on third-party sellers: "This new policy at least doubles the cash a small seller needs to have on hand in order to operate, which many small firms simply do not have and do not have the ability to access.[185] He predicted that it "could put sellers in a cash bind, where they may not be able to pay suppliers and employees, which is problematic at best, and worst could put them out of business."[186]

139.    Amazon Marketplace achieved market dominance at least in part through the contractual controls it exercises over the prices its third-party sellers can offer products through competing retail e-commerce channels.

140.    Amazon's price policies are injurious to market competition. Consumers pay inflated prices for products that are protected from competitive pricing by Amazon's anticompetitive pricing policies. Amazon's dominance is durable. No other competing retailers have comparable infrastructure, inventory, customer base, search or data advantages to challenge Amazon in the ecommerce market.

141.    "[C]ompanies that once drew sufficient consumer traffic from search engines to their own sites are now compelled to become vendors or sellers on Amazon's platform—or forego

---

[182] *Id.*

[183] Eugene Kim, *Some Amazon sellers are outraged over a new payment policy designed to attract more corporate buyers*," CNBC (Aug. 21, 2018). https://www.cnbc.com/2018/08/21/amazon-corporate-buyers-longer-terms-some-sellers-upset.html.

[184] *Id.*

[185] *Id.*

[186] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

access to a majority of online shopping traffic."[187] This "gives it an unprecedented degree of structural power in the economy."[188] As early as 2016, the internet-marketing firm BloomReach Inc. found that 55% of those surveyed first start with Amazon when searching for products.[189] Consumer preference for Amazon Marketplace as a starting point has only increased with time. A survey conducted by Feedadviser in 2019 found that 66% of consumers start their search for new products on Amazon Marketplace and 74% start there when they are ready to buy a specific product.[190] Because so many consumers start their shopping on Amazon, Amazon holds valuable and often unique data on consumers' search and product browsing history. This allows the creation of consumer and household profiles, and the targeting of advertising by sellers that use the platform in a way that is not possible on new or smaller rivals.

---

[187] *Id.*

[188] *Id.*

[189] Spencer Soper, *More than 50% of Shoppers Turn First to Amazon in Product Search*, BLOOMBERG, Sept. 26, 2016, https://www.bloomberg.com/news/articles/2016-09-27/more-than-50-of-shoppers-turn-first-to-amazon-in-product-search.

[190] Feedadvisor, *The 2019 Amazon Consumer Behavior Report*, https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**Where Consumers Start Their Search for New Products**

- Amazon — 66%
- Search Engine — 20%
- Brand Website — 4%
- Retailer Website — 4%
- Another Marketplace — 3%
- Social Media — 1%
- Other — 1%

**Where Consumers Go When They Are Ready to Buy a Specific Product**

- Amazon — 74%
- Search Engine — 10%
- Brand Website — 5%
- Retailer Website — 4%
- Another Marketplace — 4%
- Other — 3%
- Social Media — 1%

142.    With over 340 million products and 2.3 million sellers on Amazon Marketplace, Amazon has unparalleled inventory. Its sprawling network of over 100 warehouses is scattered across the United States.[191] Amazon has now surpassed DHL to become the world's largest provider of shipping and fulfillment services, giving it a vast edge over its competitors in the distribution of products.[192] Amazon delivers the majority of its own packages.[193]

---

[191] Nate Rattner and Annie Palmer, *This map shows how Amazon's warehouses are rapidly expanding across the country*, CNBC (Jan. 19, 2020), https://www.cnbc.com/2020/01/19/map-of-amazon-warehouses.html.

[192] *Supra* Weise.

[193] Emma Cosgove, *Amazon Logistics parcel volume will surpass UPS and FedEx by 2022*, Retail Dive, (Dec. 16, 2019), https://www.retaildive.com/news/amazon-logistics-volume-surpass-ups-fedex-2022-morgan-stanley/569140/.

143.    The sheer size of Amazon's first-party retail operations allows it to offer the full suite of entire digital sales infrastructure to third-party sellers, such as inventory management, fulfillment, return processing, and advertising.[194] Lacking that scale, Amazon's rivals like Walmart and Target, who also offer third-party marketplaces, cannot truly compete.[195] And by selling more services, Amazon generates greater profits from the sales of third-party sellers than its competitors can on their online marketplaces.[196]

144.    The Amazon Marketplace accounts for more than half of all retail e-commerce in the United States, and its closest competitor accounts for only 7.1% of online retail sales.[197] This along with direct evidence of Amazon's power to raise prices and exclude competition support monopoly power.

145.    Alternatively, at a minimum, Amazon has a monopoly in the ecommerce submarkets where Amazon Marketplace has a monopoly share of those markets ("Identified Submarkets"), including:

        (a)    Batteries (97%),

        (b)    Kitchen and Dining (94%),

        (c)    Musical Instruments & Karaoke (94%),

        (d)    Home Improvement Tools (93%),

        (e)    Automotive (92%),

        (f)    Golf (92%),

        (g)    Skin Care (91%),

        (h)    Health (91%),

        (i)    Cleaning Supplies (88%),

        (j)    Sports, Fitness & Outdoors (87%),

        (k)    Party, Arts & Crafts (86%),

---

[194] *Supra* Statt.

[195] *Id.*

[196] *Id.*

[197] Blake Droesch, *Amazon dominates US ecommerce, though its market share varies by category*, eMarketer (Apr. 27, 2021), https://www.emarketer.com/content/amazon-dominates-us-ecommerce-though-its-market-share-varies-by-category.

1    (l)    Household Essentials (83%),

2    (m)    Office (83%),

3    (n)    Home Improvement (82%),

4    (o)    Electronics (82%),

5    (p)    Toys & Video Games (81%),

6    (q)    Personal Care (81%),

7    (r)    Men's Athletic Shoes (74%),

8    (s)    Beauty (73%),

9    (t)    Home (72%),

10   (u)    Appliances (70%),

11   (v)    Jewelry & Accessories (70%),

12   (w)    Pets (68%),

13   (x)    Baby (68%), and

14   (y)    Furniture (54%).

15   **D.    Alternatively, Amazon Has Attempted to Monopolize The Relevant Markets Through MFN Agreements With Its Third-Party Sellers**

16

17   146.    Amazon, inclusive of its third-party sellers, has over 50% of all online sales of

18   consumer goods; compared to a meager 21% *combined* share of the next nine biggest online

     retailers.[198] Amazon Marketplace has the power to control retail e-commerce prices generally in

19   the United States and demonstrates this power by setting a floor price for products sold anywhere

20   online by its 2.3 million third-party sellers. Amazon Marketplace's 90% share of the Online Retail

21   Marketplaces Market likewise demonstrates its monopoly power.

22
     147.    Amazon Marketplace has achieved this market power at least in part by enforcing
23
     its MFN agreements.
24
     148.    Setting a floor price for products sold through competing retail e-commerce
25
     channels is anticompetitive and causes consumers to overpay in their online purchases.
26

27

28   _____
       [198] House Report at 255; *Amazon Now Has Nearly 50% of US Ecommerce Market*, EMARKETER (July 16, 2018), https://www.insiderintelligence.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.



1    149.    Alternatively, if through the MFN agreements, Amazon Marketplace does not

2  already exercise monopoly power in the relevant markets, it has a dangerous probability of

3  achieving a monopoly through its internet dominance and injurious price policies.

4  **E.    Amazon is The Subject of a Government Investigation For Possible Antitrust
       Violations, Including Whether it Uses Its Relationship With Its Third-Party Sellers**

5  **to Harm Competition**

6    150.    As a result of the German authority's findings, as well as coordinated efforts by the

7  U.K.'s Office of Fair Trading, Amazon ultimately abandoned its Price Parity Clause throughout

8  the EU. Amazon also revoked its Price Parity Clause in Japan in response to an investigation by

9  the Japan Fair Trade Commission that concluded in June 2017. But Amazon continued to enforce

10  this provision in the U.S. market until March 2019, when it withdrew the provision in response to

11  the threat of an investigation by the FTC.

12    151.    Still, Amazon did not stop enforcing its other MFN agreements or assuage concerns

13  by government investigators. In 2019, the House subcommittee on antitrust conducted an extensive

14  investigation of Amazon's pricing policies governing third-party sellers. The resulting House

15  Report concluded that "Amazon has a history of using MFN clauses to ensure that none of its

16  suppliers or third-party sellers can collaborate with an existing or potential competitor to make

17  lower-priced or innovative product offerings available to consumers."[199]

18    152.    The House Report rejected Amazon's claims that it competes with brick-and-mortar

19  retailers, outside the Online Retail Sales Market, explaining that "[t]his approach is inconsistent

20  with evidence gathered by Subcommittee staff, conventional antitrust analysis of relevant product

21  markets, and common sense."[200] The House Report further highlighted the FTC's recent conclusion

22  that a "relevant market may be divided by channel of sale, resulting in separate markets for brick-

23  and-mortar sales and online sales."[201]

24    153.    Relatedly, after a two-year investigation into Amazon's method of awarding Buy

25  Box winners on its marketplace, the Italian competition authority imposed a € 1.1-billion fine,

26

27    [199] House Report at 295.

    [200] House Report at 255.

28    [201] *Id.*

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

based on its conclusion that Amazon abused its dominant position in the Online Retail Marketplaces Market.[202] Amazon also entered into a consent decree with the Washington Attorney General and agreed to a penalty in connection with the Washington Attorney General's investigation into horizontal price-fixing under the "Sold by Amazon" program, which allowed Amazon to agree on price with third-party sellers, rather than compete with them.[203]

154.    Then, after a two-year investigation, the California Attorney General sued Amazon on September 15, 2022, alleging that Amazon used the same MFN agreements that Plaintiffs challenge in this lawsuit to unreasonably restrain trade and monopolize online markets in violation of California's antitrust laws. The California Court denied Amazon's motion to dismiss, holding that the California Attorney General "adequately state[d] a claim that Amazon's agreements and policies have had the anticompetitive effect of raising prices on competing retail marketplaces as well as on third-party seller's own websites."

155.    Following a four-year investigation, the FTC sued Amazon on September 26, 2023, alleging that Amazon uses a set of interlocking anticompetitive and unfair strategies to illegally maintain its monopoly power in online markets, including MFN agreements that Plaintiffs challenge here, like the Price Parity Clause and SC-FOD, which the FTC characterizes as anti-discounting measures that punish third-party sellers from offering prices lower than Amazon and keeps prices higher for products across the internet.

## VI.    INTERSTATE TRADE AND COMMERCE

156.    Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells goods on its own behalf and as a platform for its third-party sellers across, and without regard to, state lines.

---

[202] Steve Dent, *Italian regulator fines Amazon $1.28 billion for abusing its market dominance*, Engadget (Dec. 9, 2021), https://www.engadget.com/italy-fines-amazon-for-abuse-of-dominant-position-085244332-085736675.html.

[203] Press Release, *AG Ferguson investigation shuts down Amazon price-fixing program nationwide*, Washington State Attorney General's Office, (Jan. 26, 2022), https://www.atg.wa.gov/news/news-releases/ag-ferguson-investigation-shuts-down-amazon-price-fixing-program-nationwide (last visited Feb. 23, 2022).

**HAGENS BERMAN**

1

## VII.    RELEVANT MARKETS

2      157.    The antitrust injuries alleged herein have occurred in a) the U.S. retail e-commerce

3    market, b) the Identified Submarkets within that market, or c) the Online Retail Marketplace

4    Market.

5    **A.    U.S. Retail Ecommerce Market And Identified Submarkets Are Relevant Markets to assess amazon's anticompetitive MFN Agreements**

6      158.    Government agencies, economists, customers and retailers alike recognize the retail

7    ecommerce market as a distinct market within the U.S. retail market. Industry recognition of a

8    distinct ecommerce retail market is relevant because economic actors usually have accurate

9    perceptions of economic realities and the parties active in the market understand its function and

10    demarcation.

11      159.    For example, the U.S. Census Bureau defines ecommerce as "[t]he sale of goods

12    and services where the buyer places an order, or the price and terms of the sale are negotiated over

13    an Electronic Data Interchange, the Internet, or any other online system (extranet, e-mail, instant

14    messaging)." The market also includes mobile shopping.[204] It has collected data on ecommerce

15    sales since 1998.[205] In 2002, it began compiling E-STATS, statistics "devoted exclusively to

16    'Measuring the Electronic Economy,'"[206] and it publishes quarterly ecommerce reports.[207] More

17    recently, the Census Bureau released a supplemental data table on retail e-commerce by type of

18    retailer to enhance "understanding of where consumers are shopping online" and "provide an

19    overview of trends in retail and e-commerce sales."[208] Census data are also available for e-

20    commerce sales by type of product.[209] Similarly, the Bureau of Labor Statistics Producer Price

21    Index (PPI) program separately tracks the ecommerce industry group, which includes both

22

---

23    [204] *E-commerce in the United States - Statistics & Facts*, Statista, Dec 18, 2023, https://www.statista.com/topics/2443/us-ecommerce/.

24    [205] New Insights on Retail E-Commerce, U.S. Department of Commerce, https://web.archive.org/web/20190110125004/https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

25

26    [206] https://www.census.gov/programs-surveys/e-stats.html.

      [207] https://www.census.gov/retail/ecommerce/historic_releases.html.

27    [208] New Insights on Retail E-Commerce,  U.S. Department of Commerce, https://web.archive.org/web/20190110125004/https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

28      [209] *Id.*

THIRD AMENDED COMPLAINT - 61
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

**HAGENS BERMAN**

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

electronic shopping and auctions.[210] According to a publication by the U.S. Bureau of Labor Statistics, ecommerce retailers typically maintain lower margins than brick-and-mortar stores because of lower overhead costs associated with preserving store appearance, *e.g.*, décor and store maintenance.[211] Because they do not have the same overhead, the publication finds that online retailers can provide more competitive prices, whereas brick-and-mortar stores, on the other hand, offer consumers immediate gratification and personalized service.[212] On the other hand, data from the U.S. Census Bureau, indicated that brick and mortar stores require less advertising and that on average, ecommerce and mail-order retailers spent three times as much as store retailers on advertising and promotions per dollar of sales.[213]

160.   Ecommerce has unique characteristics, including the marketing and distribution of products. Economists recognize that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[214] An online channel has distinct characteristics from a physical channel.[215] Ecommerce has a superior method of transmitting information, effective asynchronous communication, greater flexibility in dealing with information, with far greater interactivity and search capability.[216] "Despite the relative inefficiency of delivering goods directly to the home," ecommerce leads to unique cost savings because "supplying direct to the consumer is less expensive than doing so through a store."[217] Ecommerce retail businesses avoid the costs "of handling within the store (unpacking, stocking and maintaining shelves, and such), theft (which can easily account for 3 percent of the sales of a retailer), rent (low-cost distribution

---

[210] Lana Borgie, *Trends in producer prices between e-commerce and brick-and-mortar retail trade establishments*, Prices & Spending Vol. 3, No. 18, Aug. 2014, https://www.bls.gov/opub/btn/volume-3/pdf/trends-in-producer-prices-between-e-commerce-and-brick-and-mortar-retail-trade-establishments.pdf.

[211] *Id.* at 3.

[212] *Id.* at 2-3.

[213] *Id.* at 3-4 and n.8.

[214] Forsythe, S.M., & Shi, B. (2003). *Consumer patronage and risk perceptions in Internet shopping*. Journal of Business Research 56, 867–875 at 874.

[215] Katawetawaraks, C., & Wang, C. H. (2011). *Online Shopper Behavior: Influences of Online Shopping Decision*. Asian Journal of Business Research, 1(2), 66-74.

[216] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce*, JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 15, No.1 (Winter 2001) at 5, https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/Economics%20and%20Electronic%20Commerce.pdf; *see also* David VanHoose, ECOMMERCE ECONOMICS (Routledge 2nd Ed. 2011); https://www.routledge.com/eCommerce-Economics/VanHoose/p/book/9780415778985.

[217] *Id.*

---

THIRD AMENDED COMPLAINT - 62
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  centers replace expensive urban or suburban real estate), and selling costs (automated and tele-sales

2  replace relatively expensive in-store salespeople)."[218] Consumers similarly benefit from greater

3  "information about available goods and services, and services; an improvement in access to these

4  goods; and the ability to customize goods to fit the tastes of buyers."[219] Economists also recognize

5  that the physical location of the business operating within ecommerce becomes less relevant

6  because the ecommerce market "facilitates production and distribution across borders ... and can

7  assist in opening markets that were previously closed."[220] The lower transaction costs and

8  production costs also facilitate easier entry into the market and increase competition.[221] Demand

9  side preferences also make online retailing unique in terms of certain factors such as convenience

10  and price.[222] Because competing offers are "just a few clicks away on the Internet, online consumers

11  can more easily compare different alternatives before buying with lower search cost than offline

12  consumers."[223] Online shoppers can also more easily put off purchases decisions until they are

13  ready to buy because they have not invested in travel time and do not face the pressure from the

14  salespeople that shoppers in brick and mortar stores experience.[224]

15      161.    Yale economist Fiona Morton notes that "[d]igital platforms combine economies of

16  scale, low marginal costs, economies of scope through data and an installed base of users, network

17  effects, multi-sidedness, and sometimes a global reach."[225] The combination of these attributes

18  "tend to generate concentrated markets, or market structures containing few firms," and "the

---

[218] *Id.* at 5-6.

[219] *Id.* at 6-7.

[220] Andrew D. Mitchel, Towards Compatibility: The Future of Electronic Commerce within the Global Trading System, J Int Economic Law (2001) 4 (4): 683.

[221] *Id.*

[222] Tracey Wallace, *Omnichannel Retail Strategy: How to Meet the Needs of Today's Shoppers*, https://www.bigcommerce.co.uk/articles/omnichannel-retail/; *see also* Isabel P. Enrique and Sergio Romàn, *The Influence of Consumers' Cognitive and Psychographic Traits on Perceived Deception: A Comparison Between Online and Offline Retailing Contexts*, J Bus Ethics (2014) 119:405–422 (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived deception associated with online vis- à-vis in-store shopping, indicating that they need to be considered as distinct experiences for the customer).

[223] *Supra* Isabel P. Enrique and Sergio Romàn at 408.

[224] *Id.*

[225] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house .gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[226]

162.    The Stigler Committee on Digital Platforms, on which Ms. Morton also serves as the chair of the Subcommittee on Market Structure and Antitrust, reports that "[t]raditional brick-and-mortar stores and online platforms differ greatly in their advertising and personalization capabilities."[227] Online retailers "almost always require account creation for purchasing, verify this information for each transaction, and have direct or easy access to detailed non-shopping information about their customers."[228] This account creates a digital identity, which incorporates select data on age, sex, address, email address, preferences, and, potentially, more information.[229] By comparison, physical shops tend not to force shoppers to identify themselves—and indeed consumers who use cash, credit cards with chips or phone payment apps do not identify themselves to the store.[230] In addition to the data the online retailers collect, data intermediaries also collect consumers' information that they then sell. Consumers on the internet leave numerous traces of their activities across a broad range of applications, and the emergence of the Internet of Things means that platforms have access to yet more data generated by home appliances, cars, and other devices, *e.g.*, tracking eye movement, mouse movement, body movement, and body position.[231] Advances in data mining and artificial intelligence enable firms to learn more from data than was conceivable a few decades ago.[232] The digital identities online retailers and others create help them identify and tag users to the data they generate, permitting the collection and analysis of vast amounts of data on individual behavior. This ability to merge a consumer's purchase history with other detailed information about their customers' lives from other consumer data sources gives online platforms a distinct advantage over in-store retailers to design targeted advertising for

---

[226] *Id.*

[227] Stigler Committee on Digital Platforms (Sep. 16, 2019), https://research.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf at 45.

[228] Stigler Committee on Digital Platforms at 45.

[229] *Id.* at 54.

[230] *Id.* at 45; *How Does the Chip in My Credit Card Work?* Ascent (Apr 24, 2024), https://www.fool.com/the-ascent/credit-cards/articles/how-does-the-chip-in-my-credit-card-work/.

[231] *Id.* at 48.

[232] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

particular consumers, based on many aspects of their lives beyond their historical shopping habits.[233] Lina M. Khan agrees: "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store-- precisely because the type of behavior that online firms can track is far more detailed and nuanced."[234]

163.    Large platform operators like Amazon operate other services (for example, Prime video, Goodreads, Kindle books) that allow them to collect different dimensions of data on a consumer (for example, identity, location, and purchase intent) which give faster intelligence on competitive threats and superior insights into what firms they should block, which they should buy, and how they should grow strategically.[235] The Stigler Committee on Digital Platforms reports: "This gives the platform an advantage over a rival entrant considering the same set of opportunities, and increases their abilities to exclude such rivals."[236]

164.    U.S. retailers recognize the online market as a separate economic entity. Established large retailers, *e.g.*, Walmart, Target, and Costco, have an online presence, but focus their efforts overwhelmingly on their physical stores. For example, in 2017, ecommerce accounted for only 5.5% of revenue for Target,[237] 4% for Costco,[238] and 3% for Walmart.[239] Only 28% of small businesses sell online.[240] Online retailers commonly advertise only online, whereas store retailers

---

[233] *Id.* at 45. *See also id.* at 232 ("It is not evident from Amazon's privacy policies that there are limits on the company's ability to purchase data from a third party like Fitbit, to aggregate that database with Amazon's own data, and then to identify particular kinds of consumers (*e.g.*, long-distance runners) on that basis.").

[234] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 764 (2017).

[235] *Id.* at 75.

[236] *Id.*

[237] Nat Levy, *Target's digital sales grew 10X faster than in-store sales in 2018, as retailer adjusts to battle Amazon*, Geekwire, Mar. 5, 2019, https://www.geekwire.com/2019/targets-digital-sales-grew-10x-faster-store-sales-2018-retailer-adjusts-battle-amazon/.

[238] *Trefis Team, How Much Of Wal-Mart's Revenue Will Come From E-Commerce In 2020?*, Forbes, Nov. 27, 2017, https://www.forbes.com/sites/greatspeculations/2017/11/27/how-much-of-wal-marts-revenue-will-come-from-e-commerce-in-2020/#454ed14359f2.

[239] E-commerce accounts for 4% of Costco's sales and is growing 12%, https://www.digitalcommerce360.com/2017/03/06/e-commerce-accounts-4-costcos-sales-growing-12/.

[240] Jia Wertz, *How Brick-And-Mortar Stores Can Compete With E-Commerce Giants*, Forbes, May 17, 2018, https://www.forbes.com/sites/jiawertz/2018/05/17/how-brick-and-mortar-stores-can-compete-with-e-commerce-giants/#4be14a943cc0.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

advertise both on and offline.[241] Unlike brick and mortar stores, ecommerce retailers do not have a way to take payment by cash or checks.[242] Brick and mortar stores typically provide customer service in-store to respond to questions about product offerings, whereas customer service for ecommerce retail is typically less comprehensive or effective.[243]

165.    U.S. Consumers distinguish between ecommerce and brick-and-mortar shopping markets. As a practical matter, the ecommerce market requires access, usually through a personal computer, smart phone or tablet, and most, but not all U.S. consumers have access to this market.[244] According to a Pew Research Center study in 2016, 64% of U.S. consumers prefer shopping in physical stores, and when purchasing something for the first time, 84% of U.S. consumers found it important to be able to ask questions about what they are buying or to buy from sellers they are familiar with, and 78% think it is important to be able to try the product out in person, where physical stores have an advantage over ecommerce.[245]

166.    Ecommerce attracts a younger demographic. A 2017 survey by Statista found that 67% of Millennial shoppers preferred to search and purchase on ecommerce sites rather than in store, while only 28% of seniors do.[246] Online retailers offer a broader selection and a larger inventory than offline retailers do. Consumers can shop online 24/7 and locate hard-to-find items more easily than they could by searching physical stores.[247] Online retail provides greater convenience to consumers who can order products from any location without having to find a brick-and-mortar store selling the specific product with the specific desired attributes and the desired quantity.[248] Shopping in physical stores offers more social interaction and socializing with other

---

[241] Anna Johansson, *6 Differences Between E-Commerce & Brick-and-Mortar Stores*, RetailNext, https://retailnext.net/en/blog/6-fundamental-differences-between-e-commerce-brick-and-mortar-stores/.

[242] *Id.*

[243] *Id.*

[244] Aaron Smith and Monica Anderson, *Online Shopping and E-Commerce, Pew Research Center*, Dec. 19, 2016, https://www.pewresearch.org/internet/2016/12/19/online-shopping-and-e-commerce/.

[245] *Id.*

[246] Stephanie Chevalier. U.S. online shopping preference 2017, by age group, Oct 13, 2021, https://www.statista .com/statistics/242512/online-retail-visitors-in-the-us-by-age-group/.

[247] Susan Ward, *Brick and Mortar Stores vs Online Retail Sites*, Sep. 13, 2022, https://www.thebalancesmb.com/compare-brick-and-mortar-stores-vs-online-retail-sites-4571050.

[248] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  shoppers and it is faster and easier to return a defective or unwanted product in-store rather than

2  shipping back to an online retailer.[249] The following graphic summarizes the key differences

3  between markets from the consumers' perspective: [250]



ADVANTAGES AND DISADVANTAGES

ADVANTAGES        Online Shopping        DISADVANTAGES

Saving time, fuel and energy

Comparison of Prices

24/7 Availability

No lines

Easy to search for the products

Better prices (rebates and online deals)

More variety (more stock)

No compulsive shopping

Easier to find used/ refurbished items

Discrete shopping is easier

Losing the tactile experience

Shipping adds to the cost

Returns can be costly

Dealing with an unknown vendor

Online security can be compromised

Shipping damages

[249] *Supra* Ward.

[250] Rose Leadem, *67 Fascinating Facts About Ecommerce vs. Brick and Mortar (Infographic)*, Dec. 30, 2017, https://www.entrepreneur.com/article/306678.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

167.    Ecommerce stores have a distinctly different look and feel to customers than markets that rely on a different chain of distribution, *e.g.*, in-store purchases, mail-order or purchases made from traveling sales staff. Typically, with a few clicks or a simple voice command, an ecommerce retailer will send the product directly to the consumers without any interaction with sales staff.

168.    For purposes of their rule of reason and monopoly claims, Plaintiffs allege that the relevant market in which to assess the impact of Amazon's conduct is the U.S. retail ecommerce market as a whole. In the alternative, the relevant markets are the U.S. ecommerce retail market for the sales of the Identified Submarkets, where Amazon has a dominant share of the online market.

169.    Amazon's restraints on competition directly impact the U.S. retail ecommerce market and each of the Identified Submarkets as alleged herein.

**B.    The Two-Sided Online Retail Marketplace Market is Another Relevant Market to Assess Whether Amazon's MFN Agreements Have Had an Anticompetitive Impact**

170.    Amazon's MFN agreements not only raise consumer prices and reduce competition with existing and potential online retailers, they also act as barriers to prevent existing online retail marketplace operations from expanding or potential rivals from entering the market.

171.    The Italian competition authority, Autorità Garante della Concorrenza e del Mercato ("AGCM") recently fined Amazon $1.3 billion for its use of a biased algorithm that suppressed offers from third-party sellers that Amazon disfavored because they chose not to enroll in Amazon's Fulfilled by Amazon.[251] For purposes of its enforcement action, the AGCM defined the relevant market as the market for intermediation services on online marketplaces.[252]

172.    An online "marketplace," as distinguished from a retailer's proprietary website, "allows consumers to access the offer of goods of one or more product categories by a plurality of sellers and the latter to offer their products online to an often very large audience of consumers."[253] An intermediation service, as used by the AGCM and alleged here by Plaintiffs, refers to the business of a two-sided platform that brings together consumers and sellers and can resolve

---

[251] Autorità Garante Della Concorrenza e del Mercato, Dec. 9, 2021 Final report ("AGCM Report"), ¶ 883.

[252] *Id.* ¶¶ 508-21.

[253] *Id.* ¶ 38.

THIRD AMENDED COMPLAINT - 68
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

1    transactions without redirecting them elsewhere.[254] In economic theory, a two-sided platform is

2    characterized by the presence of network effects: its usefulness for users on one side of the platform

3    increases as the number of users on the other side increases (in this case consumers and sellers

4    occupy respective sides of Amazon Marketplace's two-sided platform).[255] As described below,

5    online retail marketplaces are characterized by their network effects.

6        173.    This market (identified in this Complaint as the "Online Retail Marketplace

7    Market"), comprising of online platforms that allow consumers to purchase retail products listed

8    by multiple independent sellers without having to leave the platform, is therefore another relevant

9    market where the anticompetitive effects of Amazon's MFN agreements are felt. The Online Retail

10   Marketplace Market necessarily excludes the following retail sales:

(a)    Offline sales because "the physical channel for the sale of products to end
consumers is not considered replaceable with online sales" or
"intermediation services offered by marketplaces" in "e-commerce";[256]

(b)    Sales on proprietary online sites managed directly by retailers because of the
"significant differences" from "the perspective of the retailer" between "the
exercise of the online sales activity through a platform and the construction
and management of a website owned with ecommerce functionality";[257]

(c)    Sales on social media or a price comparison service because the sales
transactions are not realized on the original platform, but rather require the
consumer to be redirected "to sellers' websites or to marketplaces";[258] and

(d)    Sales on specialized marketplace platforms that offer a selection of products
in a limited category because they only serve "the needs of consumers
looking for a specific product and a targeted purchase" and attract only a

---

[254] *Id.* ¶¶ 38-46.

[255] *Id.* ¶ 41.

[256] *Id.* ¶ 522.

[257] *Id.* ¶ 532.

[258] *Id.* ¶ 565.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

small fraction of the third-party sellers that sell on broader "horizontal markets," like Amazon's.[259]

174.    Amazon's anticompetitive conduct has allowed it to maintain or increase its market share of the Online Retail Marketplace Market, which is estimated to be as high as 90% of all U.S. online marketplace sales.[260]

175.    For many U.S. consumers online shopping is virtually synonymous with Amazon. Before making a purchase, 82% of consumers check prices from Amazon, 79% check Amazon's reviews, and 74% of U.S. consumers go directly to Amazon when they are ready to purchase a specific product.[261]

**1.    Online retail marketplaces, like Amazon Marketplace, have powerful network effects.**

176.    Online retail marketplaces like Amazon Marketplace, benefit from powerful network effects. "Network effect" refers to any situation in which the value of a product, service, or platform depends on the number of buyers, sellers, or users who use that product, service, or platform.[262] Indirect network effects occur when there are two types of users and the benefit of the platform increases for one user group as the membership of other group increases. As applied here, the more consumers who use Amazon Marketplace to shop, the greater the benefit to sellers using the platform to make retail sales, and conversely, the more sellers that join Amazon Marketplace, the greater the benefit to consumers using the platform to make retail purchases.

177.    Amazon Marketplace is the prototypical example of strong indirect network effects. Amazon' consumer base of hundreds of millions of customers makes it indispensable to third-party sellers, and its 2 million active third-party sellers help to secure its customers' loyalty, who cannot find the breadth of products that Amazon's marketplace offers anywhere else.

---

[259] *Id.* ¶¶ 81, 84.

[260] House Report at 255.

[261] The 2019 Amazon Consumer Behavior Report, https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf at 14-15.

[262] Tim Stobierski, *What are network effects?*, Harvard Business School Online (Nov. 12, 2020), https://online.hbs.edu/blog/post/what-are-network-effects.

178.    As a first-party retailer, Amazon sells 12 million unique products on its marketplace—not including books, media, wine, and services.[263] Third-party sellers greatly expand the number of unique products offered on Amazon Marketplace by offering 340 million products.[264]

**2.      Amazon does not face any serious competitive threat to its dominance in the Online Retail Marketplace Market.**

179.    Amazon's size alone is direct evidence of its market power. Amazon's market capitalization is currently $1.797 trillion.[265] By that measure, Amazon is the world's fifth-biggest company.

180.    Online big box stores do not pose a credible threat to Amazon Marketplace. While they may have a significant number of visitors to their website, they cannot compete with the broad catalogue of goods available on online retail marketplaces or the marketplaces' ability to deliver to their customers.[266] Because "most marketplaces launched by retailers" do not invest in the infrastructure necessary to offer a sufficiently broad category of goods, they "fail to generate significant sales volume."[267] For example, Best Buy launched its marketplace in the U.S. in 2011, only to shut it down five years later because of "customer confusion over marketplace purchases."[268] Jeff Shelman, Best Buy spokesperson, explained that its customers were confused by Best Buy's "inability to offer in-store pickup for items offered for sale by third-party merchants," and by "the fact that customers could not return marketplace items to Best Buy's retail stores."[269]

181.    The anticompetitive effects of Amazon's MFN agreements must also take into consideration the market advantages that Amazon already enjoys by virtue of being one of the first online retail marketplaces and through its early recognition of the value of gathering consumer data.

---

[263] *How many products does Amazon carry?*, Retail TouchPoints, https://www.retailtouchpoints.com/resources/how-many-products-does-amazon-carry.

[264] 15 Amazon Statistics You Need to Know in 2022, repricerexpress.com, https://web.archive.org/web/20220308015705/https://www.repricerexpress.com/amazon-statistics/.

[265] https://companiesmarketcap.com/amazon/marketcap/ (visited April 25, 2024).

[266] *Retailers Do Not Need Marketplaces*, Marketplace Pulse (Sep 15, 2020), https://www.marketplacepulse.com/articles/retailers-do-not-need-marketplaces.

[267] *Id.*

[268] *Id.*

[269] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

182.    The U.S. House subcommittee itself recognized that "large technology firms" like Amazon "maintain market power in part because it is not easy for users to switch away from the incumbent's technology."[270] For example, a third-party seller cannot easily download and migrate its ratings and reviews from Amazon Marketplace and would instead have to start without ratings and reviews on a new platform.[271] The difficulty users face with switching away from Amazon's technology causes both consumers and third-party sellers to stick with Amazon even though they may prefer an Amazon rival.[272]

183.    Other Big Tech companies have failed to challenge Amazon's dominance. After attracting fewer than 8,000 sellers even with the promise of eliminating seller commissions,[273] Google exited the online marketplace market in 2021.[274]

184.    Nor does the specialized ecommerce platform, Shopify, pose a risk to Amazon Marketplace's dominance. As recently confirmed by CEO Tobi Lütke, Shopify has no current intention of competing with Amazon in the Online Retail Marketplaces Market.[275] Instead, Shopify helps online retailers to build their own online store, but it does not help them reach customers, and conversely Shopify's consumer-facing app does not even allow consumers to search for products across Shopify stores.[276] "Merchants are not a point of leverage for Shopify to build a consumer brand, explains Ben Thompson at Stratechery, "they are Shopify's reason to exist, and no growth hack is going to change that[.]"[277]

---

[270] House Report at 41.

[271] *Id.* at 42.

[272] *Id.* at 41-42.

[273] *Google Shopping Is Not Attracting Sellers Despite 0% Fees*, Marketplace Pulse (Sep. 30, 2020), https://www.marketplacepulse.com/articles/google-shopping-is-not-attracting-sellers-despite-0-fees.

[274] *Google Promised a Marketplace but Then Gave Up*, Marketplace Pulse (Aug. 19, 2021), https://www.marketplacepulse.com/articles/google-promised-a-marketplace-but-then-gave-up.

[275] *Shopify Won't Build a Marketplace*, Marketplace Pulse (Apr. 6, 2021), https://www.marketplacepulse.com/articles/shopify-wont-build-a-marketplace; Lucy Carney, *Shopify vs Amazon: Which Platform Should You Use?* (Aug 17, 2023), https://www.websitebuilderexpert.com/ecommerce-website-builders/comparisons/shopify-vs-amazon/.

[276] *Shopify's Almost-Marketplace Called Shop*, Marketplace Pulse (Apr. 29, 2020), https://www.marketplacepulse.com/articles/shopifys-almost-marketplace-called-shop.

[277] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

185.    Sally Hubbard, former New York Assistant Attorney General and current Director of Enforcement Strategy at the Open Markets Institute, observes, consumers "benefit from robust competition, open markets, and a de-concentrated economy," where "the best rise to the top because of merit, not because powerful gatekeepers control who gets to succeed."[278]

186.    In China, for example, where Amazon withdrew from the market because of the fierce competition it faced, consumers have many innovative options for online shopping. Most Chinese sites offer next-day shipping, which Amazon Marketplace struggles to provide.[279] Payment for Chinese e-commerce is also commonly held in an escrow and then released once the delivery occurs, eliminating many disputes related to shipping.[280] Online sites in China provide shoppers extensive product suggestions based on machine learning, allow consumers to skip time-consuming credit card transactions by using mobile payment, and permit consumers to avoid the chaos of China's equivalent of Black Friday by paying a security deposit to reserve products at the sales price weeks before the sale occurs.[281] And built-in online chat forums allow consumers to bargain with online sellers.[282]

187.    In a competitive market, U.S. consumers would likely benefit from similar innovations. But facing no serious competition in the Online Retail Marketplace Market, Amazon does not innovate: "The feedback Amazon gathered over the years is that it doesn't need to do more than it already does," and instead it "spends most of its resource" on fortifying its monopoly power.[283] This includes Amazon's enforcement of MFN agreements to prevent price competition with the products it sells as part of its first-party retail sales.

188.    Eliminating Amazon's anticompetitive pricing policies would not lead to any discernible negative indirect network effects under the circumstances described herein. For

---

[278] Amazon Is a Monopoly, an Interview With Sally Hubbard - Marketplace Pulse (Aug. 6, 2019), https://www.marketplacepulse.com/articles/amazon-is-a-monopoly-an-interview-with-sally-hubbard.

[279] *The Real Difference Between China and US E-Commerce*, Enleaf, https://enleaf.com/the-real-difference-between-china-and-us-e-commerce/.

[280] *Id.*

[281] *Supra* Kaur.

[282] *Supra* The Real Difference Between China and US E-Commerce.

[283] *Supra* Minimum Viable Amazon.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

example, unlike credit-card transaction platforms, allowing third-party sellers to compete on price through competing retail e-commerce channels would not reduce the money available to pay rebates or rewards to consumers because Amazon does not pay rebates or rewards to its retail customers.

189.    Amazon also does not need the contested price policies to prevent free riding from third-party sellers. Amazon already collects substantial fees from them and prevents free-riding by generally prohibiting third-party sellers from communicating directly with customers on Amazon Marketplace.[284]

190.    Nor are they needed to combat free riding from consumers. Many regular Amazon customers already pay substantial fees for their Prime membership, and Amazon dominates consumers' online searches of retailer websites, creating an "information bottleneck" that prevents many consumers from ever receiving competitive price information from other sources.[285]

191.    In fact, Amazon can point to no legitimate considerations that countervail the propriety of the monetary and injunctive relief that Plaintiffs seek.

## VIII.    CLASS ACTION ALLEGATIONS

192.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief on behalf of the members of the following Class:

> All persons who, on or after March 19, 2016, purchased from a third-party seller on the Walmart or eBay online retail marketplaces in the United States one or more new, physical products concurrently offered for sale by Amazon's third-party sellers on Amazon Marketplace and monitored by Amazon as part of its competitive price monitoring.

193.    Excluded from the Class are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers

---

[284] *Supra* Hart; Irwin Decl., Ex. A at 6 (¶ 14).

[285] Retail Industry Leaders Association letter to the Federal Trade Commission re: Competition and Consumer Protection in the 21st Century Hearings (Project Number P181201) (Jun. 30, 2019), at 3, https://rila.my.salesforce.com/sfc/p/#61000000dOrP/a/4M000000DO0Z/H5c7IH2umW0ayLluMXZ0TsRBosaLIZAV9aTfcf9rs3o.

and their personnel, and all governmental entities. For avoidance of doubt, persons are not included in the class by reason of their purchases of used products, digital products, or purchases made through a prescription.

194.    The identity of all products encompassed within the Class's definition are readily identifiable from information and records maintained by Defendant. The identity of the members of the Class and their records of Class Product purchases is readily available through multiple sources that record online purchases, including Class members' own records of online transactions and payment, the records of the online retail marketplaces from whom the Class Products were purchased, and Class members' and online retailers' records of payment through PayPal, credit cards and other financial institutions.

195.    **Numerosity:** Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are tens of millions of members of the Class (if not more), geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

196.    **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Class.

197.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

198.    **Commonality:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class are inherent in

THIRD AMENDED COMPLAINT - 75
Case No. 20-cv-00424-JHC
010888-11/2577616 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    Defendant's wrongful conduct because the overcharge injuries incurred by Plaintiffs and each

2    member of the proposed Class arose from the same anticompetitive conduct alleged herein.

3        199.    There are common questions of law and fact specific to the Class that predominate

4    over any questions affecting individual members, including:

5        (a)    Whether Defendant and its third-party sellers unlawfully contracted,

6    combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act

7    by agreeing to refrain from competing outside of Amazon at prices lower than on Amazon

8    Marketplace;

9        (b)    Whether Defendant has unlawfully monopolized, attempted to monopolize,

10    or conspired to monopolize any of the relevant markets asserted herein, including by way of the

11    contractual terms, policies, practices, mandates, and restraints described herein;

12        (c)    Whether competition in the relevant markets has been restrained and harmed

13    by Amazon's conspiracy, monopolization, or attempted monopolization, of these markets;

14        (d)    Whether consumers and Class members have been damaged by Defendant's

15    conduct;

16        (e)    The amount of any damages; and

17        (f)    The nature and scope of injunctive relief necessary to restore a competitive

18    market.

19        200.    **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad

20    of individual actions for the conduct complained of were undertaken, there likely would be

21    inconsistent or varying results. This would have the effect of establishing incompatible standards

22    of conduct for the Defendant. Certification of Plaintiffs' proposed Class would prevent these

23    undesirable outcomes.

24        201.    **Injunctive relief:** By way of its conduct described in this complaint, Defendant has

25    acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is

26    appropriate respecting the Class as a whole.

27        202.    **Predominance and superiority:** This proposed class action is appropriate for

28    certification. Class proceedings on these facts and this law are superior to all other available

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  methods for the fair and efficient adjudication of this controversy, given that joinder of all members

2  is impracticable. Even if members of the proposed Class could sustain individual litigation, that

3  course would not be preferable to a class action because individual litigation would increase the

4  delay and expense to the parties due to the complex factual and legal controversies present in this

5  matter. Here, the class action device will present far fewer management difficulties, and it will

6  provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by

7  this Court. Further, uniformity of decisions will be ensured.

8                    **IX.    ANTITRUST INJURY**

9         203.    During the Class Period, Plaintiffs and Class members directly purchased Class

10  Products, *i.e.*, they directly purchased— from an online retail marketplace seller on a platform other

11  than Amazon Marketplace—new physical products that Amazon's third-party sellers concurrently

12  offered for sale on Amazon Marketplace and that Amazon monitored as part of its competitive price

13  monitoring. Because of Defendant's anticompetitive conduct, Plaintiffs and Class members were

14  forced to pay more for Class Products than they would have if Amazon had permitted its third-

15  party sellers to engage in price competition outside Amazon Marketplace. Defendant therefore has

16  caused Plaintiffs and Class members to suffer overcharge damages. Because Defendant continues

17  to enforce its MFN agreements and use them to monopolize the relevant markets, Plaintiffs and

18  Class members are reasonably likely to incur future overcharges for Class Products. Both the actual

19  harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's

20  violations of federal antitrust laws, including its anticompetitive agreements with its third-party

21  sellers, its monopolization, attempted monopolization or conspiracy to monopolize the relevant

22  markets, as alleged herein.

23         204.    Defendant, through its unlawful conduct alleged herein, increased prices offered

24  through competing retail e-commerce channels, reduced choice for purchasers, and caused antitrust

25  injury to purchasers in the form of overcharges. Plaintiffs and Class members have sustained, and

26  continue to sustain, significant losses in the form of artificially inflated prices caused by

27  Defendant's anticompetitive activity. The full amount of such overcharge damages will be

28  calculated after discovery and upon proof at trial. Unless Amazon's anticompetitive conduct is

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    stopped, Plaintiffs and the Class will incur future overcharges in their direct purchases of Class

2    Products.

### X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF 15 U.S.C. § 1

6    205.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

7    206.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each

8    member of the proposed Class described above.

9    207.    Plaintiffs and the Class members have been injured and will continue to be injured

10   in their businesses and property by paying more for Class Products than they would have paid or

11   would pay in the future in the absence of Defendant's unlawful acts.

12   208.    Plaintiffs and Class members are direct purchasers because they directly purchase

13   Class Products, whose retail price is inflated as a direct result of Amazon's anticompetitive

14   agreements with its 2.3 million third-party sellers.

15   209.    In violation of Section 1 of the Sherman Antitrust Act, Defendant and its 2.3 million

16   third-party merchants unlawfully agreed under Amazon's MFN agreements to refrain from

17   competing with Amazon Marketplace at prices lower than prices on Amazon Marketplace. These

18   unlawful agreements have unreasonably restrained price competition among retailers for online

19   sales of consumer goods and had the effect of establishing a price floor for Class Products.

20   210.    Defendant is liable for the creation, maintenance, and enforcement of the

21   agreements under a "quick look" or rule-of-reason standard.

22   211.    The agreements have harmed competition in the relevant markets defined herein and

23   caused prices to be higher in those markets than the prices would have been without the agreements

24   between Defendant and its third-party sellers.

25   212.    For purposes of Plaintiffs and Class members' quick-look or rule-of-reason claims,

26   the relevant geographic market is the United States. The relevant product markets are any or all of

27   the following markets: the Online Retail Marketplace Market, the Online Retail Sales Market or

28   the Identified Submarkets.

213.    **Online Retail Marketplace Market**: Defendant's MFN agreements have an open and obvious adverse effect on competition in the in the Online Retail Marketplace Market, where Defendant's MFN agreements act as barriers to market entry for new marketplace competitors and hinder the expansion of existing competitors in that market. This is because the MFN agreements prevent competitor marketplaces from competing on the most significant parameter—the fees for platform services. Competitor marketplaces cannot translate lower fees into lower prices for consumers. Amazon's MFN agreements therefore raise prices above a competitive level, prevent competing marketplaces from entering the market, and restrict the expansion of existing competitors in the market. They also decrease innovation and consumer choice in the relevant market. Defendant also possesses market power in the Online Retail Marketplace Market, where Amazon accounts for 65% to 70% of all online marketplace purchases.

214.    **Online Retail Sales Market**: Defendant's MFN agreements also have an open and obvious adverse effect on competition in the Online Retail Sales Market, where they raise prices, by shielding Amazon's first-party sales from price competition from its third-party merchants. In a competitive market, Amazon would have to lower its first-party retail prices to compete with lower prices offered by online retail merchants that compete with sales on Amazon's marketplace. Defendant and its co-conspirators possess dominant market power. Retail sales on Amazon's marketplace represent well over 50% of all sales in the Online Retail Sales Market. The marketplace nearest in size to Amazon (eBay) has a distant 6.6% of the market. That Amazon has dominant market power is evident from its power to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow it to exercise market power. It controls 66% of all online product searches for first-time purchases and 74% for goods previously purchased. It has a much larger inventory than any of its competitors. It has a vast digital advantage over its competitors, having amassed detailed consumer preferences and behavior over decades from its 200 million unique monthly customers.

215.    **Identified Submarkets**: For the reasons previously stated, Defendant's MFN agreements also have an open and obvious adverse effect on competition in the Identified Submarkets of the Online Retail Sales Market, where retail sales on Amazon's marketplace

1    represent over 50% of all sales in the Identified Submarkets and where Amazon's unique

2    advantages allow it to exercise market power in the Identified Submarkets.

3        216.    A straightforward application of fundamental economic principles shows that the

4    arrangements in question would have an anticompetitive effect on customers and the relevant

5    markets.

6        217.    Defendant and its co-conspirator third-party sellers did not act unilaterally or

7    independently, or in their own economic interests, when entering into the agreements. The

8    agreements and their enforcement substantially, unreasonably, and unduly restrain trade in the

9    relevant markets, and harmed Plaintiffs and the Class thereby.

10       218.    The agreements have an open and obvious adverse effect on competition. By forcing

11   its third-party sellers to raise prices on other platforms, Amazon limits the number of meaningful

12   choices consumers have in the sale of Class Products.

13       219.    Amazon's MFN agreements have actual detrimental effects, *i.e.*, less competitive

14   pricing, fewer consumer choices, and reduced innovation in online shopping.

15       220.    Amazon's relationship with its third-party sellers is further evidence of its market

16   power. It has the power to dictate and arbitrarily change the rules by which its third-party sellers

17   have access to Amazon Marketplace, *e.g.*, extending the amount of time that business buyers have

18   to pay third-party sellers, deciding what products they can sell and whether they can participate as

19   vendors or third-party sellers, and bends the search results rules to promote its FBA and sponsored

20   advertising services. Amazon charges them exorbitant fees that give Amazon a competitive

21   advantage over its third-party sellers and uses their supplier information to contract directly with

22   the supplier and their customer information to decide what areas to focus its retail or product

23   developments.

24       221.    There is no legitimate, pro-competitive business justification for Amazon's MFN

25   agreements or any justification that outweighs their harmful effect. Even if a conceivable

26   justification exists, the agreements are broader than necessary to achieve such a purpose.

27

28

222.    Plaintiffs and members of the Class were injured in their business or property by paying higher prices for Class Products than they would have paid in the absence of Defendant's unlawful conduct.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
### (15 U.S.C. § 2)

223.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

224.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

225.    Through Amazon Marketplace, Amazon possesses market power in the relevant markets as demonstrated by its market share and its ability to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow it to exercise and maintain market power, *e.g*., search, inventory, data, and infrastructure dominance. Amazon's market power is also demonstrated by the exorbitant fees it charges its third-party sellers and the power to adopt and enforce rules on the platform that benefit itself and jeopardize its third-party sellers' businesses.

226.    Amazon has gained and maintains monopoly power in the applicable markets by improper and unlawful means.

227.    Defendant has willfully acquired its monopoly power in the relevant markets by unlawful and improper means, including through its enforcement of its MFN agreements. These provisions establish a price floor based on third-party merchants' price listings on Amazon's marketplace. By requiring its 2.3 million third-party merchants to apply a price floor on all other online retail platforms—both on marketplaces and on their own websites—Defendant has largely immunized its goods from competitive pricing in the Online Retail Sales Market and caused goods sold on Amazon's marketplace to be listed at supra-competitive prices. Amazon has likewise largely immunized its marketplace services from more competitive fees in the Online Retail Marketplace Market because Amazon's MFN agreements do not allow its 2.3 million third-party merchants to capitalize on the more favorable fees, *i.e*., by lowering list prices for consumers on

marketplaces that compete with Amazon's marketplace. This, in turn, causes higher prices in competing online retail marketplaces, and the absence of price competition compels consumers to shop on Amazon, where they pay supra-competitive prices.

228. Plaintiffs and Class members are direct purchasers because they directly purchase Class Products through a U.S. e-commerce retail channel that competes with Amazon Marketplace.

229. Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Class Products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

230. Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2)

231. Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

232. Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

233. If Defendant does not already have a monopoly in the relevant markets, it has attempted to monopolize these markets.

234. Through enactment of the pricing policies challenged herein—Amazon's MFN agreements—Defendant has demonstrated its intent to control online prices of virtually every consumer good offered in the U.S. retail e-commerce market.

235. Through its enforcement of its MFN agreements, Defendant has furthered its goal of controlling prices of virtually every consumer good offered in the relevant markets.

236. Based on its current market power and its gatekeeper status, there is a dangerous probability that Defendant will succeed in monopolizing the relevant markets.

237. Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Class Products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

238. Plaintiffs and Class members are direct purchasers because they directly purchase Class Products that are inflated as a direct result of Amazon's anticompetitive conduct.

239. Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

### FOURTH CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2)

240. Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

241. Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

242. Through their MFN agreements, Amazon and its third-party sellers have combined or conspired to create or maintain or attempt to create or maintain Amazon Marketplace's monopoly power in the relevant markets. The MFN agreements facilitate Amazon Marketplace's monopoly power by raising online retail marketplace prices and suppressing competition from competing online marketplaces (like eBay and Walmart) by eliminating the benefit of lowering seller fees to compete in the Online Retail Marketplaces Market.

243. Amazon has taken steps in furtherance of the conspiracy by entering into MFN agreements with each of its third-party sellers and enforcing the MFN provisions to penalize sellers that offer their goods at a lower price on online sites other than Amazon Marketplace. Amazon's co-conspirators have taken steps in furtherance of the conspiracy by entering into the MFN agreements and refraining from lowering their prices outside of Amazon Marketplace even when it would be in their independent economic self-interest to lower their prices on other sites to gain more profit.

244. The purpose and effect of the MFN agreements is to prevent price competition with Amazon Marketplace. Because Amazon and its third-party sellers agreed to restrain competition with Amazon Marketplace, especially from other online retail marketplaces, they share a specific intent to establish or maintain Amazon Marketplace's monopoly power.



245.    Amazon Marketplace possesses monopoly power in the relevant markets, as demonstrated by its share of these markets and its ability to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow Amazon Marketplace to exercise and maintain market power, *e.g.*, search, inventory, data, and infrastructure dominance.

246.    Defendant and its third-party sellers have harmed Plaintiffs and the proposed class by raising prices artificially on sites that compete with Amazon Marketplace.

247.    Defendant and its co-conspirators have willfully acquired or attempted to acquire monopoly power for Amazon Marketplace in the relevant markets by unlawful and improper means, including through its enforcement of its MFN agreements. These provisions establish a price floor based on third-party merchants' price listings on Amazon's marketplace. By agreeing to apply a price floor on all other retail e-commerce channels, Defendant and its third-party sellers largely immunize Amazon Marketplace from competitive pricing in the relevant markets and causes Class Products to be sold at supracompetitive prices and through their agreements, Defendant and its third-party sellers largely immunize Amazon from competition from online retail marketplaces that offer marketplace services at a more competitive rate because Amazon's MFN agreements do not allow its 2.3 million third-party merchants to capitalize on the more favorable fees, *i.e.*, by lowering list prices for consumers on marketplaces that compete with Amazon's marketplace. This, in turn, causes higher prices in competing online retail marketplaces, and the absence of price competition compels consumers to shop on Amazon, where they pay supra-competitive prices.

248.    Plaintiffs and Class members are direct purchasers because they directly purchase Class Products through a U.S. e-commerce retail channel that competes with Amazon Marketplace.

249.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Class Products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

250.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY TRIAL DEMANDED**

251.    Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A.    The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.    Adjudication that the acts alleged herein constitute monopolization or attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.    Actual damages and treble damages, and such other relief as provided by the statutes cited herein;

E.    Pre-judgment and post-judgment interest on such monetary relief;

F.    Equitable relief requiring that Amazon cease the abusive, unlawful, and anti-competitive practices described herein (including pursuant to federal antitrust law: *see, e.g.*, 15 U.S.C. § 26);

G.    The costs of bringing this suit, including reasonable attorneys' fees; and

H.    All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.



| 1 | DATED: May 13, 2024 | HAGENS BERMAN SOBOL SHAPIRO LLP |
|---|---|---|

1    DATED: May 13, 2024          HAGENS BERMAN SOBOL SHAPIRO LLP

2                                  By /s/ *Steve W. Berman*
                                        Steve W. Berman (WSBA No. 12536)

3                                  By /s/ *Barbara A. Mahoney*
                                        Barbara A. Mahoney (WSBA No. 31845)

4                                  1301 Second Avenue, Suite 2000
                                   Seattle, WA 98101

5                                  Telephone: (206) 623-7292
                                   Facsimile:  (206) 623-0594

6                                  Email:    steve@hbsslaw.com
                                             barbaram@hbsslaw.com

7

8                                  Anne F. Johnson (*pro hac vice*)
                                   68 3rd Street, Suite 249

9                                  Brooklyn, NY 11231
                                   Telephone: (718) 916-3520

10                                 Email:    annej@hbsslaw.com

11                                 KELLER POSTMAN LLC

12
                                   Zina G. Bash (*pro hac vice*)
13                                 111 Congress Avenue, Suite 500
                                   Austin, TX, 78701
14                                 Telephone: (512) 690-0990
                                   Email:    zina.bash@kellerpostman.com
15

16                                 Jessica Beringer (*pro hac vice*)
                                   Shane Kelly (*pro hac vice*)
17                                 150 North Riverside Plaza, Suite 4100
                                   Chicago, Illinois 60606
18                                 Telephone: (312) 741-5220
                                   Email:    Jessica.Beringer@kellerpostman.com
19                                           shane.kelly@kellerpostman.com

20
                                   Daniel Backman (*pro hac vice*)
21                                 1101 Connecticut Avenue, N.W., Suite 1100
                                   Washington, D.C., 20036
22                                 Telephone: (202) 918-1123
                                   Email:    Daniel.Backman@kellerpostman.com
23

24                                 *Interim Co-Lead Counsel for Plaintiffs and the*
                                   *proposed Class*
25

26

27

28



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KELLER ROHRBACK L.L.P.

By: /s/ Derek W. Loeser
   Derek W. Loeser (WSBA No. 24274)
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile:  (206) 623-3384
Email:    Dloeser@kellerrohrback.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: /s/ Alicia Cobb
   Alicia Cobb, WSBA # 48685
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Email:    aliciacobb@quinnemanuel.com

Steig D. Olson (*pro hac vice*)
David D. LeRay (*pro hac vice*)
Nic V. Siebert (*pro hac vice*)
Maxwell P. Deabler-Meadows (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Email:    steigolson@quinnemanuel.com
    davidleray@quinnemanuel.com
    nicolassiebert@quinnemanuel.com
    maxmeadows@quinnemanuel.com

Adam B. Wolfson (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Email:    adamwolfson@quinnemanuel.com

*Interim Executive Committee for Plaintiffs and the
proposed Class*

