UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEBORAH FRAME-WILSON ET AL.,

Plaintiffs,

v.

AMAZON.COM, INC.,

Defendant.

CASE NO. 2:20-cv-00424-JHC

REDACTED ORDER

# I
## INTRODUCTION

This matter comes before the Court on Defendant's Motion to Exclude Testimony of Parag Pathak, Ph.D. Dkt. # 325. The Court has considered the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law. The Court finds oral argument unnecessary. Being fully advised, for the reasons below, the Court DENIES the motion.

# II
## BACKGROUND

Plaintiffs sue Defendant Amazon.com, Inc. under 15 U.S.C. § 1 and § 2—Sections One and Two of the Sherman Act. Dkt. # 147 at 81–87. Plaintiffs, a group of Walmart and eBay customers, bring this action on behalf of themselves and a class of "[a]ll persons who, on or after

ORDER - 1

March 19, 2016, purchased from a third-party seller on the Walmart [ ] online retail marketplace[ ] in the United States two or more new, physical products concurrently offered for sale by Amazon's third-party sellers on Amazon Marketplace and monitored by Amazon as part of its competitive price monitoring" or who bought four or more such products on the eBay online retail marketplace.[1]  Dkt. ## 147 at 29, 33–39, 77; 266 at 11; 429 at 7.

Plaintiffs contend that "Amazon's anti-discounting policy"[2] is a platform most-favored nation restraint (PMFN) that serves to "stifle sellers' price competition outside of Amazon Marketplace," including in the eBay and Walmart online marketplaces.  Dkt. # 147 at 4–8.  They argue that this policy has "major" anticompetitive effects, as it "act[s] both as a restraint on the prices of third-party-seller goods to protect the supra-competitive prices of Amazon's retail goods, and also as a restraint on the fees of competing marketplaces to protect the supra-competitive fees of Amazon's own marketplace."  *Id*. at 15–16.  And they say that consumers are harmed as a result, as customers must pay artificially inflated prices for goods listed on Amazon's marketplace by third-party sellers *and* for goods listed on the eBay and Walmart marketplaces by third-party sellers.  *Id*. at 16, 20, 32.

---

[1] This proposed class definition comes from Plaintiffs' Third Amended Complaint (TAC), as modified by Plaintiffs' filings in connection with their Motion for Class Certification.  *See* Dkt. ## 147 (TAC); 266 (Plaintiffs' Motion for Class Certification); 429 (Plaintiffs' Reply in Support of Class Certification).

[2] Plaintiffs refer to the collection of Amazon policies and practices that they are challenging as "Amazon's anti-discounting policy."  *See generally* Dkt.  As stated by Dr. Pathak, "Amazon's anti-discounting policy has been in effect since 2004 and pursued through many mechanisms."  Dkt. # 317-1 at 11.  These mechanisms include: (a) the pre-2019 Price Parity Clause in Amazon's Business Services Agreement (the PPP), which expressly prohibited merchants on Amazon from selling their merchandise at lower prices on other websites; (b) the 2021 merchant notification, which informed merchants on Amazon that if they offered better discounts outside of Amazon they would violate Amazon's Seller Code of Conduct; (c) the 2017 Marketplace Fair Pricing Policy and the 2018 Amazon Standards for Brands, which expressly warned merchants on Amazon that they will lose the "Buy Box" on Amazon if they sell their merchandise at lower prices outside of Amazon; (d) the post-2015 comprehensive automatic monitoring system—the "Select Competitor-Featured Offer Disqualification" (SC-FOD) algorithm—which tracks prices across websites to ensure price parity; and (e) Amazon's accompanying enforcement actions.  *Id*. at 11–13; *see also* Dkt. # 147 at 8–14.

ORDER - 2

On February 20, 2025, Plaintiffs moved for class certification.  Dkt. # 266.  In support of this motion, Plaintiffs submitted an Expert Report from Dr. Parag Pathak.  *See* Dkt. # 317-1.[3] Dr. Pathak holds a Ph.D. in Business Economics from Harvard University and is the Class of 1922 Professor of Economics at the Massachusetts Institute of Technology.  *Id*. at 7.  He is also a Research Associate at the National Bureau of Economic Research (NBER) and the founding Director of the NBER Working Group on "Market Design"—"a branch of microeconomics that studies the design and performance of market-clearing institutions."  *Id.*  Dr. Pathak has provided expert reports in other lawsuits, including in the related *De Coster* class action that is pending before this Court.  *See De Coster v. Amazon.com*, No. 2:21-cv-00693-JHC, Dkt. # 262 (corrected version).  And his opinions are critical to Plaintiffs' arguments in favor of class certification in this action.  *See generally* Dkt. ## 266 & 429.

In his Report, Dr. Pathak concludes that "Amazon's anti-discounting policy harmed all or virtually all class members."  Dkt. # 317-1 at 21.  To reach this conclusion, Dr. Pathak first evaluates the policies and practices that constitute Amazon's anti-discounting policy, explaining how and why he believes that these policies and practices collectively function as a de facto PMFN.  *Id*. § 6.  He then "turn[s] to an economic assessment of how the anti-discounting policy affected merchandise prices and competition between marketplaces, and in particular, whether it harmed all class members."  *Id*. at 128; *see also id.* § 7.  In this section of the report, Dr. Pathak "review[s] the relevant economic literature on pricing constraints like those imposed by Amazon" and then "outline[s] an economic model that demonstrates the anticompetitive effect that Amazon's restraints had on referral fees in other marketplaces[,]" explaining how and why

---

[3] Dr. Pathak's Expert Report was initially filed on February 20, 2025, *see* Dkt. # 267-1, but Plaintiffs have since filed two praecipes to correct typographical errors.  *See* Dkt. ## 290 & 317.  This Order exclusively cites Dr. Pathak's second corrected report—the report at Dkt. # 317-1.

ORDER - 3

this model should be applied to the relevant marketplaces. *Id.* Finally, Dr. Pathak applies this model to transactional data provided by Amazon, concluding that for all categories of products, the model's counterfactual fees are lower than the products' actual fees, thereby inflating prices and causing class-wide harm. *Id.* § 8.

As pertinent to the instant motion, Dr. Pathak's economic model is "in large part adapted" from a 2016 paper by Andre Boik and Kenneth Corts. Dkt. # 317-1 at 132 n.691. As noted in *De Coster*, the paper containing Boik and Corts' model "was first published in a peer-reviewed journal in 2016 and, in the words of Amazon's expert, has become 'one of the papers that you would normally cite if you [were] studying a [PMFN].'" *De Coster v. Amazon.com*, No. 2:21-cv-00693-JHC, Dkt. # 366 at 8 (citations omitted).[4] But even as modified by Dr. Pathak, the Boik-Corts model remains just that: a model. Accordingly, it is built on a series of assumptions, some of which are inherent to the Boik-Corts framework and some of which are discretionary selections by Dr. Pathak. *See* Dkt. # 317-1 §§ 6, 7.

In response to Defendant's experts' critiques, Dr. Pathak's Rebuttal Report expands on the model's design: Dr. Pathak elaborates on why he selected the Boik-Corts model and why his assumptions are appropriate given the facts of the case. *See generally* Dkt. # 432-3. He also clarifies how he applied the model and addresses the other experts' economic theories and suggestions, ultimately concluding that the initial report's core analysis and main conclusions are unaffected by Defendant's critiques. *Id.*

Defendant has responded to Dr. Pathak's opinions in numerous ways. Defendant has: (1) submitted substantive arguments, requesting that the Court reject Dr. Pathak's opinions on the merits, *see* Dkt. # 323; (2) provided various expert reports critiquing Dr. Pathak's model and his

---

[4] Below, the Court calls this order the "*De Coster* Order."

ORDER - 4

conclusions, *see* Dkt. # 324; (3) requested a concurrent expert hearing to allow the Court to "hear directly" from Dr. Pathak and Amazon's experts, *see* Dkt. # 446; (4) filed a surreply motion to strike or in the alternative, grant leave to respond to the purportedly "new" arguments in Dr. Pathak's Rebuttal Report, *see* Dkt. # 435; and (5) filed a *Daubert* motion, requesting that the Court exclude Dr. Pathak's expert testimony as "unreliable." *See* Dkt. # 325. The Court limits its analysis in this Order to Defendant's Motion to Exclude Testimony of Parag Pathak, Ph.D. (Dkt. # 325) and the parties' arguments for and against exclusion under Federal Rule of Evidence 702.

# III
## DISCUSSION

A.    Legal Standards

*Rule 702*. Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" provided that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[5] "The proponents of expert testimony bear the burden of establishing its admissibility over the objections of the opposing party by a preponderance of the evidence."

---

[5] Rule 702 was amended in 2023. *See* Notes of Advisory Committee on 2023 Amendment to Rule 702. But "[n]othing in the amendment imposes any new, specific procedures." *Id.* So "cases interpreting [Rule] 702 that predate the 2023 amendments remain fully applicable." *Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024).

ORDER - 5

*Qualey v. Pierce Cnty.*, 2025 WL 254810, at *3 (W.D. Wash. Jan. 21, 2025); *see also Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Rule 702 thus imposes a "gatekeeping role" on district courts. *Daubert v. Merrell Dow Pharms., Inc. (Daubert I)*, 509 U.S. 579, 597 (1993); *see also Murray v. S. Route Mar. SA*, 870 F.3d 915, 923 (9th Cir. 2017) ("District judges play an active and important role as gatekeepers examining the full picture of the experts' methodology and preventing shoddy expert testimony and junk science from reaching the jury."). A court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir. 2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)). But district court judges also have "'broad discretion' in rendering such evidentiary rulings[,]" *id.* (quoting *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1065 (9th Cir. 2017)), and are instructed to liberally construe Rule 702 in favor of admissibility. *See Daubert I*, 509 U.S. at 588; *see also Chinn v. Whidbey Pub. Hosp. Dist.*, 2021 WL 5200171, at *2 (W.D. Wash. Nov. 9, 2021).

*Relevance.* Expert testimony is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert I*, 509 U.S. at 588 (citing Fed. R. Evid. 702(a)). "The relevancy bar [for expert testimony] is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1315 (9th Cir. 1995)).

*Reliability.* Courts generally apply four factors to determine whether expert testimony is reliable: "(1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific

ORDER - 6

community." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94). But this list of factors is neither exhaustive nor intended to be applied in every case. *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). And a court "not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quoting *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002)). Thus, "[w]hile evidence that suffers from serious methodological flaws can be excluded, courts are not permitted to determine the veracity of the expert's conclusions at the admissibility stage." *Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024) (cleaned up and internal quotation marks and citations omitted). "Disputes as to the strength of [an expert's] credentials, faults in [their] use of [a particular] methodology, or lack of textual authority for [their] opinion, go to the weight, not the admissibility, of [the expert's] testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)). And "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

B.    *De Coster* Ruling and Effect

As mentioned in part II above, the instant action relates to another antitrust case that is pending before this Court: *De Coster v. Amazon.com*, No. 2:21-cv-00693-JHC. Although the cases differ in certain respects, they both raise similar claims against the same Defendant—Amazon.com—based on the same underlying theory of economic harm. Accordingly, many issues here have already been raised by the parties and resolved by the Court in *De Coster*.

One such issue is the admissibility of Dr. Pathak's testimony. In *De Coster*, Dr. Pathak submitted an expert report in which he concluded that: (1) Amazon's anti-discounting policy

ORDER - 7

functions as a PMFN restraint; and (2) this restraint reduces competition and inflates prices on Amazon.com, thereby harming class members. *See generally De Coster v. Amazon.com*, No. 2:21-cv-00693-JHC, Dkt. # 262 (corrected version). Defendant then moved to exclude Dr. Pathak's testimony. *See De Coster v. Amazon.com*, No. 2:21-cv-00693-JHC, Dkt. # 230.[6] The *De Coster* Motion argued six grounds for exclusion: (1) Dr. Pathak's model is not generally accepted in the field of economics; (2) Dr. Pathak's model has an extraordinary error rate; (3) Dr. Pathak's model rests on unreliable and unfounded assumptions; (4) Dr. Pathak's model ignores heterogeneity in sellers' business strategies; (5) Dr. Pathak's regressions are based on a small, unrepresentative sample; and (6) Dr. Pathak's regressions do not demonstrate a relationship between fees and prices. *Id*. at 8–17.

On July 1, 2025, the Court denied the *De Coster* Motion. *See generally De Coster* Order. In this 24-page order, the Court thoroughly analyzed whether Dr. Pathak's testimony satisfies the admissibility standards for expert testimony under Rule 702. *Id*. It also specifically discussed, and then rejected, each of Defendant's grounds for exclusion, concluding that many of Defendant's arguments implicated the testimony's weight, not its admissibility. *See id*.

But the *De Coster* Order does not automatically control here. Under the law-of-the-case doctrine, "a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case." *United States v. Lummi Nation*, 763 F.3d 1180, 1185 (9th Cir. 2014). This doctrine applies to evidentiary decisions,[7] and can also be

---

[6] Below, the Court calls this motion the "*De Coster* Motion."

[7] *See, e.g.*, *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 2023 WL 5322213, at *5 (6th Cir. Aug. 18, 2023) ("[C]ourts have discretion to apply the law-of-the-case doctrine to evidentiary rulings."); *Barranco v. 3D Sys. Corp.*, 2018 WL 4323895, at *6 (D. Haw. Sept. 10, 2018) ("The law of the case doctrine applies to evidentiary rulings.").

ORDER - 8

invoked in related cases.[8]  But "the law of the case doctrine is not an inexorable command[.]" *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979) (internal quotation marks and citation omitted); *see also Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance[.]").  And the Ninth Circuit has cautioned against the doctrine's use in class action proceedings.  *Fair Hous. for Child. Coal., Inc. v. Pornchai Int'l*, 890 F.2d 420, at *1 (9th Cir. 1989) (unpublished) ("The law of the case doctrine applies only sparingly in class certification proceedings.").  Courts thus regularly decline to apply the law-of-the-case doctrine to evidentiary rulings in class action proceedings or related cases based on changed factual circumstances.[9]

In this Order, then, rather than revisit previously rejected arguments, the Court focuses its analysis on Defendant's new arguments and on those arguments from the *De Coster* Motion that have been affected by any changed circumstances or new factual developments since July 1, 2025—the date of the *De Coster* Order.

C.    Analysis

Defendant argues that Dr. Pathak's model, and his opinions relating to it, "should be excluded because the model: (1) is a theoretical exercise that cannot assess the impact of real-

---

[8] *See, e.g.*, *Disimone v. Browner*, 121 F.3d 1262, 1266–67 (9th Cir. 1997) (applying the law-of-the-case doctrine to a related case to bar the respondent from raising a previously rejected argument); *In re Wisdom*, 2017 WL 6517548, at *7 (D. Idaho Dec. 20, 2017), *aff'd sub nom. Wisdom v. Gugino*, 787 F. App'x 390 (9th Cir. 2019) (applying the law-of-the-case doctrine to a closely related case); *DC Comics v. Pac. Pictures Corp.*, 2011 WL 13124038, at *2 (C.D. Cal. Apr. 11, 2011) (same).

[9] *See e.g.*, *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *4, *10 (N.D. Cal. Aug. 28, 2023) (admitting an expert's opinions for the purpose of class certification but later excluding the same opinions from trial after "the situation ha[d] developed"); *Williams v. PillPack LLC*, 343 F.R.D. 201, 207 (W.D. Wash. 2022) (concluding that the court "is not bound by the law of the case doctrine to apply [its] prior determinations as to class certification"); *Zenith Lab'ys, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) (explaining that in a class action case, "a district court is obliged to take cognizance of a changed factual situation and may alter an earlier order accordingly"); *United States v. Wells*, 2019 WL 3219138, at *2 (D. Alaska July 17, 2019) (declining to apply the law-of-the-case doctrine to admit expert testimony).

ORDER - 9

world conduct; (2) by design always reaches the same result, no matter what data are input into the model; (3) has a 100% false positive rate; (4) has not been empirically validated in the field of economics; (5) assumes key elements of the multi-step causal chain on which Plaintiffs' claims depend; and (6) ignores that the millions of sellers on Walmart.com and eBay, and also Amazon, have different business strategies that impact their prices." Dkt. # 325 at 7. It also argues that Dr. Pathak's regression analyses, and his opinions that rely on them, should be excluded because the regressions are based on an unrepresentative sample and do not demonstrate a common relationship between fees and price. *Id*. at 16–17. The Court addresses each argument in turn below.

1.      Theoretical Exercise

Defendant contends that Dr. Pathak's opinions must be excluded because they are based on a "theoretical model" that is "deterministic" and "not capable of determining common impact [and damages] from real-world data." Dkt. # 325 at 7–10; *see also* Dkt. # 451 at 5–7. It argues that theoretical models "cannot be relied on to determine whether antitrust injury can be established on a class-wide basis" and so "[Dr.] Pathak's attempt to extrapolate from a theoretical premise (PMFNs *can result* in higher fees and prices) to an unfounded conclusion (PMFNs *always result* in higher fees and prices) is unjustifiable and should be excluded." Dkt. # 325 at 8 (emphasis in original).

Defendant also argues that *De Coster*'s admissibility finding should not control here, as Dr. Pathak's opinions were admitted in *De Coster* based on statements by Plaintiffs and Dr. Pathak that "we now know were misstatements." Dkt. # 451 at 4. Specifically, Defendant contends that the Court admitted Dr. Pathak's opinions in *De Coster* based on a false understanding that "[Dr.] Pathak applied the Boik-Corts model to the facts of that case by taking

ORDER - 10

the 'model to transactional data,' and by confirming the model's findings via various 'variant' models assessing the effect of other 'economic' and 'competitive conditions.'" *Id.*

Plaintiffs respond that Dr. Pathak's model should be accepted for the same reasons as in *De Coster*: the Boik-Corts model is a widely accepted economic model, Dr. Pathak's model is not automatically unreliable just because it lacks statistical verification, and Defendant's experts' critiques of the model speak more to the issue of weight than admissibility.  Dkt. # 431 at 5–8. Plaintiffs also contend that the Boik-Corts model has been "empirically tested" and "reflects an accepted consensus that PMFNs result in higher fees and prices."  *Id*. at 13.  And while Plaintiffs could not respond to Defendant's Reply (Dkt. # 451), they have argued in other filings that Defendant's "claim that [Dr.] Pathak admitted he did not use data to assess impact is demonstrably false" and "relies on a bad faith interpretation of [his Rebuttal] Report and disregard for his deposition testimony[.]"  Dkt. ## 460 at 5; 488 at 12.

As for the "taking the model to transactional data" issue, the Court agrees with Plaintiffs. While the Court acknowledges that Dr. Pathak's Rebuttal Report and deposition testimony both include statements that, when read in isolation, suggest that Dr. Pathak's model was not applied to transactional data and therefore does not reflect the specific facts of the case,[10] the Court does not find that these statements render Dr. Pathak's opinions unreliable.  Although Defendant's Reply homes in on the phrase "taking the model to data," *see generally* Dkt. # 451, Defendant's

---

[10] Dr. Pathak's Rebuttal Report states:
Dr. Ostrovsky has also garbled his critique somewhat by claiming that I "show" harm to class members by taking the model to data. What I have actually done is provide an approach for estimating damages to class members by taking the model to data; my demonstration of harm considers the model's findings for any demand parameters, and the reasonableness of its setup as a conservative approximation of the competitive conditions and incentives facing marketplaces and merchants.
Dkt. # 432-3 at 286.  Dr. Pathak's December 17, 2025 deposition testimony reiterates this idea. *See, e.g.*, Dkt. # 452 at 15 (Dr. Pathak confirming that he has "tak[en] the model to data" to "get[ ] to the damages number"); *id*. at 24–26 (explaining Section 7 of his report contains the base model).

ORDER - 11

true argument is that Dr. Pathak's model is unreliable because "he determined class-wide impact based solely on economic theory manifested in off-the-shelf algebraic formulas, limiting his use of transactional data to calculating average damages for a sample of the class." *Id*. at 4.  But this argument conflicts with the actual contents of Dr. Pathak's opinions.[11]  And so the Court rejects Defendant's argument that its reliability finding from *De Coster* is inapplicable because it rests on purported "misstatements."

As for the "variant model" issue, the Court does not find that this issue is best addressed via a *Daubert* motion.  As shown by the experts' reports and the parties' briefings, there is significant disagreement about what the appropriate variant models are and what their functions should be.  *See generally* Dkt.  Ruling on the appropriateness of Dr. Pathak's variant models would thus require the Court to "take a side in a dispute between experts about complex modeling[,]" which "is not the proper function of a *Daubert* motion." *De Coster* Order 17.  The Court also does not find that any purported changes in Dr. Pathak's variant models affect the admissibility of his testimony, as any such changes would speak to the weight of his testimony

---

[11] *See, e.g.*, Dkt. # 317-1 at 152 (explaining that the model can be applied to eBay and Walmart transactional data to calculate counterfactual fees and prices); *id*. at 155–57 (using the real-world example of "Funko POP! Marvel: Endgame - Hulk w/ Taco" to provide a sample estimate of harm); *id*. at 157 (stating that he has repeated the Funko POP! Exercise for "12,846 unique items in the 'Media and Gaming' category during October 2020"); *id*. at 158 (using transactional data to estimate the counterfactual prices for each product); *id*. at 168–72 (estimating damages using transactional data and calculating lower counterfactual fees for all product categories); Dkt. # 452 at 14 (explaining his approach in response to a question about "taking the model to data" by stating "I looked at the facts of the case. So that includes looking at some of the data and figuring out whether the Boik and Corts framework is a reasonable way to proceed" and noting that "data is informing me throughout in a consistent way"); *id*. at 15 ("[M]y damages computation methodology is using Walmart and eBay data. But the reason we're using that algorithm is informed by all of the data that I've seen in this case."); *id*. at 20 (rejecting Amazon lawyer's contention that the "harm model [from Section 7] does not apply . . . to the eBay or Walmart transaction data"); *id*. at 21 (affirming that Walmart's and eBay's data "inform[ed] [his] decisions about an appropriate model"); *id*. at 46 (describing his model as a "calibration exercise" but noting that "calibration is informed by transactions data").

and the propriety of surreply (addressed by the Court in its Order at Dkt. # 502), not the reliability of the model's underlying economic theory.

As for Defendant's other arguments, the Court is not persuaded. Although "economic theory alone does not make [an expert's] opinions admissible[,]" *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025), "that the model is based on economic theory and assumptions is not a reason to exclude it." *In re JUUL Labs, Inc. Antitrust Litig.*, 2026 WL 539344, *8 (N.D. Cal. Feb. 26, 2026). Here, as in *De Coster*, Dr. Pathak selected a peer-reviewed economic model based on real-world transactional data provided by Amazon. *See generally* Dkt. ## 317-1 & 432-3; *see also De Coster* Order at 9. He then applied this model to the facts of the case, determining that Amazon's anti-discounting policy creates class-wide harm because it inflates fees and prices across all product categories. *See id.* And while Defendant vehemently challenges Dr. Pathak's use of the Boik-Corts model and his underlying assumptions, it does not identify any disqualifying flaws with the model's underlying economic principles nor provide an alternative model that would be more appropriate here. *See generally* Dkt.[12]

2.      Designed to Reach the Same Result

Defendant argues that Dr. Pathak's testimony is inadmissible because his model "assumes its predetermined conclusion: uniformly higher fees and prices[.]" Dkt. # 325 at 10. Plaintiffs respond that Dr. Pathak's model does not "assume" its conclusions: its conclusions "follow logically from principles and interactions set out at the outset." Dkt. # 431 at 8 (quoting Dr. Pathak's Rebuttal Report in *De Coster*).

---

[12] Most of Defendant's critiques about the theoretical nature of the model were also already raised and rejected by the Court in *De Coster*. *See De Coster* Motion at 8–9; *De Coster* Order at 6–11.

ORDER - 13

The Court agrees with Defendant that it should not accept a model designed to "always reach the same predetermined conclusion."  Dkt. # 325 at 10; *see also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 988 (C.D. Cal. 2012) (excluding expert opinion because the expert's "approach impermissibly predetermined the results of [their] analysis"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) (same).  But it disagrees with Defendant that Dr. Pathak's is such a model.  As with any model derived from an algorithm, Dr. Pathak's model relies on certain assumptions and is built on mathematical principles that operate in a specific way.  *See* Dkt. # 432-3 at 146.  This does not, however, automatically render his methodology faulty or his opinions "unreliable," as courts regularly accept expert opinions that are based on mathematical formulas, even if such models involve critical assumptions that ultimately affect the models' results.[13]

Although Defendant cites various cases that support the exclusion of expert testimony based on "predetermined results," none of them directly support exclusion here, as they all involve critical methodological flaws that are not present in Dr. Pathak's approach.[14]  The Court

---

[13] *See, e.g.*, *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 462, 467 (N.D. Cal. 2025) (accepting expert opinions based on "a textbook Cournot model," i.e., a "theoretical model of oligopoly competition" that "assumes that competitors will make simultaneous decisions regarding their levels of output depending on the number of competitors in the market in order to maximize their profits, which in turn impacts the price of the product"); *Abarca v. Franklin Cnty. Water Dist.*, 813 F. Supp. 2d 1199, 1222 (E.D. Cal. 2011) (accepting expert opinions that were based on certain assumptions and "recognized air modelling principles," i.e., a series of mathematical techniques used to develop complex predictions about air pollutants).

[14] *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144–46 (1997) (affirming district court's exclusion of expert opinions where the experts had relied on animal studies, statistically insignificant epidemiological studies, and other causally dubious studies to support their contention that the plaintiff's exposure to PCB's had contributed to his cancer); *Live Concert*, 863 F. Supp. 2d at 987–89 (excluding expert's market definition because the expert purported to rely on the SSNIP method but failed to "reliably apply the SSNIP methodology to the facts of this case"); *REMEC*, 702 F. Supp. 2d at 1273–75 (excluding expert opinions because the expert's multivariate regression model omitted "key independent variables" and included other "fatal" methodological flaws).

ORDER - 14

is thus unconvinced that Dr. Pathak's purportedly "predetermined results" render his model unreliable.

### 3.    100% False Positive Rate

Defendant contends that Dr. Pathak's opinions must be excluded because Dr. Hitt's "placebo tests" returned a false positive effect, even when no challenged conduct was present. Dkt. # 325 at 14.  But as explained by Plaintiffs, Dr. Pathak, and the Court in *De Coster*, Defendant's claim that the model generates "false positives" is misleading, as the model "is not a test of whether a PMFN exists, and it does not return 'positive' or 'negative' results." *De Coster* Order at 13 (quoting Dr. Pathak's Rebuttal Report in *De Coster*); *see also* Dkt. # 431 at 13.  The Court also previously found that neither Dr. Hitt's placebo tests, nor the model's assumption of a PMFN more generally, render the model's results unreliable. *See De Coster* Order at 13–14. And Defendant offers no new tests or explanations for why this supposed "100% false positive rate" even speaks to the issue of reliability once the model's true purpose and function are properly accounted for.  *See generally* Dkt. ## 431 & 451.

### 4.    No Empirical Validation

Defendant contends that Dr. Pathak's model should be rejected because it lacks empirical validation and does not reflect a generally accepted consensus in the field of economics.  Dkt. # 325 at 14–15.  But Defendant raised this exact same argument in *De Coster*.  *See De Coster* Motion at 8–9.  And the Court rejected it, concluding that "Dr. Pathak's opinion derives from an application of a well-known, peer-reviewed economic model" and thus satisfies the reliability standards of *Daubert*.  *De Coster* Order at 11.

### 5.    Reliance on Impermissible Assumptions

Defendant contends that Dr. Pathak's model is unreliable because it is based on "unsupported" and "unrealistic" assumptions.  *See* Dkt. # 325 at 11–14.  For example, Dr. Pathak

ORDER - 15

assumes that: (a) Amazon has a PMFN; (b) there is no competition from sellers who do not sell on Amazon and Walmart or eBay; and (c) consumers do not shop across marketplaces and purchase products from the seller who offers the product at the lowest price. *Id*. According to Defendant, "[t]hese assumptions bear no relationship" to the real-world, i.e., the actual facts of this case. *Id*. at 11. And so it contends that the model's findings, which are based on these impermissible assumptions, must be excluded.

Plaintiffs respond that Dr. Pathak's model relies on "reasonable simplifying instructions" and is properly aligned with real world conditions. Dkt. # 431 at 9. They also argue that Dr. Pathak has adequately explained the model's underlying assumptions and responded to Defendant's experts' critiques. *Id*. And they say that the Court has already rejected many of Defendant's same arguments in *De Coster*. *Id*.

Because the *De Coster* Order already discussed and rejected many of Defendant's same assumption arguments,[15] the Court declines to re-address them here. As for Defendant's new assumption arguments,[16] the Court concludes that they have no impact on admissibility. As in *De Coster*, Dr. Pathak has "reasonably explain[ed] why [Defendant's experts'] adjustments to the model do not affect his conclusions regarding class-wide injury and damages." *De Coster* Order at 16. For example, in response to Dr. Hitt's critiques, Dr. Pathak states:

> Dr. Hitt's claims about the model's supposed lack of realism are overstated or incorrect. Modeling assumptions are, by definition, simplified representations of reality and therefore clearly imperfect in the literal sense of Dr. Hitt's critique. That criticism does not address whether the model is reliable or useful. The modifications he does suggest are completely divorced from reality and replace the

---

[15] *De Coster* addressed these assumptions: (1) Amazon has a PMFN; (2) a single seller sells a single product on both marketplaces; (3) the single seller is a monopolist and faces no competition; and (4) consumers can only buy from two marketplaces. *See De Coster* Motion at 13–15; *De Coster* Order at 14–18.

[16] Defendant's Motion to Exclude raises these additional assumptions: both marketplaces (1) have a PMFN with a 50% share of sales; (2) do not compete for sellers; (3) only compete for consumers on fees rather than quality or other factors; and (4) pass through their fees in defined amounts to consumers. *See* Dkt. # 325 at 11.

ORDER - 16

Boik and Corts model's flexible demand structure with a highly restrictive, edge-case assumption. Dr. Hitt himself admits this is not realistic.

Dkt. # 432-3 at 31; *see also id.* at 32 ("Dr. Hitt makes a variety of misleading or incorrect statements about the Boik and Corts modeling assumptions and proposes an alternative model that adopts a naive and significantly less realistic approach to demand.").  And in Section 7.8 of the Rebuttal Report, Dr. Pathak explains how Dr. Hitt's criticisms of the model's realism and his proposed adjustments to the model's assumptions are "mistaken." *See id*. at 173–178.  Dr. Pathak also responds to Dr. Ostrovsky's concerns about the model's assumptions, explaining why his chosen assumptions are reasonable and why the model's other assumptions are not "cherry picked," but rather, inherent to and justified by the Boik-Corts model.  *Id*. at 265–268.

The Court also notes that while it is appropriate to reject an expert's model if it "contains entirely too many assumptions and simplifications that are not supported by real-world evidence[,]" *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), it is also true that "every model relies on assumptions and no model can account for every conceivably relevant factor." *De Coster* Order at 16 (quoting *S&H Farm Supply, Inc. v. Bad Boy, Inc.*, 25 F.4th 541, 552 (8th Cir. 2022)).  And mere disagreement with an expert's assumptions does not provide an adequate basis for exclusion especially where, as here, Defendant has "not shown why, in light of the explanations offered by Dr. [Pathak], the disagreements between [its experts] and Dr. [Pathak] are anything more than reasonable disagreements between experts." *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, *5 (E.D.N.Y. Dec. 21, 2012).  Accordingly, the Court concludes that Defendant's "critiques of the model's assumptions go to the weight that should be afforded to Dr. Pathak's opinion, not its admissibility." *De Coster* Order at 16.

ORDER - 17

6.    Failure to Consider the Heterogeneity of Sellers' Business Strategies

Defendant argues that Dr. Pathak's model should be rejected because it disregards "known heterogeneity in sellers' business strategies[,]" such as focal-point pricing and value-based pricing. Dkt. # 325 at 15–16. Plaintiffs respond that the Court should reject this argument because: (1) Dr. Pathak has "adequately addressed the possibility that sellers using focal point pricing might not increase their prices based on a small increase in fees"; (2) Defendant's value-based pricing critique conflicts with Dr. Berger's opinions; and (3) Defendant's more general argument—that Dr. Pathak's model fails because it "improperly assumes sellers act uniformly in adjusting prices for all products subject to a fee change"—was already considered and rejected by the Court in *De Coster*. Dkt. # 431 at 14–15 (internal quotation marks and citations omitted).

As for focal-point pricing, Dr. Pathak's Report states:

> Accounting for [the focal-point pricing] phenomenon does not affect whether all or nearly all class members[17] paid more as a result of the conduct. Insofar as focal point pricing might have caused some counterfactual prices to be the same as real-world prices, the chance that this is true for any given purchase is small. The propensity of a merchant to round prices to an increment is as likely to result in their rounding a price down as up – meaning the focal pricing phenomenon would result in greater harm (an even lower but-for world price) as often as it results in less harm (a higher but-for world price). Given this fact, and given the likely frequency of focally-priced products in the dataset, I find that more than ██% of class members would have been harmed by the conduct on at least one of their purchases. Given this, the number of unharmed class members (i.e. those, who only purchased products that would have been priced at the same level given a lower marketplace fee) would be extremely small – less than ██% of the class.

Dkt. # 317-1 at 20. He calculates that "[t]he probability of a class member [ ] being unharmed themselves after making two purchases (as per the class definition), each with a ███████████ chance of being unharmed, is ██████████." *Id.* at 160. And he writes that "even if any class members were not directly harmed on pricing, [they] would still have been harmed by other

---

[17] At the time this report was submitted, the class consisted of customers who had purchased *two* or more class products from Walmart *or* eBay during the class period. *See generally* Dkt. # 317-1.

ORDER - 18

economic effects associated with reduced competition – i.e., reduced choice and quality." *Id*. at 168 n.775.

Dr. Pathak's Rebuttal Report confirms that "regardless of focal point pricing practices . . . all or virtually all class members were harmed," especially when the class definition is amended to require four purchases on eBay.  Dkt. # 432-3 at 23.  And Dr. Berger, although arguing for a higher prevalence rate of focal-point pricing, does not meaningfully rebut Dr. Pathak's testimony that the model takes focal-point pricing into account or that the number of unharmed class members (even using a higher focal-point pricing rate) falls within the acceptable range.  *See generally* Dkt. # 324-2; *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 672–73 (9th Cir. 2022) (affirming class certification despite 5.5% of class members reportedly being uninjured).

As for value-based pricing, Dr. Pathak does not appear to consider this strategy in his model.  *See generally* Dkt. ## 317-1 & 432-3.  But this failure also does not appear to render the model unreliable.  Although Dr. Berger states that "[a]cademic research finds that sellers are less likely to change their prices by small amounts in certain situations, including: . . . [w]hen sellers price products based on what they think their customers perceive the value to be[,]" Dkt. # 324-2 at 11, he provides no evidence that third-party sellers on Amazon, eBay, or Walmart actually use a value-based pricing strategy.  *See generally id*.; *see also* Dkt. # 432-8 at 3 ("I have not empirically analyzed the prevalence of value-based pricing in the data.").  Without such evidence, the Court cannot conclude that Dr. Pathak's failure to consider this strategy amounts to a fatal flaw in his methodology.

As for Defendant's more general argument—that Dr. Pathak's model fails because it assumes the same pass-through rate for all sellers rather than considering the heterogeneity of seller pricing strategies—this argument was already rejected in *De Coster*.  *See De Coster*

ORDER - 19

Motion at 15–16; *De Coster* Order at 18–19.  Courts also regularly accept expert models that rely on average pass-through rates, so long as the rates appear reasonable and the court believes that the plaintiffs will be able to prove that prices were generally affected.  *See In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *11 (N.D. Cal. Apr. 12, 2017) (collecting cases).  The Court thus declines to exclude Dr. Pathak's model for "ignor[ing] known heterogeneity in sellers' business strategies."  *See* Dkt. # 325 at 15.

            7.    Unreliable Regressions

        Defendant argues that Dr. Pathak's regressions are unreliable because: (1) "they did not 'examine an appropriate selection of data'"; and (2) they "do not demonstrate a common relationship between fees and price[,]" as they "look at an average common relationship between fees and prices" and their results are contradicted by real-world data.  Dkt. # 325 at 16–17 (quoting *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1168 (S.D. Cal. 2022)).  But Defendant raised these exact same arguments in *De Coster*.  *See De Coster* Motion at 16–17.  And the Court rejected them, concluding that: (1) Dr. Pathak did not select data in a biased manner; (2) Defendant has not shown that his methodological decisions are so flawed as to make his opinions unreliable; (3) Dr. Pathak has appropriately responded to Dr. Hitt's critiques of his regressions; and (4) any concerns that Defendant has about the statistical significance or accuracy of Dr. Pathak's regressions speak to weight, not admissibility.  *See De Coster* Order at 20–24.  For these same reasons, the Court does not find that Dr. Pathak's regressions in this case are so unreliable as to warrant exclusion.

## IV
### CONCLUSION

        For these reasons, the Court DENIES Defendant's Motion to Exclude Testimony of Parag Pathak, Ph.D (Dkt. # 325).  ~~The Court provisionally files this Order under seal.  The Court~~

ORDER - 20

~~DIRECTS the parties to file a joint statement, on or before April 13, 2026, indicating what redactions, if any, should be included in the public version of the Order.~~

Dated this 13th day of April, 2026.

*John H. Chun*

John H. Chun
United States District Judge

ORDER - 21