UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DEBORAH FRAME-WILSON ET AL.,<br>Plaintiffs,<br>v.<br>AMAZON.COM, INC.,<br>Defendant. | CASE NO. 2:20-cv-00424-JHC<br>REDACTED ORDER |

## I
## INTRODUCTION

This antitrust matter comes before the Court on Plaintiffs' Motion for Class Certification. Dkt. # 266. The Court has considered the presentations of counsel at oral argument on September 11, 2026, the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law. Being fully advised, and for the reasons below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' request for class certification.

## II
## BACKGROUND

Defendant Amazon.com operates the largest online retail marketplace in the United States—Amazon Marketplace. *See* Dkt. # 147 at 39–40. Amazon sells directly to customers

through its platform, offering about 12 million of its own unique products on the Amazon Marketplace. *Id.* at 5, 74. It also facilitates the sale of hundreds of millions of other products to consumers, with such products listed and sold by the 2.3 million third-party (3P) merchants[1] that have registered to sell their goods on the Amazon Marketplace. *Id.* at 39, 59. Many of Amazon's direct customers overlap with those of its 3P sellers, as many products on the Amazon Marketplace are offered by both Amazon and its 3P sellers. *Id.* at 5–6. Amazon's customers also overlap with those of other online retail marketplaces, as many 3P sellers offer their products on the Amazon Marketplace and on eBay.com, Walmart.com, or some other online platform. *Id.* at 6–7, 17.

When 3P sellers register to sell goods on the Amazon Marketplace, they are required to agree to certain terms and conditions. *See id.* at 8. Namely, they are required to agree to the terms of the Amazon Services Business Solutions Agreement (BSA) and all policies incorporated by reference into that agreement. *Id.*; *see also* Dkt. # 267-4 at 3 ("Sellers wishing to sell in Amazon's store must enter into the [BSA]."). According to Plaintiffs, these policies and Amazon's corresponding enforcement tools amount to an "anti-discounting policy"—a kind of platform most-favored-nations-restraint (PMFN) policy that prohibits 3P sellers from "offer[ing] their products on competing marketplaces for a lower price than they offer on Amazon." Dkt. # 147 at 4–5, 8; *see also* Dkt. # 266 at 9–10. And they say that this PMFN has been unlawfully used by Amazon to suppress price competition on rival platforms and maintain dominance in the market for U.S. Online Retail Marketplaces, thereby raising prices in this market and harming consumers, including eBay and Walmart customers. *See id.*; *see also* Dkt. # 147 at 15–23.

---

[1] Like the parties, this order uses the terms "3P merchant," "3P seller," and "3P retailer" interchangeably.

Plaintiffs cite a variety of policies and enforcement mechanisms that purportedly combine to create the PMFN at the heart of this case. *See generally* Dkt. ## 147 & 266. They include:

- *The Price Parity Clause (PPC)*

The PPC was included in the BSA from the beginning of the Class Period until March 2019. *See* Dkt. ## 147 at 8; 266 at 18. The clause required 3P sellers to "maintain parity between [their] products" offered on and off Amazon "by ensuring that . . . the Purchase Price and every other term of offer or sale of [the product on Amazon] . . . is at least as favorable to Amazon Site users as the most favorable terms" offered to customers off Amazon. Dkt. # 324-16 at 16;[2] *see also* Dkt. ## 147 at 8; 266 at 18. As the clause appeared in the BSA, all 3P sellers were required to adhere to it. *See id.*; *see also* Dkt. # 267-4 at 3. Plaintiffs say that the PPC was initially enforced by manual price parity audits and later via automated enforcement tools. *See* Dkt. # 317-1 at 77, 82–83.

Defendant disputes the extent to which Amazon enforced the PPC. *See generally* Dkt. # 323 at 13–14; *see also* Dkt. # 536 at 34–35. And it says that while the PPC was in effect, Amazon never had a systematic way to monitor or enforce compliance with the policy. *See id.* But Defendant does not dispute that the BSA had an explicit price parity provision before March 2019 and that Amazon did enforce it, at least on occasion, by manual audit. *See generally id.*; *see also* Dkt. # 122 at 5.

[2] When referring to the PPC (or PPP), Plaintiffs' Motion cites "Ex. 7, CAAGLit-AMZ_04281891," uploaded to the record at Dkt. # 267-7. *See, e.g.*, Dkt. # 266 at 18 n.18 (citing Exhibit 7); *id.* at 19 n.21 (same). But the document at Dkt. # 267-7 is a BSA dated June 10, 2020, and thus does not contain the PPC referenced and quoted throughout their filings. *See generally* Dkt. # 267-7. This order thus cites Defendant's exhibit at Dkt. # 324-16, as it contains the referenced PPC and appears to be a pre-March 2019 version of the BSA.

- *The Seller Code of Conduct (SCC)*

The SCC sets forth various "principles" that "[a]ll sellers are expected to adhere to . . . when listing products on Amazon." Dkt. # 268-1 at 2. It is also incorporated by reference into the BSA and thus applies to all 3P sellers. *See* Dkt. # 267-7 at 2, 10; *see also* Dkt. # 267-4 at 3. In November 2021, Amazon posted a "Clarification of Amazon's Policy on Rebates, Coupons, and other Marketing Incentives" (the 2021 SCC Clarification) to Seller Central.[3] *See* Dkt. # 267-16 at 2; *see also* Dkt. # 266 at 19. The Clarification states, "[Amazon] consider[s] it a violation of the Amazon Seller Code of Conduct if off-Amazon rebates, discounts, and other schemes are designed to drive customers to products that are listed and sold without those incentives on Amazon." *Id.* At oral argument, Plaintiffs confirmed that they believe the 2021 SCC Clarification is another clear statement of Amazon's anti-discounting policy and that it is enforced against sellers via the mechanisms used to enforce the SCC, including the SC-FOD tool (discussed below). *See* Dkt. # 536 at 9–10; *see also* Dkt. # 540-1 at 6.

Defendant admits the existence and contents of the 2021 SCC Clarification but contends that its purpose was to address manipulation of search rankings *on* Amazon, not seller pricing *off* Amazon. *See* Dkt. ## 323 at 16; 536 at 32. Defendant also asserts that the Clarification has never been enforced against any 3P seller. *See id.*; *see also* Dkt. # 324-10 at 4.

- *The Marketplace Fair Pricing Policy (MFPP)*

The MFPP, adopted in November 2017, is incorporated by reference into the BSA and thus applies to all 3P sellers. *See* Dkt. ## 147 at 14; 266 at 20; *see also* Dkt. ## 267-7 at 2, 10;

---

[3] Seller Central "is a digital hub where Amazon sellers manage and grow their businesses." *What is Amazon Seller Central?*, Amazon Seller Central (Sep. 11, 2026, at 4:00 PT), https://sell.amazon.com/tools/seller-central. 3P sellers on Amazon can use Seller Central to log into their accounts, manage their orders, and view sales data. *Id.*; *see also* Dkt. # 267-10 at 3. Amazon's Selling Policies and Seller Code of Conduct are also "published and publicly available on Amazon Seller Central." Dkt. # 267-12 at 17.

267-4 at 3. It states, "Amazon regularly monitors the prices of items on our marketplaces, including shipping costs, and compares them with other prices available to our customers." Dkt. # 268-2 at 2. It then states that if Amazon sees "pricing practices on a marketplace offer that harms [*sic*] customer trust, Amazon may remove the Buy Box,[4] remove the offer, or in serious or repeated cases, suspend or terminate selling privileges." *Id.* And it lists "[s]etting a price on a product or service that is significantly higher than recent prices offered on or off Amazon" as a pricing practice that "harm[s] customer trust[.]" *Id.* Plaintiffs say that this policy has been enforced against 3P sellers via the Atypical Pricing-Featured Offer Disqualification (AP-FOD) tool, with sellers receiving AP-FOD notifications when they violate the policy that mirror the "price competitiveness" notifications they receive under SC-FOD. *See* Dkt. # 536 at 7–8; *see also* Dkt. # 540-1 at 4–5.

Defendant admits the existence and contents of the MFPP but contends that it was introduced to prevent price gouging, not price parity. *See* Dkt. # 323 at 16–17; *see also* Dkt. # 122 at 5–6. And it says that the MFPP, although enforced, is enforced by AP-FOD. *See id.*; *see also* Dkt. # 536 at 53. Thus, enforcement is triggered only when the AP-FOD tool finds a "significantly higher price" either on or off Amazon, i.e., a price that is [redacted] higher than the weighted composite price of recent offers. *Id.*

- *The Amazon Standards for Brands (ASB)*

The ASB was introduced in 2018 and is incorporated by reference into the BSA. *See* Dkt. ## 147 at 12; 266 at 21; *see also* Dkt. ## 267-7 at 2, 10; 267-4 at 3. The ASB applies to

[4] "The 'Buy Box' is the display from which a shopper can 'Add to Cart' or 'Buy Now' an Amazon-selected offer for a product." Dkt. # 147 at 10. Per Plaintiffs, "[e]limination of the 'Buy Box' button from the [3P] seller's listing is devastating to the seller's business because . . . 99% of all new units purchased [are] sold by the Featured Offer/Buy Box winners" and "most buyers searching for a product on Amazon's marketplace will see a [3P] seller's product only if it has the Buy Box." *Id.*; *see also* Dkt. # 266 at 20, 25.

"Brands and manufacturers, as well as their agents, licensees, and other representatives selling on their behalf in the Amazon store." Dkt. # 267-36 at 3. It states, "If you are unable to maintain our standards for customer experience, you might lose certain privileges associated with operating as a seller in the Amazon store (including having your offers featured on product detail pages), or you might lose the opportunity to operate as a seller in the Amazon store altogether." *Id.* at 2. It also notes that Amazon "measure[s] customer experience in a number of ways, including . . . price competitiveness[.]" *Id.* Plaintiffs say that Amazon enforces ASB's price competitiveness[5] requirement via the Competitor Monitoring Team's (CMT) monitoring of external prices, Buy Box suppression, emails to 3P sellers informing them of a 95% price competitiveness target, and displays of the brand merchants' compliance rates on their seller dashboards. *See* Dkt. # 266 at 22. They also say that the ASB is a later version of Amazon's Manufacturers on Amazon (MOA) policy, a policy that was enforced via Buy Box suppression and that required brands to "maintain price parity across all of their selling channels." *Id.* at 21; *see also* Dkt. # 536 at 9.

Defendant takes issue with Plaintiffs' attempt to equate "price competitiveness" with "price parity." *See generally* Dkt. # 323 at 13, 17–18. It also disputes Plaintiffs' characterization of enforcement, stating that the "ASB's application is neither automatic nor mechanical," and that the ASB "is applied to only a small subset of brands in the Amazon store[.]" *Id.* at 17. Defendant also contends that Plaintiffs' characterization of the relationship between the MOA and the ASB is wrong, as the MOA applies only to "manufacturers" and most 3P sellers do not qualify as such. *See* Dkt. # 536 at 54. Defendant does not, however, dispute that the ASB

[5] Amazon has previously stated, "Price competitiveness for purposes of ASB is . . . intended to be the same as price competitiveness for SC-FOD[,]" Dkt. # 267-40 at 6, with price competitiveness for SC-FOD explained in greater detail below.

imposes an enforceable "price competitiveness" requirement on all sellers to which the policy applies. *See generally* Dkt. ## 323 at 17–18; 536 at 53–55.

- *The Select Competitor-Featured Offer Disqualification (SC-FOD) Algorithm*

SC-FOD is a price-monitoring tool that was introduced in 2015 and adopted for all product categories by 2016. Dkt. ## 147 at 9; 266 at 23–24. Plaintiffs describe SC-FOD as follows:

> Through SC-FOD, Amazon monitors off-Amazon prices and 'suppresses' (i.e., withholds) the Buy Box from Amazon sellers if it finds lower prices for the same goods off Amazon. Amazon notifies its merchants "every time" they set a price on Amazon that is even "one cent" higher than the lowest price Amazon finds outside of its marketplace . . . By email and through Seller Central, Amazon tells merchants what price they need to charge to match the lowest external price. Amazon also pushes merchants to use Amazon's automated pricing tool to automatically match the Buy Box eligible price (the "lowest external price"). Amazon warns merchants that if they do not meet this price, their offers will lose the Buy Box.

Dkt. # 266 at 23–24 (citations omitted). They also contend that SC-FOD functions as an enforcement mechanism for the alleged price parity policies discussed above. *Id.*

Defendant, in turn, describes SC-FOD as follows:

> SC-FOD assesses whether a [3P] seller's offer in Amazon's store is competitively priced compared to a limited group of reputable off-Amazon retailers where consumers are likely to comparison shop, called "Select Competitors." . . . Amazon is able to apply SC-FOD only when it collects recent prices for that product from certain Select Competitors, which it has for at most [redacted] of products in its store in a given month. . . . SC-FOD notices are sent to sellers offering products for sale in Amazon's store, informing them that their offers are ineligible to be a Featured Offer because "they are not priced competitively compared to prices for those products from retailers outside Amazon." The notices also tell sellers how they can restore eligibility by using Amazon's Pricing Health Page "to lower your price on Amazon."

Dkt. # 323 at 18–19 (citations omitted). It adds that these "Select Competitors" are typically large, national retailers that do not sell on the Amazon Marketplace, and not the 3P sellers. *Id.* Thus, it says, in virtually all scenarios, a 3P seller that has lost the Buy Box can regain Featured

Offer eligibility only by lowering its on-Amazon price, not by raising its off-Amazon price. *Id.* Defendant also says that SC-FOD has never been used to enforce the purported price parity requirements contained in the policies discussed above. *Id.*

Plaintiffs, a group of eBay and Walmart consumers, now seek class certification to challenge Amazon's purported anti-discounting policy under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. *See generally* Dkt. # 266. They request that the Court certify the following class:

> All persons who, on or after March 19, 2016, made in the United States at least two purchases from a third-party seller on the Walmart online retail marketplace or at least four purchases from a third-party seller on eBay of new, physical products concurrently offered for sale by Amazon's third-party sellers on Amazon Marketplace and monitored by Amazon as part of its competitive price monitoring.

Dkt. # 429-1 at 2; *see also* Dkt. ## 266 at 11; 429 at 7. They also request that the Court: (1) designate the named Plaintiffs—Christian Sabol, Chaunda Lewis, and Phyllis Huster[6]—as Class Representatives; (2) appoint Hagens Berman Sobol Shapiro LLP and Keller Postman LLC as Co-Lead Counsel; and (3) appoint Quinn Emanuel Urquhart & Sullivan, LLP as Executive Class Counsel. *See* Dkt. ## 266 at 50; 429-1 at 2.

## III
## DISCUSSION

Federal Rule of Civil Procedure 23 "provides a procedural mechanism for 'a federal court to adjudicate claims of multiple parties at once, instead of in separate suits.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (quoting *Shady*

[6] Plaintiffs' Motion for Class Certification also named Gerry Kochendorfer and Deborah Frame-Wilson as named Plaintiffs and Proposed Class Representatives. *See generally* Dkt. # 266. But Gerry Kochendorfer has since withdrawn as a named plaintiff pursuant to the parties' Stipulated Motion at Dkt. # 279 and the Court's Order at # 280. And Deborah Frame-Wilson has since passed away and is no longer a Proposed Class Representative. *See* Dkt. ## 510 at 2; 538 at 2. This order thus does not consider any requests, arguments, or claims that relate to Gerry Kochendorfer or Deborah Frame-Wilson.

*Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010)); *see also* Fed. R. Civ. P. 23. To take advantage of this procedure, "[the] plaintiffs must make two showings." *Olean*, 31 F.4th at 663. First, they must satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy. *Id.*; *see also* Fed. R. Civ. P. 23(a). Second, they must show that the putative class satisfies at least one of the three Rule 23(b) categories. *Olean*, 31 F.4th at 663; *see also* Fed. R. Civ. P. 23(b). Where, as here, certification is sought under Rule 23(b)(3), plaintiffs must show that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 provides a district court with broad discretion in deciding whether to certify a class. *See, e.g.*, *De Coster v. Amazon.com, Inc.*, 350 F.R.D. 293, 304 (W.D. Wash. 2025) (collecting cases). But "[b]efore it can certify a class, a district court must be 'satisfied, after a rigorous analysis, that the prerequisites' of both Rule 23(a) and 23(b)(3) have been satisfied": numerosity, commonality, typicality, adequacy, predominance, and superiority. *Olean*, 31 F.4th at 664 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). This is not "a mere pleading standard"; at the class certification stage, "the plaintiffs must 'affirmatively demonstrate' by a preponderance of actual evidence that they satisfy all the Rule 23 prerequisites." *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1258 (9th Cir. 2024) (internal quotation marks and citation omitted); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

But the "rigorous analysis" requirement also does not grant courts a "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Instead, "[m]erits questions may be considered to the extent—

but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Likewise, Rule 23 does not require a court to deny class certification simply because it believes that the plaintiffs may not be able to prove their allegations at trial. *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018). And the Ninth Circuit has cautioned on many occasions that district courts should not equate a "rigorous analysis" with "an in-depth examination of the underlying merits[,]" nor should they attempt to convert class certification proceedings into "mini-trials" on the merits. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011); *see also Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015).

Here, Plaintiffs contend that the Court should grant their motion for class certification because they have proven, by a preponderance of the evidence, that the proposed class satisfies all the requirements for class certification under Rule 23(a) and Rule 23(b)(3). *See generally* Dkt. # 266. Defendant responds that the Court should deny the motion because "Plaintiffs do not—and cannot—'affirmatively demonstrate' that their claims satisfy the commonality, predominance, or superiority requirements of Rule 23[.]" Dkt. # 323 at 9 (quoting *Dukes*, 564 U.S. at 350).

For the reasons below, and upon engaging in the rigorous analysis required by Rule 23, the Court concludes that Plaintiffs have met their burden of proving each[7] requirement of Rule 23 by a preponderance of the evidence for the modified class definition below. It thus GRANTS Plaintiffs' request for class certification, subject to the modifications discussed in this order.

---

[7] Defendant has presented no argument concerning numerosity, typicality, or adequacy under Rule 23(a). *See generally* Dkt. ## 323, 506, & 536. It also has not addressed Plaintiffs' request for class counsel appointment under Rule 23(g). *See id.* "Nonetheless, the Court has an independent duty to 'make determinations that each requirement of Rule 23 is actually met.'" *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 660 (S.D. Cal. 2010) (quoting *Dukes*, 603 F.3d at 587); *see also De Coster*, 350 F.R.D. at 305 n.8 (collecting cases). The Court thus addresses each requirement for class certification under Rule 23 below, regardless of whether they are contested by Defendant.

A. Class Definition

The broad discretion provided to district courts by Rule 23 encompasses the discretion to modify a proposed class definition at the class certification stage.[8] Having now engaged in a thorough review of the relevant evidence and arguments in the record, the Court believes that a narrowing of the class definition is required to ensure that the class retains standing and that the certified class definition conforms to Plaintiffs' proof.[9] And while sympathetic to the Multi-Store seller[10] data matching issue identified by Plaintiffs at oral argument, *see* Dkt. # 536 at 13–16, the Court believes that such issue may be mitigated, at least in part, by additional discovery and the use of alternative seller identification techniques. The Court thus narrows Plaintiffs' proposed class definition as follows:

> All persons who, on or after March 19, 2016, made in the United States at least two purchases from a third-party seller on the Walmart online retail marketplace or at least four purchases from a third-party seller on eBay of new, physical products concurrently offered for sale by that same third-party seller on Amazon Marketplace and monitored by Amazon as part of its competitive price monitoring.[11]

[8] *See, e.g.*, *Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 467 (9th Cir. 1987) (recognizing "the [district] court's power to adjust the class definition to conform to the proof"); *Hawkins v. Kroger Co*., 337 F.R.D. 518, 527 (S.D. Cal. 2020) ("[C]ourts are empowered to narrow class definitions at the class certification stage[.]"); *Montoya v. City of San Diego*, 2021 WL 2350927, at *3 (S.D. Cal. June 9, 2021) ("District courts have the discretion to modify a class definition during the certification process."); *Rodriguez v. Bostock*, 349 F.R.D. 333, 355 n.6 (W.D. Wash. 2025) (recognizing the district court's authority to sua sponte amend a class definition to address concerns of overbreadth and rejecting the defendants' request to allow supplemental briefing prior to adopting a revised class definition); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 713 (E.D. Cal. 2025) (modifying the plaintiffs' proposed class definitions "for clarity and to ensure the scope of the classes are sufficiently narrowed to the theories of liability raised in the complaint").

[9] The modified Class Definition ensures that all class members have purchased from a 3P seller who is subject to the alleged PMFN, thereby ensuring that the members' injuries are not too attenuated from the allegedly unlawful conduct such that causation or standing are defeated. It also ensures that all consumers in this action are proceeding under a single—i.e., common—theory of standing, which supports predominance and manageability.

[10] "Multi-Store sellers" are 3P sellers who offer their same product or products on Amazon *and* on eBay or Walmart. "Non-Multi-Store sellers" are sellers who offer their product or products on eBay or Walmart but *do not* offer such products on Amazon. The parties also sometimes refer to such sellers as "multi-homing sellers."

[11] This order refers to such products as "Class Products" below.

And it proceeds with the rigorous analysis under Rule 23 using this modified class definition.

B. Numerosity

Rule 23(a)(1) provides that the class must be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "'[I]mpracticable' does not mean impossible; it refers only to the difficulty or inconvenience of joining all members of the class." *Juarez v. Jani-King of Cal., Inc.*, 273 F.R.D. 571, 578 (N.D. Cal. 2011). And courts are permitted to "make common-sense assumptions and reasonable inferences" when conducting this analysis. *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017) (internal quotation marks and citation omitted). Courts in this Circuit thus regularly find numerosity satisfied where the proposed class has "at least 40 members" or "[w]here the exact size of the class is unknown, but general knowledge and common sense indicate that it is large[.]" *In re Valve Antitrust Litig.*, 780 F. Supp. 3d 1110, 1124 (W.D. Wash. 2024) (internal quotation marks and citations omitted); *see also De Coster*, 350 F.R.D. at 305 (collecting cases).

Here, the numerosity requirement is easily satisfied. Plaintiffs seek to represent all persons in the United States who, on or after March 19, 2016, purchased at least two Class Products on Walmart, or four such products on eBay. *See* Dkt. # 429-1 at 2. Using transactional data provided by Amazon, Plaintiffs estimate that the proposed class contains at least 10 million consumers. *See* Dkt. ## 536 at 10; 540-1 at 19. And general knowledge and common sense suggest that, given the millions of transactions involving Class Products on eBay and Walmart, at least 40 consumers have purchased the requisite number of Class Products since March 2016, even under the narrowed definition adopted by the Court in part III(A) above. Defendant also offers no evidence that would suggest that the number of consumers in Plaintiffs' proposed class is small, let alone less than 40. *See generally* Dkt. ## 323, 506, & 536. The Court is thus convinced that Plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement.

C. Commonality & Predominance

Commonality under Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). To satisfy this element, the plaintiffs' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. In other words, the plaintiffs must show that "class treatment will 'generate common *answers* apt to drive the resolution of the litigation.'" *Abdullah v. United States Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Dukes*, 564 U.S. at 350) (emphasis in original). Rule 23(a)(2)'s commonality requirement, however, is often "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 609 (1997). Courts thus often consider Rule 23(a)'s commonality and Rule 23(b)(3)'s predominance requirements together.[12]

Predominance under Rule 23(b)(3), meanwhile, requires a showing that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem*, 521 U.S. at 623). As explained by the Supreme Court,

> This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.

---

[12] *See, e.g.*, *Valve*, 780 F. Supp. 3d at 1126–28 (evaluating commonality and predominance together); *Cole v. Keystone RV Co.*, 2020 WL 3969993, at *4–6 (W.D. Wash. July 14, 2020) (same); *Stewart v. Quest Diagnostics Clinical Lab'ys, Inc.*, 2022 WL 5236821, at *11–16 (S.D. Cal. Oct. 5, 2022) (same).

*Id.* (internal quotation marks and citations omitted). Courts have also noted that "[p]redominance is a test readily met in certain cases[,]" including antitrust cases, *see Amchem*, 521 U.S. at 625, as antitrust violations typically "turn[ ] on *defendants'* conduct and intent along with the effect on the market, *not* on [the conduct or circumstances of] individual class members." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (emphasis in original).

In evaluating predominance, a district court is also required to "make a 'rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove' the common question in one stroke." *Olean*, 31 F.4th at 666 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008)). This often requires a court to "weigh[ ] conflicting expert testimony and resolv[e] expert disputes[.]" *Id.* (cleaned up and citation omitted). But in doing so, the court "is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Id.* at 667 (emphasis in original). And predominance is satisfied, even if "other important matters will have to be tried separately," so long as "one or more of the central issues in the action are common to the class and can be said to predominate[.]" *Tyson*, 577 U.S. at 453 (internal quotation marks and citation omitted).

Here, Plaintiffs argue that there are several common questions central to the case and capable of class-wide resolution, "including questions of market definition and market power; whether Amazon and its merchants agreed to restrain trade; whether Amazon monopolized, attempted to, or conspired to monopolize the relevant market; [ ] whether Amazon's conduct harmed competition and class members"; and whether Plaintiffs have standing. Dkt. # 266 at

13–14. They also contend that these common questions predominate over any individual questions, as they involve the antitrust issues at the heart of this case and "can be resolved using a common body of evidence that includes expert analysis and data [and] documents and testimony from Amazon and non-parties." *See id.* at 11, 16. And they note that many of Defendant's arguments and defenses are themselves common questions that predominate over individualized ones. *See*, *e.g*., Dkt. ## 266 at 27 n.82; 429 at 9–10, 12.

Defendant does not meaningfully argue that such questions are not "common" or "central" to the resolution of this dispute. *See generally* Dkt. ## 323, 506, & 536. Nor could it, as issues such as market definition, standing, anticompetitive conduct, and antitrust injury are questions of law or fact common to all putative class members and essential to their ability to bring claims against Amazon under the Sherman Act.[13] Instead, Defendant argues that these questions are incapable of class-wide resolution because they involve numerous individualized issues and are unsupported by a body of common evidence. *See generally id.* Specifically, Defendant asserts the following: (1) Plaintiffs' de facto price parity theory does not present a common question resolvable by common evidence; (2) Plaintiffs have not presented "significant proof" of a unified, class-wide, anti-discounting policy to support their claims; (3) Plaintiffs' expert's model fails to provide a reliable methodology for demonstrating class-wide injury and damages; (4) Plaintiffs' claims depend on a complex, multi-step causal chain, raising significant gaps in proof and numerous individualized issues as to injury, damages, and standing; (5) Plaintiffs' proposed class contains a significant number of uninjured class members, thereby

[13] *See, e.g.*, *Olean*, 31 F.4th at 666 (acknowledging that "the existence of an antitrust violation," "antitrust injury," and "impact flowing from [the antitrust] violation" are "essential elements" of a cause of action under the Sherman Act) (internal quotation marks and citations omitted); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (noting that defining the relevant market is a "threshold step in any antitrust case"); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 117 (C.D. Cal. 2007) (concluding that issues such as "market definition, monopoly power, anticompetitive conduct, and [ ] antitrust injury" are common questions of law or fact).

negating Article III and antitrust standing; (6) Plaintiffs have not presented a methodology that can identify which class members and transactions are harmed versus not; and (7) Plaintiffs have presented no common method for establishing market definition or market power. Dkt. ## 323 at 9–12; 506 at 5–6.

This order addresses each of Defendant's specific concerns in turn below.

1. Amazon says that Plaintiffs' de facto price parity theory does not present a common question resolvable by common evidence.

Defendant asserts that Plaintiffs have not presented a common question resolvable by common evidence because: (1) Plaintiffs' theory of liability depends on the existence of a de facto PMFN policy after March 2019; and (2) to prove that Amazon operated such a policy, the Court must rely on individual evidence and conduct a "staggering amount" of individualized inquiries into the subjective beliefs of millions of 3P sellers, thereby defeating commonality and predominance. *See* Dkt. # 323 at 9–10, 24–29. It also contends that Plaintiffs' own evidence "shows that individual evidence dominates" and that the Supreme Court's decision in *Dukes* precludes the Court from concluding that "claims based on a [disputed] *de facto* policy[,]" like the one here, satisfy Rule 23's commonality and predominance requirements. *See id.*

Plaintiffs respond that they have presented common evidence that Amazon operated a de facto PMFN policy—the anti-discounting policy—after March 2019. *See* Dkt. # 429 at 7–13; *see also* Dkt. # 266 at 17–27. They say that common evidence demonstrates that throughout the Class Period, every 3P seller agreed via the BSA to not set lower prices off Amazon. *See id.* And they ask the Court to apply the same reasoning from *De Coster* to reject Defendant's arguments concerning individual evidence, sellers' subjective beliefs, and the inability to prove a de facto policy under *Dukes*. *See* Dkt. # 429 at 6–12.

After reviewing the evidence, the Court concludes that Plaintiffs' de facto price parity theory presents a common question resolvable by common proof. While Defendant rejects Plaintiffs' contention that Amazon operated a de facto anti-discounting policy after March 2019, *see generally* Dkt. # 323, it does not persuasively explain why the actual question—whether such a policy exists—is not a common question resolvable by common evidence.

Here, it is undisputed that *every* merchant that seeks to sell on Amazon is required to sign the BSA and is bound by its terms. *See* part II above. It is also undisputed that from 2016 to 2019, the BSA contained an explicit price parity policy—the PPC—that required all 3P sellers to ensure that "the Purchase Price and every other term of offer or sale of [the product on Amazon] . . . is at least as favorable to Amazon Site users as the most favorable terms" offered to customers off Amazon. *See id.* Plaintiffs have also presented evidence, in the form of Amazon's internal documents and communications to sellers, that Amazon considered it to be a PPC violation for 3P sellers to offer their products for a lower price off Amazon.[14] Plaintiffs have thus offered common evidence to support their contention that there was an anti-discounting policy in effect at the beginning of the Class Period.

They have also offered common evidence to support their contention that such policy remained in effect after the PPC was removed from the BSA in March 2019. Plaintiffs have

[14] *See, e.g.*, Dkt. ## 267-8 at 4 ("June 2016 MBR for Marketplace Pricing Program" document stating that a 3P seller committed "price parity violations" by offering lower prices off Amazon); [redacted] 267-11 at 3 (email to 3P seller from Amazon stating, "our seller agreement requires that Sellers who choose to offer products on Amazon agree not to charge higher prices on Amazon than they charge elsewhere" and identifying various listings of that 3P seller on Amazon that "violate this expectation"); 267-26 at 5–7 (former Amazon CEO of Worldwide Consumer testifying that Amazon had a policy that addressed 3P sellers offering different prices on and off Amazon); 267-56 at 5 (email chain among Amazon employees indicating that a 3P seller figured out their listings were "suppressed due to 'price matching'" despite Amazon's "cryptic" communications about the reason behind the suppression).

presented internal documents and statements from Amazon employees that indicate that Amazon's "expectations and policies" regarding "price competitiveness" did not change after the PPC was removed.[15] They have also presented evidence that between 2015 and 2021, Amazon adopted and implemented other policies and tools addressing price competitiveness—the SCC, MFPP, ASB, and SC-FOD algorithm—and that collectively, such policies and tools apply to all 3P sellers. *See* part II above. This evidence includes the policies themselves, internal Amazon documents, statements from Amazon employees, communications to 3P sellers indicating that they have violated certain Amazon policies by offering an "uncompetitive" price on Amazon, and Dr. Pathak's expert analysis of these policies.[16] Plaintiffs have supplemented this evidence

---

[15] *See, e.g.*, Dkt. ## [redacted] 267-13 at 9 ("Brand Program – PR Stress Test" document from April 2019 stating that Amazon "worked with reporters on background to make clear that our expectations and policies have not changed [after the PPC was removed], but did not go on the record as [it] had competing strategic interests."); 267-14 at 2 (email chain among Amazon employees discussing removal of the PPC, in which one employee states: "To be clear, this [change] does not at all change our actions on FOD (Featured Offer Disqualification) in fact we (inclusive of the Pricing team) plan to increase our suppression rate/experience[.]"); 267-15 at 22–23 (Amazon employee testifying that when the PPC was removed, Amazon published an article to Seller Central saying that it was removed but that the article contained no other information about the change); 267-6 at 8 (email chain among Amazon employees indicating that the PPC was removed with "no comment").

[16] *See, e.g.*, Dkt. ## 267-3 at 2 ("Reducing Glance Views on Price Uncompetitive 3P Offers" document indicating that Amazon will take "immediate action to remove an uncompetitive item/offer" and will work to "immediately notify the Selling Partner" via "immediate and clear selling partner notifications"); 267-16 (copy of the 2021 SCC Clarification); 267-36 (copy of the ASB); 268-2 (copy of the MFPP); 267-19 at 5 (slide notes from "Pricing Competitively to Accelerate Sales" PowerPoint stating, "At Amazon, we consider a price for a product to be competitive, if it is priced at or below the price we find for the product at other reputable retailers outside Amazon. . . . In fact, we consider a price to be un-competitive even if it is one cent above the price available outside Amazon! If you're wondering if this includes shipping, the answer is yes[.]"); *id.* at 12–13 (slide notes from "Pricing Competitively to Accelerate Sales" PowerPoint saying that Amazon sends sellers "an email every time [they] have an offer that is uncompetitive" in addition to an update on Seller Central, and that sellers can restore Featured Offer eligibility by lowering their on-Amazon price to the "competitive price"); [redacted] 267-27 at 5 (Amazon employee testifying about communicating Amazon's price competitiveness standards to ASB brands and stating that Amazon expects their prices "to be competitive relative to . . . what they may be providing elsewhere in other stores"); 267-33 at 2 (email chain among

with anecdotal evidence that many 3P sellers, competing marketplace operators, regulators, and other industry professionals understood Amazon to continue to require price parity after March 2019.[17] And while this evidence is no doubt individual, *see* Dkt. # 323 at 25, it helps to

---

Amazon employees indicating that certain 3P sellers whose products are also sold on Walmart are "at risk" of ASB enforcement if their on-Amazon offers are "not priced competitively"); 267-34 at 3 (email chain among Amazon employees discussing price-monitoring and how to ensure that prices off Amazon "match" those on Amazon); 267-35 at 29 (notes from Amazon employee stating that the VP of Worldwide Pricing's direct reports "need to eliminate price parity from all documents" relating to ASB); 267-40 at 6 (Amazon's Response to Interrogatory No. 33 explaining that a seller's price competitiveness performance is reflected in their "Customer Experience Dashboard," with price competitiveness requiring the seller to offer their product "at or below the competitive signal price"); 267-41 at 3–4 ("Amazon Standards for Brands Program Update – 10/20/2020" document explaining the proposed communications that Brands will experience when their prices are deemed uncompetitive); 267-44 at 7 ("Sample Article: Amazon vs. Jet – Who Wins on Price?" document indicating that "[p]rice display treatments such as removing Buy Box eligibility for noncompetitive priced offers are a faster mechanism to price parity"); 267-45 at 3 ("Parity Terms for BBY & 3P OEMs Adopting Fire TV Edition (12-11-18)" document listing Buy Box suppression as a potential "recourse" for "price parity," absent "a contractual price parity commitment under which Amazon could pursue legal remedies"); 267-46 at 3 (email chain among Amazon employees indicating that Amazon will remove featured offer eligibility through SC-FOD when a "Seller's prices on Amazon are higher than prices for offers at select competitors"); 267-47 at 3–5 (Amazon's Responses to Interrogatory Nos. 17 & 18 explaining that Featured Offer eligibility is based on a seller maintaining a competitively priced offer on Amazon); 267-49 at 10 (FTC Specifications document indicating that after "Amazon disqualifies an offer from being the Featured Offer . . . [it] informs the [3P] seller that it has done so and provides the competitive price that could qualify for eligibility to be the Featured Offer at that time"); 267-50 at 2 (email chain among Amazon employees discussing the notifications that sellers will receive after they lose the Buy Box); 267-51 at 2 (email chain among Amazon employees indicating that "suppressing offers" is Amazon's "standard recourse for managing price parity issues"); [redacted] 430-9 at 3 (Amazon employee testifying, "If a brand's products were found for sale on . . . their seller account, and those products were priced higher than at other retailers, then [Amazon] would attempt to communicate to the brand to adjust their prices and encourage them that to ensure [a] positive customer experience, they should maintain price competitiveness with where their products are sold elsewhere."); 430-10 at 2 (email chain among Amazon employees stating that "not featuring [a brand's] uncompetitively priced offers as the 'featured offer'" is an "enforcement action[ ] that brands and their representatives may experience related to ASB"); 317-1 § 6 (Dr. Pathak examining Amazon's pricing constraints and concluding that they operated as an anti-discounting policy throughout the Class Period); 432-3 at 70–71 (Dr. Pathak stating, "Dr. Hitt himself has found that in less than four years, Amazon sent nearly [redacted] notifications to 3P sellers under SC-FOD, FO [Featured Offer] Eligible, and AP-FOD to inform them that their prices were not eligible for the Buy Box and reminding them of the pricing policy that price competitiveness is an eligibility requirement for the Buy Box.").

[17] *See, e.g.*, Dkt. ## [redacted]

[redacted] 267-56 at 2 (email chain among Amazon employees indicating that after a Buy Box suppression, "[t]he only option [3P sellers] see, is to go direct with the [Select Image Competitor] and 'try to influence' the sales price"); [redacted] 267-63 at 6 (Amazon document indicating that [redacted] 267-65 at 2 (Amazon document discussing removal of the PPC and indicating that [redacted] 267-68 at 10 (Amazon document indicating that "Sellers live in constant fear that their accounts will be suspended, or that top selling products will be removed"); 267-69 at 10 (Amazon document acknowledging that "Sellers could perceive [Amazon's Buy Box suppression policy] as Amazon's attempt at 'price fixing'" and that "the Brand team has received complaints that this policy encourages Sellers to raise their prices on competitor websites"); [redacted]

demonstrate that Amazon's price parity expectations were not merely theoretical or presumed but actually imposed on 3P sellers with real-world impacts on pricing.[18]

Contrary to Defendant's argument then, Plaintiffs' theory presents a common question—whether Amazon's merchants were contractually bound to adhere to an anti-discounting policy throughout the whole Class Period—that is resolvable by common evidence—the text of the policies themselves, statements from Amazon employees, internal Amazon documents, and communications between Amazon and 3P sellers concerning price competitiveness. And while Plaintiffs have also presented individual evidence in support of this theory, such evidence does not dominate where, as here, Plaintiffs' theory is rooted in Amazon implementing nondiscretionary price parity mechanisms that apply to all or most 3P sellers.

This reality renders *Dukes* inapt. As explained in *De Coster*, *Dukes* "concerned a class of over one million then-current and former female employees of Walmart who alleged that the subjective criteria used by local supervisors about pay and promotion-related matters violated Title VII by discriminating against women." 350 F.R.D. at 311 (citing *Dukes*, 564 U.S. at 358). To prove their case, the *Dukes* plaintiffs relied on a corporate "'policy' of *allowing discretion* by local supervisors over employment matters[,]" statistical evidence that female employees were paid less, anecdotal evidence of discrimination from 120 women, and the opinions of a sociologist. *Dukes*, 564 U.S. at 353–58 (emphasis in original). In a 5-4 decision, the Supreme

[redacted]

[18] *See, e.g.*, *Valve*, 780 F. Supp. 3d at 1127 (concluding that evidence of a "common industry understanding of [a company's] price-parity expectation . . . [was] sufficient, under the rule of reason to establish common evidence of a price parity expectation that drives common market behavior."); *Buchanan v. Homeservices Lending LLC*, 2013 WL 1788579, at *5 (S.D. Cal. Apr. 25, 2013) (suggesting that relying on "anecdotal evidence" may be permissible if accompanied by "substantial evidence of a class-wide practice that could be used as a common method of proving liability") (internal quotation marks and citation omitted); *Pedroza v. PetSmart, Inc.*, 2013 WL 1490667, at *8 (C.D. Cal. Jan. 28, 2013) (indicating that anecdotal evidence may "give rise to an inference of a common practice" if it is "representative in number and in geography").

Court concluded that the plaintiffs had not satisfied commonality because they had not demonstrated "a general policy of discrimination" or that managers throughout the company used "a common mode of exercising discretion." *Id.* The Supreme Court emphasized that a corporate policy of discretion is, by definition, the opposite of a common policy. *See id.* And so, "[e]ven if every single one of [the] accounts [of discrimination] is true, that would not demonstrate that the entire company operate[s] under a general policy of discrimination, which is what [the plaintiffs] must show to certify a companywide class." *Id.* at 358 (internal quotation marks and citations omitted).

Here, however, Plaintiffs' evidence suggests that Amazon operates under a general policy of price parity via its contractual agreements with sellers and its company-level understanding of what those agreements entail. Plaintiffs also cite explicit, nondiscretionary corporate policies and examples of how they were implemented to seek to prove the existence of an anti-discounting policy; they do not attempt to infer a general policy based on discretionary decisions and individual interactions between Amazon employees and 3P sellers. Thus, unlike in *Dukes*, Plaintiffs' ability to prove that a de facto policy exists depends on common evidence concerning the defendant company's conduct, not on individual evidence concerning the subjective beliefs of millions of individuals. Defendant's other cited cases are also inapplicable, as they do not involve corporate conduct related to class-wide agreements and policies like those at issue here.[19]

---

[19] *See, e.g.*, *Chicken Delight, Inc. v. Harris*, 412 F.2d 830, 831 (9th Cir. 1969) (rejecting inclusion of the "pricing issue" in a class notice for a group of franchisees, as "the determination of such issue would involve significantly different evidence and separate factual determinations as to each separate franchisee," but accepting the inclusion of the "requirements issue," as it was "relative to certain provisions in [the defendant's] standard forms of franchise agreements"); *Cokeley v. Tandy Corp.*, 19 Fed. R. Serv. 2d 1054, at *2–3 (N.D. Cal. 1974) (denying class certification because "[t]he differing claims and proof as to coercion . . . lead to the conclusion that individual claims of coercion would overshadow any common question thereof," but acknowledging a difference between coercion claims that arise under the franchise agreement itself and those that arise by virtue of activities that were not specifically

Defendant thus does not rebut Plaintiffs' showing that whether a de facto PMFN policy existed after March 2019[20] is a common question capable of class-wide resolution by common evidence.[21]

2. Amazon says that Plaintiffs have not presented "significant proof" of a unified, class-wide, anti-discounting policy to support their claims.

Defendant contends that even if Plaintiffs could proceed under a de facto price parity theory, they have not met their burden of establishing commonality and predominance because they "have not come forward with 'significant proof' of a unified class-wide policy." Dkt. # 323 at 10. It argues that Plaintiffs' evidence—"anecdotes based on a handful of seller statements, mischaracterizations of internal Amazon documents, and their expert's limited case studies"—is insufficient to establish a company-wide policy under *Dukes*. *Id.* It further argues that Plaintiffs cannot demonstrate that the purported PMFN "impacted every Amazon seller, much less every

---

authorized or compelled by the agreement); *Smith v. Denney's Restaurants, Inc.*, 62 F.R.D. 459, 460 (N.D. Cal. 1974) (denying class certification because "individual testimony would be necessary as to each franchise to establish: (1) whether its issuance was conditioned on acceptance of the claimed anti-competitive scheme; (2) whether the purchases of suppliers and services from the defendants were in fact at fixed higher-than-market prices, and if so, (3) the extent of the injury suffered"); *Castillo v. Bank of Am., NA*, 980 F.3d 723, 733 (9th Cir. 2020) (affirming denial of class certification because the "case raise[d] complicated questions of who was ever exposed to [the challenged] policies, and whether those who were exposed were harmed in a way giving rise to liability"); *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1343 (9th Cir. 1982) (affirming denial of class certification because the plaintiffs had not presented "common evidence of standard contracts that demonstrate control over the [challenged] pricing decisions or some other readily demonstrable and equally convincing evidence").

[20] While not specifically challenged by Defendant, the Court also notes that whether a PMFN was in place at the beginning of the Class Period until March 2019 is also a common question resolvable by common proof: the PPC's explicit price parity requirement. *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 n.13 (9th Cir. 2023) ("An express agreement is direct evidence of concerted activity.") (internal quotation marks and citation omitted).

[21] *See, e.g.*, *De Coster*, 350 F.R.D. at 307–12 (concluding that "Plaintiffs have presented common proof, by a preponderance of the evidence, that Amazon has implemented certain policies and practices concerning third-party sellers that function as a PMFN policy."); *Markson v. CRST Int'l, Inc.*, 2022 WL 790960, at *13–14 (C.D. Cal. Feb. 24, 2022) (concluding that the plaintiffs offered class-wide proof of an antitrust conspiracy based on direct and circumstantial evidence concerning the defendant's conduct); *Valve*, 780 F. Supp. 3d at 1126–27 (concluding that the plaintiffs presented common evidence of a PMFN policy based on evidence that the company's standard distribution agreement required parity).

Walmart[ ] and eBay seller" because: (1) even with the PPC, "Amazon never had the ability to enforce a parity requirement against the three million sellers and hundreds of millions of products in its store, with enforcement manual and infrequent, and [3P] sellers often charging lower prices off-Amazon" before March 2019; and (2) the conduct challenged by Plaintiffs as part of their supposed de facto PMFN after March 2019 "affected only a limited percentage of [3P] sellers in Amazon's store." *Id.* at 9–10; *see also id.* at 30–31; Dkt. # 536 at 34–36.

Plaintiffs respond by discussing the various pieces of evidence that support their claimed anti-discounting policy. *See generally* Dkt. ## 266 at 17–27; 429 at 7–13. And they ask the Court to apply the same reasoning from *De Coster* to conclude that they have provided common evidence to establish the existence of a PMFN in accordance with the applicable legal standards. *See id.*

When considering whether a party has adequately alleged a policy or practice to satisfy commonality and predominance at the class certification stage, a district court need not resolve any factual disputes about whether the challenged conduct affected the class as a whole. *See Ellis*, 657 F.3d at 983. Instead, its role is "to resolve any factual disputes necessary to determine whether there was a common pattern and practice that *could* affect the class as a whole." *Id.* (emphasis altered). This requires the district court to determine whether there is "significant proof" that the defendant subjected the whole class to the same allegedly unlawful pattern or practice. *Id.* And while "a company's policy by itself—even if it remains constant during the class period—is not an elixir that turns canned allegations in a complaint into a pot of class action gold[,]" the existence of such a policy, combined with evidence that "the company consistently implemented and enforced the policy across all [class members] during the class period[,]" suffices. *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1223 (9th Cir. 2024). A "smattering of examples" to the contrary or a few isolated cases of nonenforcement also "do[ ]

not automatically defeat class certification if . . . the overwhelming evidence shows that the company consistently enforced its policy across [the class]." *Id.* at 1223–24.

Plaintiffs have met this threshold. First, like in *De Coster*, Plaintiffs have presented a robust body of common evidence that shows that Amazon operated an anti-discounting policy throughout the Class Period. *See De Coster*, 350 F.R.D. at 307. This evidence includes the common evidence discussed in part III(C)(1) above—specifically, the policies addressing price competitiveness that apply to all or most sellers and Amazon's own statements and communications addressing price parity. It also includes Plaintiffs' evidence that: (1) Amazon consistently enforced its anti-discounting policy against 3P sellers by informing them of their price parity obligations, notifying them of violations via email and messages on their dashboards, and suppressing their products' eligibility for the Buy Box whenever it learned that the product was priced lower off Amazon;[22] (2) Amazon worked to consistently expand its price monitoring operations overtime, thereby allowing for more robust and uniform enforcement throughout the Class Period;[23] and (3) Amazon encouraged 3P sellers to match their on-Amazon prices to the

---

[22] *See* Footnotes 16 & 17; *see also* Dkt. ## 267-46 at 3 (email chain among Amazon employees indicating that Buy Box suppression through SC-FOD is "a disincentive that applies to all Sellers" and that Amazon does not "offer exceptions to or exemptions from this policy"); 267-54 at 7 ("SIC Buy Box Removal Experiment Results & Recommendation – 9/15 Review" document listing "[w]e apply consistent competitiveness thresholds for Buy Box suppression across all Buy Box eligible 3P offers" as a guiding tenet).

[23] *See, e.g.*, Dkt. ## 267-39 at 4 (email chain among Amazon employees discussing CMT Monitoring and Amazon's ongoing [redacted] 267-42 at 35 (2012 Response to OFT Section 26 Notice indicating that Amazon has "implemented a standardised procedure for auditing compliance with price parity," with Amazon's auditing team using "an in-house software tool, known as the Price Parity Engine, to manage the auditing process and record actions taken"); 267-43 at 2–8 ("Price Parity Engine – Summary October 2010" document providing an overview of Amazon's existing price parity auditing process and plans for further automation of the process); 267-44 at 7 ("Sample Article: Amazon vs. Jet – Who Wins on Price?" document discussing manual price parity auditing and Buy Box suppression as a "faster mechanism to price parity"); 267-45 at 3 ("Parity Terms for BBY & 3P OEMs Adopting Fire TV Edition (12-11-18)" document discussing potential "recourses" for "price parity"); 267-49 at 10 (FTC Specifications document explaining that "Amazon monitors prices across a defined set of reputable and relevant retailers and then compares the price in Amazon's store against prices from those select retailers"); 267-50 at 2–3

lowest external prices for those items.[24] The Court also agrees with Plaintiffs that Defendant's attempt to distinguish between "price competitiveness" and "price parity" is a distinction without a material difference given the factual circumstances and Amazon's definition of "price competitiveness." *See* Dkt. # 429 at 11.

Second, Plaintiffs have provided ample evidence that the alleged PMFN applied class-wide. Plaintiffs have presented evidence that the challenged conduct was codified via the BSA and thus applied to all Multi-Store sellers. *See* part II above. Plaintiffs have also presented evidence that sellers substantially complied with Amazon's anti-discounting policy by setting prices on Amazon equal to or lower than their prices on Walmart and eBay.[25] And while

---

(email chain among Amazon employees discussing expansion of the "Buy Box removal logic"); 317-1 at 30 (Dr. Pathak stating, "Between 2015 and 2023, Amazon monitored the prices of some [redacted] on other marketplaces or websites sold by at least [redacted]); *id.* at 31 (Dr. Pathak stating, "Data provided by Amazon has more than [redacted] monitored prices from Walmart, for more than [redacted] [redacted] since May 2015. For eBay, Amazon had more than [redacted] rows of monitored prices from 2015 May, for more than [redacted] unique products."); *id.* at 97 (Dr. Pathak stating, "Amazon has also produced data showing that between January 2022 and March 2023, there were at least [redacted] instances in which Amazon checked their database of external prices as part of their Buy Box allocation algorithm. In [redacted] of these instances, Amazon identified and used an external price as a threshold for [3P] merchant pricing.").

[24] *See, e.g.*, Dkt. ## 267-19 at 21 ("Pricing Competitively to Accelerate Sales" PowerPoint slide explaining that "[p]ricing competitively means setting a price that is at or below the price available outside Amazon" and listing various "tools to help [sellers] price competitively"); 267-48 at 4 (Declaration of Amazon employee explaining that they respond to 3P sellers' questions about how they can price more competitively by "advis[ing] [them] about Amazon's optional tools that assist [3P] sellers in setting competitive prices"); 267-69 at 2–11 ("Internal Press Release: Free Pricing Tools on Amazon Helps Sellers Increase Revenue" document outlining Amazon's new automated pricing tools).

[25] *See, e.g.*, Dkt. ## 267-15 at 25 (Amazon employee testifying that brand merchants comply with the price competitiveness requirement approximately [redacted] of the time); 317-1 at 113 (Dr. Pathak explaining that his analysis of Amazon's data "shows broad overall compliance with Amazon's anti-discounting policy": "Merchants priced in accordance with the anti-discounting policy and kept their prices on competing platforms equal to (or higher than) offer prices on Amazon Marketplace a majority of the time."); *id.* (Dr. Pathak explaining that "[his] own analysis of prices across Amazon, eBay and Walmart finds that when the same item was sold on Amazon Marketplace and another platform on the same day, Amazon hosted the lowest offer 70%–80% of the time."); *id.* at 115 (Dr. Pathak explaining that "[a] comparison of Buy-Box suppression incidents with the off-Amazon prices gathered in the Monitoring data shows that prices for the same merchandise on other platforms tended to increase when merchants' Buy-Box offers were suppressed."); *id.* at 13–14 [redacted] 432-3 at 125–26 (Dr. Pathak rebutting Dr. Hitt's compliance arguments and reaffirming that there is substantial compliance among 3P sellers); *id.* at 284 (Dr. Pathak explaining that when competition is

Defendant claims that Dr. Pathak's evidence of "compliance" is unreliable and that Plaintiffs' inference of anticompetitive conduct "makes no sense," *see* Dkt. # 323 at 29, such arguments speak to the ultimate resolution of the underlying merits question—whether there was a de facto PMFN policy that harmed class members—not to whether Plaintiffs have provided sufficient class-wide proof of such a policy to support class certification.

Third, nothing in Defendant's cited cases requires the Court to deny class certification given the circumstances at issue here. As for *Dukes*, the Court affirms its view from *De Coster* that "the nature and quality of evidence here matter" and are markedly different from the evidence presented in *Dukes*. *See De Coster*, 350 F.R.D. at 311. As for *Miles*, the Court applies the opinion's logic to conclude that Amazon's limited evidence of nonenforcement is insufficient to defeat class certification given Plaintiffs' overwhelming evidence that Amazon consistently enforced its policy across all sellers. And as for *Ellis*, the Court believes that the significant proof offered by Plaintiffs and the analysis conducted above accords with the "rigorous analysis" contemplated by the Ninth Circuit in that case.

Finally, the Court notes that Amazon's evidence of nonenforcement, while highly relevant to the ultimate merits question, is not enough to defeat Plaintiffs' showing at the class certification stage. For example, Amazon presents evidence that the PPC was rarely enforced before March 2019, no seller has been subject to the 2021 SCC Clarification, external prices collected from Select Competitors in the same month were unavailable for over [redacted] of products, and the ASB applied to at most [redacted] of sales on Amazon in a month. *See* Dkt. # 323 at 10, 30–31; *see also* Dkt. # 536 at 34–36. But this evidence does not necessarily mean that Amazon did not have an anti-discounting policy or that it did not consistently enforce such a policy against 3P

---

restored in Dr. Ostrovsky's setup "through the inclusion of a single multihoming merchant, . . . a PMFN still raises fees and prices.").

sellers who did not maintain price parity; Amazon could require price parity and consistently enforce its policy against merchants while still being unaware of every violation, and thus unable to fully enforce its policy against every seller at any given time. Defendant has also failed to identify any examples of Amazon learning of a price parity (or "price competitiveness") violation by a 3P seller and then declining to take an enforcement action. *See generally* Dkt. ## 323, 506, & 536; *see also* Dkt. # 531 at 4 (inviting Defendant to provide such an example).

Similarly, Amazon's evidence—declarations from some employees indicating that they do not ask for price parity, *see* Dkt. # 323 at 28—may lead a reasonable juror to conclude that Plaintiffs have not met their burden of proving the existence of a PMFN. It also may require the factfinder to inquire into the individual conduct of certain Amazon employees. But such evidence does not mean that Plaintiffs have not offered significant common evidence to support their claims at the class certification stage. Nor does it require a factfinder to conduct millions of individualized inquiries, as the evidence concerning individual employees' understanding of Amazon's policies speaks to a common question—whether Amazon has a price parity policy—and remains the same across all class members.

The Court thus concludes that Plaintiffs have managed to present "significant proof" of a unified, class-wide anti-discounting policy to support their claims.[26]

3. Amazon says that Plaintiffs' expert's model fails to provide a reliable methodology for demonstrating class-wide injury and damages.

Defendant contends that Plaintiffs have not met their burden of establishing injury-in-fact and damages for all or virtually all class members because Dr. Pathak's model does not provide a valid method for proving class-wide injury and damages. *See* Dkt. ## 323 at 10–11, 32; 506 at 5–6. Specifically, it says Dr. Pathak's model is deficient because it relies on a theoretical model

[26] *See* Footnote 21.

of algebraic formulas that, by design, reaches predetermined conclusions, generates false positives where no injury could be present, and does not track the empirical facts. *Id.* It also takes issue with Dr. Pathak's assumptions and variant models. *See* Dkt. ## 323 at 33–36; 506 at 7–10; 536 at 44–47. And it argues that other courts have denied class certification in similar circumstances, as using a model like Dr. Pathak's to establish class-wide impact would improperly rewrite antitrust law. *See* Dkt. # 323 at 11, 32–34.

Plaintiffs respond that Dr. Pathak has provided a reliable methodology that can prove class-wide impact. *See* Dkt. # 429 at 13; *see also* Dkt. ## 266 at 40–48; 536 at 27–28. They say that, as in *De Coster*, Dr. Pathak "demonstrates all class members were harmed by a robust analysis of economic evidence, applying the leading economic model for assessing the impact of PMFNs, using a regression to study the relationship between fees and prices, and validating his findings through yardstick and other analyses." Dkt. # 429 at 13. And they offer counterarguments, case law, and rebuttal expert testimony in response to each of Defendant's specific critiques. *See id.* at 13–18; *see also* Dkt. # 536 at 23–27.

The Court begins by noting that Defendant raised many of these same arguments in its concurrently filed *Daubert* motion, *see* Dkt. # 325, with the Court rejecting such arguments in its Order denying Defendant's Motion to Exclude Testimony of Parag Pathak, Ph.D. *See generally* Dkt. # 505. And while expert evidence may be admissible under *Daubert* but inadequate under Rule 23,[27] the Court need not reconsider Defendant's previously rejected arguments[28] or otherwise reanalyze the issue of reliability. Instead, the Court focuses its analysis on whether the

[27] *See, e.g.*, *Olean*, 31 F.4th at 666 n.9 ("Courts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23.").

[28] Such arguments include those related to false positives, placebo tests, error terms, seller heterogeneity, measures of statistical significance, and whether the Boik-Corts model is supported in the field of economics. *See generally* Dkt. # 505.

purported deficiencies with Dr. Pathak's model render it incapable of resolving questions concerning injury and damages in one stroke or will cause individualized inquiries to predominate in this action. *See Olean*, 31 F.4th at 666 n.9, 668. For the reasons below, the Court concludes that they do not.

Defendant first argues that Plaintiffs cannot rely on Dr. Pathak's model as proof of a common method because Dr. Pathak's model, a modified Boik-Corts model, is a theoretical model designed to reach a single conclusion: higher prices for all class members. Dkt. # 323 at 33. But Defendant's own experts have endorsed the validity of using the Boik-Corts model to evaluate the effects of a PMFN on prices.[29] And while Defendant and its expert, Dr. Ostrovsky, suggest that stochastic models are preferable to deterministic ones, *see* Dkt. ## 323 at 35; 430-11 at 4, they have not shown that such modeling is possible based on the available data, nor have they established that Dr. Pathak's approach or use of deterministic relationships is fundamentally flawed.[30] Defendant also points to no other economic model that could be used to demonstrate class-wide impact in this case or in circumstances where, as here, the plaintiff alleges that the defendant's conduct prevented a competitive market from forming at the outset.[31] Nor does

[29] *See, e.g.*, Dkt. # 430-11 at 6 (Dr. Ostrovsky testifying that "Boik and Corts would be one of the papers I would look at if I were to test this [economic effect on competition of a price parity provision] theory seriously."); *De Coster*, 2025 WL 1970287, at *5 (W.D. Wash. July 1, 2025) (noting that during Dr. Hitt's deposition, "Dr. Hitt stated that he looked at 82 research papers focused on PMFNs and could not recall any of these papers critiquing the Boik-Corts model.") (citation omitted).

[30] *See* Dkt. # 505 at 13; *see also* Dkt. ## 430-11 at 8 (Dr. Ostrovsky acknowledging that his report does not discuss whether it would be possible to build a stochastic model in this case); *id.* at 4–5 (Dr. Ostrovsky endorsing Dr. Pathak's general approach to the question); 324-35 at 2 (ABA Treatise, submitted by Defendant, indicating that "[m]ost economic models hypothesize a direct positive relationship between cost and price" and that such relationship is "deterministic").

[31] *See generally* Dkt. ## 323, 506, & 536.

Defendant cite any academic papers[32] or cases[33] suggesting that it is improper to rely on a Boik-Corts model to prove class-wide impact given the circumstances here.[34]

---

[32] Defendant cites a 2024 article by Frank Schlütter and a 2021 article by Andrea Mantovani et al., neither of which say that the Boik-Corts model incorrectly finds that PMFNs raise prices. *See generally* Dkt. ## 324-38 & 324-36.

[33] Defendant cites the following cases: *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019); *Fed. Trade Comm'n v. Microsoft Corp.*, 136 F.4th 954 (9th Cir. 2025); *In re Wholesale Grocery Prods. Antitrust Litig.*, 2012 WL 3031085 (D. Minn. July 25, 2012), *aff'd*, 752 F.3d 728 (8th Cir. 2014); *In re Interest Rate Swaps Antitrust Litig.*, 2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023). *See* Dkt. ## 323 at 32–35; 506 at 7. Each is inapposite. In *Blades*, the Eighth Circuit concluded that the plaintiffs did not establish antitrust impact on a class-wide basis through common proof because their expert "*presume[d]* class-wide impact without any consideration of whether the markets or the alleged conspiracy at issue [ ] actually operated in such a manner so as to justify that presumption." 400 F.3d at 570 (emphasis in original). But here, Dr. Pathak does not rely on mere presumptions; his report *determines* that Amazon's policies impacted all or virtually all class members based on a careful consideration of how the market for U.S. Online Retail Marketplaces operates, and how Amazon and its policies function within that environment. In *Rail Freight*, the district court determined that predominance was not satisfied because the plaintiffs' expert determined that there were more than a *de minimis* number of uninjured class members. 292 F. Supp. 3d at 141. By contrast, here, Plaintiffs' expert indicates that the number of uninjured class members is *de minimis*. *See* Dkt. # 432-3 at 87; *see also* part III(C)(5) below. The individualized inquiry rationale from *Rail Freight* thus does not apply. In *Microsoft Corporation*, the Ninth Circuit noted that a plaintiff "cannot rely on intuition, theory, or other 'short cut[s]' to carry its ultimate burden" and instead "must come forward with evidence to make a sufficient showing as to the anticipated effect of [the particular challenged conduct] and how it would substantially lessen competition." 136 F.4th at 973 (internal quotation marks and citation omitted). Dr. Pathak's model, however, has numerous quantitative components, and is supplemented by corroborative regressions, real-world observations, and other non-academic analyses. *Microsoft Corporation* thus does not preclude certification based on Dr. Pathak's model. In *Wholesale Grocery*, the district court concluded that the plaintiffs' proposed method of proving antitrust impact—the contrary hypothesis test—failed because it proved only that the defendant's *presence* influenced prices in that region, not that the *challenged conduct* did so. 2012 WL 3031085, at *10. The court also took issue with the plaintiffs' failure to address price levels after the challenged policy was imposed and the lack of discussion as to whether each class member paid supra-competitive prices. *See id.* In contrast, Dr. Pathak's model directly links the challenged conduct to higher prices and it addresses the price levels experienced by customers as a result of such conduct. Finally, in *Interest Rate Swaps*, the district court concluded that, "[g]iven the nature of the relevant market, [the plaintiffs'] appeal to the economic literature and to expert reports containing only generalized analysis . . . falls short[,]" especially because the defendants "ha[d] identified empirical evidence" that rebutted the plaintiffs' generalized analyses. 2023 WL 8675625, at *8. Here, however, the nature of the relevant market supports the use of Dr. Pathak's model. And Defendant's evidence does not "rebut" Plaintiffs' analyses but instead, creates a genuine dispute on the merits.

[34] The Court is aware of no case, nor have the parties identified one, in which a court has rejected the use of a Boik-Corts model to prove class-wide damages and/or antitrust impact. *See, e.g.*, Dkt. ## 531 at 3, 5 (inviting the parties to identify such a case); 536 at 48, 58 (the parties representing that *Valve* and *De Coster* are the only two cases that they are aware of in which a plaintiff has sought class certification based on a Boik-Corts model).

Additionally, Dr. Pathak's model was not designed in a vacuum. As explained earlier by this Court, "Dr. Pathak selected a peer-reviewed economic model based on real-world transactional data provided by Amazon. He then applied this model to the facts of the case, determining that Amazon's anti-discounting policy creates class-wide harm because it inflates fees and prices across all product categories." Dkt. # 505 at 13 (internal citations omitted). Dr. Pathak also explains: (1) why the Boik-Corts model is an appropriate method for evaluating the impact of a PMFN; (2) why it is appropriate to assume, to calculate injuries and damages, that Amazon operates a PMFN; and (3) why the model's other underlying assumptions, such as a uniform pass-through rate of 50%,[35] make sense given the facts here. *See* Dkt. ## 317-1 §§ 6–8; 432-3 §§ 3, 5, 7, 14. And Dr. Pathak corroborates and supplements his main model's finding of antitrust injury with other analyses, including regressions, variant models, empirical observations, and discussions of natural experiments. *See* Dkt. # 266 at 40–48 (outlining Plaintiffs' common evidence).

The Court also notes that while econometric regression models are often used to establish class-wide impact in antitrust cases, *see Olean*, 31 F.4th at 677, district courts can and do accept alternative economic models to show class-wide impact especially when data for the hypothetical but-for world is lacking.[36] Plaintiffs have also identified two cases in which class certification

[35] Contrary to Defendant's assertion, *see* Dkt. # 323 at 33, Dr. Pathak's estimated 50% pass-through rate is not calculated "without regard to actual pass-through rates." As explained by Dr. Pathak, the 50% pass-through rate was selected based on his "own analysis of Amazon's fee changes" and is "highly conservative compared to values observed in the real world." Dkt. # 432-3 at 188–89. Defendant also offers no persuasive explanation about why it is improper to establish class-wide impact by relying on a conservative pass-through rate for all transactions at the class certification stage, rather than relying on a specific pass-through rate for each transaction. *See generally* Dkt. ## 323, 506, & 536.

[36] *See, e.g.*, *Iowa Pub. Emps. Ret. Sys. v. Bank of Am. Corp.*, 2022 WL 2829880, at *24–25 (S.D.N.Y. June 30, 2022) (concluding that the plaintiffs' non-regression models were "reliable, formulaic model[s]" capable of proving damages and class-wide impact because no "clean" data existed for the hypothetical but for world); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090, at *7 (N.D. Cal. Feb. 21, 2012) (acknowledging that "formal statistical techniques" are not always needed to prove class-wide impact); *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570–71 (9th Cir. 2024), *cert. denied*, 223

was granted based on an expert relying on a similar model to demonstrate class-wide impact: *De Coster* and *Valve*. And while Defendant cites many cases that stand for the proposition that theoretical models do not satisfy a putative antitrust class member's burden of showing class-wide impact, *see* Footnote 33, it cites no case in which the Court denied certification based on the factual circumstances and type of economic model at issue here. *See generally* Dkt. ## 323, 506, & 536. The Court also notes that "to the extent that Defendant[ ] seek[s] to show now or at a future stage that [Dr. Pathak's] damages model is inaccurate, that, too, is itself a question common to the claims made by all class members, and thus reinforces that common issues will predominate." *Iowa Pub.*, 2022 WL 2829880, at *24 (cleaned up and citations omitted). Defendant's "predetermined results" argument is therefore insufficient to defeat class certification.

The Court likewise declines to deny class certification based on the model's purported "inconsistencies" with real-world data. As explained earlier by this Court, Dr. Pathak's model, like all economic models, must rely on some simplifying assumptions that do not perfectly reflect reality. *See* Dkt. # 505 at 17; *see also De Coster*, 350 F.R.D. at 317–18. This, however, does not automatically render the model unreliable or incapable of proving class-wide impact. *See id.* The Court also does not believe that Dr. Pathak's model rests on unsupported assumptions or inferences.[37] In his reports, Dr. Pathak carefully explains each of the model's assumptions, drawing on economic literature and the relevant factual circumstances. *See* Dkt.

---

L. Ed. 2d 24 (2025) (noting that "an expert may extrapolate harm to competition on a market-wide level based on the volume of [products affected by the alleged anticompetitive conduct] and the coercion of particular customers") (internal quotation marks and citation omitted); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 15, 25 n.31 (E.D.N.Y. 2020) (accepting the expert's use "of a market yardstick to show classwide impact in the but-for world" since they lacked "actual data" regarding the but-for world).

[37] *See, e.g.*, *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 27–30 (1st Cir. 2008) (denying certification because the expert's model presumed, without further theoretical development, that all purchasers paid higher prices).

## 317-1 §§ 6–8; 432-3 §§ 3, 5, 7, 14. He then performs a variety of robustness checks using his variant models and explains why relaxing certain assumptions in the original model would not alter his overall conclusions. *See id.*; *see also* Dkt. # 432-3 §§ 15, 18, Appendix. His rebuttal report also carefully responds to each critique offered by Defendant's experts. *See generally* Dkt. # 432-3. And Plaintiffs have adequately explained why Amazon's contention that Dr. Pathak's variants "are incomplete[,] incorrect, [and] riddled with mathematical errors[,]" *see* Dkt. # 323 at 36, is misguided. *See* Dkt. # 431 at 6; *see also* Dkt. # 536 at 23–27.

Accordingly, the Court concludes that Plaintiffs have met their burden of putting forth a method capable of resolving the common question of class-wide damages in one stroke. And while Defendant critiques Dr. Pathak's economic model and its underlying assumptions, such critiques speak to the overall accuracy and thus the persuasiveness of Dr. Pathak's opinions, not to whether the impact of Amazon's challenged conduct is capable of being measured on a class-wide basis.[38] Dr. Pathak's model thus satisfies the common method requirements at the class certification stage.[39]

---

[38] *See, e.g.*, *Tyson*, 577 U.S. at 459 (A district court should deny class certification based on the probative value of expert evidence "only if it conclude[s] that no reasonable juror could have believed [the expert's opinion]."); *De Coster*, 350 F.R.D. at 318 ("Whether Dr. Pathak's opinion is ultimately persuasive is not the question before the Court at the class-certification stage."); *Olean*, 31 F.4th at 678 ("[I]t is for the jury, not the court, to decide the persuasiveness of [the expert's] evidence in light of common sense and empirical evidence.") (internal quotation marks omitted).

[39] *See, e.g.*, *De Coster*, 350 F.R.D. at 317–20 (accepting Dr. Pathak's model as a reliable method for demonstrating common injury and damages); *Olean*, 31 F.4th at 679–80 (accepting the plaintiffs' expert's model because "each member of the class [could] rely on [it] to show antitrust impact of any amount"); *Valve*, 780 F. Supp. 3d at 1127–28 (concluding that the plaintiffs have established common antitrust injury and damages based on their expert's testimony); *In re Broiler Chicken Grower Antitrust Litig. (No. II)*, 2024 WL 2117359, at *17–20 (E.D. Okla. May 8, 2024) (concluding that the plaintiffs' "documentary and testimonial evidence, along with [an expert report] offering economic and econometric opinions derived from this evidence, demonstrate[d] common issues [would] predominate concerning antitrust impact").

4. Amazon says that Plaintiffs' claims depend on a complex, multi-step causal chain, raising significant gaps in proof and numerous individualized issues as to injury, damages, and standing.

Defendant argues that commonality and predominance are defeated because "Plaintiffs' claims depend on a complex (at least) four-step causal chain[.]" Dkt. # 323 at 11. It says that this causal chain is even more complex than the causation theory recognized in *De Coster*, raising significant gaps in proof and numerous individualized issues as to injury, damages, and standing at every step of the way. *See id.*

Plaintiffs respond that the Court already rejected this argument in *De Coster*, concluding that Plaintiffs' theory of causation is not so complex as to defeat class certification. *See* Dkt. # 429 at 18–22. They also address Defendant's specific arguments concerning gaps in proof, explaining why they have provided sufficient class-wide proof to satisfy each step of the causal chain. *See id.* The Court addresses Defendant's claimed gaps in proof for each step below, concluding that Plaintiffs' evidence suffices to satisfy causation at the class certification stage for the modified class definition.[40]

*Step 1: Raising Off-Amazon Prices.* At step 1, Plaintiffs contend that Amazon's challenged conduct led to higher prices on Walmart and eBay. *See* Dkt. # 266 at 9; *see also* Dkt. # 323 at 38. Specifically, they allege that Amazon's PMFN raised the price of virtually all goods

[40] The Court also notes that Defendant's cited cases do not set forth the standard for causation on a motion for class certification. *See Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 961–67 (N.D. Cal. 2025) (discussing causation in the context of Federal Rule of Evidence 702 and the defendant's motion to exclude expert testimony); *Bakay v. Apple Inc.*, 2024 WL 3381034, at *5–7 (N.D. Cal. July 11, 2024), *aff'd*, 2025 WL 3012822 (9th Cir. Oct. 28, 2025) (discussing causation in the context of the defendant's motion to dismiss). And the Ninth Circuit has explicitly rejected Defendant's more general argument that causation is defeated simply because there are multiple steps in the causal chain. *See, e.g.*, *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) ("A causation chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.") (cleaned up and citations omitted).

offered on eBay and Walmart, irrespective of whether the goods were offered by Multi-Store or Non-Multi-Store sellers. *See* Dkt. # 429 at 19.

Contrary to Defendant's argument, then, Plaintiffs need not show that Amazon determined Featured Offer eligibility based on the 3P sellers' own prices across platforms or that Multi-Store sellers never set lower prices on Walmart or eBay compared to Amazon. *See* Dkt. # 323 at 11, 39–40. Instead, Plaintiffs need only show that 3P sellers substantially complied with the alleged PMFN, thereby affecting price competition across platforms. Plaintiffs have offered such evidence,[41] and it is also common to the class. Additionally, the narrowing of the class definition to cover only purchases from Multi-Store sellers ensures that all 3P sellers at issue in this case are contractually bound by the alleged PMFN and thus are allegedly prohibited from offering lower prices off Amazon. There is thus sufficient common evidence to support the first link in the causal chain.[42]

*Step 2: Higher Fees.* At step 2, Plaintiffs contend that the reduced price competition from step 1 disincentivizes Walmart and eBay from lowering their referral fees. *See* Dkt. # 266 at 9; *see also* Dkt. # 323 at 38. And so, they say, Amazon's challenged conduct causes Walmart and eBay to maintain supra-competitive referral fees. *See id.*

---

[41] *See* Footnote 25; *see also* Footnote 17; Dkt. ## [redacted]

[42] *See, e.g.*, *De Coster*, 350 F.R.D. at 313–20 (accepting the plaintiffs' argument that their evidence of sufficient compliance with the PMFN sufficed to show that price competition was reduced on rival platforms).

To prove this allegation, then, Plaintiffs must offer common evidence that Walmart and eBay charged supra-competitive referral fees due to Amazon's conduct. Plaintiffs have offered such evidence in the form of expert analysis from Dr. Pathak[43] and internal documents from Amazon, Walmart, and eBay.[44] And Defendant's arguments as to why Amazon's challenged conduct does not lead to higher fees on eBay and Walmart, *see* Dkt. # 323 at 40, while perhaps persuasive on the ultimate merits question, does not negate the common nature of Plaintiffs' evidence in support of the second link in the causal chain.[45]

*Steps 3 & 4: Pass-through of Fees & Higher Prices for All.* At steps 3 and 4, Plaintiffs contend that all Multi-Store sellers pass through the inflated referral fees from step 2 to their customers, thereby raising the price of virtually all Class Products. *See* Dkt. # 266 at 9; *see also* Dkt. # 323 at 38–39. In support of this contention, Plaintiffs offer Dr. Pathak's regression analysis estimating that the average rate of pass-through is somewhere between 52% and 66%. *See* Dkt. # 429 at 15 (citing Dkt. # 432-3 at 189). They also offer Dr. Pathak's expert opinion that "absent Amazon's anti-discounting policy, consumers would have paid lower prices for all goods sold through eBay and Walmart, because the referral fees on these marketplaces would

---

[43] *See* Dkt. # 317-1 §§ 2.2.4, 6–7 (Dr. Pathak concluding that eBay's and Walmart's referral fees would have been lower but for Amazon's PMFN).

[44] *See, e.g.*, Dkt. ## 430-13 at 2 (Amazon document describing referral fees "as a cash cow source for competitors"); 430-14 at 8 [redacted] 267-63 at 6 (Amazon document indicating that [redacted] 267-64 at 2 (similar); 267-66 at 2 (Amazon document noting that "the worst story that could be written about the model contemplated by the Supplier Singularity proposal" is: "Marketplaces used to be able to lower their fees to sellers in the hopes those sellers would pass on the savings to their customers, attracting customers to the marketplace. With Amazon's changes, other marketplaces aren't able to differentiate their sites with lower pricing. This creates a disincentive for sellers to offer lower prices.").

[45] *See, e.g.*, *De Coster*, 350 F.R.D. at 313–20 (concluding that the plaintiffs' evidence sufficed to show that Amazon suppresses platform competition, thereby allowing it to maintain inflated referral fees); *Valve*, 780 F. Supp. 3d at 1118, 1124 (concluding that the plaintiffs' evidence—expert analysis and internal company documents—sufficed to support the plaintiffs' contention that, absent the PMFN, competitive pressures would force the company to reduce its commission structure).

have been lower[,]" Dkt. # 317-1 at 150, as well as his evidence and analyses in support of this conclusion.[46] This evidence is common to the class and provides the necessary proof to establish the final links in the causal chain.[47]

Defendant's arguments to the contrary are unavailing. First, it says that Dr. Pathak's model fails because it uses an identical, fixed fraction pass-through rate for all sellers. *See* Dkt. # 323 at 40. But as explained in part III(C)(3) above, Dr. Pathak selected a pass-through rate of 50% as a conservative estimate of his calculated pass-through rate of 52–66%. And Defendant has not explained why Dr. Pathak's use of an identical, yet calculated, pass-through rate defeats class certification. *See generally* Dkt. ## 323, 506, & 536. Second, Defendant says that contrary to his predictions, Dr. Pathak's pass-through regression analysis for Walmart found no pass-through. *See* Dkt. # 323 at 41. Such argument, however, misunderstands Plaintiffs' theory. Plaintiffs' theory is that "Amazon sets the floor price; when Amazon lowers referral fees, prices drop, and when Walmart lowers referral fees, they [do not]." Dkt. # 429 at 19. Dr. Pathak's finding that [redacted] is thus consistent with Plaintiffs' theory. *See* Dkt. # 317-1 at 118, 121–22. Third, Defendant argues that courts regularly deny class certification where, as here, the "plaintiffs fail to consider the numerous factors influencing the final price paid by putative class members" and instead "simply assume the 'pass-through' of allegedly supracompetitive fees." Dkt. # 323 at 41; *see also* Dkt. # 506 at 11–12. Plaintiffs, however, *have* considered the many factors that affect price, with their experts

---

[46] *See generally* Dkt. ## 317-1 §§ 6–7; 432-3 §§ 3–4; *see also* Dkt. ## 317-1 at 13–14 [redacted] 267-56 at 2 (email chain among Amazon employees indicating that after a Buy Box suppression, "[t]he only option [3P sellers] see, is to go direct with the [Select Image Competitor] and 'try to influence' the sales price"); 267-69 at 10 (Amazon document acknowledging that "the Brand team has received complaints that [Amazon's Buy Box suppression] policy encourages Sellers to raise their prices on competitor websites").

[47] *See, e.g.*, *De Coster*, 350 F.R.D. at 313–20 (accepting the plaintiffs' evidence that inflated referral fees lead to higher prices for products offered on the platform).

addressing focal point pricing, Walmart's and eBay's policies, and other factors that may have impacted seller pricing decisions and the level of pass-through. *See generally* Dkt. # 430-16; *see also* Dkt. ## 317-1 at 20, §§ 6–7; 432-3 §§ 2.2, 3, 7. And Defendant's cited cases are distinguishable.[48]

Finally, as for Defendant's more general argument—that Plaintiffs' theory of causation is just too complex to warrant class certification—the Court disagrees. As in *De Coster*, "Plaintiffs' theory of injury is not overly complicated: Plaintiffs allege that the challenged policies and practices reduced competition and resulted in higher prices paid by all class members." *De Coster*, 350 F.R.D. at 314 n.17. And the Court has already endorsed Plaintiffs' underlying theory of causation, concluding that Defendant's cited cases are distinguishable and determining that the causal chain does not cause individualized issues to predominate. *See id.* at

[48] *See, e.g.*, *New Motor Vehicles*, 522 F.3d at 21–22 (vacating class certification order based on "extrinsic economic studies" to allow "for a more thorough explanation of how the pivotal evidence behind [the] plaintiff's theory can be established") (emphasis omitted); *Sabol v. PayPal Holdings, Inc.*, 2024 WL 3924686, at *3 (N.D. Cal. Aug. 23, 2024) (dismissing complaint because the plaintiffs failed to plead facts to support their theory of harm); *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *12 (N.D. Apr. 12, Cal. 2017) (denying class certification because the plaintiffs failed to explain how their expert's pass-through analysis "demonstrate[d] the antitrust impact [was] 'passed on' to each level of the indirect purchasers in the distribution chain"); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *13 (N.D. Cal. June 9, 2010) (same); *Lithium Ion*, 2018 WL 1156797, at *4–5 (N.D. Cal. Mar. 5, 2018) (denying renewed motion for class certification because the plaintiffs' expert did not establish whether "'pass through' ever occurred"); *In re Domestic Drywall Antitrust Litig.*, 2017 WL 3700999, at *14 (E.D. Pa. Aug. 24, 2017) (denying class certification because the model was "riddled with assumptions that divorce the model from the facts and the theory of liability[,]" including an assumed 100% pass-through rate); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 323–25 (N.D. Cal. 2014) (denying class certification because the plaintiffs had "not presented a persuasive explanation as to why it would be reasonable to assume a uniform pass through rate"); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 160 (E.D. Pa. 2015) (denying class certification in part because the "pass-through model improperly assume[d], without adequate support, that because one retailer passed through the overcharge at a certain rate averaged across its stores, all retailers *nationwide* shared that overcharge rate or, at least, passed along some positive overcharge"); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49–51 (S.D.N.Y. 2020) (denying class certification because "lay evidence," in the form of "broad generalizations by market participants . . . cannot, in the absence of a proper chain of expert models, serve as common proof that all [class members] suffered pricing injury during the six-year class period").

313–17. The Court thus concludes that commonality and predominance are not defeated by Plaintiffs' proposed multi-step causal chain.

5. Amazon says that the proposed class contains a significant number of uninjured class members, thereby negating Article III and antitrust standing.

Defendant states that "Plaintiffs cannot establish Article III or antitrust standing because the proposed class contains a significant number of uninjured class members." Dkt. # 323 at 11. It also argues that Plaintiffs "cannot rely on co-conspirator antitrust standing for class members who purchased exclusively from [N]on-Multi-Store Sellers," as this "umbrella standing" theory[49] has been rejected by other courts. *See id.* at 11–12.

Plaintiffs respond that they have established Article III and antitrust standing. Dkt. # 429 at 22. They say that "[a]ll class members can prove common injury and damages with the same class-wide methodology[,]" regardless of whether they purchased from a Multi-Store or Non-Multi-Store seller, "because Amazon's PMFN eliminated effective competition on referral fees[.]" *Id.* And so, they say, the PMFN caused all class members to pay inflated prices for Class Products. *See id.* They also say that Defendant's cited cases do not preclude "umbrella standing" or "*AGC* standing,"[50] thereby allowing Plaintiffs to proceed under a co-conspirator standing theory. *See id.* at 22–23; Dkt. # 536 at 16–20.

The Court concludes that the parties' standing arguments are largely moot. Because the Court has already found that Plaintiffs have standing as direct purchasers of Amazon's alleged

---

[49] As defined by the Ninth Circuit, the "umbrella [standing] theory is essentially a consequential damages theory. It seeks to hold price-fixers liable for harm allegedly flowing from the illegal conduct even though the price-fixing defendants received none of the illegal gains and were uninvolved in their competitors' pricing decisions." *Petroleum Prods.*, 691 F.2d at 1339.

[50] At oral argument, Plaintiffs walked away from their claim of umbrella standing and instead represented that all class members have standing under their proposed class definition, irrespective of whether they purchased from a Multi-Store or Non-Multi Store seller, because all putative class members satisfy the factors set forth by the Supreme Court in *Assoc. Gen. Contractors of Cal., Inc. (AGC) v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983). *See* Dkt. # 536 at 18.

antitrust co-conspirators, *see, e.g.*, Dkt. ## 48 at 8; 94 at 3, 8, it need not reevaluate whether a putative class member who bought from a Multi-Store seller has standing to bring their claims. And because the Court has narrowed the class definition to include only such class members, *see* part III(A) above, it need not reach the parties' alternative standing theories.

Likewise, the Court sees no reason to reject standing based on the number of potentially uninjured class members. Under well-established Ninth Circuit caselaw, a class may proceed even if it "potentially includes more than a de minimis number of uninjured class members[,]" so long as less than 5.5% of the class is uninjured. *Olean*, 31 F.4th at 669, 672 n.18. Plaintiffs' evidence meets this threshold, even under the larger, unmodified class definition, with Dr. Pathak estimating that less than 5% of the class is uninjured. *See* Dkt. # 432-3 at 87. And while Defendant argues that this percentage will still result in millions of uninjured class members, *see* Dkt. # 506 at 12–14, such a claim does not affect a court's standing determination where, as here, the plaintiffs satisfy the 5.5% threshold and have presented common evidence of class-wide impact.[51]

The Court thus concludes that Plaintiffs have established Article III and antitrust standing to support their claims, and so it rejects Defendant's request to rule that commonality and predominance are negated by individualized issues concerning the threshold issue of standing.

6. Amazon says that Plaintiffs have not presented a methodology that can identify which class members and transactions are harmed versus unharmed.

Defendant contends that "[Dr.] Pathak's model cannot identify which transactions (or class members) are unharmed, necessitating individualized inquiry for all class members." Dkt.

[51] *See Olean*, 31 F.4th at 682; *see also In re Apple Iphone Antitrust Litig.*, 2025 WL 3124160, at *16 (N.D. Cal. Oct. 27, 2025) (granting decertification because the court could not determine whether the class was "fatally overbroad" but disagreeing with the defendant's focus on the number of unharmed class members instead of the percentage).

# 506 at 13 (citation omitted). It then says that this deficiency warrants denial of class certification, as Plaintiffs offer no manageable process to identify uninjured transactions or otherwise remove uninjured persons from the class. *Id.* at 13–15. And so, it says, Plaintiffs' model runs afoul of the Supreme Court's decision in *Comcast Corporation v. Behrend*, 569 U.S. 27 (2013). *See id.*

At oral argument, Plaintiffs responded through a slide deck that there is no *Comcast* issue, as Dr. Pathak's model reliably shows that all class members are injured by the alleged PMFN. *See* Dkt. # 540-1 at 56. The slide deck also reiterated Plaintiffs' position that at the class certification stage, the standard for proving damages is "modest," with an antitrust plaintiff needing only to provide "some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." *Id.* at 57 (quoting *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982)); *see also* Dkt. # 429 at 15.

Per *Comcast*, at the certification stage, a putative class action plaintiff must "establish[ ] that damages are capable of measurement on a classwide basis" and present a method of measuring damages that is consistent with their theory of liability. 569 U.S. at 34–35. But "calculations need not be exact[.]" *Id.* at 35. And "[w]hile a plaintiff must present the likely method for determining class damages, it is not necessary to show that this method will work with certainty at [the time of certification]." *Hilsley v. Ocean Spray Cranberries, Inc.*, 2018 WL 6300479, at *12 (S.D. Cal. Nov. 29, 2018) (cleaned up and citations omitted).[52] Likewise, predominance is not defeated just because "more individualized determinations [will be] needed later to allocate damages among class members." *Glumetza*, 336 F.R.D. at 479 (quoting *In re*

---

[52] *See also Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1027 (9th Cir. 2024), *cert. denied*, 221 L. Ed. 2d 396 (2025) ("[N]othing in [*Comcast* or *Olean*] requires that Plaintiffs actually prove damages at the class certification stage or prohibits Plaintiffs from relying on an unexecuted but reliable damages model.").

*Suboxone (Buprenorphine Hydrochlorine and Naloxone) Antitrust Lit.*, 967 F.3d 264, 269 (3d Cir. 2020)). And the Ninth Circuit has "repeatedly confirmed" that "the need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

Here, Dr. Pathak's model does not suffer from a "*Comcast* infirmity." *See* Dkt. # 506 at 14. As explained by Dr. Pathak at his deposition, he cannot separate out "harmed" and "unharmed" transactions using his model because he believes that Amazon's challenged conduct affected fees, and thus prices, for every Class Product. *See* Dkt. # 452 at 11–12. And contrary to the situation in *Comcast*, Plaintiffs' damages model does accord with their theory of liability and attempts to measure only those damages attributable to that theory. *See Comcast*, 569 U.S. at 36. The Court is thus convinced that Plaintiffs' method for proving damages complies with the Supreme Court's opinion in *Comcast*, as interpreted by the Ninth Circuit. *See Lytle*, 114 F.4th at 1024–29 (explaining the implications of *Comcast*). Any remaining issues involving individualized damages calculations identified by Defendant are thus a question for the factfinder, not a reason for the Court to deny class certification under Rule 23(b)(3).[53]

7. Amazon says that Plaintiffs have presented no common method for establishing market definition or market power.

Defendant argues that "Plaintiffs have presented no common method for establishing market definition or market power." Dkt. # 323 at 12. It says that Plaintiffs' proposed market—the U.S. Online Retail Marketplaces Market—presents an insuperable hurdle for class certification: "proposed class members and their purchases are not in the defined market." *Id.*

---

[53] *See, e.g.*, *Glumetza*, 336 F.R.D. at 479–81 (concluding that the plaintiffs' expert's damages model satisfied *Comcast*); *Valve*, 780 F. Supp. 3d at 1121–22 (same); *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 652 (N.D. Cal. 2007) (rejecting the notion that the existence of "various exogenous factors [affecting] the amount of recovery individual plaintiffs may obtain" militates against class certification when the plaintiffs have shown "that means exist for proving impact on a class-wide basis").

And it argues that Plaintiffs' reliance on such a market definition "runs afoul of the Ninth Circuit's ruling in *[Federal Trade Commission] v. Qualcomm*," as Plaintiffs are asking the Court to consider harms outside "the area of effective competition." *Id.* at 46 (citations omitted). Defendant also critiques certain aspects of Dr. Pathak's market definition and market power analysis, including his purported failure to explain the five "essential features" of his proposed market, consider output, address the customer-side of the equation, and discuss differing competitive conditions across product categories. *See id.* at 47–48.

Plaintiffs respond that Defendant mischaracterizes their proposed market and Dr. Pathak's definition of it. *See* Dkt. # 429 at 24. They say that contrary to Defendant's argument, the core offering in the market for U.S. Online Retail Marketplaces is the "transaction service offered to both merchants and consumers[.]" *Id.* (quoting *De Coster*, 350 F.R.D. at 321). And so, they say, their alleged harms *do* fall within the "area of effective competition" under *Qualcomm*. *Id.*; *see also* Dkt. # 266 at 16–17. They also note that the Court rejected Defendant's identical arguments in *De Coster*, concluding that Dr. Pathak's evidence is enough to establish market definition and market power at the class certification stage for the proposed market. *See* Dkt. # 429 at 24–25.

The Court agrees with Plaintiffs. Before a plaintiff can establish that anticompetitive effects occurred, they must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 981 (N.D. Cal. 2023) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)). Establishing market definition and market power is thus "[a] threshold step in any antitrust case[.]" *Qualcomm*, 969 F.3d at 992. And at the class certification stage, Plaintiffs must support their claims by offering a "plausible class-

wide methodology" for establishing market definition and market power. *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015); *see also In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. 549, 556 (N.D. Cal. 1998).

Here, Plaintiffs' proposed market is the U.S. Online Retail Marketplaces Market. *See* Dkt. # 266 at 16. As defined by Dr. Pathak, this market consists of "the market for online intermediated platform marketplaces that offer a wide variety of items of merchandise." Dkt. # 317-1 at 39. This is a "two-sided platform market," i.e., an "economic market[ ] in which two distinct groups of users"—here, merchants and consumers—"interact through a common platform or intermediary" and where "[t]he platform facilitates transactions, interactions, or exchanges between these two groups, creating value for both sides." *Id.* at 42. In his report, Dr. Pathak explains the features of this market and why he believes it is sufficiently distinct from other antitrust markets. *See id.* at 43–59. He also supports these conclusions with thorough reasoning and specific evidence, including internal documents suggesting that Amazon itself views "marketplaces" as "a distinct 'channel' from other forms of e-commerce retail" and statements from analysts and regulatory bodies indicating that Amazon and other online retail platforms, like eBay and Walmart, are "marketplaces" and operate differently from other retail channels. *See id.* And while Defendant disagrees with Dr. Pathak's proposed market definition and his related analysis, *see* Dkt. # 323 at 47, such disagreement does not negate the conclusion that Plaintiffs have offered common proof to support the existence of such a market.

Plaintiffs' proposed market definition also does not run afoul of *Qualcomm*. There, the Ninth Circuit concluded that the district court erred in considering economic harms to the defendant's customers because those harms were not suffered in the antitrust market where competition was allegedly being restrained. *See Qualcomm*, 969 F.3d at 992–93. In doing so, the Ninth Circuit reasoned that for antitrust purposes, "the relevant market [ ] refers to the area of

effective competition." *Id.* at 992 (internal quotation marks and citation omitted). And "courts must focus on anticompetitive effects in the market where competition is allegedly being restrained" when assessing alleged antitrust injuries. *Id.* (cleaned up and citation omitted).

But unlike in *Qualcomm*, Plaintiffs here are alleging harms that occurred in the market where competition is allegedly being restrained. As explained in *De Coster*, the U.S. Online Retail Marketplaces Market is a two-sided platform market offering "different products or services to two different groups who both depend on the platform to intermediate between them." 350 F.R.D. at 321 (quoting *Ohio v. Am. Express Co. (Amex)*, 585 U.S. 529, 534 (2018)). The market's "core product" is thus "a transaction service offered to both merchants and consumers[,]" not a service offered only to sellers. *Id.*; *see also* Dkt. # 317-1 at 43. Accordingly, proposed class members and their claimed harms of higher prices as a result of inflated referral fees charged to sellers fall within the scope of the relevant market. The Court is thus satisfied that Plaintiffs have met their burden of presenting class-wide proof in support of their proposed market for U.S. Online Retail Marketplaces.

Plaintiffs have also met their burden of presenting a plausible method for establishing market power in said market. According to the Ninth Circuit, market power is "the special ability to force a contracting partner to do something that [they] would not do in a competitive market" and it is "generally inferred from the defendant's possession of a high market share and the existence of significant barriers to entry." *Epic*, 67 F.4th at 982–83 (cleaned up and citations omitted). Plaintiffs have offered evidence of both.

In his report, Dr. Pathak explains that because the U.S. Online Retail Marketplaces Market is a two-sided platform market that is distinct from other retail channels, Amazon's only competitors in this market are other two-sided platforms, like eBay and Walmart, that provide the same online retail transaction services. Dkt. # 317-1 at 43–59; *see also Amex*, 585 U.S. at

546 ("Only other two-sided platforms can compete with a two-sided platform for transactions."). Dr. Pathak also calculates that Amazon's share of this market is roughly 70%, *see* Dkt. # 317-1 at 65—a percentage that suffices to establish market power for all of Plaintiffs' Sherman Act claims.[54] And he provides evidence of substantial barriers to entry, including cross-platform network effects, high switching costs for merchants and consumers, low market shares for existing competitors, and failed attempts of numerous would-be competitors to establish rival online marketplaces. *See id.* at 66–69; *see also* Dkt. # 266 at 36–37 (discussing the failed attempts of Jet.com and Google to enter the market).

Defendant does not meaningfully contest, let alone address, the fact that Plaintiffs have offered common evidence concerning high market share and significant barriers to entry. *See generally* Dkt. # 323.[55] Instead, Defendant offers a series of nonresponsive arguments concerning referral fees, reduced output, other competitors, and market definition. *See id.* at 47–49. And while these arguments may have merit, none of them directly implicate Plaintiffs' ability to establish market power via class-wide proof. *See* Dkt. # 429 at 24–26. Such issues are thus properly addressed at the merits stage, not by the Court on a motion for class certification.[56]

---

[54] *See, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 484 (9th Cir. 2021) ("A market share of sixty-five percent or more usually establishes a prima facie case of monopoly power in Section 2 contexts."); *id.* ("[A] market share as low as forty-four percent is sufficient to support a finding that a party was dangerously close to monopoly power where barriers to entry were high and competitors could not expand their short-run output" in Section 1 contexts.); *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, 2018 WL 4904918, at *5 (N.D. Cal. Oct. 9, 2018) ("Courts have quantified substantial share as 40% to 50% of the relevant market" for claims brought under Section 1.) (internal quotation marks and citation omitted).

[55] The Court notes that Defendant's cited case—*Amex*—involves an appeal of a district court judgment following a 7-week bench trial on the merits of the plaintiffs' claims. *See Amex*, 585 U.S. at 539–40. The opinion thus discusses whether the plaintiffs met their burden of *proving* an anticompetitive exercise of market power; it does not address whether the plaintiffs met their burden of *presenting common evidence* of market power to support class certification. *See id.* at 547–52.

[56] *See, e.g.*, *Live Concert*, 247 F.R.D. at 131 (explaining that at the class certification stage, "the Court's focus is the process of defining the relevant market" and determining whether common questions predominate while "the *outcome* of the [market definition] analysis—how the market is defined is to be determined by the jury"); *De Coster*, 350 F.R.D. at 320–23 (rejecting Amazon's contention that the

The Court is thus convinced that Plaintiffs have presented common evidence of market definition and market power to support their proposed market for U.S. Online Retail Marketplaces, and that common issues of law and fact predominate with respect to market definition and market power in this case.[57]

* * *

In conclusion, Plaintiffs' Motion for Class Certification presents numerous common questions of law and fact that are central to Plaintiffs' claims and capable of class-wide resolution based on a common body of evidence. These questions include: (1) whether there is a distinct antitrust market for U.S. Online Retail Marketplaces; (2) whether Amazon has market power in the relevant antitrust market; (3) whether Amazon and its 3P merchants acted in concert; (4) whether Amazon's conduct had anticompetitive effects; (5) whether Amazon intended to monopolize, attempted to monopolize, and/or conspired to monopolize; (6) whether Plaintiffs have shown class-wide injury; and (7) whether Plaintiffs have established standing to bring their claims. Collectively, these questions predominate over individual ones; and Defendant's defenses, contradictory evidence, and potential procompetitive justifications, while perhaps valid and ultimately persuasive to a jury, are insufficient to negate Plaintiffs' showing at

---

plaintiffs' market definition was not capable of class-wide proof); *Giuliano*, 2015 WL 10890654, at *17 (rejecting the defendant's "objections to the adequacy of [the expert's] analysis regarding market power" because they go to the merits of his opinion, not to the relevant inquiry—"whether market power is capable of being proved at trial through common evidence").

[57] *See, e.g.*, *De Coster*, 350 F.R.D. at 320–23 (concluding that market definition and market power satisf[ied] Rule 23's commonality and predominance requirements); *Live Concert*, 247 F.R.D. at 131 (concluding that the market definition and market power analyses were "predominated by common questions" because they "involve[d] the same data, the same experts, the same industry analyses, and the same application of the same economic tests"); *Giuliano*, 2015 WL 10890654, at *17 (concluding that "market power [was] capable of being proved at trial through common evidence" based on the plaintiffs' expert's economic analysis).

the class certification stage.[58] Plaintiffs have thus demonstrated commonality under Rule 23(a) and predominance under Rule 23(b)(3) by a preponderance of the evidence.

D. Typicality

Rule 23(a)(3) requires a court to ensure that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). This requires the proposed class representatives to be part of the class, possess the same interests, and suffer the same injuries as other class members. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 539 (N.D. Cal. 2015) (citing *Gen. Tel.*, 457 U.S. at 156). In conducting this inquiry, courts are instructed to consider "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "In the antitrust context, generally, typicality will be established by plaintiffs and all class members alleging the same antitrust violation by defendants." *Nat'l Collegiate Athletic*, 311 F.R.D. at 539 (internal quotation marks and citations omitted); *see also Valve*, 780 F. Supp. 3d at 1125 (collecting cases).

Plaintiffs contend that the Proposed Class Representatives "are typical of the class because they allege the same antitrust violations—the imposition of Amazon's anti-discounting

[58] The Court also notes that many of Defendant's arguments themselves present common questions that predominate over individualized inquiries. *See, e.g.*, *Valve*, 780 F. Supp. 3d at 1127 (concluding that the defendant's challenges to the plaintiff's theory of antitrust impact raised "common questions about the class-wide response to [the allegedly anticompetitive conduct], an issue which predominate[d] over any individualized questions"); *In re Coll. Athlete NIL Litig.*, 2023 WL 8372787, at *5 (N.D. Cal. Nov. 3, 2023) (concluding that "whether [the defendants'] procompetitive justifications for the challenged [conduct] [were] valid" was a common question capable of class-wide resolution through common evidence).

policy—and, like all other proposed class members, they allegedly suffered antitrust injury by paying supracompetitive prices for Class Products because of Amazon's anti-discounting policy." Dkt. # 266 at 14. They also contend that two of the Proposed Class Representatives—Christian Sabol and Chaunda Lewis—satisfy the modified Class Definition from part III(A) above. *See* Dkt. # 538 at 2. The Court agrees.

Like other class members, Christian Sabol and Chaunda Lewis are eBay and Walmart consumers who have purchased the requisite number of Class Products during the Class Period. *See* Dkt. ## 266 at 14; 538 at 2–3; *see also* Dkt. ## 269 & 270. They also allege the same anticompetitive conduct, harms, and theory of injury against Amazon as the rest of the class. *See* Dkt. # 266 at 14; *see also* Dkt. # 147 at 33–34, 37–38. And nothing in the record suggests that the Proposed Class Representatives' claims meaningfully differ from those of other class members or that their interests are misaligned. *See generally* Dkt. Typicality is thus satisfied for Christian Sabol and Chaunda Lewis.

E. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement "'serves to uncover conflicts of interest between named parties and the class they seek to represent' as well as the 'competency and conflicts of class counsel.'" *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (quoting *Amchem*, 521 U.S. at 625, 626 n.20). In determining whether representation is adequate, a court must "consider two questions: '(a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Sali*, 909 F.3d at 1007 (quoting *In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000)); *see also Hyundai*, 926 F.3d at 566.

The Court concludes that adequacy is met. As for the Proposed Class Representatives, the Court agrees with Plaintiffs that Christian Sabol and Chaunda Lewis "fit the class definition, share the same interest with absent class members in ending Amazon's restraints, and 'share a common injury as putative class members'—having paid supracompetitive prices for Class Products." Dkt. # 266 at 15; *see also* Dkt. # 147 at 33–34, 37–38. The Proposed Class Representatives also appear to have responded to all discovery requests, reviewed relevant documents, conferred with their attorneys, and otherwise litigated this action competently and effectively since the case was filed in March 2020. *See id.*; *see also* Dkt. ## 269 & 270. And the Court finds nothing in the record that would suggest that Christian Sabol and/or Chaunda Lewis have a conflict of interest with other class members or will not vigorously prosecute this action on behalf of the class going forward. *See generally* Dkt.

As for Plaintiffs' counsel, they are experienced in antitrust law and class action litigation and appear to have competently and effectively litigated this action since March 2020. *See* Dkt. # 266 at 15; *see also* part III(G) below. There is also nothing in the record that would suggest a conflict of interest between counsel and the class or that would give the Court a reason to believe that counsel will not vigorously prosecute this action on behalf of the class going forward. *See generally* Dkt. Plaintiffs have thus met their burden of proving adequacy.

F. Superiority

In addition to predominance, Rule 23(b)(3) also requires a putative class action plaintiff to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether superiority is satisfied, courts are instructed to consider the factors set forth in the rule itself—"(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against

class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*; *see also Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).

More generally, courts are required to consider whether a class action "is the most efficient and effective means of resolving the controversy" and whether it will accomplish the specific objectives of the proposed class action in a particular case. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175–76 (9th Cir. 2010). "This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998). And the Ninth Circuit has clarified that "[a] class action is the superior method for managing litigation if no realistic alternative exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996).

Plaintiffs say that their proposed class satisfies superiority, as it meets Rule 23(b)(3)'s superiority criteria and "[a] class action 'is the only fair and efficient means to adjudicate this controversy.'" Dkt. # 429 at 27 (quoting *De Coster*, 350 F.R.D. at 324); *see also* Dkt. # 266 at 49. Defendant responds that a class action is not superior because "the unprecedented size of the proposed class, the individualized issues on which their claims depend, and the required identification of 'concurrent' sales for each of billions of class transactions" renders the class "unmanageable." Dkt. # 323 at 12, 50. The Court disagrees.

Plaintiffs have satisfied the four requirements for superiority under Rule 23(b)(3). Like the *De Coster* plaintiffs, the Court is persuaded here that: (1) the average class member's claims are likely too small to be brought in an individual action; (2) there is limited other litigation

concerning the claims at issue;[59] (3) the Western District of Washington is a convenient venue to resolve the litigation given Amazon's location in the district and the extent of related litigation pending before the undersigned judge; and (4) the size of Plaintiffs' proposed class weighs in favor of, not against, certification.[60] *See De Coster*, 350 F.R.D. at 324–25. And Defendant's concerns regarding Plaintiffs' supposedly deficient evidence, *see* Dkt. # 323 at 50, speak more to the issues of commonality, predominance, and Plaintiffs' ultimate burden of persuasion, not the manageability of this action.

Defendant's cited case on manageability—*In re Hotel Telephone Charges*, 500 F.2d 86 (9th Cir. 1974)—is inapposite. Defendant is correct that there, the Ninth Circuit concluded that the proposed class action did not satisfy Rule 23(b)(3)'s superiority requirement and in doing so, stated that class actions can sometimes be "dismissed on the basis of manageability problems alone, particularly in cases involving large numbers of [ ] class members." *Id.* at 90. But the Ninth Circuit did not deny certification based solely on the size of the proposed class. *See generally id.* at 89–92. Instead, it found superiority defeated by the millions of plaintiffs *and* the presence of more than six hundred defendants, the existence of many individualized questions, and its conclusion that there was no realistic possibility that class members would be compensated. *See id.* Here, however, there is only one defendant, the Court has concluded that common questions predominate, and there is a realistic possibility that Plaintiffs will be compensated if a jury finds that Defendant violated the Sherman Act. The Ninth Circuit's

---

[59] According to Plaintiffs, there are no individual actions and there is only one pending putative class action—*Mbadiwe et al. v. Amazon.com, Inc.*, Case No. 1:22-cv-09542-VSB (S.D.N.Y)—that involves Plaintiffs' same claims. Such case, however, also involves a wide variety of state-law claims not at issue here.

[60] *See, e.g.*, *De Coster*, 350 F.R.D. at 305, 324–25 (certifying a class of 300 million consumers); *Edwards v. Nat'l Milk Producers Fed'n*, 2014 WL 4643639, at *4, 7–8 (N.D. Cal. Sep. 16, 2014) (certifying a class of 46 million consumers); *In re Zoom Video Commuc'ns, Inc. Privacy Litig.*, 2022 WL 1593389, at *4–5, (N.D. Cal. Apr. 21, 2022) (certifying a settlement class of 150 million individuals).

opinion in *Hotel Telephone* thus does not provide an adequate basis to deny certification in this action.

Defendant also does not present a realistic alternative to a class action. Defendant's filings do not identify any specific alternatives. *See generally* Dkt. ## 323 & 506. And when asked at oral argument, Defendant suggested that Plaintiffs could instead initiate multiple smaller actions based on "a group of products" or "a group of sellers." *See* Dkt. # 536 at 52. But "multiple lawsuits would be costly and inefficient," exclude "class members who cannot afford separate representation," and "consume judicial resources, impose additional burdens and expenses on the litigants, and present a risk of inconsistent rulings." *De Coster*, 350 F.R.D. at 324 (cleaned up and citations omitted). Multiple lawsuits based on product categories or sellers thus does not present a realistic alternative to the current action, making a class action the superior method for managing this litigation. *See Valentino*, 97 F.3d at 1234–35.

The Court is thus convinced that a class action "is not only the most efficient and convenient method to resolve this controversy," but it is also "the only 'fair' and 'efficient' means to adjudicate this controversy." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 527 (S.D.N.Y. 1996); *see also De Coster*, 350 F.R.D. at 324–25. And so, Rule 23(b)(3)'s superiority requirement is satisfied.

G. Appointment of Class Counsel

Per Rule 23, "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing counsel, a court "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that

counsel will commit to representing the class[.]" *Id.* It may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]" *Id.*

In March 2023, the Honorable Richard A. Jones appointed Hagens Berman and Keller Postman as Interim Co-lead Counsel, and Quinn Emanuel as Interim Executive Committee member, for this action. Dkt. # 95. Such appointment was based on Judge Jones's careful review of the Rule 23(g) factors, Plaintiffs' motion at Dkt. # 84, and various submissions from the three law firms. *See id.* at 2. Over the past three years, Interim Counsel has ably performed on behalf of the putative class. *See generally* Dkt. And nothing in the record suggests that Interim Counsel no longer satisfies the requirements of Rule 23(g) or will fail to competently and vigorously advocate for Plaintiffs in the future if appointed as Class Counsel. The Court thus concludes that Plaintiffs' proposed counsel satisfy the requirements of Rule 23(g), and so it appoints Hagens Berman and Keller Postman as Co-Lead Class Counsel and Quinn Emanuel as Executive Class Counsel for this certified class action.

## IV
## CONCLUSION

For these reasons, the Court concludes that Plaintiffs satisfy the class certification requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3) by a preponderance of the evidence for the modified class definition. It thus GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Class Certification (Dkt. # 266) and ORDERS as follows:

(1) The above captioned action is CERTIFIED as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) for purposes of litigation and trial. Plaintiffs' claims are certified for class treatment, and the Class is defined as follows:

> All persons who, on or after March 19, 2016, made in the United States at least two purchases from a third-party seller on the Walmart online retail marketplace or at least four purchases from a third-party seller on eBay of new, physical products

concurrently offered for sale by that same third-party seller on Amazon Marketplace and monitored by Amazon as part of its competitive price monitoring.

(2) Christian Sabol and Chaunda Lewis are DESIGNATED as class representatives.

(3) Hagens Berman Sobol Shapiro LLP and Keller Postman LLC are APPOINTED as Co-Lead Class Counsel. Quinn Emanuel Urquhart & Sullivan, LLP is APPOINTED as Executive Class Counsel.

(4) As soon as practicable after entry of this Order, the parties shall meet and confer regarding a plan for dissemination of notice to the Class, pursuant to Federal Rule of Civil Procedure 23(c)(2), and shall file a joint status report with the Court on or before October 30, 2026.

~~The Court provisionally files this Order under seal. The Court DIRECTS the parties to file a joint statement, on or before October 30, 2026, indicating what redactions, if any, should be included in the public version of the Order.~~

Dated this 2nd day of November, 2026.

John H. Chun
United States District Judge